**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Richmond Division**

| | | |
|---|---|---|
| United States of America, | ) | |
| Respondent, | ) | Case No. 3:92CR68 |
| | ) | |
| v. | ) | O9-8 |
| | ) | |
| James H. Roane, Jr., | ) | |
| Petitioner. | ) | |

## PETITION FOR WRIT OF HABEAS CORPUS, PURSUANT TO 28 U.S.C. § 2255, BY A FEDERAL PRISONER UNDER SENTENCE OF DEATH

BILLY H. NOLAS, ESQ.
SHAWN NOLAN, ESQ.
ANGELA ELLEMAN, ESQ.
Assistant Federal Defenders
Federal Community Defender Office
  for the Eastern District of Pennsylvania
Suite 545 West - The Curtis Center
601 Walnut Street
Philadelphia, PA 19106
(215) 928-0520

PAUL F. ENZINNA, ESQ.
Baker Botts, LLP
1299 Pennsylvania Avenue, NW
Washington, DC 20004
(202) 639-7752

Counsel for Petitioner James H. Roane, Jr.

## PRELIMINARY STATEMENT REGARDING CITATIONS

All emphasis herein is supplied unless otherwise indicated.

Parallel citations usually are omitted.

Transcripts of the original trial proceedings are cited as "Tr." followed by the page number. Transcripts of the other proceedings are cited as "Tr." followed by the date and page number.

A paginated Appendix is filed along with this Petition, and is cited as "A" followed by the page number.

# TABLE OF CONTENTS

PRELIMINARY STATEMENT REGARDING CITATIONS . . . . . . . . . . . . . . . . . . . . . . . . . ii

TABLE OF CONTENTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

PROCEDURAL HISTORY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF FACTS RELEVANT TO MURDER OF DOUGLAS MOODY . . . . . . . . . 1

I.     THE TRIAL EVIDENCE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.    NEW EVIDENCE PROVING THAT JAMES ROANE DID NOT KILL DOUGLAS MOODY . . . . . . 4
     A.     Evidence that Mr. Moody Was Killed By Keith Barley . . . . . . . . . . . . . . . . . . . 5
     B.     Evidence Refuting Government Witnesses Regarding the Moody Murder . . . . . 11
     C.     Alibi Evidence Proving That Mr. Roane Was Not Present When Mr. Moody Was Killed . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18
     D.     Evidence Showing that Mr. Moody Was Not A Drug Dealer, Thus Showing That Mr. Roane Had No Motive to Kill Mr. Moody and Negating The Theory Upon Which Mr. Roane Was Made Eligible For The Death Penalty . . . . . . . . . . . . . . . . . . . 19

AN EVIDENTIARY HEARING IS APPROPRIATE . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

PETITIONER WILL PROVE AT AN EVIDENTIARY HEARING THAT HE SATISFIES THE SUCCESSIVE PETITION STANDARD OF § 2255(h) . . . . . . . . . . . . . . . . . . . . . . . 22

PETITIONER WILL PROVE AT AN EVIDENTIARY HEARING THAT HE IS ENTITLED TO HABEAS RELIEF FROM THE MOODY MURDER CONVICTION AND DEATH SENTENCE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

I.     PETITIONER'S CONVICTION FOR MURDERING DOUGLAS MOODY, AND THE DEATH SENTENCE IMPOSED FOR THAT CONVICTION, SHOULD BE VACATED BECAUSE TRIAL COUNSEL WAS INEFFECTIVE FOR FAILING TO REASONABLY INVESTIGATE, DEVELOP AND PRESENT EVIDENCE THAT PETITIONER IS INNOCENT OF THE MOODY MURDER . . . . . . . . . . . . . . . . . . . . . 25

II.    PETITIONER'S DEATH SENTENCE SHOULD BE VACATED BECAUSE TRIAL COUNSEL WAS INEFFECTIVE FOR FAILING TO INVESTIGATE, DEVELOP AND PRESENT EVIDENCE THAT DOUGLAS MOODY WAS NOT KILLED IN FURTHERANCE OF ANY ALLEGED CONTINUING CRIMINAL ENTERPRISE AND, THUS, PETITIONER WAS NOT DEATH-ELIGIBLE . . . . . . . . . 28

III.    PETITIONER'S CONVICTION FOR MURDERING DOUGLAS MOODY, AND THE DEATH SENTENCE IMPOSED FOR THAT CONVICTION, SHOULD BE VACATED BECAUSE HE IS INNOCENT OF THE MOODY MURDER . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

PRAYER FOR RELIEF . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . <u>33</u>

# PROCEDURAL HISTORY

Petitioner, James Roane, was tried, with three co-defendants, in the United States District Court for the Eastern District of Virginia on an indictment charging each with several crimes, including murder in furtherance of a "continuing criminal enterprise." According to the indictment, the defendants' activities took place over several years, but Petitioner's participation lasted just two and one-half months. Petitioner received several sentences of life imprisonment without parole, and a single death sentence, for the murder of Douglas Moody. The United States Court of Appeals for the Fourth Circuit affirmed. United States v. Tipton, et. al., 90 F.3d 861 (4th Cir. 1996), cert. denied, 520 U.S. 1253 (1997).

Petitioner sought relief under 28 U.S.C. § 2255. After an evidentiary hearing, the District Court granted a new trial on the Moody murder, the sole offense for which death was imposed, finding trial counsel constitutionally ineffective in failing to investigate and present evidence that Petitioner had an alibi for the Moody killing. United States v. Roane, No. 3:92CR68 (E.D.Va. May 1, 2003). The Fourth Circuit reversed, and reinstated the conviction and death sentence for the Moody murder. United States v. Roane, 378 F.3d 382 (4th Cir. 2004), cert. denied, 546 U.S. 810 (2005).

This is Petitioner's second § 2255 petition. Petitioner seeks relief solely from the Moody murder conviction and death sentence.

## STATEMENT OF FACTS RELEVANT TO MURDER OF DOUGLAS MOODY

James Roane was sentenced to death for one murder, of Douglas Moody, a crime he did not commit. Petitioner is serving several life and other sentences for various other crimes, which he does not contest. However, he did not kill Douglas Moody and should not be executed.

## I.    THE TRIAL EVIDENCE

On direct appeal, the Fourth Circuit summarized the trial evidence relating to the Moody murder as follows:

Recounted in summary form and in the light most favorable to the Government, the core evidence revealed the following. Tipton, Roane, and Cory Johnson were principal "partners" in a substantial drug-trafficking conspiracy that lasted from 1989 through July of 1992. The conspiracy's operations began in Trenton, New Jersey where Johnson and Tipton, both from New York City, became members. In August of 1990, the conspiracy expanded its operations to Richmond, Virginia where Roane joined the conspiracy in November of 1991.

\* \* \*

Over a short span of time in early 1992, Tipton, Cory Johnson, and Roane were variously implicated in the murders of ten persons within the Richmond area– all in relation to their drug-trafficking operation and either because their victims were suspected of treachery or other misfeasance, or because they were competitors in the drug trade, or because they had personally offended one of the "partners."

\* \* \*

On the evening of January 13, 1992, Tipton and Roane went to the apartment of Douglas Moody, a suspected rival in their drug-trafficking area, where Tipton shot Moody twice in the back.[1] After Moody fled by jumping through a window, both Tipton and Roane pursued. Roane, armed with a military-style knife retrieved from an apartment where the knife was kept for co-conspirator Curtis Thorne, caught up with Moody in the front yard of the apartment where he stabbed him eighteen times, killing him.

\* \* \*

Tipton was charged under 21 U.S.C. § 848(e) and 18 U.S.C. § 2 with capital murder for eight of these killings (Talley, Moody, Louis Johnson, Long, Carter, Armstrong, Thorne, and Chiles); Cory Johnson, with seven (Louis Johnson, Long, Carter, Armstrong, Thorne, Chiles, and Peyton Johnson); and Roane, with three, (Moody, Louis Johnson, and Peyton Johnson).

The jury convicted Tipton of six of the eight capital murders with which he was charged under § 848(e) (Talley, Armstrong, Long, Carter, Chiles, and Thorne). One of the other two § 848(e) charges was dismissed (Louis Johnson) and the other resulted in acquittal (Moody).

\* \* \*

The jury convicted Roane of all three of the capital murders with which he was charged under § 848(e) (Moody, Peyton Johnson, and Louis Johnson.) He was also convicted of conspiracy to possess cocaine base with the intent to distribute (21 U.S.C. § 846), engaging in a CCE (21 U.S.C. § 848(a)), five counts of committing acts of violence (including the three killings charged under § 848(e)) in aid of

---

[1] Mr. Moody actually was killed in the very early hours of January 13, before 1:00 a.m., *not* in the evening of January 13. See, e.g., Richmond Police Incident Notification (dated 1/13/92) (time of offense was "0005" hours (i.e., 12:05 a.m.) on January 13), A10; Richmond Police Supplementary Offense Report (dated 2/18/92) (same), A2; Moody Autopsy Report (autopsy performed at 8:00 a.m. on January 13), A116.

racketeering activity (18 U.S.C. § 1959), four counts of using a firearm in relation to a crime of violence or a drug-trafficking offense (18 U.S.C. § 924(c)), and one count of possession of cocaine base with the intent to distribute (21 U.S.C. § 841(a)(1)).

Following a penalty hearing on the capital murder counts, the jury recommended that Cory Johnson be sentenced to death on all of the seven § 848(e) murders of which he had been convicted; that Tipton be sentenced to death for three of the six § 848(e) murders of which he was convicted (Talley, Chiles, and Thorne); and that Roane be sentenced to death for one of the three of which he was convicted (Moody). The district court sentenced Johnson, Tipton, and Roane to death in accordance with the jury's recommendations pursuant to 21 U.S.C. § 848(l), and imposed various sentences of imprisonment upon each of the appellants for the several non-capital counts on which they were convicted and for those capital murder counts on which Tipton and Roane had been convicted but were not given death sentences.

United States v. Tipton, Johnson & Roane, 90 F.3d 861, 868-70 (4th Cir. 1996).

The evidence for Mr. Roane's guilt of the Moody murder "was neither undisputed nor overwhelming and hinged primarily on the testimony of Pepsi Greene and Denise Berkley." District Court Opinion of May 1, 2003, at 10.

> Denise Berkley testified that on the night of the Moody murder, she watched Roane stab Moody "18 or 19 times" while Moody pleaded for his life; that she then saw Sandra Reavis, Roane, Curt Thorne, Linwood Chiles, and Priscilla "Pepsi" Greene leave the scene of the murder in Chiles's station wagon; and that Roane took the knife he used to stab Moody and gave it to Pepsi Greene, asking her to get rid of it;
>
> Pepsi Greene testified that she heard two or three shots and then saw Roane and Tipton exit the house from which the shots were fired; that Roane then directed her to get him a knife; and that later that night, Roane returned the knife, then covered with blood, and told her to get rid of it[.]

United States v. Roane, 378 F.3d 382, 393 (4th Cir. 2004) (citing District Court opinion of May 1, 2003, at 3-4). In addition, "Robert Davis testified that, immediately following the Moody murder, he saw Tipton and Roane by the steps near his house and heard them stating, 'Yeah, I got him, I got him ... we can't stay out here, man. This is hot anyway.'" Id.

Mr. Roane at trial presented eyewitness testimony from "Gina Taylor, who observed the Moody murder." Roane, 378 F.3d at 393 (citing District Court opinion of May 1, 2003, at 4). Ms.

Taylor, a nursing student who lived in the house immediately adjacent to where Mr. Moody was killed, saw him being stabbed and "attempted to aid the wounded Moody." District Court Opinion of May 1, 2003, at 4 (citing Tr. 2902). She was "an apparently disinterested eyewitness, ... who insisted that Roane did not commit the murder." District Court Opinion of May 1, 2003, at 9.

Ms. Taylor testified that the assailant "was definitely not Roane," whom she knew from the neighborhood. District Court Opinion of May 1, 2003, at 4 (citing Tr. 2905-06). She testified that "I myself am five-six-and-a-half" and the assailant was "a thin person" who was "shorter than me and much, much smaller." Tr. 2905; see also id. at 2911 (assailant was "[w]ay smaller than me"). Her testimony was consistent with her statement to police immediately after the murder, that the assailant was smaller than the five-feet-six-inches tall victim, Mr. Moody. Tr. 2929.

Mr. Roane at trial "followed up Taylor's testimony by presenting evidence [through Richmond Police Detective Steve Dalton] that two hours before the murder, a person named Keith had come to Moody's mother's house looking for him, and that a week prior, Keith's friends, armed with machine guns, had kicked in the door of Moody's mother's residence while attempting to find Moody." District Court Opinion of May 1, 2003, at 4 (citing Tr. 2930-31).

At trial, "Detective Dalton conceded that [the] foregoing information initially had led the police to suspect Keith Barley, a small featured black juvenile male, as Moody's murderer." District Court Opinion of May 1, 2003, at 4 (citing Tr. 2928).

## II. NEW EVIDENCE PROVING THAT JAMES ROANE DID NOT KILL DOUGLAS MOODY

As set forth above, the defense presented evidence at trial suggesting that the actual killer of Mr. Moody was Keith Barley. New evidence shows that Mr. Moody was indeed killed by Keith Barley, a.k.a. "Little Keith," a violent young drug dealer who killed Mr. Moody because Mr. Moody owed Mr. Barley money for drugs. Mr. Roane did not kill Mr. Moody. Mr. Roane was not at the scene when Mr. Moody was killed; he was miles away in a Richmond hotel. However, *no* alibi

evidence was presented to the jury. Moreover, new evidence – never before considered by the jury or any court – shows that the prosecution's evidence of guilt is scientifically unsupportable; that an eyewitness saw Keith Barley kill Mr. Moody; that Keith Barley confessed to three people that he committed the murder; and that Mr. Moody was not a drug dealer, eliminating death eligibility for his killing. In short, Mr. Moody was not killed in the manner alleged at trial, for the reasons asserted at trial, or by the killer alleged at trial. Mr. Roane should not be executed for this murder, which he did not commit.

## A. Evidence that Mr. Moody Was Killed By Keith Barley

The trial evidence was that just before the murder someone named Keith, quickly identified by police as Keith Barley, came to Mr. Moody's mother's house looking for him, while a week earlier Keith's friends, armed with machine guns, had kicked in the mother's door looking for Mr. Moody.[2] Eyewitness Gina Taylor was sure Mr. Roane was not the killer, and her description of the killer, given to police within minutes of the killing, as short (less than 5'6") and slight is utterly inconsistent with Mr. Roane, who was approximately 6'1" and 170 pounds, see Virginia Department of Corrections Commitment Form, A1, and entirely consistent with Keith Barley, who was approximately 5'2" – 5'4" and 120 pounds, see Metro Richmond Crime Stoppers Report (dated 3/8/92) (describing Barley as 5'2"), A5; Tr. 1755 (testimony of government witness Denise Berkley that Barley was about 5'4"); Police Photo of Keith Barley, A111.

---

[2] See also Richmond Police Supplementary Offense Report (dated 2/18/92) at 1 (describing Detective Dalton's 1/13/92 interview with Mr. Moody's mother: "She stated that approximately an hour before the murder 'Keith' had come by looking for her son. Keith lives at 1216 W. Clay Street. She stated Keith dealt drugs for 'Maurice' and that her son had stated they were looking for him"), A2; id. at 2 (on 1/14/92, "Maurice" was identified as Peyton Maurice Johnson); id. at 2 ("On 1/17/92 Keith Alexander Barley,1216 W. Clay Street, ... admitted to looking for the victim but not finding him."); Detective Dalton's handwritten notes of interview with Mr. Moody's mother, page 4 (she "is very scared and does not want [Keith and Maurice] to know she has talked to the police"), A6; Richmond Police Incident Notification (dated 1/13/92) ("There are two suspects to this offense" named "Keith" and "Maurice"), A10.

Eyewitness Gina Taylor recently provided undersigned counsel with new evidence, which the jury did not hear, *directly identifying Keith Barley as the killer*, and explaining why she did not previously do so. See Declaration of Gina Taylor, A11.

Ms. Taylor now admits that *she saw Keith Barley kill Mr. Moody*, and *Mr. Barley admitted to her that he killed Mr. Moody*:

> Doug Moody was killed right in front of my house. I heard yelling and looked outside. *I saw Keith Barley, who I knew as "Little Keith." He was stabbing Doug. He was the person who killed Doug. ...*
> I knew Little Keith was a drug dealer and was a very violent and dangerous guy. He also knew me from the neighborhood. A couple of weeks after the killing, he came to my house. He talked to me on my porch. He knew I was a witness to Doug Moody's killing.
> *Little Keith told me that he had killed Doug* over some drugs.
> * * *
> *Keith Barley, who I knew as Little Keith, killed Doug Moody. I saw him do it. He admitted to me that he did it.*

Declaration of Gina Taylor ¶¶ 2-4, 9, A11.

Ms. Taylor also explains that she did not directly identify Keith Barley before now because she was terribly afraid of him:

> I was called as a witness at James Roane's trial. I knew James Roane. I knew that it was not him who killed Doug Moody. I was scared to say that it was Little Keith who did the killing, so I testified that I didn't see the person's face, but that I knew it was not James Roane. I testified that I am five foot six and that the person was shorter than me, which was true. Little Keith was shorter than me. This was the same description I gave to police of the killer on the night of the incident, hoping they could figure it out without me saying it was little Keith.
> I am coming forward now, and did not come forward earlier, because Little Keith is dead. He can no longer hurt me. I saw him kill someone. I was afraid he would do the same to me if I told all of what I witnessed.

Declaration of Gina Taylor ¶¶ 6-7, A11; see also id. ¶ 4 ("I was really scared, so I never told the police or anyone else that I had seen [Keith Barley] stabbing Doug. I tried to give the police a description of the killer – Little Keith – without specifically naming Little Keith."); Detective Dalton's handwritten notes of interview with Mr. Moody's mother, page 4 (she "is very scared and

does not want [Keith and Maurice] to know she has talked to the police"), A6.

Ms. Taylor, in contrast to alleged eyewitnesses who testified for the prosecution at trial, had never been involved in any criminal activity and was not testifying in exchange for leniency. She was "an apparently disinterested eyewitness." District Court Opinion of May 1, 2003, at 9. The District Court in the first § 2255 proceedings, however, stated that "the exculpatory value of Taylor's [trial] testimony was undermined by" (1) her "acknowledgment that she could not identify the assailant's gender or see the assailant's face"; (2) "her evasive manner on cross-examination"; and (3) "her admission she had 'kind of' dated Tipton." District Court Opinion of May 1, 2003, at 4; see also Roane, 378 F.3d at 393 (same, citing District Court).

The new evidence from Ms. Taylor, in addition to providing compelling substantive evidence of Mr. Roane's innocence, also negates the District Court's proposed rationales for finding that "the exculpatory value" of her trial testimony "was undermined."

Ms. Taylor now makes it clear that the reason she claimed at trial that "she could not identify the assailant's gender or see the assailant's face" and the reason she may have seemed somewhat "evasive" on cross-examination is that *she was afraid of Keith Barley*, whom she knew to be the real killer. Thus, "the exculpatory value of Taylor's [trial] testimony was undermined by" her fear of revenge from Mr. Barley, not by any doubts about Mr. Roane's innocence. Ms. Taylor was sure at trial, and is sure today, that Mr. Roane did not kill Mr. Moody and that Mr. Barley did kill him.

Moreover, no significant weight attaches to Ms. Taylor's "admission she had 'kind of' dated Tipton," especially in light of her new affidavit. The suggestion that Ms. Taylor lied to protect Mr. Tipton is utterly implausible. Ms. Taylor saw that Mr. Moody was injured; rushed to his aid; left his side only very briefly to ask neighbors to call 911; attempted to stop his bleeding; stayed with him until authorities arrived and told her to move; and immediately gave police a description of the assailant as a short, thin person. See, e.g., Tr. 2902-06. If Ms. Taylor believed Mr. Tipton was one

of the assailants, and wanted to protect him, why would she get involved at all? If she did not believe he was one of the assailants, why would she make up a description of the assailant? If she was trying to protect Mr. Tipton, why would she make up a description that exculpates Mr. Roane? As Ms. Taylor reaffirms in her new affidavit:

> At the trial, the prosecutor tried to make it out that I was Tipton's girlfriend. I was not. I knew Tipton's family and we were friends. As I testified at the trial, we "kind of" dated at the very beginning but really we were just friends. I was never his girlfriend. I did not understand why they thought this was important, because even if it was true, it would not change the fact that James Roane did not kill Doug Moody.
> Keith Barley, who I knew as Little Keith, killed Doug Moody. I saw him do it. He admitted to me that he did it. ... I can now tell the truth about him.

Declaration of Gina Taylor ¶¶ 8-9, A11.

Moreover, Gina Taylor's identification of Mr. Barley as the killer does not stand alone. Mr. Barley confessed to at least two other people, including his best friend, that he killed Mr. Moody.

In a recently obtained affidavit, Lloyd McDaniels states:

> Little Keith Barley was my best friend. We were best friends from the time we were about six years old.
> Keith and I were about fourteen or fifteen when all the murders happened in our neighborhood, back in the early nineties. We hung out together and with our friend Willie Coley.
> 　　　　　　　　*　　*　　*
> James Roane did not kill Doug Moody. Keith Barley, my best friend, did it. He told me he killed Moody. ... Keith told me that he killed Moody because [Moody] owed him money for drugs.
> James Roane should not be executed for a murder that Keith Barley committed.

Declaration of Lloyd McDaniels ¶¶ 2-3, 6-7, A13.

Another friend of Keith Barley, Willie Coley, also recently stated, for the first time, that Barley confessed to him that he killed Moody over a drug debt:

> Keith [Barley] sold to Doug Moody sometimes, and Doug always seemed to owe money for drugs. Keith told me later that he killed Doug over money. I don't want to see James Roane get killed for something Keith Barley did. And I know that he

did it because Keith told me.

Declaration of Willie Coley ¶ 5, A15.

Richard Coles, a neighborhood resident, provides further new evidence that Keith Barley was Mr. Moody's killer. In newly discovered evidence, Mr. Coles has provided a sworn statement that Mr. Barley, armed with a gun, kicked in a door looking for Mr. Moody just *one hour* before Mr. Moody was killed, because Mr. Moody owed money to Mr. Barley. Declaration of Richard Coles at 1 ("At or about 10:30 or 11:00 pm on the 13th of January, Little Keith, who I had known for many years, kicked in the door at Charlie's house and said he was looking for Little Doug. He had a gun in his hand and said he was looking for Doug because he owed him money."), A18.

Keith Barley was a violent drug dealer in the neighborhood where Douglas Moody was killed. Gina Taylor describes him as a "violent and dangerous guy." Declaration of Gina Taylor ¶ 3, A11. In recently obtained evidence, many other people have confirmed Keith Barley's violent nature.

* Amie Coley, who also lived in the neighborhood at the time of Moody's killing, knew Keith Barley and describes him as "mean and violent. He would blow your head off if you looked at him funny. He was a drug dealer and was known as a gangster who carried a gun and weapons all the time." Declaration of Amie Coley ¶ 3, A20.

* Ronita Holman, a prosecution witness at trial, describes Mr. Barley as a tough neighborhood drug dealer with a violent temper. Declaration of Ronita Holman ¶¶ 3-4, A21.

* Richard Coles states that Mr. Barley "was a wild guy. Everyone knew he was violent. He was off the chain. His mind was not stable. He would shoot at people for fun and then laugh about it. He even shot at me one time and we were supposed to be friends." Declaration of Richard Coles ¶ 2, A18.

* Harold Coles states that Mr. Barley was "a known drug dealer in the neighborhood – the Carver School area. He was 'muscle' for a local drug dealer. He was an aggressive guy. Once, he even went after my cousin with a gun. I saw this and had to jump in on behalf of my cousin." Declaration of Harold Coles ¶ 3, A23.

*   Jeanette Pauley, a prosecution witness at trial, states: "I remember Little Keith Barley from the neighborhood. He had a reputation as a mean and terribly violent guy." Declaration of Jeanette Pauley ¶ 5, A25.

*   Keith Ross, a resident of the Carver School area, states that he "knew Little Keith Barley, who grew up in the Carver School Neighborhood too. He sold drugs there. Even though he was young he had a reputation as a violent and dangerous guy." Declaration of Keith Ross ¶ 4, A27.

*   Wanda Wright, another neighborhood resident, states: "I knew Little Keith from the block, too. He sold and used drugs. He sold for Maurice. He was a mean little bastard. He was angry at the world and downright nasty. He had a reputation as dangerous and violent. People knew he wasn't to be played with." Declaration of Wanda Wright ¶ 3, A29.

*   Lloyd McDaniels, Barley's best friend, states that "Keith was a live wire at the time. He was sniffing a lot of powder cocaine and doing crazy things. He was selling drugs and he made sure he got paid. Keith shot a couple of people and stabbed another guy. He didn't care if the person was male or female. He did what he had to do to get his money." Declaration of Lloyd Daniels ¶ 3, A13.

*   Willie Coley, another friend of Barley's, states that "Keith was the kind of guy you didn't want to have trouble with. He always carried a knife – he was fascinated with that stuff. ... I remember one time when Keith stabbed a junkie over a drug debt. I don't know who the guy was; he was just one of the addicts who hung out on Catherine Street. He owed Keith money so Keith beat him up and stabbed him." Declaration of Willie Coley ¶¶ 3-4, A15.

Keith Barley was a violent drug dealer, with motive and opportunity to kill Douglas Moody. Within an hour before Mr. Moody's killing, Mr. Barley was armed and looking to kill him, following up on a prior armed search one week before. Mr. Barley accomplished his mission, found Mr. Moody and killed him over a drug debt. Gina Taylor, an unbiased eyewitness, consistently has stated since the time of the offense that the killer was not Mr. Roane; consistently has given a description of the killer matching Mr. Barley; was fearful for her life prior to Mr. Barley's death; and now has come forward and specifically identified Mr. Barley as the killer. Two other people, including his best friend, have come forward and admitted that Mr. Barley confessed to the murder of Douglas Moody. Keith Barley killed Douglas Moody. James Roane did not.

**B.      Evidence Refuting Government Witnesses Regarding the Moody Murder**

Because Mr. Roane did not kill Mr. Moody, there was no physical evidence to support the government's claim that he did.  Neither the gun nor the knife used to kill Mr. Moody were recovered.  No evidence recovered at the scene showed that Mr. Roane was even there – no fingerprints, no blood, no hair, no flakes of skin, no personal items belonging to Mr. Roane, nothing.  Hair and fibers were collected from the scene, <u>see</u> Forensic Synopsis Sheet, A56, but no evidence showed any connection to Mr. Roane.  Two bullets were recovered from Mr. Moody's body, but no gun was ever linked to the crime.

Lacking physical evidence, the government relied on the testimony of two supposed eyewitnesses, Priscilla "Pepsi" Greene and Denise Berkley.  Even their trial testimony raises significant questions about the credibility of Ms. Greene and Ms. Berkley.

Pepsi Greene suffered a gunshot wound to the head between the time of the offense and the trial, causing her to lose parts of her brain and impairing her memory.  Tr. 2541-42, 2559-61, 2564.  She admitted that she could not recall her address at the time of the offense, could not recall giving a statement to police shortly after the offense, and could not recall if the government had gone over questions with her before she testified.  Tr. 2560, 2562, 2581.

Ms. Greene's trial testimony was riddled with contradictions.  She claimed to observe that Mr. Moody "jumped out the window," Tr. 2549, but later admitted that she did not actually see this, but was *told* it was so by Curt Thorne, Tr. 2570.  Spurred by Ms. Greene's admission that her purported knowledge was second-hand at best, defense counsel asked her "who told you" that Mr. Roane killed Mr. Moody, to which she replied "Nobody. I saw him do it." Tr. 2570.  However, she thrice contradicted this and admitted she did *not* see Mr. Roane kill Mr. Moody:

> Q.     Did you see "J.R." use that knife that night?
> A.     *I didn't see him use it on him* because I had left out the house.

Tr. 2551;

11

> Q. Well, did you see James Roane stab him?
> A. No.

Tr. 2574;

> Q. You didn't see Doug Moody get killed, did you?
> A. No.

Tr. 2582.

The trial record also shows strong reasons to doubt Denise Berkley. She never spoke to the police on the scene, and the police reports make no mention of her presence. She was an admitted "worker" in the criminal enterprise; she was testifying in exchange for immunity from prosecution; the government was paying her bills and providing her food, shelter, clothing, a job and relocation. Tr. 1757-58, 1763, 1776-77. She was a heavy user of crack cocaine, and was smoking crack at the time of the offense. She admitted that, for over a year leading up to the offense, she used crack "[f]our or five times" a day "every day." Tr. 1661-62, 1723. She admitted she was smoking crack at the time of the offense, and was high. Tr. 1694. She testified that when smoking crack she was "real paranoid." Tr. 1728.

Ms. Berkley's description of the offense was inconsistent with Ms. Greene's. Ms. Greene claimed that at least five-to-ten minutes elapsed between the gunshots and when Mr. Roane came to her apartment and asked for a knife, Tr. 2572-73, while Ms. Berkley testified that the shooting and stabbing were almost simultaneous, Tr. 1696-97, 1774. Ms. Greene claimed the stabbing took place "on the porch," Tr. 2574, while Ms. Berkley claimed that "[a]t first it was like in the yard then Doug Moody was trying to jump over the fence behind the house" and "ended up in the middle of the alley," Tr. 1698-99. Ms. Berkley claimed Mr. Roane gave the knife to Ms. Greene immediately after the stabbing, Tr. 1669, while Ms. Greene said it was later that night, Tr. 2551.

Additional evidence never heard by the jury, including new scientific evidence, further undermines the credibility of Ms. Greene and Ms. Berkley and shows that they could not have been

telling the truth at trial.

At trial, Ms. Greene gave a detailed description of the knife supposedly used by Mr. Roane, saying it was a "big," "long" "military knife" with a "black handle" and a "wide" blade of two-to-three inches. Tr. 2550, 2568-70. In the statement she gave to police two weeks after the offense, however, Ms. Greene said *she did not see the knife* and *could not describe it.* Greene Statement (1/28/92) at 3 ("Q. What type of knife was it? A. I don't know. ... [H]e didn't pull it out so we could see it."), A30. The jury did not hear this because trial counsel did not use it.

At trial, Ms. Greene specifically denied using crack at the time of the offense, see Tr. 2577, and gave no testimony indicating she ever used drugs at all. New evidence, not heard by the jury, shows that Ms. Greene, like Ms. Berkley, was a heavy user of cocaine and heroin. For example:

* Wanda Wright states: "I knew Pepsi Greene back then. Her drug habit was really bad, and she used both heroin and cocaine. Pepsi was sneaky and underhanded and she did whatever she had to to get drugs. She stole, ran scams and turned tricks. She'd lie, steal and kill to get her drug of choice." Declaration of Wanda Wright ¶ 2, A29.

* Harold Coles states: "I knew 'Pepsi' Greene from the neighborhood – that's all she did was chase after drugs. She got high every chance she got. I saw her after she was shot and she wasn't the same. I wasn't even sure that she knew who I was. She was limping along – still trying to get high." Declaration of Harold Coles ¶ 4, A23.

* Keith Ross states: "I knew Denise Berkley from the neighborhood. Denise was always a mess. She was a terrible drug addict. She tried to kill herself a number of times before all the trouble started in the neighborhood. ... I also knew Pepsi Greene from the neighborhood. She was in awful shape, too, in late 1991 and early 1992. She was a crackhead. Getting high and staying high her whole life. She would do anything for drugs." Declaration Keith Ross ¶¶ 5-6, A27.

* Prosecution witness Jeanette Pauley states: "Pepsi Greene lived in the apartment above me. I knew her very well. We both had horrible drug addictions. I also knew and used drugs with Denise Berkley. Her addiction was as severe as mine and Pepsi's. Denise was extremely unstable. I remember that she tried to kill herself several times by slashing her wrists. She sold her body for drugs. Pepsi Greene was very unreliable. She stole from her own mother to pay for drugs. Like Denise

Berkley, she also turned tricks to get money for drugs. They would do anything to get money for drugs." Declaration of Jeannette Pauley ¶¶ 2-4, A25.

At trial, Ms. Berkley testified that she saw Mr. Roane stab Mr. Moody "[b]etween 18 and 19 times." Tr. 1697. Her trial testimony is flatly contradicted by her testimony before the grand jury where she stated that Mr. Moody was stabbed "about *four* times." United States v. John Doe, aka Whitey, Grand Jury 92-1, at 16 (E.D. Va. March 17, 1992), A71. The jury did not hear this because trial counsel did not use it.

Ms. Berkley's changed testimony about the number of stabbings is particularly suspicious because she changed her to story to conform exactly with the Medical Examiner's autopsy findings and trial testimony. The Medical Examiner, Marcella F. Fierro, M.D., who performed the autopsy and testified for the government at trial, now states:

> Denise Berkley's trial testimony, claiming to have seen Mr. Moody stabbed 18 to 19 times, is incredible. It took me several hours of examination to determine that the total number of wounds on Mr. Moody's body which consisted of nine stab wounds, 3 cuts, and 6 puncture wounds – 18 total, plus two gunshot wounds. The variable nature of the wounds in this case, makes Ms. Berkley's testimony suspect. She could not have known the exact number of the wounds unless she had seen or been told about my autopsy report before she testified.

Declaration of Marcella F. Fierro, MD, ABP, FASCP, FCAP, ¶ 7, A52.

The Medical Examiner, Dr. Fierro, recently reviewed her previous reports and files, the crime scene video (which she had never seen before) and the trial transcript. She has now provided undersigned counsel an affidavit explaining that the testimony of Pepsi Greene and Denise Berkley is *inconsistent with the physical evidence*:

> At trial, Denise Berkley ... testified that James Roane was standing in front of Moody when he started stabbing him. However, with exception of a stab wound to the left forehead and one to the left anterior neck, all of the stab wounds are on the upper right and middle back. It is very unlikely that the back stab wounds in this case were inflicted in a face to face combat situation. On the contrary, because the stab wounds are clustered around the upper right region of his back, it is more likely, after the two stabs to the front, that the Mr. Moody had his back to the perpetrator while being stabbed. The multiple abrasions to the front of Mr. Moody's body are also

14

consistent with this scenario. Had I been asked at the time of trial, I would have testified that *Ms. Berkley's testimony in this regard was inconsistent with the physical evidence for most of the wounds.*

Denise Berkley also testified that she witnessed Mr. Roane using a butcher knife to stab Mr. Moody. Priscilla Greene testified that Mr. Roane used a military knife which she described as a "wide" blade, approximately 2-3 inches wide. However, Mr. Moody could not have been stabbed with either a butcher knife or a military knife as described by these witnesses. Based on the width and depth of the stab wounds, Mr. Moody was stabbed by a cutting instrument with a blade between ½ to 3/4 inch in width. Moreover, the skin, as an organ, is more elastic than the internal organs. For this reason, cuts to internal organs are less likely to expand over time and measuring these cuts provides the most accurate indicator of the size of the cutting instrument. In this case, there was a 5/8 inch wide cut to Mr. Moody's pleura, the membrane covering his lung. This is the most accurate indicator of the size of the cutting instrument used. Butcher knives and military knives typically have blades much wider than 5/8 inch. The blade could not have been 2-3 inches wide as described by Priscilla Greene. In addition, military knives typically have thicker blades and the wounds in this case were not thick enough to be made by such a knife. Had I been asked at the time of trial, I would have testified that *Denise Berkley and Priscilla Greene's testimony describing the weapon as a butcher knife or military knife with a 2-3 inch wide blade was inconsistent with the physical evidence.*

Declaration of Marcella F. Fierro, MD, ABP, FASCP, FCAP, ¶¶ 5-6, A52.

Another important aspect of the testimony of Ms. Greene and Ms. Berkley is also contradicted by new scientific evidence. Ms. Greene testified that Mr. Moody jumped out a window in an attempt to escape his assailants, Tr. 2549; Ms. Berkley testified that she "heard a window break" just before seeing Mr. Moody outside the house, Tr. 1696; Detective Paul Tuttle testified that it appeared that Mr. Moody had jumped through a window, which was identified in crime scene video and photographs, Tr. 1831-33; and the prosecutor claimed Mr. Moody jumped out the window and was chased down and killed by Mr. Roane, Tr. at 2994 (prosecutor's closing argument). There was no evidence presented at trial that Mr. Moody's clothing or shoes had glass or wood fragments which likely would have been present had he actually jumped through and broken the window, but the prosecution attributed this to the fact that the shoes and clothing had not been checked for such fragments. Tr. 1832.

15

Recently developed expert evidence proves that the prosecution's claim that Mr. Moody jumped through the window was false. This window, and the two broken panes of glass that Mr. Moody allegedly broke while jumping out of the window are clearly visible in the police crime scene video and the government's trial exhibits, photographs 9-2 and 9-3, A62-63. Robert Tressel, an expert in crime scene reconstruction, has recently reviewed this evidence and has concluded that it was simply not possible for any human being to have jumped out this window. See Declaration of Robert Tressel, A57.

The window consists of lower and upper sashes, each of which contains six smaller individual panes of glass. The crime scene video and the photographs show that only two of the six small panes of glass and one piece of the wood trim between those two panes of glass were broken. Both broken panes were in the upper sash of the window – *no other glass or wood, on either the upper or lower sash of the window were broken or disturbed.* See Government's trial exhibits, photographs 9-2 and 9-3, A62-63. Noting the relatively small size of the panes on the upper window sash, Robert Tressel concluded that it was physically impossible for an adult male to jump through that window without breaking additional panes of glass and wood trim. Declaration of Robert Tressel, A57. In addition, because of the height of the window, it was impossible for anyone, especially an adult male, to jump through the upper sash without breaking or disturbing a portion the lower window sash. Id. Indeed, based on the visible damage to the window, or lack thereof, jumping through the window as alleged would have required Mr. Moody simultaneously to "jump into the air, compress his arms and hands, and raise his legs and feet *after* his upper torso passed through the window. Such a 'dolphin' or 'swan' dive, resulting in the breaking of only two small panes of glass which were narrower than the body of an average adult male, is not possible." Id.

The only other evidence relied upon by the government was the testimony of Robert "Papoose" Davis, who claimed that, immediately after Mr. Moody was killed, Mr. Roane and Mr.

16

Tipton "came to my house in the rain; running, huffing and puffing. ... At the bottom of the steps in my doorway, they said, 'Yeah, I got him, I got him.' Said, 'Yeah, man, we can't stay out here, man. This is hot anyway." Tr. 1896.

Even on the trial record, Mr. Davis' testimony is suspect. Mr. Davis never identified *which* person, Mr. Roane or Mr. Tipton, supposedly said "I got him, I got him." Mr. Davis claimed the two men arrived "running, huffing and puffing," which is inconsistent with the testimony of government witnesses Pepsi Greene and Denise Berkley, who claimed that Mr. Roane, *but not Mr. Tipton*, left the scene in an *automobile*. Tr. 1699, 2552. Mr. Davis claimed the two men arrived "in the rain," which was not mentioned by any other witness. Mr. Davis had a motive to implicate Mr. Roane and Mr. Tipton, because two other homicide victims, Dorothy "Mousey" Armstrong and Bobby Long, were his siblings. Tr. 1883. He had motive to please to government because he admitted to selling drugs and hiding guns but was never charged with anything. Tr. at 1916-17.

The suspect nature of Mr. Davis' trial testimony, even on the trial record, is highlighted by the fact that *Mr. Tipton*, who was equally inculpated by Mr. Davis' testimony, was *acquitted of killing Mr. Moody*.

New evidence, which the jury never heard, refutes Mr. Davis' testimony.

There is sigificant impeachment information about Mr. Davis that the jury did not hear. Mr. Davis had numerous convictions on larceny and weapons charges, <u>see</u> Robert Davis Criminal Extract, A64, but the jury only heard about one of these convictions, Tr. 1929-30. In his earlier grand jury testimony, Mr. Davis was questioned about his knowledge of the Moody murder, and *never claimed he had seen Mr. Roane or Mr. Tipton on the night of Mr. Moody's killing.* <u>See</u> Tr. 3/17/92 (Robert Davis grand jury testimony), A92. What Mr. Davis *did* purport to "know" about the Moody case contradicted the government's claim at trial that Pepsi Greene gave the murder weapon knife to Mr. Roane – Mr. Davis claimed before the grand jury that Mr. Moody was killed

17

with a pair of scissors provided by Mr. Davis' sister, Dorothy "Mousey" Armstrong. Tr. 3/17/92 at 10-11, A92.

Moreover, the new evidence undermining Mr. Davis's trial testimony goes far beyond impeaching his credibility. As set forth above, Mr. Davis testified at trial that Mr. Roane and Mr. Tipton arrived at his house immediately after the offense, i.e., in the very early hours (before 1 a.m.) of January 13, 1992. Mr. Davis claimed that Mr. Roane and Mr. Tipton arrived "*in the rain.*" Tr. 1896. But weather reports from that time show that *it was not raining* in Richmond. See NOAA-National Weather Service Local Climatological Data, A112; Crime Scene Video, A61. Mr. Davis did not see Mr. Roane and Mr. Tipton after the Moody murder. His testimony does not support the government's case at all.[3]

### C. Alibi Evidence Proving That Mr. Roane Was Not Present When Mr. Moody Was Killed

As set forth above, Mr. Roane did not kill Mr. Moody, Keith Barley did. Mr. Roane's innocence is confirmed by evidence showing that Mr. Roane was not present when Mr. Moody was killed, but was miles away at a hotel.

Documentary evidence of this alibi was presented at the District Court evidentiary hearing in the first § 2255 proceedings. See Tr. 6/21/02 at 3-11 (testimony of private investigator Alfred Brown). This evidence included hotel receipts that support what Mr. Roane has always maintained – when Mr. Moody was killed, Mr. Roane was in a hotel room with Sandra Reavis, which had been rented on his behalf by Linwood Chiles and Carmella Coley. See also id. at 64 (testimony of trial counsel, David Baugh) ("Mr. Roane was very candid about admitting to me the things that he had done and the things he had not done. And he told me that he had not been involved in the murder

---

[3]In the first § 2255 proceedings, the District Court stated that the trial "testimony of Berkley, Davis, and Greene was credible and was corroborated by the physical evidence of murder including the autopsy and the crime scene video." District Court Opinion of May 1, 2003, at 4. In light of the new evidence described above, these credibility considerations must be revisited.

of Douglas Moody. And I was convinced that he had not been involved in the Douglas Moody murder .... When Douglas Moody was murdered ... he told me he had been at a hotel and he told me with whom he had been. He remembered the name and location.").

Mr. Roane also testified as to his alibi at the § 2255 hearing. Tr. 6/21/07 at 39-49. The District Court heard Mr. Roane's testimony, observed his "demeanor and the details of his account" and found his testimony "tenable." District Court Opinion of May 1, 2003, at 6. Additionally, in new evidence, Carmella Coley has sworn that she recalls driving Mr. Roane and Sandra Reavis to the hotel, along with Linwood Chiles. See Declaration of Carmella Coley, A66. Ms. Coley's declaration further corroborates the alibi and the testimony of Mr. Roane. The jury never heard this alibi evidence, which reinforces the evidence of innocence.[4]

### D. Evidence Showing that Mr. Moody Was Not A Drug Dealer, Thus Showing That Mr. Roane Had No Motive to Kill Mr. Moody and Negating The Theory Upon Which Mr. Roane Was Made Eligible For The Death Penalty

At trial, the prosecution claimed that Mr. Roane and Mr. Tipton killed Mr. Moody because Mr. Moody was a rival drug dealer who "worked for Peyton Maurice Johnson. They didn't want anyone else operating in their territory ... They would kill anybody who came in their way in order to take over turf." Tr. 2995 (prosecution closing argument). This claim was significant for two reasons. First, it provided a motive for the killing. Second, *it made the killing death-eligible* under 21 U.S.C. § 848(e)(1)(A), which requires that the killing be "in furtherance of a continuing criminal enterprise." See Claim II, infra.

The evidence at trial for motive and death eligibility was quite weak. New evidence shows that Mr. Moody was *not* a drug dealer, and did *not* work for Maurice Peyton Johnson. Thus, there

---

[4]In the first § 2255 proceedings, the District Court found "flat and unpersuasive" the testimony of another alibi witness, Sandra Reavis. District Court Opinion of May 1, 2003, at 7. In light of the compelling new evidence of Mr. Roane's innocence, the District Court's assessment should be revisited. Even if Ms. Reavis' testimony is ignored however, there is strong alibi evidence.

was no motive for Mr. Roane to kill him, providing further support for the showing that Mr. Roane did not kill him, and Mr. Roane is not eligible for the death penalty for Mr. Moody's murder.

At trial, the government presented two witnesses who testified about this supposed motive and death eligibility information: Pepsi Greene and Ronita Holman.[5]

Pepsi Greene testified that Mr. Moody "was killed because 'O' [i.e., Cory Johnson] and 'Whitey' [i.e., Tipton] and them didn't want Maurice [Johnson] and 'Little Doug' [Moody] to work in that area" selling cocaine. Tr. 2553. She did not give any basis for this assertion. As set forth above, Ms. Greene's claims are utterly unreliable.

Ronita Holman testified that Mr. Moody had sold drugs for Maurice Johnson "[a]t one time," but "[n]ot too much." Tr. 1992. She testified that she had *never actually seen Mr. Moody obtain drugs from Mr. Johnson*, though she generally was present when he supplied drugs to all of his dealers. Tr. 1993. Ms. Holman now admits that, to the extent her trial testimony even supported the government's claim that Mr. Moody sold drugs for Maurice Johnson, it was false. She states: "I knew Doug Moody who also lived in the neighborhood. He was a heavy drug user. He was not a dealer. He did not work for Maurice Johnson, who I also knew. Doug was a bad addict who always owed people money for drugs." Declaration of Ronita Holman ¶ 2, A21.

New evidence from numerous additional people confirms that Mr. Moody did not sell drugs and did not work for Maurice Johnson:

  *  Prosecution trial witness Jerry Gaiters, another neighborhood resident and alleged drug worker, states: "I knew Doug Moody. ... He was not dealing drugs or involved

---

[5]In his opening statement, the prosecutor told the jury: "You will hear testimony [from Denise Berkley] about a tape that they thought had been made where Doug Moody and Peyton Maurice Johnson made threats to 'Whitey' [i.e., Tipton] and 'O' [i.e., Cory Johnson] in that tape over drug turf. [Moody] was killed for that[.]" Tr. 801. However, the prosecution presented no such testimony. Denise Berkley testified that she had "heard something about a tape" but "I'm not sure what was on the tape." Tr. 1700. The prosecutor then abandoned any claim about the tape in his closing argument. See Tr. 2994-95.

in the drug business around that time." Declaration of Jerry Gaiters ¶ 2, A67.

* Earl Granger, a neighbor of Mr. Moody's mother, attests to a statement by her that Mr. Moody "was not a drug dealer," but "a drug addict who never had any money at all." Declaration of Earl Granger ¶ 2, A70.

* Lloyd McDaniels states that he knew Mr. Moody as a "hardcore drug addict in the neighborhood. He was using cocaine. He was never a dealer. He was a mess. He was incapable of dealing." Declaration of Lloyd McDaniels ¶ 5, A13.

* Willie Coley states that Mr. Moody "was a junkie. He was always asking around for money to buy drugs. He never dealt drugs, he just used them all the time." Declaration of Willie Coley ¶ 2, A15.

* Harold Coles "knew Doug Moody well and ... never knew him to deal drugs. He was an addict and a drug user, not a seller." Declaration of Harold Coles ¶ 2, A23.

* Keith Ross, a close friend of Mr. Moody, states: "Doug developed a terrible drug problem. In the months before his death he was shooting heroin and cocaine every day. He was completely controlled by his addiction. Doug was never a drug dealer. He wasn't together enough to sell drugs and he would have been his own best customer. He was never anything but a user and an addict." Declaration of Keith Ross ¶¶ 2-3, A27.

In short, Mr. Roane proffers and will prove at an evidentiary hearing that Douglas Moody was not a rival drug dealer as portrayed by the prosecution at trial; thus, there was no motive for Mr. Roane to kill Mr. Moody and the government had no basis for this death sentence.[6]

## AN EVIDENTIARY HEARING IS APPROPRIATE

This Court should hold an evidentiary hearing.

"Unless the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief, the court shall ... grant a prompt hearing thereon, determine the issues and

---

[6]Keith Barley, who actually did kill Mr. Moody, did work with Maurice Johnson. See, e.g., Declaration of Gina Taylor ¶ 5 ("Little Keith ran with a group of Johnson boys. Not Corey Johnson but Maurice Johnson. Maurice was a drug dealer in the neighborhood"), A11; Declaration of Wanda Wright ¶ 3 ("I knew Little Keith from the block, too. He sold and used drugs. He sold for Maurice."), A29.

make findings of fact and conclusions of law with respect thereto." 28 U.S.C. § 2255(b). In particular, when a petitioner presents "colorable constitutional claims of ineffective assistance of counsel, he should ... receive[] a hearing on the factual claims at issue." Becton v. Barnett, 920 F.2d 1190, 1195 (4th Cir. 1990); accord United States v. Moore, 204 Fed.Appx. 250, 251, 2006 WL 3069307, *1 (4th Cir. 2006) ("When a [§ 2255] movant presents a colorable Sixth Amendment claim showing disputed facts beyond the record and a credibility determination is necessary to resolve the issue, an evidentiary hearing in open court is required.").

As set forth in this Petition, Petitioner has proffered substantial evidence showing that he is innocent of the Moody murder and that he has "colorable constitutional claims of ineffective assistance of counsel." Plainly, it cannot be said that the record "conclusively show[s]" that relief should be denied. This Court should hold an evidentiary hearing.

## PETITIONER WILL PROVE AT AN EVIDENTIARY HEARING THAT HE SATISFIES THE SUCCESSIVE PETITION STANDARD OF § 2255(h)

Because this is Petitioner's second § 2255 Petition, Petitioner must show that the Petition proffers "newly discovered evidence that, if proven and viewed in light of the evidence as a whole, would be sufficient to establish by clear and convincing evidence that no reasonable factfinder would have found the movant guilty of the offense." 28 U.S.C. § 2255(h).

In determining whether Petitioner has made the required § 2255(h) showing, the Court should consider guidance given by Sawyer v. Whitley, 505 U.S. 333 (1992), and Schlup v. Delo, 513 U.S. 298 (1995), which interpreted identical language from pre-AEDPA court-made rules, see Schlup, 513 U.S. at 301 ("Under Sawyer, the petitioner must show 'by clear and convincing evidence that ... no reasonable juror would have found the petitioner' guilty."); and by Williams v. Taylor, 529 U.S. 420 (2000), which interpreted identical language in 28 U.S.C. § 2254(e)(2)(B).

First, "the analysis must incorporate the understanding that proof beyond a reasonable doubt marks the legal boundary between guilt and innocence." Schlup, 513 U.S. at 328. Thus, in

determining if Petitioner has made the requisite showing of innocence, the Court must take into account that the government bears a heavy burden of proving guilt. Id.

Second, the § 2255(h) standard "falls short of the Jackson standard governing habeas review of claims of insufficiency of the evidence. See Jackson v. Virginia, 443 U.S. 307, 324 (1979) ("[N]o rational trier of fact *could* have found proof of guilt beyond a reasonable doubt")." Schlup, 513 U.S. at 323 n.38 (emphasis in Schlup). "Thus, though under Jackson the mere existence of sufficient evidence to convict would be determinative of petitioner's claim, that is not true under" Sawyer and § 2255(h). Schlup at 330 & n.49.

Third, in a capital case, the requisite showing of innocence is made "upon a showing, by clear and convincing evidence, that no reasonable factfinder would have found [Mr. Roane] guilty of *capital* murder." Williams, 529 U.S. at 440.

Petitioner has made an appropriate proffer of innocence under § 2255(h). He should be allowed an evidentiary hearing so that this Court can hear and assess the evidence.

Petitioner's proffer establishes that Keith Barley, not Petitioner, killed Douglas Moody. The proffer of new evidence includes a disinterested eyewitness who will testify that she saw Keith Barley, not Petitioner, kill Mr. Moody; three witnesses, including Mr. Barley's best friend, who will testify that Mr. Barley confessed to them that he killed Mr. Moody because Mr. Moody owed Mr. Barley money for drugs; a witness who will testify that Mr. Barley, with gun in hand, kicked in a door looking for Mr. Moody an hour before the killing, seeking to collect on a drug debt; and several witnesses who will testify that Mr. Barley was a violent drug dealer who worked as an "enforcer" for drug dealer Peyton Maurice Johnson.

Petitioner's proffer also establishes that the three government trial witnesses who connected Petitioner to the Moody murder are incredible and could not have been testifying truthfully. The proffer of new evidence includes strong new impeachment information for each witness, and

objective scientific and factual evidence establishing that these witnesses could not have been telling the truth when they implicated Mr. Roane in the Moody murder.

Petitioner's proffer also establishes that Petitioner is innocent of "capital murder," Williams, 529 U.S. at 440, even if it is falsely assumed that Petitioner killed Mr. Moody.

Petitioner's death-eligibility for the Moody murder was premised upon 21 U.S.C. 848(e)(1)(A), which states that "any person engaging in or working in furtherance of a continuing criminal enterprise ... who intentionally kills or counsels, commands, induces, procures, or causes the intentional killing of an individual and such killing results ... may be sentenced to death." The government cannot establish § 848(e)(1)(A) merely by showing that the defendant committed a murder while he was part of a continuing criminal enterprise ("CCE"). Instead, the government must prove there was a *"substantive connection"* between the killing and the CCE, i.e., that the killing was committed *"in furtherance of the CCE's purposes."* United States v. Tipton, Johnson & Roane, 90 F.3d 861, 887 (4th Cir. 1996); accord United States v. Stitt, 250 F.3d 878, 885 n.6 (4th Cir. 2001) (same); United States v. Peterson, 210 F.3d 363, 2000 WL 305137, *4-*5 (4th Cir. March 24, 2000) (Table, text in Westlaw) (same; killing must be "working to promote or advance the interests of" the CCE). At trial, the government claimed that the "substantive connection" to the CCE, establishing death-eligibility under § 848(e)(1)(A), was that Mr. Moody was a rival drug dealer and that Mr. Roane and Mr. Tipton killed Mr. Moody for that reason.

As set forth in this Petition, however, new evidence shows that Mr. Moody was *not* a rival drug dealer – he was not a drug dealer at all. Instead, he was drug addict who was killed by Keith Barley because he owed Mr. Barley money for drugs. Thus, the new evidence shows Mr. Moody's murder had no "substantive connection" to the CCE for which Petitioner was convicted and, thus, Petitioner is innocent of capital murder, even if it is falsely assumed that Petitioner killed Mr. Moody.

The trial evidence for Petitioner's guilt of the Moody murder "was neither undisputed nor overwhelming." District Court Opinion of May 1, 2003, at 10. At the first § 2255 hearing, Petitioner presented evidence supporting an alibi, further undermining confidence in Petitioner's guilt. Petitioner's proffered "newly discovered evidence ..., if proven and viewed in light of the evidence as a whole" will "establish by clear and convincing evidence that no reasonable factfinder would have found him guilty of the offense" of killing Douglas Moody. Petitioner should be afforded an evidentiary hearing at which he can present, and this Court can assess, his evidence of innocence.

**PETITIONER WILL PROVE AT AN EVIDENTIARY HEARING THAT HE IS ENTITLED TO HABEAS RELIEF FROM THE MOODY MURDER CONVICTION AND DEATH SENTENCE**

I.     PETITIONER'S CONVICTION FOR MURDERING DOUGLAS MOODY, AND THE DEATH SENTENCE IMPOSED FOR THAT CONVICTION, SHOULD BE VACATED BECAUSE TRIAL COUNSEL WAS INEFFECTIVE FOR FAILING TO REASONABLY INVESTIGATE, DEVELOP AND PRESENT EVIDENCE THAT PETITIONER IS INNOCENT OF THE MOODY MURDER

Petitioner was sentenced to death for killing Douglas Moody. Petitioner did not kill Mr. Moody, Keith Barley did. Had counsel undertaken the constitutionally required investigation in this capital case, he would have developed and presented compelling evidence that Mr. Moody was killed by Keith Barley, not Petitioner. This Court should allow an evidentiary hearing on this claim of counsel's ineffective assistance.

— A —

Sixth Amendment ineffective assistance of counsel claims are evaluated under the two-prong test of Strickland v. Washington, 466 U.S. 668 (1984), and its progeny. Petitioner must show (1) counsel's deficient performance, i.e., that counsel's performance fell below "an objective standard of reasonableness," id. at 688; and (2) prejudice, i.e., that confidence in the result of the original sentencing proceeding is undermined due to counsel's deficiencies, id. at 694; accord United States v. Breckenridge, 93 F.3d 132, 136 (4th Cir. 1996).

Given Petitioner's factual proffer, this Court should allow an evidentiary hearing on his claim that counsel was ineffective for failing to investigate, develop and present evidence of his innocence of the Moody murder.

**1.     Deficient performance**:   Trial counsel was deficient for failing to adequately investigate, develop and present the evidence of Petitioner's innocence of the Moody murder.

Adequate investigation is an essential component of effective representation by counsel. "Counsel in criminal cases are charged with the responsibility of conducting 'appropriate investigations, both factual and legal, to determine if matters of defense can be developed.'" United States v. Mooney, 497 F.3d 397, 404 (4th Cir. 2007) (quoting Coles v. Peyton, 389 F.2d 224, 226 (4th Cir. 1968)) (emphasis in original); see also United States v. Russell, 221 F.3d 615, 620 (4th Cir. 2000) ("an attorney has a duty to adequately examine the law and facts relevant to the representation of his client"); id. ("Defense counsel should conduct a prompt investigation of the circumstances of the case and explore all avenues leading to facts relevant to the merits of the case and the penalty in the event of conviction.") (quoting ABA Standards for Criminal Justice, ch. 4, Defense Function 4-4.1 (3d ed. 1993)). Even "[t]he most able and competent lawyer in the world can not render effective assistance in the defense of his client if his lack of preparation for trial results in his failure to learn of ... facts which might have afforded his client a legitimate justiciable defense." McQueen v. Swenson, 498 F. 2d 207, 217 (8th Cir. 1974).

When counsel is conducting a preliminary investigation as part of deciding *which* defense to present, counsel has significant leeway in deciding when to terminate investigation into a particular area. After all, there are infinitely many theoretically potential defenses, and counsel cannot exhaustively investigate all of them. However, counsel's "failure to investigate adequately and discover evidence to support his *strategy of choice* is an entirely different question." Jacobs v.

Horn, 395 F.3d 92, 104 (3d Cir. 2005) (citing <u>Wiggins v. Smith</u>, 539 U.S. 510, 523 (2003)). Once a trial strategy has been chosen, counsel must thoroughly investigate the chosen defense before counsel can make a reasonable tactical decision to cease investigation. <u>Id.</u>; <u>see</u> <u>also</u> <u>Rompilla v. Beard</u>, 545 U.S. 374, 394-95 (2005) (O'Connor, J., concurring) (noting counsel's duty to fully investigate areas that relate to "the defense's primary ... arguments"); <u>Dugas v. Coplan</u>, 428 F.3d 317, 329 (1st Cir. 2005) (counsel ineffective for failing to obtain expert evaluations relevant to defense actually presented at trial; it is "unfathomable" for counsel to fail to fully investigate defense of choice).

Here, trial counsel did some preliminary investigation and "made the strategic choice to *focus on Roane's misidentification defense*." <u>Roane</u>, 378 F.3d at 410; <u>accord</u> <u>id.</u> at 411 (after preliminary invesigation, counsel decided to "turn to and focus on Roane's misidentification defense"). Having made this decision to focus on misidentification, counsel had a duty to thoroughly investigate and develop evidence to support that chosen defense. Counsel failed to do so.

Counsel knew before trial that Gina Taylor's statements showed that a misidentifcation defense was plausible. Ms. Taylor was "an apparently disinterested eyewitness, ... who insisted that Roane did not commit the murder." District Court Opinion of May 1, 2003, at 9. Her description of the assailant was consistent with Keith Barley, and police reports identified Barley as a suspect. Reasonable counsel would have "expand[ed his] investigation beyond" Ms. Taylor and developed additional evidence to support her eyewitness testimony. <u>Wiggins</u>, 539 U.S. at 524. Counsel's failure to do so was deficient representation.

Counsel also knew before trial that prosecution witnesses Pepsi Greene, Denise Berkley and Robert Davis would be the primary obstacles to the misidentification defense. Reasonable counsel would have thoroughly investigated, developed and presented evidence to undermine the testimony of these government witnesses. <u>Rompilla</u>, 545 U.S. at 394 (O'Connor, J., concurring) (noting

27

counsel's duty to fully investigate areas that relate to the "heart of the prosecution's case"). Counsel's failure to do so was deficient representation.

There should be an evidentiary hearing at which Petitioner can establish the facts proving this colorable claim of counsel's deficient representation.

2.  **Prejudice**: Petitioner was prejudiced by counsel's failure to reasonably investigate, develop and present the evidence of his innocence.

The factual proffer described in this Petition, developed by current counsel, shows the evidence that trial counsel would have developed had he reasonably investigated the misidentifcation defense he pursued. Had trial counsel reasonably investigated, the jury would have heard compelling evidence proving that Petitioner did not kill Mr. Moody; that Keith Barley did kill Mr. Moody; and that the testimony of the government witnesses connecting Petitioner to the Moody murder was incredible and inconsistent with objective scientific evidence. This evidence "undermines confidence" in Petitioner's conviction for the Moody murder, i.e., it shows a "reasonable probability" that Petitioner would have been acquitted of killing Mr. Moody, had counsel effectively investigated and presented the evidence. Strickland, 466 U.S. at 694. Petitioner was prejudiced.

There should at least be an evidentiary hearing at which Petitioner can establish the facts proving this colorable claim that he was prejudiced by trial counsel's deficient representation.

## II. PETITIONER'S DEATH SENTENCE SHOULD BE VACATED BECAUSE TRIAL COUNSEL WAS INEFFECTIVE FOR FAILING TO INVESTIGATE, DEVELOP AND PRESENT EVIDENCE THAT DOUGLAS MOODY WAS NOT KILLED IN FURTHERANCE OF ANY ALLEGED CONTINUING CRIMINAL ENTERPRISE AND, THUS, PETITIONER WAS NOT DEATH-ELIGIBLE

Had trial counsel reasonably investigated, he would have developed and presented evidence showing that Petitioner was not death-eligible for the Moody murder. This Court should allow an evidentiary hearing on this claim of counsel's ineffective assistance.

### — A —

Petitioner's death-eligibility for the Moody murder was premised upon 21 U.S.C.

848(e)(1)(A), which states that "any person engaging in or working in furtherance of a continuing criminal enterprise ... who intentionally kills or counsels, commands, induces, procures, or causes the intentional killing of an individual and such killing results ... may be sentenced to death."

The government cannot establish § 848(e)(1)(A) merely by showing that the defendant committed a murder while he was part of a continuing criminal enterprise ("CCE"). Instead, the government must prove there was a *"substantive connection"* between the killing and the CCE, i.e., that the killing was committed *"in furtherance of the CCE's purposes."* United States v. Tipton, Johnson & Roane, 90 F.3d 861, 887 (4th Cir. 1996); accord United States v. Stitt, 250 F.3d 878, 885 n.6 (4th Cir. 2001) (same); United States v. Peterson, 210 F.3d 363, 2000 WL 305137, *4-*5 (4th Cir. March 24, 2000) (Table, text in Westlaw) (same; killing must be "working to promote or advance the interests of" the CCE).

At trial, the government claimed that the "substantive connection" to the CCE, establishing death-eligibility under § 848(e)(1)(A), was that Mr. Moody was a rival drug dealer and that Mr. Roane and Mr. Tipton killed Mr. Moody for that reason. As set forth in this Petition, however, new evidence shows that Mr. Moody was *not* a rival drug dealer – he was not a drug dealer at all. Thus, the new evidence shows Mr. Moody's murder had no "substantive connection" to the CCE for which Petitioner was convicted, even if it is falsely assumed that Petitioner killed him.

— B —

Under the Sixth Amendment standards of Strickland v. Washington and its progeny, see Claim I, supra, counsel was ineffective for failing to reasonably investigate, develop and present evidence that Mr. Moody was not a drug dealer, as claimed by the prosecution.

**1.    Deficient performance**: Trial counsel was deficient for failing to adequately investigate, develop and present evidence that Mr. Moody was not a drug dealer.

As set forth in Claim I, supra, counsel has a duty to investigate areas that are important to the

defense. Counsel's duty to investigate is particularly important when it comes to death-eligibility factors such as § 848(e)(1)(A) – counsel should endeavor "to discover *all reasonably available ...* evidence to rebut any aggravating evidence that may be introduced by the prosecutor." Wiggins, 539 U.S. at 524 (quoting ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases 11.4.1(C) (1989)) (emphasis in Wiggins).

Reasonable counsel in Petitioner's case would have thoroughly investigated and developed evidence to rebut the death-eligibility factor in this case – the prosecution's claim that Mr. Moody was a rival drug dealer who was killed for that reason. Petitioner's trial counsel failed to do so. This was deficient representation.

There should be an evidentiary hearing at which Petitioner can establish the facts proving this colorable claim of counsel's deficient representation.

**2.** **Prejudice**: Petitioner was prejudiced by trial counsel's failure to adequately investigate, develop and present evidence that Mr. Moody was not a drug dealer.

The factual proffer described in this Petition, developed by current counsel, shows the evidence that trial counsel would have developed had he reasonably investigated the issue of whether Mr. Moody's murder had a "substantial connection" to the CCE. Had trial counsel reasonably investigated, the jury would have heard compelling evidence proving that Petitioner did not kill Mr. Moody; that Keith Barley did kill Mr. Moody; and that, in any event, Mr. Moody was *not a drug dealer*. This evidence "undermines confidence" in the jury's finding that the government established death-eligibility under § 848(e)(1)(A), i.e., it shows a "reasonable probability" that Petitioner would not have been found death-eligible for the Moody murder, even if the jury thought Petitioner was guilty at all. Strickland, 466 U.S. at 694. Petitioner was prejudiced.

There should at least be an evidentiary hearing at which Petitioner can establish the facts proving this colorable claim that he was prejudiced by trial counsel's deficient representation.

**III. PETITIONER'S CONVICTION FOR MURDERING DOUGLAS MOODY, AND THE DEATH SENTENCE IMPOSED FOR THAT CONVICTION, SHOULD BE VACATED BECAUSE HE IS INNOCENT OF THE MOODY MURDER**

As set forth above, Petitioner is actually innocent of the Moody murder. Mr. Moody was killed by Keith Barley. In light of his innocence, his conviction and death sentence for the Moody murder should be vacated under Herrera v. Collins, 506 U.S. 390 (1993).

In a § 2254 case brought by a state prisoner, Royal v. Taylor, 188 F.3d 239 (4th Cir. 1999), the Fourth Circuit read Herrera as holding that innocence can be a substantive claim for relief *only* when the state does not provide a *clemency* process:

> Royal contends that he is factually innocent of capital murder because, under Virginia law, only the triggerman can be sentenced to death, ... and new evidence assertedly reveals that Royal did not fire the fatal shot in this case.
>
> Initially, Royal maintains that his actual innocence in and of itself renders his conviction and execution violative of the Eighth and Fourteenth Amendments. Precedent prevents us from granting Royal's habeas writ on this basis alone. Because federal habeas relief exists to correct constitutional defects, not factual errors, "[c]laims of actual innocence based on newly discovered evidence have never been held to state a ground for federal habeas relief absent an independent constitutional violation occurring in the underlying state criminal proceeding." Herrera v. Collins, 506 U.S. 390, 400 (1993).
>
> Although the Herrera Court assumed *arguendo* that the execution of a defendant who had made a persuasive claim of actual innocence would violate the Constitution and therefore warrant federal habeas relief *if* no state relief proceedings were available, it stopped short of holding that such a claim exists in every case. Id. at 417. Rather, the Court explained that, when available, state clemency proceedings provide the proper forum to pursue claims of actual innocence based on new facts. Id. at 411-12, 417. Virginia has such an executive clemency process available to Royal. ... Thus we cannot grant Royal the requested habeas relief based simply on his assertion of actual innocence due to newly discovered evidence. See Herrera, 506 U.S. at 416-17; see also Lucas v. Johnson, 132 F.3d 1069, 1074-76 (5th Cir.1998).

Royal, 188 F.3d at 243 (emphasis in original).

In Petitioner's case, the executive *does* provide an executive clemency process. Thus, if Petitioner were a state prisoner, the Fourth Circuit's precedent in Royal would forbid relief on a Herrara claim in this case.

31

Petitioner respectfully submitts, however, that <u>Royal</u> should not apply in § 2255 cases, because the federal-state comity issues that are present in § 2254 cases are not present in § 2255 cases. Petitioner requests that further briefing on this matter be allowed.[7]

---

[7]Of course, the ultimate determination of whether <u>Royal</u> controls for § 2255 cases eventually will have to be made by the Fourth Circuit.

## PRAYER FOR RELIEF

Based upon all of the above allegations and the entire record of this case, Petitioner respectfully requests that the Court provide the following relief:

A.    That the Government be required to answer this Petition and file a responsive Brief;

B.    That the Court permit such discovery as will be requested in Petitioner's to-be-filed Motion for Discovery;

C.    That upon such discovery litigation, that Petitioner be permitted to Amend this Petition;

D.    That the Court conduct an evidentiary hearing addressing all material and disputed issues of fact;

E.    That the Court permit oral argument as appropriate and required;

F.    That at the conclusion of the proceedings that the Court vacate Petitioner's conviction and sentence for the Moody murder and order that appropriate retrial and/or new sentencing hearings be conducted.

Respectfully submitted,

BILLY H. NOLAS, ESQ.
SHAWN NOLAN, ESQ.
ANGELA ELLEMAN, ESQ.
Assistant Federal Defenders
Federal Community Defender Office
   for the Eastern District of Pennsylvania
Suite 545 West - The Curtis Center
601 Walnut Street
Philadelphia, PA 19106
(215) 928-0520

PAUL F. ENZINNA, ESQ.
Baker Botts, LLP
1299 Pennsylvania Avenue, NW
Washington, DC 20004
(202) 639-7752

Counsel for Petitioner James H. Roane, Jr.

33