**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division**

| | | |
|---|---|---|
| United States of America, | ) | |
| Respondent, | ) | Case No. 3:92CR68 |
| | ) | |
| v. | ) | O9-8 |
| | ) | |
| James H. Roane, Jr., | ) | |
| Petitioner. | ) | |

---

**APPENDIX TO PETITION FOR WRIT OF HABEAS CORPUS,
PURSUANT TO 28 U.S.C. § 2255, BY A FEDERAL PRISONER
UNDER SENTENCE OF DEATH**

---

# VOLUME II

# Table of Contents

**VOLUME I**

Virginia Department of Corrections Commitment form for James H. Roane, Jr.....................1

Supplementary Offense Report, 2/18/92.....................2

Metro Richmond Crime Stoppers Report.....................5

Handwritten notes by Detective Steve Dalton regarding initial investigation.....................6

Richmond Police Incident Notification, 1/13/92.....................10

Declaration of Gina Taylor.....................11

Declaration of Lloyd McDaniels.....................13

Declaration of Willie Coley.....................15

Declaration of Richard Coles.....................18

Declaration of Amiee Coley.....................20

Declaration of Ronita Holman.....................21

Declaration of Harold Coles.....................23

Declaration of Jeanette Pauley.....................25

Declaration of Keith Ross.....................27

Declaration of Wanda Wright.....................29

Statement of Priscilla Greene.....................30

Declaration of Marcella Fierro.....................52

Forensic Synopsis Sheet.....................56

Declaration of Robert Tressel.....................57

Video footage of crime scene.....................61

Government Exhibit 9-2.....................62

Government Exhibit 9-3................................................................................................63

Criminal Extract of Robert Davis.................................................................................64

Declaration of Carmella Coley....................................................................................66

Declaration of Jerry Gaiters.........................................................................................67

Declaration of Earl Granger.........................................................................................70

Grand Jury Testimony of Denise Berkley....................................................................71

Grand Jury Testimony of Robert Davis........................................................................92

Police Photo of Keith Barley......................................................................................111

National Climatic Data Center records of Richmond, VA weather data on January 12
and 13, 1992..............................................................................................................112

Autopsy Report of Douglas Moody.............................................................................116

**VOLUME II**

Opinion in the Fourth Circuit Court of Appeals, 7/8/96.............................................126

Motion Under 28 U.S.C. §§ 2255 to Vacate, Set Aside, or Correct Sentence by a Person
in State Custody, 6/1/98.............................................................................................174

Motion to Amend Motion to Vacate, Set Aside, or Correct Sentence Pursuant to
28 U.S.C. §§ 2255, 3/15/99........................................................................................182

Second Amended Motion to Vacate, Set Aside, or Correct Sentence Pursuant to
28 U.S.C. §§ 2255, 10/1/99........................................................................................231

Motion to Amend Motion to Vacate, Set Aside, or Correct Sentence Pursuant to
28 U.S.C. §§ 2255, 6/25/01........................................................................................238

Third Amended Motion to Vacate, Set Aside, or Correct Sentence Pursuant to
28 U.S.C. §§ 2255, 6/25/01........................................................................................242

District Court Opinion, 5/1/03....................................................................................244

Opinion in the Fourth Circuit Court of Appeals, 5/6/04.............................................258

order of the Commission, we necessarily conclude that Sabia's violation was "repeated" within the meaning of section 666(a).

We therefore grant the Secretary's petition for review. We will vacate the order of the Commission, and we will remand to the Commission with the direction that the Commission reinstate the November 25, 1994 order of the ALJ affirming the citation and imposing a penalty of $4,000 as stipulated by the parties. Jt.App. 15.



UNITED STATES of America,
Plaintiff-Appellee,

v.

Richard TIPTON, a/k/a Whittey,
Defendant-Appellant (Two
Cases).

UNITED STATES of America,
Plaintiff-Appellee,

v.

Cory JOHNSON, a/k/a "O", a/k/a
"CO", Defendant-Appellant.

UNITED STATES of America,
Plaintiff-Appellee,

v.

James H. ROANE, Jr., a/k/a J.R.,
Defendant-Appellant.

UNITED STATES of America,
Plaintiff-Appellant,

v.

Richard TIPTON, a/k/a Whittey; Cory
Johnson, a/k/a "O", a/k/a "CO"; James
H. Roane, Jr., a/k/a J.R., Defendants-
Appellees.

Nos. 93-4005 to 93-4007, 93-
4009 and 93-4010.

United States Court of Appeals,
Fourth Circuit.

Argued Dec. 7, 1994.

Decided July 8, 1996.

Three defendants were convicted in the United States District Court for the Eastern District of Virginia, James R. Spencer, J., of capital murder in furtherance of a continuing criminal enterprise and various related racketeering, firearms and drug offenses. Each defendant was sentenced to death, but death sentences were stayed on ground that Congress had not authorized means by which death sentences should be carried out. Defendants appealed, and government cross-appealed. The Court of Appeals, Phillips, Senior Circuit Judge, held that: (1) trial court's question to prospective jurors, which asked "do you have any strong feelings in favor of the death penalty?" was sufficient to determine any bias in favor of death penalty; (2) prosecutor did not violate defendants' constitutional rights to confront witnesses by advising witnesses in witness protection program that they did not have to agree to submit to interviews with defense counsel; (3) defendants were not entitled to severance of penalty phase of capital murder trials; and (4) although trial court erred in instructing jury in penalty phase of capital murder trial that it could find any or all of four levels of culpability set out in aggravating factor, error was harmless.

Affirmed in part, vacated and remanded in part.

**1. Constitutional Law ⊙=268(6)**

**Criminal Law ⊙=662.70**

Confrontation clause of Sixth Amendment and due process clause of Fifth Amendment together guarantee right of federal defendants charged with felonies to be present at all critical stages of their trials. U.S.C.A. Const.Amends. 5, 6.

**2. Criminal Law ⊙=636(3)**

Defendant's constitutional right to be present at all critical stages of his trial includes right to be present at voir dire and impaneling of jurors. U.S.C.A. Const. Amends. 5, 6; Fed.Rules Cr.Proc.Rule 43(a), 18 U.S.C.A.

**3. Criminal Law ⊙=660, 1028**

Where protected trial right has been effectively waived by defendant, all possibili-

ty of error respecting that right has been extinguished; but even where right has not been waived, any entitlement to have error in its denial or abridgement corrected on appellate review may be forfeited by failure to make timely assertion of right at trial.

**4. Criminal Law ⊙⇒636(1), 1035(3)**

Denial of defendant's constitutional and rule-based right to be present at all critical stages of trial does not affect defendant's substantial rights independent of any prejudicial impact and, thus, to establish plain error on appeal based on denial of right to be present at trial, defendant must demonstrate prejudice. U.S.C.A. Const.Amends. 5, 6; Fed.Rules Cr.Proc.Rule 43(a), 18 U.S.C.A.

**5. Criminal Law ⊙⇒1163(2)**

Prejudice could not be presumed from denial of defendants' constitutional and rule-based right to be present during voir dire in murder, racketeering and drug trial, where defendants did not object to absences, and absences were intermittent and did not approach total denial of any effective participation in critical phases of voir dire. U.S.C.A. Const.Amends. 5, 6; Fed.Rules Cr. Proc.Rule 43(a), 18 U.S.C.A.

**6. Criminal Law ⊙⇒1035(3)**

Defendants were not prejudiced by their absence from certain portions of voir dire in murder, racketeering and drug trial and, thus, their absence did not amount to plain error in violation of defendants' constitutional and rule-based right to be present at all critical stages of trial; defendants offered no showing of prejudice, and defendants were present during initial interviews of prospective jurors and when preemptory strikes were used. U.S.C.A. Const.Amends. 5, 6; Fed.Rules Cr.Proc.Rule 43(a), 18 U.S.C.A.

**7. Jury ⊙⇒131(6, 15.1)**

Trial court's procedure during voir dire, whereby court would ask prospective jurors "do you harbor any bias or prejudice, racial or otherwise, that would prevent you from being fair to the defendants in this case?" followed by limited follow-up questions by counsel, was sufficient to determine any racial bias in prospective jurors in murder, firearms and drug trial, where race was not itself an issue and none of offenses charged was interracial in nature.

**8. Criminal Law ⊙⇒1152(2)**
   **Jury ⊙⇒131(6)**

Once decision has been made to conduct any inquiry into any racial bias of prospective jurors, exact nature and scope of that inquiry is committed to broad discretion of district court, and is subject to review only for abuse.

**9. Jury ⊙⇒131(17)**

Trial court's question to prospective jurors in capital trial, which asked "do you have any strong feelings in favor of the death penalty?" was sufficient to determine any bias in favor of death penalty and, thus, defendants' were not entitled to conduct detailed questioning of prospective jurors on specific mitigating factors; district court's inquiry was sufficient to cull out any prospective juror who would always vote for death penalty whatever the circumstances.

**10. Jury ⊙⇒33(4)**

Defendants have a right, grounded in Sixth Amendment, to voir dire adequate to assure defendant a jury, all of whose members are able impartially to follow court's instructions and evaluate evidence. U.S.C.A. Const.Amend. 6.

**11. Jury ⊙⇒33(4)**

During voir dire of trial for capital crime, defendant has a right to an inquiry sufficient to ensure—within limits of reason and practicality—a jury none of whose members would unwaveringly impose death after finding of guilt and hence would uniformly reject any and all evidence of mitigating factors, no matter how instructed on the law. U.S.C.A. Const.Amend. 6.

**12. Jury ⊙⇒33(2.15)**

Sixth Amendment's guarantee of impartial jury is violated by exclusion of prospective juror simply because he expresses some reservations about imposing death penalty in any case; it is not violated, however, by exclusion of juror whose expressed reservations are such as to make him irrevocably committed to vote against death penalty regardless of facts and circumstances of case or, short of that, such as to prevent or sub-

stantially impair performance of his duties as juror in accordance with his instruction and his oath. U.S.C.A. Const.Amend. 6.

**13. Criminal Law ⌐1152(2)**

   **Jury ⌐108**

Whether prospective juror's reservations about voting for death penalty require exclusion of juror is committed to trial court discretion based upon voir dire inquiry, and review of that determination is most deferential.

**14. Jury ⌐108**

Trial court properly struck three prospective jurors for cause in capital murder trial based on their opposition to death penalty, where each prospective juror expressed reservations, never retracted, about whether they could vote for death penalty under any circumstances.

**15. Criminal Law ⌐1035(5)**

Court of Appeals would not consider defendants' claim that government impermissibly exercised its peremptory strikes against disproportionate number of women in violation of defendants' constitutional rights, where defendants never objected to government's use of peremptory strikes and offered no evidence of gender discrimination other than number of women struck relative to men. U.S.C.A. Const.Amend. 5.

**16. Conspiracy ⌐47(12)**

Evidence in drug conspiracy prosecution sustained finding that three defendants were part of single conspiracy, even though conspiracy existed in shifting geographical areas and not all defendants were members of conspiracy at same time; despite changing areas and membership, conspiracy used single name, operated under same leadership, and employed same methods of intimidation and violence to dominate crack cocaine trade in its markets.

**17. Criminal Law ⌐622.1(1)**

Persons who have been indicted together, particularly for conspiracy, should be tried together.

**18. Conspiracy ⌐45**

Government may not properly be deprived of its right to detail full scope of conspiracy and to present its case in proper context simply because particular coconspirators were not involved in full scope of its activities.

**19. Conspiracy ⌐45**

   **Criminal Law ⌐673(2)**

Drug conspiracy defendants were not entitled to exclusion of evidence or limiting instructions regarding activities of others in furtherance of conspiracy, where each defendant was member of same conspiracy.

**20. Criminal Law ⌐622.2(4)**

Three defendants in drug conspiracy prosecution were not entitled to severance of trial, where each was member of same conspiracy.

**21. Criminal Law ⌐1173.2(1)**

Even if defendants were entitled to multiple conspiracy instruction in drug conspiracy prosecution, defendants were not prejudiced by lack of multiple conspiracy instruction, where evidence of single conspiracy was strong enough in relation to that of multiple conspiracies that defendants would have been convicted even if multiple conspiracy instruction had been given.

**22. Criminal Law ⌐814(5)**

Properly requested multiple conspiracy instruction is not required if evidence only supports finding of single conspiracy as charged.

**23. Conspiracy ⌐48.2(1)**

   **Criminal Law ⌐772(6)**

Multiple conspiracy jury instruction may be required, as may instructions on specific defense theories generally, if sufficiently supported by evidence.

**24. Criminal Law ⌐1173.2(1)**

Failure to give multiple conspiracy jury instruction is not reversible error unless defendant can show that this caused him substantial prejudice.

**25. Indictment and Information ⚷110(3)**

Indictment alleging a continuing criminal enterprise (CCE) adequately identified drug-related violations comprising continuing series of violations and five persons allegedly supervised by defendants as part of enterprise; defendants could not claim unfair surprise since indictment tracked language of CCE offense, incorporated other crimes alleged in indictment by reference, and gave notice of five supervisees by reference to other counts of indictment. Comprehensive Drug Abuse Prevention and Control Act of 1970, § 408(a), 21 U.S.C.A. § 848(a).

**26. Drugs and Narcotics ⚷73.1**

Capital murder in furtherance of continuing criminal enterprise (CCE) could be considered by jury as predicate offense for violation of CCE statute; statute stated that person is engaged in CCE if he violates any provision of subchapter as part of continuing series of violations of subchapter, and subchapter specifically listed murder in furtherance of CCE in its provisions. Comprehensive Drug Abuse Prevention and Control Act of 1970, § 408(a, e), 21 U.S.C.A. § 848(a, e).

**27. Drugs and Narcotics ⚷132**

Trial court did not fail to adequately instruct jury that it must find each of five elements of continuing criminal enterprise (CCE) offense as to each of three defendants, where trial court specifically instructed jury that government must prove each of five elements as to each defendant, and generally cautioned jury that as to all charges, case of each defendant must be considered separately and individually. Comprehensive Drug Abuse Prevention and Control Act of 1970, § 408(a, e), 21 U.S.C.A. § 848(a, e).

**28. Criminal Law ⚷1038.2**

In continuing criminal enterprise (CCE) prosecution, trial court's failure to instruct jury that it must be unanimous as to three predicate violations and five supervisees as to each defendant was not plain error; by its verdict it was clear that jury unanimously found each defendant guilty of at least five predicate violations, and special unanimity instruction was not required on five supervisees element, as focus of CCE is size of enterprise rather than particular identities of those involved. Comprehensive Drug Abuse Prevention and Control Act of 1970, § 408(a, e), 21 U.S.C.A. § 848(a, e).

**29. Criminal Law ⚷872.5**

There is no general requirement of jury unanimity on preliminary factual issues which underlie verdict.

**30. Criminal Law ⚷798(.5)**

Special unanimity instruction is required only when there is genuine risk of juror confusion or that conviction could result from different jurors having concluded that defendant committed quite different acts within those of a prescribed set or among multiple means of violating statute.

**31. Criminal Law ⚷1038.1(4)**

In continuing criminal enterprise (CCE) prosecution, trial court's error in instructing jury that government must prove that continuing series of violations "was undertaken by the defendants" rather than by each defendant individually was not plain error; error was merely slip of the tongue by trial court, and other instructions adequately advised jury that to convict, each element of offense must be proved separately as to each defendant. Comprehensive Drug Abuse Prevention and Control Act of 1970, § 408(a), 21 U.S.C.A. § 848(a).

**32. Criminal Law ⚷1172.1(5)**

Although trial court technically violated rule governing jury instructions by giving supplemental jury instruction after closing arguments in continuing criminal enterprise (CCE) prosecution, error was harmless, where supplemental instruction was accurate statement of law and defendants did not indicate how they would have changed their arguments if they had been allowed to argue after supplemental instruction was given. Comprehensive Drug Abuse Prevention and Control Act of 1970, § 408(a), 21 U.S.C.A. § 848(a); Fed.Rules Cr.Proc.Rule 30, 18 U.S.C.A.

**33. Homicide ⚷289**

In prosecution for capital murder in furtherance of continuing criminal enterprise (CCE), trial court adequately instructed jury

that it must find substantive connection between murders and CCE; instructions stated that defendants were charged with two specific, distinct types of homicide, including "killing while engaged in or in furtherance of a [CCE]," and that to find defendants guilty, they must find that each defendant "was engaged in or working in furtherance of the [CCE]" and that the killing occurred "while the defendant was so engaged." Comprehensive Drug Abuse Prevention and Control Act of 1970, § 408(a, e), 21 U.S.C.A. § 848(a, e).

### 34. Criminal Law ☞1038.1(4)

In racketeering prosecution, trial court's failure on two occasions to differentiate between an "enterprise engaged in racketeering activity" and "racketeering activity" did not amount to plain error; trial court clearly identified the two different concepts in explaining racketeering statute and correctly told jury that to convict, it had to find that defendants acted to "gain entrance to" an "enterprise engaged in racketeering activity." 18 U.S.C.A. § 1959.

### 35. Criminal Law ☞666.5

Prosecutor did not violate defendants' constitutional right to confront witnesses by advising witnesses in witness protection program that they did not have to agree to submit to interviews with defense counsel; although a defendant has right to have access to witnesses, there is no right to compel witness to submit to interview. U.S.C.A. Const.Amend. 6; 18 U.S.C.A. § 3521.

### 36. Criminal Law ☞662.4

Government's delay in providing defendants with addresses of witnesses who were participating in witness protection program did not violate defendants' constitutional right to confront witnesses against them, where defendants were not prejudiced by delay. U.S.C.A. Const.Amend. 6; 18 U.S.C.A. §§ 3521, 3532.

### 37. Criminal Law ☞662.7

Trial court's refusal to allow defense counsel to cross-examine witnesses who were participating in witness protection program about their reasons for refusing to submit to interviews with defense counsel did not vio-

late defendants' constitutional right to confront witnesses against them, where motives and biases of witnesses were otherwise freely exposed to cross-examination. U.S.C.A. Const.Amend. 6; 18 U.S.C.A. § 3521.

### 38. Drugs and Narcotics ☞123.4

Evidence sustained finding that defendants acted as organizers, supervisors or managers with respect to five or more persons in a continuing criminal enterprise (CCE); street-level drug dealers acted as "workers" who were either or both organized, supervised, and managed by defendants who were acting as "partners" in concerted drug-trafficking enterprise. Comprehensive Drug Abuse Prevention and Control Act of 1970, § 408(a, b), 21 U.S.C.A. § 848(a, b).

### 39. Homicide ☞235

Evidence was sufficient for conviction of six murders in furtherance of a continuing criminal enterprise, even though defendant did not actually carry out execution of victims; evidence established that defendant was instrumental in planning murders in relation to drug-trafficking enterprise and that defendant directly aided their execution by driving designated executioner to scene, making sure executions were carried out and seeing that those responsible escaped detection. Comprehensive Drug Abuse Prevention and Control Act of 1970, § 408(e), 21 U.S.C.A. § 848(e).

### 40. Racketeer Influenced and Corrupt Organizations ☞95

Evidence was sufficient for conviction of two defendants for committing violent crimes for purpose of maintaining or increasing their position in enterprise engaged in racketeering activity; although defendants claimed that killing of one victim and wounding of potential eyewitnesses was prompted by personal grievance against victim for "messing with" one defendant's girlfriend, evidence showed that such violence was part of enterprise's policy of reacting violently to affronts against enterprise's members and thereby furthering reputation for violence essential to maintenance of enterprise's place in drug-trafficking business. 18 U.S.C.A. § 1959.

**41. Racketeer Influenced and Corrupt Organizations ⊜95**

Evidence is sufficient for conviction of committing violent crime for purpose of maintaining or increasing position in enterprise engaged in racketeering activity if jury could properly infer that defendant committed his violent crime because he knew it was expected of him by reason of his membership in enterprise or that he committed it in furtherances of that membership. 18 U.S.C.A. § 1959.

**42. Indictment and Information ⊜191(.5)**

Conspiracy to distribute controlled substances is lesser included offense of conducting continuing criminal enterprise (CCE) and, thus, defendants' convictions of conspiracy to distribute controlled substances would be vacated. Comprehensive Drug Abuse Prevention and Control Act of 1970, §§ 406, 408, 21 U.S.C.A. §§ 846, 848.

**43. Homicide ⊜358(1)**

Three defendants were not entitled to severance of penalty phase of capital murder trials; since penalty phases were required by statute to be held in front of same jury that determined guilt and guilt phase was tried jointly, same jury would have heard same evidence regardless of whether penalty phase was joint or severed, and trial court reduced potential prejudice by repeatedly instructing jury on its duty "to decide whether each individual defendant shall live or die." Comprehensive Drug Abuse Prevention and Control Act of 1970, § 408(i)(1)(A), 21 U.S.C.A. § 848(i)(1)(A).

**44. Criminal Law ⊜1144.15**

Appellate court is entitled, in absence of any directly negating evidence, to presume that jury heard, understood, and followed its instructions.

**45. Constitutional Law ⊜62(5.1)**

Any delegation of legislative functions to executive branch by Congress in allowing prosecutors to introduce nonstatutory aggravating factors in penalty phase of capital case is sufficiently circumscribed by intelligible principles to avoid violating separation of powers principles. U.S.C.A. Const. Art. 3, § 1 et seq.; Comprehensive Drug Abuse

Prevention and Control Act of 1970, § 408(h)(1)(B), (j, k), 21 U.S.C.A. § 848(h)(1)(B), (j, k).

**46. Homicide ⊜357(3)**

Aggravating factor that defendant committed offense after substantial planning and premeditation was not unconstitutionally vague in penalty phase of capital murder trial; although "substantial" may have different meanings depending upon context, in context of statutory text and district court's instructions, "substantial planning and premeditation" could only have been understood by jury to mean more than minimum amount sufficient to commit offense. Comprehensive Drug Abuse Prevention and Control Act of 1970, § 408(n)(8), 21 U.S.C.A. § 848(n)(8).

**47. Criminal Law ⊜1208.1(5)**

An aggravating factor in penalty phase of capital case is not unconstitutional if it has some common-sense core of meaning that criminal juries should be capable of understanding.

**48. Homicide ⊜358(1)**

In penalty phase of capital murder prosecution, evidence sustained finding of aggravating factor that defendant committed offense after substantial planning and premeditation, even though defendant stabbed victim in spontaneous effort to prevent victim from escaping after victim was shot by accomplice; although means of carrying out murder may have been spontaneous, evidence indicated that defendant and accomplice visited victim's apartment for preplanned and premeditated purpose of murdering him. Comprehensive Drug Abuse Prevention and Control Act of 1970, § 408(n)(8), 21 U.S.C.A. § 848(n)(8).

**49. Homicide ⊜357(3, 12)**

Aggravating factor which requires jury to determine both defendant's intention to cause victim's death and defendant's level of culpability in order to recommend death penalty is not unconstitutional on ground that it fails adequately to guide and channel sentencing discretion in imposing death sentence; by separating different levels of culpability, aggravating factor provides con-

stitutionally required, principled basis for distinguishing between those murderers thought deserving of death and those thought not to be. Comprehensive Drug Abuse Prevention and Control Act of 1970, § 408(n)(1), 21 U.S.C.A. § 848(n)(1).

**50. Homicide ⊕340(4)**

Although trial court erred in instructing jury in penalty phase of capital murder trial that it could find any or all of four levels of culpability set out in aggravating factor, error was harmless; jury obviously found highest level of culpability with regard to each murder since it determined that all four levels of culpability existed, and jury did not place extra weight on aggravating factor based on finding of all four levels of culpability, evidenced by fact that it did not recommend death sentence for each defendant for each murder even though it found all four levels of culpability existed for all murders. Comprehensive Drug Abuse Prevention and Control Act of 1970, § 408(n)(1), 21 U.S.C.A. § 848(n)(1).

**51. Attorney General ⊕6**

**Constitutional Law ⊕77**

**Criminal Law ⊕1219**

Attorney General had constitutional and statutory authority to provide by regulation that death sentences imposed for murder in furtherance of continuing criminal enterprise (CCE) would be carried out by lethal injection and, thus, district court's order staying execution of death sentence pending congressional authorization of means of execution would be vacated; Congress' power to legislate means of executing death sentence was not exclusive of power of executive branch, and Congress had not expressly or by implication preempted power of executive branch to authorize means of execution. Compre-

hensive Drug Abuse Prevention and Control Act of 1970, § 408(e), 21 U.S.C.A. § 848(e); 28 C.F.R. § 26.3.

---

**ARGUED:** Scott Lawrence Nelson, Miller, Cassidy, Larroca & Lewin, Washington, D.C., for Appellant Roane; Eric David White, Morchower, Luxton & Whaley, Richmond, Virginia, for Appellant Tipton; Craig Stover Cooley, Richmond, Virginia, for Appellant Johnson. Robert John Erickson, United States Department Of Justice, Washington, D.C., for Appellee. **ON BRIEF:** Paul F. Enzinna, Miller, Cassidy, Larroca & Lewin, Washington, D.C.; David Baugh, Richmond, Virginia, for Appellant Roane; Robert P. Geary, Richmond, Virginia, for Appellant Tipton; John F. McGarvey, Richmond, Virginia, for Appellant Johnson. Helen F. Fahey, United States Attorney, United States Department Of Justice, Washington, D.C., for Appellee.

Before WILKINSON, Chief Judge, ERVIN, Circuit Judge, and PHILLIPS, Senior Circuit Judge.

Affirmed in part, vacated and remanded in part by published opinion. Senior Judge PHILLIPS wrote the opinion, in which Chief Judge WILKINSON and Judge ERVIN joined.

## OPINION

PHILLIPS, Senior Circuit Judge:

Richard Tipton, Cory Johnson, and James Roane were tried to a jury on a 33–count indictment charging each with a number of federal crimes, including capital murder, growing out of their concerted drug-trafficking activities, principally in Richmond, Virginia during a several-year period.[1] Each was

---

1. All were jointly charged with conspiracy to possess with intent to distribute and to distribute in excess of 50 grams of cocaine base, in violation of 21 U.S.C. § 846 (Supp.1996) (Count 1), and with engaging in a continuing criminal enterprise in violation of 21 U.S.C. § 848(a) (Supp. 1996) (Count 2). In addition, they were variously charged with capital murders in furtherance of a criminal enterprise, in violation of 21 U.S.C. § 848(e) and 18 U.S.C. § 2 (1988) (Counts 3, 5, 8, 17, 18, 19, 24 and 25); commission of violent crimes in aid of racketeering activity, in violation

of 18 U.S.C. § 1959 (Supp.1996) (Counts, 4, 7, 10, 13, 14, 16, 21–23, and 27–30); use of a firearm in relation to a crime of violence or a drug-trafficking offense, in violation of 18 U.S.C. § 924(c) (Supp.1996) (Counts 6, 9, 12, 15, 20, and 26); and distribution (Count 31) and possession with intent to distribute (Counts 32–33) of cocaine base, in violation of 21 U.S.C. § 841(a)(1) (1988).

Also charged in this indictment were alleged co-conspirators Vernon Lance Thomas, Jerry

convicted on multiple charges, including capital murder; each was sentenced to death on one or more of the capital murder charges on which he was convicted and to various terms of imprisonment on other charges. Each has appealed challenging his conviction on various of the charges against him and the sentence(s) of death imposed upon him. Save for the necessity imposed by double jeopardy concerns to vacate their several convictions for drug conspiracy violations under 21 U.S.C. § 846, we find no error requiring reversal or remand among those assigned by appellants and we therefore affirm their respective convictions and sentences in all other respects.

The Government has cross-appealed the district court's order staying execution of the death sentences pending Congressional authorization of the means of execution. We vacate that order and remand for entry of appropriate orders.

## I.

Recounted in summary form and in the light most favorable to the Government, the core evidence revealed the following. Tipton, Roane, and Cory Johnson were principal "partners" in a substantial drug-trafficking conspiracy that lasted from 1989 through July of 1992. The conspiracy's operations began in Trenton, New Jersey where Johnson and Tipton, both from New York City, became members. In August of 1990, the conspiracy expanded its operations to Richmond, Virginia where Roane joined the conspiracy in November of 1991. The Trenton-based operation came to an end on June 4, 1991 when police confiscated a large quantity of crack cocaine and firearms. In late 1991, the conspiracy's operations were expanded from the Central Gardens area of Richmond to a second area in Richmond called Newtowne.

During the period of the conspiracy's operation, its "partners", including appellants, obtained wholesale quantities of powdered cocaine from suppliers in New York City, converted it by "cooking" into crack cocaine,

then packaged it, divided it among themselves, and distributed it through a network of 30–40 street level dealers, "workers." Typically, the appellants and their other partners in the conspiracy's operations took two-thirds of the proceeds realized from street-level sales of their product.

Over a short span of time in early 1992, Tipton, Cory Johnson, and Roane were variously implicated in the murders of ten persons within the Richmond area—all in relation to their drug-trafficking operation and either because their victims were suspected of treachery or other misfeasance, or because they were competitors in the drug trade, or because they had personally offended one of the "partners."

On January 4, 1992, Tipton and Roane drove Douglas Talley, an underling in disfavor for mishandling a drug transaction, to the south side of Richmond. Once there, Roane grabbed Talley from the rear while Tipton stabbed him repeatedly. The attack lasted three to five minutes and involved the infliction of eighty-four stab wounds to Talley's head, neck, and upper body that killed him.

On the evening of January 13, 1992, Tipton and Roane went to the apartment of Douglas Moody, a suspected rival in their drug-trafficking area, where Tipton shot Moody twice in the back. After Moody fled by jumping through a window, both Tipton and Roane pursued. Roane, armed with a military-style knife retrieved from an apartment where the knife was kept for co-conspirator Curtis Thorne, caught up with Moody in the front yard of the apartment where he stabbed him eighteen times, killing him.

On the night of January 14, 1992, Roane, Cory Johnson, and a third person retrieved a bag of guns that they had left at an apartment earlier that day. Roane then located Peyton Johnson, another rival drug dealer, at a tavern. Shortly after Roane left the tavern, Cory Johnson entered with another person and fatally shot Peyton Johnson with a semi-automatic weapon.

Gaiters, Sterling Hardy, and Sandra Reavis. Gaiters and Hardy pled guilty and testified for the Government at appellants' trial. Reavis, who

was tried with appellants, and Thomas, who was tried separately, both were convicted on various charges.

On January 29, 1992, Roane pulled his car around the corner of an alley, got out of the vehicle, approached Louis Johnson, whom appellant Johnson thought had threatened him while acting as bodyguard for a rival dealer, and shot him. Cory Johnson and co-conspirator Lance Thomas then got out of Roane's car and began firing at Louis Johnson. As Louis Johnson lay on the ground, either Cory Johnson or Thomas shot him twice at close range. Louis Johnson died from some or all of these gunshot wounds.

On the evening of February 1, 1992, Cory Johnson and Lance Thomas were told that Roane had gone to the apartment of Torrick Brown, with whom Roane had been having trouble. Johnson and Thomas armed themselves with semi-automatic weapons and went to the apartment where they joined appellant Roane outside. The three then knocked on Brown's door and asked his half-sister, Martha McCoy, if Brown was there. She summoned Brown to the door and Cory Johnson, Roane, and Thomas opened fire with semi-automatic weapons, killing Brown and critically wounding McCoy.

In late January, 1992, after being threatened by Cory Johnson for not paying for a supply of crack cocaine, Dorothy Armstrong went to live with her brother, Bobby Long. On February 1, Cory Johnson learned from Jerry Gaiters the location of Long's house. Thereafter, Tipton and an unidentified "young fellow" picked up Gaiters and Cory Johnson who were then driven by Tipton to a house where the group obtained a bag of guns. After dropping off the unidentified third party, the group proceeded to Long's house. Upon arriving at Long's house, Cory Johnson and Gaiters got out of the car and approached the house. While Tipton waited in the car, Cory Johnson and Gaiters went to the front door. When Long opened the door, Cory Johnson opened fire, killing both Dorothy Armstrong and one Anthony Carter. Bobby Long fled out the front door, but was fatally shot by Cory Johnson in the front yard.

In early February 1992, Cory Johnson began to suspect that Linwood Chiles was cooperating with the police. On February 19, 1992, Johnson borrowed Valerie Butler's au-

tomobile and arranged to meet with Chiles. That night, Chiles, Curtis Thorne, and sisters Priscilla and Gwen Greene met Cory Johnson and drove off together in Chiles's station wagon. Chiles parked the car in an alley, and Tipton soon drove in behind it in another car, got out, and came up alongside the stationwagon. With Tipton standing by, Cory Johnson told Chiles to place his head on the steering wheel and then shot Chiles twice at close range. Additional shots were fired, killing Thorne and critically wounding both of the Greene sisters. The autopsy report indicated that Thorne had been hit by bullets fired from two different directions.

Tipton was charged under 21 U.S.C. § 848(e) and 18 U.S.C. § 2 with capital murder for eight of these killings (Talley, Moody, Louis Johnson, Long, Carter, Armstrong, Thorne, and Chiles); Cory Johnson, with seven (Louis Johnson, Long, Carter, Armstrong, Thorne, Chiles, and Peyton Johnson); and Roane, with three, (Moody, Louis Johnson, and Peyton Johnson).

The jury convicted Tipton of six of the eight capital murders with which he was charged under § 848(e) (Talley, Armstrong, Long, Carter, Chiles, and Thorne). One of the other two § 848(e) charges was dismissed (Louis Johnson) and the other resulted in acquittal (Moody). Tipton was also convicted of conspiracy to possess cocaine base with the intent to distribute (21 U.S.C. § 846), engaging in a CCE (21 U.S.C. § 848(a)), eight counts of committing acts of violence (the eight killings charged under § 848(e)) in the aid of racketeering activity (18 U.S.C. § 1959), two counts of using a firearm in relation to a crime of violence or a drug-trafficking crime (18 U.S.C. § 924(c)), and two counts of possessing cocaine base with intent to distribute (21 U.S.C. § 841(a)(1)).

The jury convicted Cory Johnson of all seven of the capital murders with which he was charged under § 848(e) (Louis Johnson, Long, Carter, Armstrong, Thorne, Chiles, and Peyton Johnson). He was also convicted of conspiracy to possess cocaine base with the intent to distribute (21 U.S.C. § 846), engaging in a CCE (21 U.S.C. § 848(a)), eleven counts of committing acts of violence (including the seven killings charged under

§ 848(e)) in aid of racketeering activity (18 U.S.C. § 1959), five counts of using a firearm in relation to a crime of violence or drug-trafficking offense (18 U.S.C. § 924(c)), and two counts of possession of cocaine base with the intent to distribute (21 U.S.C. § 841(a)(1)).

The jury convicted Roane of all three of the capital murders with which he was charged under § 848(e) (Moody, Peyton Johnson, and Louis Johnson.) He was also convicted of conspiracy to possess cocaine base with the intent to distribute (21 U.S.C. § 846), engaging in a CCE (21 U.S.C. § 848(a)), five counts of committing acts of violence (including the three killings charged under § 848(e)) in aid of racketeering activity (18 U.S.C. § 1959), four counts of using a firearm in relation to a crime of violence or a drug-trafficking offense (18 U.S.C. § 924(c)), and one count of possession of cocaine base with the intent to distribute (21 U.S.C. § 841(a)(1)).

Following a penalty hearing on the capital murder counts, the jury recommended that Cory Johnson be sentenced to death on all of the seven § 848(e) murders of which he had been convicted; that Tipton be sentenced to death for three of the six § 848(e) murders of which he was convicted (Talley, Chiles, and Thorne); and that Roane be sentenced to death for one of the three of which he was convicted (Moody). The district court sentenced Johnson, Tipton, and Roane to death in accordance with the jury's recommendations pursuant to 21 U.S.C. § 848(*l*), and imposed various sentences of imprisonment upon each of the appellants for the several non-capital counts on which they were convicted and for those capital murder counts on which Tipton and Roane had been convicted but were not given death sentences.

On appellants' motion, the district court refused to order execution of the several death sentences on the grounds that Congress had neither directly authorized the means by which the death sentences imposed under § 848 should be carried out, nor properly delegated to the Attorney General the authority to issue the implementing regulations that were invoked by the Government. In consequence, the district court stayed execution of the death sentences it had imposed until such time as Congress had authorized the means of execution.

These appeals by Tipton, Roane, and Johnson and a cross-appeal by the Government from the district court's stays of execution of the death sentences followed.

Appellants present some sixty issues for our review. Most are presented as issues common to all; some only in behalf of particular appellants.[2] They pertain to the jury selection process, to the trial proper, and to the death penalty hearing and sentencing phases. Some warrant extended discussion; others, for various reasons, warrant no more than recognition or summary discussion. We will take first the issues jointly and separately presented by the appellants. Lastly, we will consider the Government's cross-appeal.

## II.

We first consider a number of joint challenges by all the appellants to various aspects of the jury-selection process.

## A.

The principal challenge is to the district court's having conducted portions of the jury voir dire out of the immediate presence of the appellants. Appellants jointly contend that this violated their constitutional right under the Fifth Amendment and their parallel statutory right under Rule 43, Fed. R.Crim.P., to be personally present through-

---

2. We ordered that all common issues in these consolidated appeals be presented and argued in one brief. Appellant Roane's brief served this function, presenting potentially common issues along with issues specific only to his appeal. Appellants Tipton and Cory Johnson filed separate briefs presenting some issues specific to their respective appeals and identifying those issues raised in Roane's brief which they adopted as common issues. Their identifications of com-

mon issues are not always as precise as might be, *see* Tipton Br. 11, 12; Johnson Br. 27–30, and some issues identified as "common" may be questionable as such either conceptually or as adequately preserved for review by all the appellants. We have assumed an intention to adopt wherever the intention was not clear, and have treated all adopted as common so far as was conceptually possible.

out the voir dire process. The Government contends in opposition (1) that appellants effectively waived any constitutional or statutory right they possessed to be personally present throughout the process, or (2) that if the right was not effectively waived, any ensuing error was forfeited by the appellants' failure to object either contemporaneously or by post-verdict motions, so that it is only reviewable for plain error under Rule 52(b), Fed.R.Crim.P., and that under that Rule's standard this forfeited error does not warrant appellate correction.

To address these issues of waiver, forfeiture, and plain error review, a fairly detailed account of the relevant proceedings is required. The issues arose as a result of the district court's decision to handle the jury selection process in a series of discrete steps designed to accommodate what the district court obviously saw as special difficulties posed by the size of the venire—250 prospective jurors—and by the capital murder counts. Initially, as a matter of convenience for the prospective jurors, they would be examined in two separate, roughly equal groups, with the second group not required to report until the first group had been preliminarily screened. Preliminary screening of the two groups was intended to yield a group of around 70 prospective jurors who had not been found excusable for various individual reasons or not subject to challenges for cause. From that preliminarily qualified set of venirepersons, the petit jury and alternates would then be chosen by lottery and the exercise of peremptory challenges.

The preliminary screening process of the two groups was to be carried out in what developed as three distinct steps. In the first step, general questions would be addressed by the court to the whole group of prospective jurors concerning such generally non-sensitive sources of possible disqualifying bias as knowledge of the case or of the parties, witnesses, or counsel. This would be done in open court, with the various defendants all present with their counsel. If in response to specific questions from the court prospective jurors indicated by standing that a question posed a possible problem they

would be called individually to the bench where, with counsel present, they would be further questioned on the matter by the court. In this step of the process, challenges for cause would be ruled upon or granted *sua sponte*, yielding a reduced set of prospective jurors. That set would then be further screened in a final step designed in particular to explore the sensitive subjects of death-penalty attitudes and possible racial prejudices. This step would be conducted by the judge in chambers with only counsel and individual prospective-jurors present with him. Further challenges for cause would be ruled upon or granted *sua sponte* during this final step in the screening process, which would yield the final pool of prospective jurors from which the jury would be selected.

Jury voir dire proceeded essentially in accordance with this plan. The fact that at two of its proposed steps the process apparently would be conducted out of the immediate presence of the defendants was not, so far as the record shows, raised in advance as a possible problem by the court or any counsel in the case. That there might be a problem was first suggested only after twelve prospective jurors from the first group had been individually questioned by the court at the bench following their indications of problems in response to the first general question put to the group. At that point, counsel for one of the appellants remarked simply, "I would remind [the court] that under *Rogers v. United States,* [853 F.2d 249 (4th Cir.1988)], our clients must waive presence." JA 885. In immediate response, the judge asked, "Does everybody waive presence of their clients?" *Id.* To this, defense counsel who had first raised the issue remarked, "We better take one second to be sure. This is a capital case." *Id.* The record then indicates that following a conference of unspecified duration between counsel and their respective client-defendants, counsel for each of the appellants in turn stated to the court that his client, by name, waived. *Id.* The process then resumed according to plan with further questioning at the bench of those prospective jurors whose responses to general questions required further inquiry. During that phase of the process, a significant number of prospective jurors were excused for cause, ei-

ther in response to challenges by counsel or by the court *sua sponte.*

When this step had been completed and just as in-chambers individual questioning of the remaining unexcused members of the group was about to commence, the courtroom clerk inquired, apparently of defense counsel, "if the defendants can go back to the lock-up or do you want them in the courtroom ... to be available to talk to them if you want?" Roane's counsel responded, "Just send them back ....," and Johnson's counsel added, "They have waived." Though the record is not clear on the point, it would appear that the defendants were not actually taken from the courtroom at that time, but only later after the in-chambers process had been underway for some time. *See* JA 1101.

During that in-chambers process, the district court concentrated in its questioning, as had been indicated to counsel, on death-penalty attitudes and possible racial or other bias, and routinely allowed Government and defense counsel to pursue limited further examination on those subjects. As a result of that examination, a number of prospective jurors were excused either upon challenge by counsel or by the judge *sua sponte* because of intimations either of disqualifying death-penalty attitudes (running both ways) or possible racial biases.

Although the second group of prospective jurors was brought in and briefly examined in a general voir dire before in-chambers examination of members of the first group had been completed, a sufficient pool of prospective jurors was obtained from the first group to allow the jury to be selected entirely from that pool. This was done, as planned, by the exercise of peremptory challenges to persons successively called to the jury box by lottery. This final step in the process was carried out in open court, with all appellants present and able to consult with counsel. A total of 52 peremptory challenges were allotted to the then four defendants for exercise with respect to the regular jurors and an additional two with respect to four alternates.

The upshot, for purposes of the denial-of-presence issue, is that appellants were personally and immediately present during some but not all portions of the overall voir dire process as it involved those prospective jurors from whom the regular and alternate jurors ultimately were selected. Specifically, they were personally and immediately present while the district court was addressing to the whole group general questions respecting possible sources of bias from relationships or knowledge of the case, and during the final jury selection process involving the exercise of peremptory challenges. They were not immediately present, though in the courtroom, during any of the judge's examination of prospective jurors at the bench in the presence of their counsel. And they were not present during any of the in-chambers examination of individual prospective jurors.

[1, 2] The Confrontation Clause of the Sixth Amendment and the Due Process Clause of the Fifth Amendment together guarantee the right of federal defendants charged with felonies to be present at all critical stages of their trials. *Illinois v. Allen,* 397 U.S. 337, 338, 90 S.Ct. 1057, 1058, 25 L.Ed.2d 353 (1970) (Sixth Amendment); *Snyder v. Massachusetts,* 291 U.S. 97, 106–08, 54 S.Ct. 330, 332–33, 78 L.Ed. 674 (1934) (Fifth Amendment). Rule 43(a), Fed. R.Crim.P., deriving from these constitutional guarantees and the even broader common law privilege, *see United States v. Gregorio,* 497 F.2d 1253, 1257–59 (4th Cir.1974), confers a comparable right to "be present ... at every stage of the trial." Included is the right to be present at the voir dire and "impaneling of jurors." *Snyder,* 291 U.S. at 106, 54 S.Ct. at 332 (dictum); Rule 43(a) (as quoted).

The Government does not contend that the appellants' constitutional and rule-based right did not extend to the specific portions of the voir dire from which they were absent. Instead, as indicated, the Government contends only that any such right as existed was effectively waived by defense counsels' several in-court announcements of waiver following consultations with their respective clients or that, if it was not waived, any ensuing error, having been forfeited, does not warrant appellate correction as "plain error" under Fed.R.Crim.P. 52(b). Responding to the Government's claim of waiver, appellants

jointly have raised two difficult issues: first, whether under Fourth Circuit precedent the right of presence may ever and by any means be waived in capital cases;[3] second, whether—if waiver is possible in such cases—it may only be effected by a formal in-court proceeding not provided in this case.[4]

Because we conclude that even if for either reason no effective waiver occurred here, any ensuing error, having been procedurally forfeited, does not warrant correction as plain error, we reserve decision on the difficult waiver issues and proceed to the discussion of the plain error basis for our decision.

*United States v. Olano*, 507 U.S. 725, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993), guides us here, both as to the relationship between waiver of rights and forfeiture of errors at trial, and as to the proper application of Rule 52(b)'s "plain error" limitation on appellate correction (noticing) of forfeited errors.

[3] Where a protected trial right has been effectively waived by a defendant, as the Government claims occurred here, all possibility of error respecting that right has been extinguished. *Id.* at 733, 113 S.Ct. at 1777. But even where a right has not been waived, any entitlement to have error in its denial or abridgement corrected on appellate review may be forfeited by the "failure to make timely assertion of [the] right" at trial. *Id.* Such a forfeiture, does not, as does waiver, extinguish the error, *id.*, but it does impose stringent limitations, embodied in Rule 52(b), on the power of appellate courts to correct the error. *Olano* has now instructed, clarifying the matter, that under Rule 52(b) a court of appeals "has authority" to correct forfeited error only if it is "plain" and "affects substantial rights," and even then is "not required to do so" unless the error is one that "causes the conviction or sentencing of an actually innocent defendant" or otherwise "seriously affect[s] the fairness, integri-

---

3. The difficulty on this issue is created by this circuit's 1963 decision in *Near v. Cunningham*, 313 F.2d 929 (4th Cir.1963), a capital case in which it was held that the right to presence in such a case is "[s]o fundamental ... that it may not be waived." *Id.* at 931 (principally relying on *Hopt v. Utah*, 110 U.S. 574, 578, 4 S.Ct. 202, 204, 28 L.Ed. 262 (1884)). *Near* (which was not brought to the district court's attention) has never been expressly overruled on this point either by this court or by the Supreme Court. Whether it has been implicitly overruled is unsettled. At least one circuit has flatly held that intervening Supreme Court decisions have established that waiver is possible in such cases. *See Campbell v. Wood*, 18 F.3d 662, 671–72 (9th Cir.1994) (concluding that *Snyder*, 291 U.S. at 106, 117, 54 S.Ct. at 332, 336, and *Allen*, 397 U.S. at 342, 90 S.Ct. at 1060, by rejecting as "mere dicta" earlier statements of non-waivability in, *e.g., Hopt* and *Lewis v. United States*, 146 U.S. 370, 13 S.Ct. 136, 36 L.Ed. 1011 (1892), have rejected any such rule). A leading commentator also believes it "highly doubtful" in light of these decisions that "there is [now] such a limitation on waiver." 3A Charles A. Wright, *Federal Practice & Procedure* § 723, at 18 (2d ed.1982). On the other hand, another circuit is not that sure on the point. *See Proffitt v. Wainwright*, 706 F.2d 311, 312 (11th Cir.1983) (on rehearing) (noting that earlier non-waivability holdings of the Supreme Court have not been expressly overruled, and reserving decision on the issue). And, expressing similar uncertainty, the drafters of amended Rule 43 consider that so far as the rule is concerned, the question of waiver in capital cases remains

open "for further clarification by the courts." Fed.R.Crim.P. 43 advisory committee's note to 1974 amendment.

4. The difficulty of this issue involves uncertainty as to how, if waiver is at all possible in capital cases, it may be effected. It is now settled that without any formal proceeding, waiver of the right to presence may be implied from a defendant's sufficiently disruptive conduct during trial, *see Allen*, 397 U.S. at 342, 90 S.Ct. at 1060 (removal by court permissible); or from his voluntarily absenting himself from a trial at whose commencement he was present, *see Taylor v. United States*, 414 U.S. 17, 94 S.Ct. 194, 38 L.Ed.2d 174 (1973) (per curiam), or from a stage of trial of whose nature he was aware, *see United States v. Gagnon*, 470 U.S. 522, 105 S.Ct. 1482, 84 L.Ed.2d 486 (1985) (per curiam). But, the question whether non-disruptive defendants in custody such as appellants here may waive the right to presence by any means other than an express waiver following a formal on-the-record proceeding arguably remains open. Appellants, relying on *Johnson v. Zerbst*, 304 U.S. 458, 464, 58 S.Ct. 1019, 1023, 82 L.Ed. 1461 (1938) (proceeding required to insure "intentional relinquishment or abandonment of a known right"), contend that a formal in-court proceeding is required in such circumstances and was not provided here; the Government, that waiver may and should be implied here, as in *Taylor* and *Gagnon*, from a defendant's voluntary conduct, including his presumed acquiescence through failure to object contemporaneously to the conduct of proceedings in his absence.

ty or public reputation of judicial proceedings." *Id.* at 734–36, 113 S.Ct. at 1777–79.

Here, where we have assumed for purposes of this case that there was not an effective waiver of the right at issue, there indisputably was, however, a forfeiture of entitlement to appellate correction of any ensuing error in denying or abridging the right. Not only was there no contemporaneous or post-verdict challenge to conducting portions of the jury voir dire outside the immediate presence of the appellants, counsel for each appellant specifically invited the procedure.

Proceeding then to the *Olano* analysis respecting forfeited error, we further assume, without deciding, that error did occur in the form of a "deviation" from the constitutionally-grounded legal rule that presence was required throughout the proceedings at issue.[5] *See id.* at 732–33, 113 S.Ct. at 1776–77. And, we also assume—as the Government seems to concede—that any such error as occurred was "plain," in the sense that it is clear on the record that the challenged proceedings were held outside the immediate presence of appellants.

This brings us to the question whether the "plain error," whose occurrence we assume *arguendo*, affected any "substantial rights" of the appellants. *Olano* has now instructed that this may ordinarily (and perhaps only) be established by a defendant's specific showing—the burden being upon him—that the error caused him actual prejudice by affecting the trial outcome. *Id.* at 734, 113 S.Ct. at 1777–78. But *Olano* also noted—without deciding—that aside from this most obvious means, there might be forms of forfeited error that, for Rule 52(b) purposes, "affect substantial rights independent of any prejudicial impact," and still other forms from which prejudice should be presumed where the defendant could not make a specific showing. *Id.* at 734–35, 113 S.Ct. at 1777–78.

As did the *Olano* Court, we must address all three possibilities, assuming *arguendo* the existence of the latter two forms of correctable forfeited errors as to which actual prejudice either need not or cannot be proved. *See id.* at 737–41, 113 S.Ct. at 1779–82.

[4] We first consider whether the assumed error here—conducting some phases of the jury voir dire out of the appellants' immediate presence—is one which could be found to "affect substantial rights independent of any prejudicial impact." We can reserve, as did the *Olano* court, the question whether any such category of forfeited plain error does in fact exist. If it does, it seemingly could only involve violations of absolute rights entitled for overarching systemic reasons to absolute enforcement without regard to any demonstrable (or presumed) prejudicial impact on the defendant. *See Arizona v. Fulminante,* 499 U.S. 279, 309–10, 111 S.Ct. 1246, 1264–65, 113 L.Ed.2d 302 (1991) (defining category of constitutional errors that may not be found harmless because, without regard to actual prejudice, they deprive defendants of "basic protections" of fundamentally fair trial). The constitutional and Rule-based right to presence at all critical stages of trial, though obviously important, is not such an absolute, systemic right. That it is not absolute is of course settled by those Supreme Court decisions, most notably *Snyder* and *Allen,* upholding the power of courts in certain circumstances to conduct trials (or portions) in absentia. *See also Rushen v. Spain,* 464 U.S. 114, 117–18, 104 S.Ct. 453, 454–55, 78 L.Ed.2d 267 (1983) (per curiam) (though right to personal presence is "fundamental," errors in conducting proceedings out of presence of defendant may be found harmless). To the extent the right is based, as is that claimed here, upon the Due Process Clause (and Rule 43's codification), it exists only "to the extent that a fair and just hearing would be thwarted by [the defendant's] absence," or, put otherwise, it is limited to "those circumstances where a defendant's presence

---

5. As indicated in earlier text, the Government relies only on its alternative claims of waiver and forfeiture, and has not contended that the general right of presence during jury voir dire does not necessarily extend to immediate physical presence during all its phases, and did not extend

under the circumstances of this case to the specific phases here in issue. Because no such contention is advanced, we do not address it, and proceed on the stated assumption for purposes of this case.

has a relation, reasonably substantial, to the fullness of his opportunity to defend himself." *Snyder,* 291 U.S. at 105–08, 54 S.Ct. at 332–33. The right is thus by definition limited to those circumstances in which absence has a "prejudicial impact" on a defendant's opportunity effectively to assist in his defense. The courts accordingly have so interpreted it, not as one to be enforced "independent of any prejudicial impact" from a defendant's absence but as one actually dependent upon the existence of such an impact. *See, e.g., United States v. Boone,* 759 F.2d 345 (4th Cir.1985) (absence from in-chambers conference between judge and counsel respecting dismissal of juror did not, under the circumstances, frustrate trial's fairness); *United States v. Fontenot,* 14 F.3d 1364 (9th Cir. 1994) (absence from peremptory challenge conference between judge and counsel not, under the circumstances, prejudicial); *cf. Olano,* 507 U.S. at 738–39, 113 S.Ct. at 1779 (comparable analysis employed in finding violation of Criminal Rule 24(c) not an "error affecting substantial rights independent of any prejudicial impact").

Accordingly, we conclude that if there be a category of plain errors affecting substantial rights "independent of any prejudicial impact," absence from portions of a jury voir dire is not among them.

[5] We next consider whether, assuming there is a category of plain errors as to which prejudice should be presumed, the assumed error here falls in that category. We conclude that it does not.

There may be circumstances of involuntary absence from jury voir dire where prejudice should be presumed, but we think they could only involve absences throughout the entire process. *See United States v. Crutcher,* 405 F.2d 239, 244 (2d Cir.1968) (complete absence never harmless error). Such an absence almost assuredly deprives a defendant of any effective means of giving informed advice or suggestions to his counsel respecting the ultimate decisions to challenge prospective ju-

rors for cause or peremptorily. But not every absence of whatever nature and duration and during whatever phase of the voir dire necessarily has that effect. Some phases obviously are more critical than others. The potential prejudice from some absences may be relieved by other circumstances. It all depends. Where absence has not been total but only intermittent during the process the courts accordingly have not presumed prejudice but have analyzed the circumstances to determine whether prejudice has been specifically established. *See, e.g., United States v. Bascaro,* 742 F.2d 1335, 1349–50 (11th Cir.1984) (although peremptory strike phase of voir dire is critical, no prejudice to defendants where attorneys conferred about peremptories outside their presence, but defendants were present both while questioning took place and when strikes actually entered); *United States v. Alessandrello,* 637 F.2d 131, 137–141 (3d Cir.1980) (absence of defendants from in-chambers questioning of venirepersons respecting pre-trial publicity not prejudicial in view of their presence at substantial part of voir dire and their counsels' presence during in-chambers proceedings).

The absences here plainly were of the intermittent sort, not approaching the total denial of any effective participation in critical phases of the voir dire that might warrant a presumption of prejudice.[6] Accordingly if prejudice is to be found here, it must be by specific showing. *Cf. Olano,* 507 U.S. at 740–41, 113 S.Ct. at 1781–82 (comparable analysis employed to hold no presumption of prejudice from violation of Criminal Rule 24(c)).

[6] Relegated to this means of showing error that "affected substantial rights," appellants' burden is to persuade us of actual prejudice, *i.e.,* that their absences "affected the outcome of the [trial]," or "probably influenced the verdict[s]" against them either on the guilt or sentencing phases. *Olano,* 507 U.S. at 734–35, 113 S.Ct. at 1777–78. We

---

6. In their jointly adopted argument on the denial-of-presence issue, appellants suggest that this case *does* involve a "complete exclusion of [the appellants] from the entirety of the voir dire," so that prejudice should be presumed. Roane Br.

29, 30. As we have pointed out, the record flatly belies this as an accurate statement of the extent of appellants' physical absences from the voir dire process.

conclude that they have not carried that heavy burden.

Just how one shows that his absence during portions of a jury selection process actually "affected the outcome of [trial]," or "probably influenced the verdict" against him has apparently never been definitively explored. Literally applied, the standard would seem to require a showing in the end that a defendant's absence resulted in selection of a jury that probably reached a verdict different from that which would have been reached by a jury selected with benefit of his presence at the times of his absence. If that be the ultimate burden, it is a stringent one indeed—near if not beyond the limits of practical possibility given the variables in the process and evidentiary restrictions. *See* Fed.R.Evid. 606(b). If we start analysis from the other end, it is obvious that at a very minimum a defendant must show that had he been present a *somehow* different jury would have been selected. The due process-based right to presence is not violated, hence could not be the source of prejudice, unless one's presence demonstrably would have made *some* difference. *See Snyder*, 291 U.S. at 106, 107, 54 S.Ct. at 332, 333 (no violation, hence no prejudice possible, "when presence would be useless, or the benefit but a shadow"). But, just as surely, showing only that *some* difference would have resulted could not suffice to show actual prejudice. If no more is shown, for example, than that jurors 1, 3, and 5 would have been excluded, this could not suffice to show that their presence caused the finally unfavorable "outcome." Something more, for example, that jurors 1, 3, and 5 in the above hypothetical were demonstrably biased, surely must be shown, and even that might not, under all the circumstances, suffice.

Fortunately, we need not in this case seek to decide just what showing between these extremes is required. Appellants, relying primarily on their argument of presumed

prejudice, offer nothing on actual prejudice beyond the conclusory assertion that "[e]ven if defendants were required to demonstrate prejudice, that prejudice was patent in this case." Roane Br. 30. This obviously could not suffice to show specific prejudice.[7]

Accordingly, we conclude that appellants have not carried their burden to show actual prejudice resulting from their absences during portions of the jury voir dire.

Having earlier held that their absences could not constitute error "affecting substantial rights independent of prejudicial impact," nor "presumed error affecting substantial rights," we need not consider whether, even if prejudicial, the assumed error so "seriously affect[ed] the fairness, integrity or public reputation of judicial proceedings" that correction was warranted. *Olano*, 507 U.S. at 741, 113 S.Ct. at 1781. Because appellants have not shown that their absence from portions of the jury voir dire "affected substantial rights," we conclude that any error involved, having been forfeited, does not warrant correction.

B.

We next consider appellants' claim that the district court erred in refusing to permit defense counsel to conduct adequate voir dire and in failing itself to conduct adequate voir dire regarding possible racial bias and attitudes respecting aggravating and mitigating factors if the capital sentencing phase were reached.

1.

[7] Appellants moved pre-trial, with supporting affidavits, that defense counsel be permitted detailed participation in jury voir dire questioning on possible racial biases, pointing to the fact that each of the appellants was black and to the pervasiveness in society of racial prejudice. The court denied

---

7. Appellants' brief seeks to offer more specific support for this conclusive assertion by referring to an affidavit of Appellant Roane appended to their motion for supplementation of the record or remand. *See supra* note 6. Although in denying that motion we refused to treat the affidavit as properly before us, we observe that it asserted no more than that had Roane been present, he

would have insisted on excluding three identified jurors by peremptory challenges. As indicated in text, even if this were accepted as fact, it would not suffice as a showing of actual prejudice. Nor would the stated bases for his challenges—relationships to law enforcement officers and to the victim of a rape-murder—suffice without more to tip the balance.

the motion but invited defense counsel to submit proposed questions pursuant to Fed. R.Crim.P. 24(a). Counsel submitted 62 such questions on such matters as beliefs in the trustworthiness and criminal propensities of black persons, whether the prospective jurors lived in racially separated neighborhoods or attended racially separated churches, and the like. The district court declined to incorporate these questions in its own in-chambers questioning of individual prospective jurors, and put only a single question respecting their possible racial bias: "Do you harbor any bias or prejudice, racial or otherwise, that would prevent you from being fair to the defendants in this case?" See, e.g., JA 1009. The court then permitted limited follow-up inquiry by counsel depending upon responses made to his general question. JA 1061.

Appellants contend that this was insufficient to provide reasonable assurance that if bias did exist, it would be uncovered, as they say was their right. And, they argue that in this case its insufficiency was exacerbated by the fact that the district judge was himself a black person, thereby making the concealment of racial bias more than ordinarily a risk.

We disagree and find no error in the district court's decision (1) not to allow detailed questioning of the type proposed by appellants, whether done by himself or defense counsel; and (2) to limit the questioning on this subject to the general question he put.

No question is raised of entitlement to *some* inquiry into possible racial bias— whether under the Constitution, see *Ristaino v. Ross,* 424 U.S. 589, 597, 96 S.Ct. 1017, 1021, 47 L.Ed.2d 258 (1976) (constitutionally compelled where racial issues "inextricably bound up with the conduct of the trial") or under the Supreme Court's broader supervisory rule for federal courts, see *Rosales-Lopez v. United States,* 451 U.S. 182, 191, 101 S.Ct. 1629, 1636, 68 L.Ed.2d 22 (1981) (compelled where "circumstances ... indicate ... reasonable possibility that racial ... prejudice might have influenced the jury"). Inquiry was made here; the challenge is only to its confinement to the single question put by

the trial judge, with opportunity only for limited followup questioning by counsel.

[8] Once the decision has been made to conduct any inquiry into this sensitive matter, the exact nature and scope of that inquiry is committed to the broad discretion of the district court, and is subject to review only for abuse. *Rosales-Lopez,* 451 U.S. at 189, 101 S.Ct. at 1634-35; *Ham v. South Carolina,* 409 U.S. 524, 527, 93 S.Ct. 848, 850-51, 35 L.Ed.2d 46 (1973); see also Fed.R.Crim.P. 24(a) (discretion extends to party participation in voir dire). Powerful conflicting considerations inform that discretion. On the one hand, there must be the concern to root out a form of bias that prospective jurors may be particularly reluctant to reveal. *See, e.g., United States v. Lewin,* 467 F.2d 1132, 1137 (7th Cir.1972). On the other hand, there has to be an equally weighty concern where race is not directly in issue not to overemphasize in jurors' minds the facts and possible relevance of the racial identities of litigants or witnesses. *See Ristaino,* 424 U.S. at 596 n. 8, 96 S.Ct. at 1021 n. 8 (danger of creating impression that justice in the courts turns on race or ethnicity); *United States v. Barber,* 80 F.3d 964, 967, 968 (4th Cir.1996) (en banc) (danger of "divert[ing] the trial's focus from the guilt or innocence of the defendant to peripheral factors, such as the defendant's race ...").

Undoubtedly taking these considerations into account, the Supreme Court has indicated that even where inquiry is constitutionally required because of inextricably involved racial issues, questioning may properly be confined to the sort of single, general question put to jurors here. *Ham,* 409 U.S. at 525 n. 2, 527, 93 S.Ct. at 849 n. 2, 850-51 (question "Would you fairly try this case on the basis of the evidence and disregarding the defendant's race," held "sufficient to focus the attention of prospective jurors on any racial prejudice they might entertain").

In this case, given the critical circumstances that race was not itself an issue and that none of the offenses charged was interracial in nature, we cannot find abuse of discretion in the district court's decision to confine questioning on racial bias to the general question the court put with opportunity

provided for follow-up questioning by counsel.[8]

2.

[9] Appellants tendered a set of proposed questions respecting prospective jurors' attitudes about various possibly mitigating factors as they might influence jurors' consideration of the penalty phase. They included inquiries into the prospective jurors' willingness to consider factors such as a defendant's "deprived, poor background," "emotional, physical abuse," "young age," "limited intelligence," and "brain disfunction." The district court declined to incorporate these in its own questioning, and when counsel for appellants attempted to ask these or similar questions, refused to allow them. Appellants claim that this violated their constitutional and rule-based right to a voir dire adequate to assure an impartial jury on the critical capital sentencing issue. We disagree.

[10, 11] It is important in assessing this claim to identify the voir dire right at issue. In general terms it is the right, grounded in the Sixth Amendment, to a voir dire adequate to assure a defendant a jury, all of whose members are "able impartially to follow the court's instructions and evaluate the evidence," *Rosales–Lopez*, 451 U.S. at 188, 101 S.Ct. at 1634, here instructions and evidence relevant to imposition of the death penalty. More specifically it is the right to an inquiry sufficient to ensure—within the limits of reason and practicality—a jury none of whose members would "unwaveringly impose death after a finding of guilt" and hence would uniformly reject any and all evidence of mitigating factors, no matter how instructed on the law. *Morgan v. Illinois*, 504 U.S. 719, 733–34, 112 S.Ct. 2222, 2232–33, 119 L.Ed.2d 492 (1992) (right to such an inquiry established).

Just how an inquiry adequate for this specific purpose should be conducted is committed to the discretion of the district courts. The Constitution no more "dictate[s] a catechism" for its conduct than it does for any other subject of required voir dire inquiry. *Id.* at 729, 112 S.Ct. at 2229–30; *Rosales–Lopez*, 451 U.S. at 189, 101 S.Ct. at 1634–35; *Aldridge v. United States*, 283 U.S. 308, 310, 51 S.Ct. 470, 471, 75 L.Ed. 1054 (1931). Obviously, the most direct way to get at the possibility that a prospective juror would *always* impose death following conviction is to put that very "reverse-*Witherspoon*" question directly to him and take it from there. *Morgan*, 504 U.S. at 724 n. 3, 112 S.Ct. at 2227 n. 3. But, just as obviously, that cannot be the "only means of ensuring ... an impartial jury" on the life-or-death issue. *Id.*

Here, by way of getting at that possible disqualifying bias, the district court first explained to each juror that if guilt of a capital offense was found in a first stage of the trial, the jury would then consider whether to impose the death penalty in a second stage at which the Government would try to convince the jury that aggravating factors warranted death while the defense would try to convince the jury that because of mitigation, death was not appropriate, and that this was then to be decided by the jurors on the basis of that evidence and the court's instructions on the law. *See, e.g.*, JA 1170–72 (juror Catlett). Against this background, the court then asked each prospective juror: "[D]o you have strong feelings in favor of the death penalty?" *See, e.g.*, JA 1172 (juror Catlett). If the juror answered with an unqualified "No," the court moved on. *E.g.*, JA 1172 (juror Catlett). If, however, the prospective juror gave any answer other than an unqualified "No" the court then asked directly whether "you would always vote to impose the death penalty in every case where a defendant is found guilty of a capital offense." *See, e.g.*, JA 1205 (juror Coleman).[9] By this course of

8. We reject appellants' apparent contention that the district judge's decision to confine questioning to himself, as Fed.R.Crim.P. 24(a) specifically authorizes, constituted in this case an abuse of discretion because the judge was a black person. Aside from the shakiness of the reason advanced by appellants—that prospective jurors would be significantly more inhibited by questions put by

the judge himself than by questions put by others in his immediate presence—the adoption of such a per se rule would be unthinkable as a matter of policy.

9. Of the twelve regular jurors who sat on the case five responded unequivocally "No" to the question whether they had strong feelings in fa-

inquiry the district court obviously considered that the question, "Do you have strong feelings in favor of the death penalty?" was sufficient for the purpose if it received an immediate and unqualified "No" in response. Presumably, the thought was that except where the response was hesitant or equivocal, a direct "reverse-*Witherspoon*" question, such as "Does this mean that you would not always vote to impose death following conviction?" would be at least an unnecessary redundancy and possibly an imprudent risk of encouraging an opposite partiality. That only if "strong feelings in favor" were revealed need there be further inquiry into just *how* strong; that a person not strongly in favor of the death penalty necessarily is not one who feels so strongly that he will always impose the death penalty no matter what the circumstances. *Cf. Lockhart v. McCree*, 476 U.S. 162, 170 n. 7, 106 S.Ct. 1758, 1763 n.7, 90 L.Ed.2d 137 (1986). ("State may challenge for cause prospective jurors whose opposition to the death penalty is so strong that it would prevent [their impartiality].") We cannot say that such a view of the matter is so implausible as to make the inquiry inadequate as a matter of law. An inquiry which more explicitly embodies the "reverse-*Witherspoon*" question might give greater assurance—might in some cases be more prudent—but that is not the question for us. Under all the circumstances—the question's logical adequacy to address the ultimate issue of death-penalty impartiality, the context in which it was put, the court's repeated admonitions that under the law consideration of mitigating factors would be required—we could not find constitutional abuse in the court's confinement of its "life-qualifying" inquiry in this way.

We are bolstered in this conclusion by the fact that in this case appellants never requested that a further specific "reverse-*Witherspoon*" question be put to those prospective jurors who already had responded

unequivocally that they had no strong feelings in favor of the death penalty. The right to any inquiry on this subject is dependent upon request, *Morgan*, 504 U.S. at 736, 112 S.Ct. at 2233, and though appellants requested detailed questioning about specific mitigating factors, they neither requested that a specific "reverse-*Witherspoon*" question be put to any prospective juror nor objected contemporaneously to the district court's mode of inquiry as to basic death penalty attitudes.

From what has been said, it follows that the district court's refusal to question or allow detailed questioning about specific mitigating factors did not constitute an abuse of discretion. The undoubted fact that such detailed questioning might have been somehow helpful to appellants in exercising peremptory challenges does not suffice to show abuse of the district court's broad discretion in conducting the requisite inquiry. *See Mu'Min v. Virginia*, 500 U.S. 415, 424–25, 111 S.Ct. 1899, 1904–05, 114 L.Ed.2d 493 (1991). Because we conclude that the district court's inquiry into death penalty attitudes was sufficient to cull out any prospective juror who would *always* vote for the death penalty whatever the circumstances, we cannot find error in the court's refusal to conduct or allow further detailed inquiry about specific mitigating factors.

### C.

Appellants jointly contend that three prospective jurors, Beazley, Ellis, and Gainsburg, were erroneously removed for cause by the district court in violation of appellants' rights under *Witherspoon v. Illinois*, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968), and its progeny. We disagree.

[12, 13] The Sixth Amendment's guarantee of an impartial jury is violated by the exclusion of a prospective juror simply be-

---

vor of the death penalty and were not questioned further on that subject by the court. JA 1496 (juror Hodson); JA 1483 (juror Hayes); JA 1465 (juror Harrison); JA 1172 (juror Catlett); JA 1470 (juror Harvey).

The remaining seven, each of whom answered the "strong feelings in favor" question other than by an unequivocal "No," were then asked the

specific "reverse-*Witherspoon*" question by the court, and each answered it, after further questioning, in the negative. JA 1372 (juror Faircloth); JA 1349 (juror Eike); JA 1431 (juror Griffiths); JA 1436 (juror Guthrie); JA 1205 (juror Coleman); JA 1216 (juror Cooke); JA 1361 (juror Jackson).

cause he expresses some reservations about imposing the death penalty in any case. *Id.* at 520–23, 88 S.Ct. at 1776–78. It is not violated, however, by the exclusion of a juror whose expressed reservations are such as to make him "irrevocably committed to ... vote against the death penalty regardless of the facts and circumstances" of a case, *id.* at 522 n. 21, 88 S.Ct. at 1777 n. 21, or, short of that, such as to "prevent or substantially impair the performance of his duties as a juror in accordance with his instruction and his oath." *Wainwright v. Witt,* 469 U.S. 412, 424, 105 S.Ct. 844, 852, 83 L.Ed.2d 841 (1985) (quoting *Adams v. Texas,* 448 U.S. 38, 45, 100 S.Ct. 2521, 2526, 65 L.Ed.2d 581 (1980)). Whether such reservations as are expressed cross the line into "irrevocable commitment" or "substantial impairment" is perforce committed in the first instance to trial court discretion based upon the voir dire inquiry. Because what is being inquired into is a state of mind whose determination turns largely on assessments of demeanor and credibility, matters peculiarly within the province of trial judges, our review of those determinations is appropriately most deferential. *Witt,* 469 U.S. at 428, 105 S.Ct. at 854; *Keeten v. Garrison,* 742 F.2d 129, 135 (4th Cir.1984); *Briley v. Bass,* 750 F.2d 1238, 1246 (4th Cir.1984).

[14] Here, we can find no abuse of discretion or error of law in the district court's exclusion of these three prospective jurors. Following the initial expression by each of some degree of reservation, each was extensively questioned further by the court and by opposing counsel. Each responded to some extent ambiguously as to the depth and likely consequence of his or her reservation. In the end, however, each expressed reservations, never retracted, sufficient to warrant the district court's determination that they would substantially impair the juror's performance of duty to vote for the death penalty if the evidence and law so dictated.

Prospective juror Ellis, asked at the outset by the court whether on the basis of the evidence and the court's instructions she

could "make an objective, reasoned and fair decision about imposing the death penalty" responded "I don't know," and to the court's follow-up question, "What gives you pause?" responded "I'm not sure at this time if I could give the death penalty." Later, in response to the prosecution's question whether her personal opinion could "substantially impair [her] service as a juror," she answered "I would hope not," and to a reiterated, "But could it?" responded, "It might." Still later, in response to defense counsel's question whether she could imagine cases "where she could contemplate imposing the death penalty" she stated that "there are some cases where I could," and to a follow-up question whether in such cases her "personal feeling would get in the way" answered "No." JA 1351–57. This simply left the court with facially ambiguous and arguably contradictory indications of the depth of her reservations. In those circumstances we have felt obliged to "rely on the trial court's discretion in determining which responses best manifested the juror's true opinions." *Briley,* 750 F.2d at 1246.[10] We so conclude as to the court's removal of prospective juror Ellis.

The same analysis applies to the Court's removal for cause of the other two prospective jurors. Prospective juror Beazley first responded to the court's question whether he would be able to impose the death penalty "disregarding any views that you might have as to what the law is or ought to be" by saying, "I doubt it," and explained, "If I get on the jury and I have to give a death sentence, I don't think I could live with it ... I really don't." Under probing by defense counsel he later said "yes" to questions whether he could "imagine" a crime sufficiently severe that he would impose the death penalty, and whether the multiple murders charged in this case would "in your estimation justify it." But when in conclusion he was asked "what about a cold-blooded murder for profit?" his final response on the subject was, "I feel yes, but like I say, I'm just a nervous person. If I could live with it after I done it, I just wonder." JA 1063–65.

10. Significantly, the court, taking account of the fact that the most directly contradictory expressions came in response to opposing counsels' understandably weighted questions, remarked:

"She gave a right answer to [the prosecutor] when he asked it, she gave a right answer for [defense counsel] when he asked it. She gave the wrong answer to me."

We cannot quarrel with the district court's obvious determination that the first and last expressions by this venireman "best manifested the juror's true opinion." *Briley*, 750 F.2d at 1246.

So also, with respect to prospective juror Gainsburg. After indicating some reservations about imposing the death penalty in any but "a very limited number of situations," he responded to the court's question whether in this case he could make "a fair, reasoned, objective determination" whether to impose the penalty by saying, "I would like to say yes. But I really suspect that my prejudices might to some extent affect my decision." Though later, under questioning by defense counsel, he stated that he "absolutely would consider it," he immediately qualified this by saying, "But I honestly believe that my decision would be based on my own biases and prejudices." And, when the court then asked if by this response he was saying that he didn't believe he could follow the court's instructions if they were "not in sync" with his biases and prejudices, he responded, "I suspect that's what I'm telling you." JA 1401–05. The court did not err in excluding venireman Gainsburg based on the course of inquiry.

### D.

[15] Appellants' final joint challenge to the jury selection process is that in exercising its peremptory strikes the prosecution impermissibly struck a disproportionate number of women, thereby violating appellants' constitutional right as recognized in *J.E.B. v. Alabama ex rel. T.B.*, 511 U.S. 127, —, 114 S.Ct. 1419, 1430, 128 L.Ed.2d 89 (1994) (equal protection under Fourteenth Amendment); *see United States v. Lane*, 866 F.2d 103, 104 n. 1 (4th Cir.1989) (Fifth Amendment provides comparable rights in federal prosecutions).

Appellants did not contemporaneously object on this basis to the prosecution's exercise of peremptory challenges, and the Government contends that this forecloses them on the issue in this court. Ordinarily it would, see *Clark v. Newport News Shipbuilding & Dry Dock*, 937 F.2d 934, 939–40 (4th Cir.1991), but appellants point out that *J.E.B.* was only decided after completion of the trial in this case and that at that time the rule in this circuit was that *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986) (race-based peremptory challenges prohibited), did not extend to gender-based challenges, see *United States v. Hamilton*, 850 F.2d 1038, 1041–42 (4th Cir.1988), so that their failure to object contemporaneously must be excused. To this, the Government responds that the failure is not excused, notwithstanding *Hamilton*, because at the time of trial, there was a direct conflict on the issue within the circuits and among the state courts, see, *J.E.B.*, 511 U.S. at — n. 1, 114 S.Ct. at 1422 n. 1, so that appellants were obliged under Fed.R.Crim.P. 51 to object in order to preserve the claim.

Without accepting the Government's position on procedural default, we nevertheless conclude that the bare showing of gender discrimination first attempted on this direct appeal does not suffice either to allow first instance consideration by this court (as appellants concede), nor to warrant a remand for first instance consideration by the district court.[11]

### III.

We next address a number of challenges, some joint, some separate, to various trial court rulings at the guilt phase of the trial.

### A.

Based on an underlying contention that the evidence on the conspiracy count tended to prove three separate conspiracies rather than the single one charged, appellants jointly and individually challenge a number of

---

11. The specific claim, supported by references to the record and an affidavit of counsel, is that the raw figures of the proportion of women to men peremptorily challenged suffice to make out a prima facie case under *J.E.B./Batson*. According to the affidavit, of the twenty women who were called by lottery for possible selection as jurors in the final stage of the selection process, eight were struck by Government peremptory challenges while only two of the twenty-one men called in that stage were struck. Roane Br. 58. No other suggestion of gender discrimination than these raw figures is offered as the basis of a *Batson/J.E.B.* prima facie case.

related district court rulings which denied (1) Roane's motions for severance and for an *in limine* exclusion of any evidence against him except that related to the Newtowne phase of any concerted drug trafficking activities, (2) related motions for instructions limiting the evidence properly to be considered against particular appellants, and (3) motions for a multiple-conspiracy instruction. We find no reversible error as to any of these.

[16] Critical to all of these challenges is the argument that the evidence could have supported findings only of three separate conspiracies, and not of the single one charged. Specifically, it is contended that the evidence only supported findings of an original conspiracy centered on Trenton, New Jersey involving the "New York Boyz" group that included Tipton and Johnson, a separate conspiracy centered on the Central Gardens area of Richmond in which only Tipton and Johnson of the appellants were involved, and another separate conspiracy centered on the Newtowne area of Richmond in which all three appellants—Roane for the first time—were involved. We disagree with this critical contention; the evidence supports the jury's finding of the single conspiracy charged and of Roane's connection to it.

The indictment charged that "from on or about January, 1989, ... and continuously thereafter up to and including the filing of this indictment," appellants and others conspired to possess with intent to distribute and to distribute cocaine base "in the Eastern District of Virginia and elsewhere." The evidence amply supports the jury's finding that such a single conspiracy existed and that each applicant was a participant in that conspiracy. In summary, the evidence was sufficient to show the following: Such a conspiracy originated in the Trenton, New Jersey area in 1989, involving as its core members a group known as the "New York Boyz" and including as members Appellants Tipton and Johnson and co-defendant Lance Thomas. In 1991, law enforcement efforts resulted in a cessation of the conspiracy's operations in the Trenton area but not in its continued existence and operation elsewhere. At that time, some members of the conspiracy ceased their participation while some went to New

York City and others, including Appellants Tipton and Johnson, and Lance Thomas, went to Richmond. Earlier, while still engaged in the Trenton operation, Tipton had organized a Central Garden operation in Richmond that expanded the conspiracy's geographical area while continuing to use its established mode of obtaining, processing, and distributing its drug product. The Central Garden operation was supplied from the New York drug source that supplied the Trenton-based operation. Under Tipton's leadership, it employed the same methods of intimidation and violence to dominate the crack cocaine trade in this new market area of its operation. Shortly after the Central Garden operation commenced, "Hess," one of the New York Boyz group, came from New York to act as an enforcer for the operation; later, he returned to New York to deal with "trouble" resulting from a police raid on a house used by the New York Boyz. Appellant Johnson came from the New York area to the Richmond area in the summer of 1990 for the specific purpose, according to Tipton, of making sure that the losses taken in earlier operations were not repeated there. Throughout the Richmond-based operations, Tipton, as key man of the conspiracy's operations there, asserted his ability to call on the New York Boyz group—who remained in the New York area—to assist the Richmond operation. Seeking to further expand the conspiracy's operations in the Richmond area, Tipton directed the development of another distribution network in the Newtowne area of Richmond. By late 1991, it was the main focus and the most productive area of the conspiracy's operations in the Richmond area. It was during the early stages of this new market area's development that Appellant Roane joined the conspiracy. A cousin of Tipton's who "had a spot" in Newtowne, Roane was brought in at Tipton's instigation in the Fall of 1991 soon after being released from prison, to help develop that new area. From that point on, he participated as a full "partner" with Tipton, Johnson, and other conspiracy leaders in the ongoing operations of the conspiracy.

Appellants emphasize the evidence that membership in the groups participating in the concerted drug trafficking activities in

A-147

the Trenton and Richmond areas shifted over time and that the activities were widely separated geographically and ·in time. That evidence was of course relevant to the ultimate factual issue whether the single conspiracy charged did exist, but it surely did not prevent a properly supported finding that it did. *See United States v. Banks,* 10 F.3d 1044, 1053–54 (4th Cir.1993) (single conspiracy properly found despite looseness of organizational structure, changing membership, shifting roles of participants, limited roles and knowledge of some members).

[17–20] Once that underlying contention is rejected, all the claims of error dependent upon ·it fail. · With its rejection, no appellant has any basis for claiming unfair prejudice from the introduction and consideration against him of any evidence about any activities of others in furtherance of the single conspiracy charged. The basic rule is that persons who have been indicted together, particularly for conspiracy, should be tried together. *United States v. Brooks,* 957 F.2d 1138, 1145 (4th Cir.1992). Once the scope of that conspiracy is established, one's having come late to or having varied his level of participation in it from time to time puts him in a position "no different from that of any co-conspirator who claims to be prejudiced by evidence that goes to the activities of co-conspirators." *United States v. Leavis,* 853 F.2d 215, 218 (4th Cir.1988). · The Government may not properly be "deprived ... of its right to detail the full scope of the conspiracy and to present its case in proper context" simply because particular co-conspirators were not involved in the full scope of its activities. *Id.* That would be the effect of the severance and evidence exclusion and limitation rulings that were denied; the district court did not, therefore, abuse its ·discretion in denying them.

[21–24] Appellants' joint claim that "at a minimum," Roane Br. 75, they were entitled to a "multiple conspiracy" instruction to enable fair presentation of this theory of defense fails essentially for the same reasons. A properly requested multiple conspiracy instruction is not of course required if the evidence only supports a finding of a single conspiracy as charged. *United States v.*

*Crockett,* 813 F.2d 1310, 1316 (4th Cir.1987). It may be required, as may ·instructions on specific defense theories generally, if sufficiently supported by the evidence. *See United States v. Dornhofer,* 859· F.2d 1195, 1198 (4th Cir.1988). Even where so required; however, failure to give it is not reversible error unless a defendant can show that this caused him substantial prejudice. · *See United States v. Maldonado–Rivera,* 922 F.2d 934, 962–63 (2d Cir.1990). Assuming without deciding that the evidence here might have supported .findings of multiple conspiracies, we are satisfied that failure to ·instruct the jury to that effect could not have resulted in unfair prejudice to any of the appellants, including Roane, the conspirator last in.

To find such prejudice, we would have to conclude· that the evidence of multiple conspiracies was *so* strong in relation to that of a single· conspiracy that the jury probably would have acquitted on the conspiracy count had it been given a cautionary multiple-conspiracy instruction. We are not persuaded of that. The evidence of the single conspiracy charged was not only strong enough to support the verdict· reached, it· was strong enough in relation to that of only multiple conspiracies that we do not believe failure to give a special instruction on this theory of defense possibly could have swayed the verdict on this count.

B.

We next consider a number· of challenges to the appellants' several convictions of continuing criminal enterprise (CCE) violations under 21 U.S.C. § 848(a) (Supp.1996).

1.

[25] It is claimed that the indictment failed adequately to charge a CCE violation, specifically that it failed to identify the three drug-related violations comprising the "continuing series of violations" element of the offense and the five persons whose supervision, organization, or management by particular defendants constituted another element. There is no merit to this claim.

The indictment charged in Count 2 that, in violation of 21 U.S.C. § 848, all of the appel-

lants engaged in a CCE by violating 21 U.S.C. §§ 841 and 846 (1988 & Supp.1996), "including, but not limited to, those violations alleged in [this] indictment, which are realleged and incorporated by reference herein, and ... other violations ... which ... were part of a continuing series of violations of [those] statutes ... undertaken ... in concert with at least five other persons with respect to whom [appellants] occupied positions of organizer, supervisor, and manager, etc."

This language essentially tracked the statutory definition of the offense and hence satisfies basic constitutional guarantees. *United States v. Amend,* 791 F.2d 1120, 1125 (4th Cir.1986). Appellants cannot claim any unfair surprise under the particular circumstances of this case from the failure of the indictment specifically to identify in Count 2 the predicate violations and the five "supervisees" upon which the Government's proof would focus. In the absence of a bill of particulars, sufficient protection against unfair surprise may be found in allegations in other counts of an indictment than that whose sufficiency is directly challenged. That form of protection amply served here. Count 2, as indicated, identified and incorporated by reference all violations of 21 U.S.C. §§ 841 and 846 charged against the appellants elsewhere in the indictment. That gave each of them ample notice of all the predicate drug-related violations relied upon by the Government at trial, including the conspiracy charged in Count 1, the drug distribution jointly charged in Count 32, and the several murders in furtherance of the CCE variously charged under 21 U.S.C. § 848(e). Similarly, allegations in other counts of the indictment gave adequate notice of all those persons, more than five, relied upon by the Government as the minimum of five "supervisees" essential to proof of CCE violations by each.

### 2.

[26] It is contended that the district court erred in allowing the jury to consider as predicate violations under the CCE Count

any of the § 848(e) capital murders "in furtherance of" the CCE charged. Specifically, the argument is that as a matter of statutory interpretation one could not murder "in furtherance of" any CCE except one whose existence was proven independently of such a murder. There is a superficial plausibility to this argument, but the plain language of the relevant statutory provisions defeats it.[12] Section 848(e) provides in relevant part that "a person is engaged in a [CCE] if ... he violates any provision of this subchapter [I] or subchapter II of this chapter the punishment for which is a felony, and ... such violation is part of a continuing series of violations of [either subchapter I or II] of this chapter." The "murder-in-furtherance" provision in § 848(e) is "a provision of this subchapter [I]," hence by the statute's plain terms may be counted "a part of a continuing series of violations" making up the proscribed "continuing ... enterprise." *See United States v. Head,* 755 F.2d 1486, 1490 (11th Cir.1985) (telephone facilitation violations under 21 U.S.C. § 843(b) (1988) properly considered predicate violations in CCE prosecution). The district court did not err therefore in instructing the jury that it might consider any murder-in-furtherance violations found under § 848(e) among the predicate violations required to convict on the CCE Count.

Nor were appellants unfairly surprised by the way in which the 848(e) violations were charged as predicate violations in the CCE Count. This was done by incorporating and realleging the conspiracy count in the CCE Count, thereby realleging the several § 848(e) murders charged to each in the conspiracy count. Appellants were sufficiently on notice by this indictment that the various § 848(e) murders-in-furtherance charged to them in the several substantive counts, then identified in the conspiracy count as overt acts, were among the predicate violations charged in the CCE Count.

### 3.

Appellants make a cluster of interrelated challenges to the court's instructions on the

12. The argument actually is two-pronged: (1) § 848(e) violations are not properly considered predicate CCE violations under any circumstances; or (2) alternatively, they may only be considered where the murder-in-furtherance occurred *after* a CCE had already come into existence. We think the plain language of the relevant provisions defeats both.

Count 2 CCE charge. Specifically, they contend that the instructions given did not sufficiently emphasize that the jury must find all the CCE elements as to each of the defendants; did not advise that the jury must be unanimous as to which three (at least) predicate violations each committed and which five (at least) persons each supervised; and misstated the predicate violations element. We find no reversible error in any of these respects.

[27] The instructions as a whole unmistakably told the jury that it must find each of the five elements of the CCE offense as to each defendant in the case. Appellants pick out snippets of the instructions which they claim could have misled the jury as to the need for individualized consideration of each element as to each defendant, but that possibility is belied by the instructions looked at whole. The court specifically instructed that the Government must prove each of the five elements that it had properly listed as to each of the defendants, and generally cautioned that as to all the charges, the case of each defendant must be considered "separately and individually." JA 4018, 4056. *See Cupp v. Naughten*, 414 U.S. 141, 146–47, 94 S.Ct. 396, 400, 38 L.Ed.2d 368 (1973) (instructions as a whole control).

[28] The failure to instruct that the jury must be unanimous as to the three (at least) predicate violations and the five (at least) supervisees does not constitute reversible error. The court gave a general unanimity instruction as to all elements of the offense. None of the appellants requested a "special unanimity" instruction on these two elements, nor objected to the court's failure to give one sua sponte. We review this challenge therefore only for plain error, and find none warranting correction.

[29, 30] There is, preliminarily, a question whether there was error, plain or otherwise. There is no general requirement of jury unanimity "on the preliminary factual issues which underlie the verdict." *Schad v. Arizona*, 501 U.S. 624, 632, 111 S.Ct. 2491, 2497, 115 L.Ed.2d 555 (1991) (plurality opinion) (quoting *McKoy v. North Carolina*, 494 U.S. 433, 449, 110 S.Ct. 1227, 1236, 108

L.Ed.2d 369 (1990) (Blackmun, J., concurring)). A special unanimity instruction is required only when there is a genuine risk of juror confusion or that a conviction could result from different jurors having concluded that the defendant committed quite different acts within those of a prescribed set or among multiple means of violating a statute. *See, e.g., United States v. Holley*, 942 F.2d 916, 925–29 (5th Cir.1991) (multiple false statements charged in single count required special unanimity instruction). There is a division among the circuits on the question whether under this general principle a special unanimity instruction is required, upon request, as to the predicate violation element in CCE prosecutions. *See United States v. Echeverri*, 854 F.2d 638 (3d Cir.1988) (required); *United States v. Canino*, 949 F.2d 928, 945–48 (7th Cir.1991) (not required).

We need not decide that general question up or down in this case. Here, the record plainly indicates that appellants could have suffered no actual prejudice from the lack of a special unanimity instruction on the predicate violation element. The district court properly instructed that to convict each of the appellants on the CCE count the jury must find that he committed at least three, *see United States v. Ricks*, 802 F.2d 731, 733 (4th Cir.1986) (en banc), of the predicate acts listed in the indictment. By its verdict, it is clear that the jury unanimously found each guilty of at least five predicate violations: the conspiracy charged in Count 1, the drug possession charged in Count 32, and at least three of the § 848(e) murders as variously charged to them. Assuming, without deciding, that unanimity on at least three predicate violations is required to convict, it is clear that unanimity occurred here as to each appellant so that no actual prejudice from the failure so to instruct could be shown. *See Olano*, 507 U.S. at 734, 113 S.Ct. at 1777–78 (burden is on defendant to show actual prejudice from forfeited error).

As to the failure to give a special unanimity instruction on the five supervisees element, we hold, in accord with a majority, if not all, of the circuits that have addressed the question, that none is required. *See, e.g., United States v. Tarvers*, 833 F.2d 1068, 1074

(1st Cir.1987); *United States v. Bond,* 847 F.2d 1233, 1237 (7th Cir.1988). We agree with those courts that the CCE focus in this element is upon the size of the enterprise— set at a floor of five—rather than upon the particular identities of those who make up the requisite number. *See Bond,* 847 F.2d at 1237 (sufficient that jurors unanimously find that at least some five were supervised by defendant, to require unanimity on identities inimical to statutory purpose).

[31] Appellants' final challenge to the CCE instruction seizes on an obvious slip of the tongue when the court said while instructing on the continuing series of violations element that the required proof was that the continuing series of violations "was undertaken by the defendants" (plural) rather than by each defendant individually. No contemporaneous objection to this obviously inadvertent misstatement was made, so it could only be reviewed for plain error. So reviewing it, it is obvious that no actual prejudice from it could be shown. In other parts of the instructions the court sufficiently emphasized, as earlier noted, that each element must be proved separately as to each defendant. From the instructions as a whole the jury was adequately advised that to convict each of the appellants on the CCE count, the jury must find that he individually committed at least three predicate violations and that in the course of doing so he individually supervised at least five other persons.

4.

[32] Johnson and Tipton jointly claim error in the district court's having amended its jury instruction on the CCE supervision element after they had given their respective closing arguments. We find no reversible error.

The court initially instructed the jury that the terms "organizer," "supervisory position," and "position of management," were to be "given their usual and ordinary meaning"; that they "imply the exercise of power and authority by a person who occupies some position of management or supervision" but who "need not be the sole or only organizer, supervisor or manager of the activities in question." The Government did not object to this instruction when it was proposed at the court's charge conference. But, after it had been given and after Tipton and Johnson had concluded their closing jury arguments, the Government moved for a supplemental instruction that more fully reflected this court's interpretation of the terms in *United States v. Butler,* 885 F.2d 195, 200–01 (4th Cir.1989). Over defense counsel's objection, the court gave a supplemental instruction whose central points were that "a person may occupy a position of organizer, a supervisory position or any other position of management without having direct personal contact with [those organized, etc.]" and that "it is ... possible for a single [CCE] to have more than one organizer [etc.]."

There is no question of the court's discretionary power to give post-argument instructions "to remedy omissions in pre-argument instructions or to add instructions necessitated by the arguments." Fed.R.Crim.P. 30 advisory committee's note to 1987 Amendment. But the rule plainly contemplates that parties will know what the court will instruct before they make their arguments. *See id.* Here that would have required either that the supplemental instruction not be given or that appellants be allowed to supplement their closing argument after it was given. Neither occurred, so there was a technical violation of the Rule. We conclude, however, that any error involved was harmless. The supplemental instruction added but one element not specifically reflected in the initial instruction: that to be an organizer, etc., a defendant need not have had direct contact with the person organized, etc. This was an accurate statement of the law under *Butler.* The fact that contact is not essential probably lies within the "ordinary and usual" meaning of the term. Certainly it did not "contradict or repudiate the thrust of [appellants'] closing argument," *United States v. McCown,* 711 F.2d 1441, 1452 (9th Cir.1983). Appellants indeed do not suggest how they would have changed their arguments had they been allowed to supplement them. Accordingly, though it might well have been better to allow supplemental argument or at least to inquire of the substance of any proposed before giving the supplemental in-

struction, we are satisfied that any error in not doing so was harmless.

### C.

[33] Appellants jointly contend that the district court erred in not making sufficiently clear in its instructions on the various capital murder counts under § 848(e) that to convict, the jury must find a substantive connection between the murders and the continuing criminal enterprise with which each was charged.[13] We disagree.

The specific contention focuses upon the court's instruction that to find a defendant guilty of § 848(e) murder, the jury must find "First, that the defendant was engaged in or working in furtherance of the [CCE] charged in Count [2];" second, "that while ... so engaged, the defendant either intentionally killed or counseled ... the intentional killing of the individual named in a particular count; and three, that the killing actually resulted." Under this instruction, the claim goes, a defendant could be found guilty simply on the basis of a temporal coincidence of a murder with a CCE; no substantive connection between the two was required. Were this the only instruction touching the offense the contention would be a serious one. But, it is not. At the outset of its instructions on the various murder counts, the court pointed out that appellants were charged with two very specific, very distinct types of homicide including "[k]illing while engaged in or in furtherance of a [CCE]." JA 4039. Further, the court noted in this portion of its instructions that it "would not be enough" to prove only that a defendant had killed someone; that "each of the specific elements of the federal crime charged" must be proved, JA 4041; and that the jury must find the defendant "was engaged in or working in furtherance of the [CCE]" and that the killing occurred "while the defendant was so engaged." JA 4042.

Considered in total compass, see Cupp, 414 U.S. at 146–47, 94 S.Ct. at 400, we believe that these instructions sufficiently required proof of a substantive as well as merely temporal connection between the § 848(e) murder and the § 848(a) CCE charged to a defendant, though it must be conceded that the substantive connection is not as clearly expressed as it might be. Any concerns that invalidating confusion on the point might actually have resulted are, however, removed by consideration of the trial evidence and the Government's arguments to the jury. The Government's evidence expressly linked each of the nine § 848(e) murders of which the appellants were severally convicted to a furtherance of the CCE's purposes: either silencing potential informants or witnesses, eliminating supposed drug trafficking rivals, or punishing underlings for various drug-trafficking misfeasances. In both its opening and closing arguments the Government emphasized that the § 848(e) murder charges were "predicated upon the [CCE]" in that they charged "murder in furtherance of a [CCE]." JA 3818, 1609, 3814–15. And it pursued this substantive connection-theme by arguing that each of the murders charged had occurred "in an effort to further [appellants'] drug business," JA 1610, pointing out, murder by murder, the specific enterprise-connected motive for each. See, e.g., JA 1625–28, 1631–35. By contrast, the failure to have charged under § 848(e) an unconnected killing revealed in the evidence was explained on that basis. All this considered, we are satisfied that no reversible error resulted from the district court's instructions on the nature of the § 848(e) capital murders charged.

### D.

[34] Appellants challenge the court's instructions on the "enterprise" element of the offense charged under 18 U.S.C. § 1959 [14] in

---

13. As the Government concedes, such a substantive connection must be implied as an essential element of § 848(e). Appellee's Br. 94; see United States v. Chandler, 996 F.2d 1073, 1097 (11th Cir.1993). Appellants make no claim that such a connection may not be implied as a matter of statutory interpretation. Cf. United States v. Whiting, 771 F.Supp. 476, 477 (D.Mass.1991) (no

substantive connection implicit in "engaging in" prong, though implicit in "in furtherance of" prong).

14. In relevant part, § 1959(a) provides that

(a) whoever, as consideration for the receipt of, or as consideration for a promise or agree-

several counts. Because none objected to the instructions at trial, we review only for plain error and find none warranting correction.

The specific claim is that in listing the elements of this offense, the district court failed to differentiate between "an enterprise engaged in racketeering activity" and the "racketeering activity" in which it was engaged. The court did misspeak in twice referring to "racketeering activity" when it should have referred to "enterprise engaged in racketeering activity." The two are different concepts: An "enterprise" is an entity distinct from the "racketeering activity" in which it engages. *See United States v. Turkette*, 452 U.S. 576, 583, 101 S.Ct. 2524, 2528–29, 69 L.Ed.2d 246 (1981) (pointing out distinction in RICO statute from which § 1959 elements derived). Had this been all the court said in its instructions on the offense, it is arguable that plain error would have occurred by effectively reading the "enterprise" element out of the offense. But that is not all that was said. Assessing the instructions as a whole, *see Cupp*, 414 U.S. at 146–47, 94 S.Ct. at 400, we are satisfied that, as the Government contends, the jury was adequately told that the elements were separate and distinct ones and that both must be proved. Viewed in total context, the two isolated references to "racketeering activity" when "enterprise engaged in racketeering activity" was appropriate must have been understood as short-hand references to the "enterprise" itself. The court earlier had read § 1959 verbatim, including the reference to an "enterprise engaged in racketeering activity." JA 4044–45. This clearly identified two different concepts. The point was further emphasized by the court's identification of an "enterprise" as including "any

group of individuals associated in fact which is engaged in or the activities of which affect interstate commerce." JA 4046. Further, the court had already explained before making the two challenged misstatements that what the defendants had to act to "gain entrance to" was an "enterprise engaged in racketeering activity." JA 4044. And finally, in the course of the same passage in which the two misstatements occurred, the court instructed that the jury could convict if it found the defendants had acted for the purpose of maintaining or increasing their positions in "the racketeering enterprise" or had received or been promised in exchange for their acts pecuniary gain from "the racketeering enterprise."

It obviously would have been better had the court not made the two challenged slips, but assessed in total context of the instructions, we could not find them plain error warranting correction. *See United States v. Locascio*, 6 F.3d 924, 941 (2d Cir.1993) (district court's use of arguably erroneous "short-hand" language in § 1959 instruction not erroneous when viewed in total context).

### E.

Appellants claim that their constitutional confrontation rights were violated by the Government's impeding their timely and effective access to a number of its witnesses who were under the Government Protection Program pursuant to 18 U.S.C. § 3521 (1988 & Supp.1996), and further by the court's restriction of their cross-examination of those witnesses respecting the reasons for their refusals to submit to interviews by defense counsel. We find no error in these respects.

In a pre-trial order entered pursuant to 18 U.S.C. § 3432,[15] the district court ordered

ment to pay, anything of pecuniary value from an enterprise engaged in racketeering activity, or for the purpose of gaining entrance to or maintaining or increasing position in an enterprise engaged in racketeering activity, murders ... shall be punished....

15. At the time, § 3432 provided that
A person charged with treason or other capital offense shall at least three entire days before commencement of trial be furnished with a copy of the indictment and a list of the veniremen and the witnesses to be produced

on the trial for proving the indictment, stating the place of abode of each venireman and witness.
The statute has since been amended by the addition of a critical proviso:
except that such list of veniremen and witnesses need not be furnished if the court finds by a preponderance of the evidence that providing the list may jeopardize the life or safety of any person.
Pub.L. No. 103–322, Tit. VI, § 60025, 108 Stat. 1982 (1994).

the Government to provide the defense with the names and addresses of all its witnesses except those under Government protection ten days in advance of trial date. The Government complied by timely providing a list of 99 witnesses, including 18 identified as protected, giving addresses for all but the protected witnesses. The court then denied a defense motion that these addresses be submitted *in camera* to allow defense interviews before trial. The court ruled that the Government's refusal to disclose the addresses was authorized by its order and was consistent "with the letter and spirit of the [Witness Protection] program," but stated that the court would arrange for defense interviews with protected witnesses before they testified. Once trial was underway, defense counsel were allowed access to these witnesses, some of whom agreed to be interviewed, but most of whom did not. In the course of this process the court denied a defense motion that the court supervise the defense counsels' access to these witnesses based upon an assertion that the prosecution had interfered with their access by advising one such witness that he need not submit to interview. Receiving the prosecution's response that he had indeed advised the witness that whether to interview was his decision, the court ruled that defense counsel was only entitled to request interviews, not to compel them, and admonished the prosecution that the defense was to have a meaningful opportunity to seek interviews.

[35, 36] We find no denial of constitutional rights in the court's handling of defense access to the protected witnesses. As the court ruled, only access is a matter of right, there is no right to have witnesses compelled to submit to interview, hence no violation by a prosecutor's advising witnesses to that effect. *See United States v. Black,* 767 F.2d 1334, 1338 (9th Cir.1985); *United States v. Walton,* 602 F.2d 1176, 1179–80 (4th Cir. 1979). Except for not providing the addresses of protected witnesses, the Government effectively complied with the court's order and with 18 U.S.C. § 3432 by submitting its entire list at least three days before the taking of testimony at trial began. The failure to provide the addresses of protected witnesses was a technical violation of § 3432

(in its then form) that may not have been curable, as the district court sought to do, by drawing on the "spirit" of the "Witness Protection Program," 18 U.S.C. § 3521 *et seq.* However, we agree with those courts that have held that a defendant claiming a violation of the right to access that § 3432 is designed to protect must show actual prejudice from any impairment or interference with the right, *see United States v. Pepe,* 747 F.2d 632, 654–55 (11th Cir.1984), and appellants have shown no particularized prejudice here. Their access to protected witnesses was delayed, but this is justified when, as clearly was the case here, the threat of violence is palpable. *See Walton,* 602 F.2d at 1179–80. Access was ultimately provided, and though appellants quarrel with its timing and its circumstances, they have offered nothing indicating how exactly they were harmed by the delay. Accordingly, we conclude that no prejudicial error occurred respecting the appellants' constitutional right not to be denied effective access to witnesses.

[37] Finally, we find no violation of appellants' confrontation rights in the court's refusal to allow defense counsel to cross-examine protected witnesses about the reasons for their refusals to submit to interviews. The motives and biases of all these witnesses were otherwise freely exposed to cross-examination. The restriction imposed was well within the district court's discretion.

### F.

Appellants severally challenge the sufficiency of the evidence to convict them on various of the counts on which the jury found them guilty. We assess these insufficiency claims under the familiar test of *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979), which asks whether viewing the evidence in the light most favorable to the prosecution "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." And, applying that test, we find no error among those assigned.

We review a voluminous trial record here and our review has disclosed a number of insufficiency claims whose lack of merit war-

rants no extended discussion—indeed whose only justification would appear to be an understandable abundance of caution. We will identify all the insufficiency claims made but confine detailed discussion to those revealed by our review to warrant it.

### 1.

[38] Each of the appellants challenges the sufficiency of the evidence to support the requisite finding under the CCE count that he acted as an organizer, supervisor, or manager with respect to five or more persons. *See* 21 U.S.C. § 848(a), (b). Our review of the record satisfies us that the evidence was more than sufficient to support the requisite jury findings on this issue as to each appellant. Briefly, the crux of the appellants' several contentions here—indeed their indispensable point—is that appellants did not organize, supervise, or manage anyone; that the persons relied upon by the Government as "supervisees" and with whom they indisputably engaged in drug trafficking activities were essentially independent retail dealers with whom their only relationships were those of seller and buyer. This essential factual theory of their defenses, and the indispensable point of their insufficiency claims, is completely belied by the record. That record reveals—certainly supports findings beyond a reasonable doubt—that these "retailers," in more than sufficient numbers as to each of the appellants, acted as "workers" who were either or both organized, supervised, and managed by appellants while acting as principal "partners" in a concerted drug trafficking enterprise, and that some of these people served variously not only as street dealers for the enterprise but as sometime chauffeurs, hideout providers, weapons-keepers, and general underlings for each of the appellants.

Our review of the record similarly discloses no merit in Roane's further claim that the evidence on the CCE count was not sufficient to prove that he had committed three (at least) predicate drug-related violations, nor in Roane's and Johnson's respective claims that neither was shown to have "obtain[ed] substantial income as resources" from the CCE, as required under § 848(c).

### 2.

[39] Tipton who, as earlier indicated, was convicted of six of the eight capital murders charged to him under § 848(e) and sentenced to death on three of the six (those involving Talley, Thorne, and Chiles) challenges the sufficiency of the evidence to convict him on all but the one involving Talley. We find the evidence sufficient to convict on all those challenged.

The five killings at issue resulted from two separate episodes, one involving the contemporaneous murders of Armstrong, Long, and Carter; the other involving the contemporaneous murders of Chiles and Thorne. We consider them in that order.

As our earlier summary account of the Armstrong, Carter, Long murder episode reveals, the actual killings were done by Cory Johnson. The evidence of Tipton's culpability was only that of aider and abettor; specifically that he was instrumental in planning the murders and directly aided their execution by driving Cory Johnson, the designated executioner, to the scene, awaiting accomplishment of the deed in a getaway car, then driving the executioner from the scene.

Similarly, though the evidence of the murders of Chiles and Thorne most surely identified Cory Johnson as the actual executioner of both, it also suffices to support verdicts against Tipton as principal or as aider and abettor in those murders. Specifically it suffices to support findings that Tipton and Johnson planned the executions of both victims for suspected treachery (Chiles) and thievery (Thorne) in relation to the drug-trafficking enterprise, and that Tipton was present at the scene as an active participant in seeing that the executions were carried out and that those responsible escaped detection.

### 3.

[40] Roane and Johnson raise like challenges to their respective convictions on Counts 14 and 16. Each attacks the sufficiency of the evidence to convict him of two counts of violating 18 U.S.C. § 1959 by killing one Torrick Brown (Count 14) and

wounding one Martha McCoy (Count 16), thereby committing violent crimes "for the purpose of ... maintaining or increasing [his] position in an enterprise engaged in racketeering activity...." The evidence on these two counts was that the killing of Brown and wounding of potential eyewitness McCoy were prompted by a purely personal grievance of Roane's against Brown for "messing" with his girlfriend. From this circumstance, each appellant contends that the evidence was insufficient to show any enterprise-related "purpose" in his participation in these deeds: on Roane's part, that it showed nothing but a private purpose of revenge; on Johnson's, no more than a private purpose to assist a friend in avenging an affront. But the evidence was sufficient to support jury findings that the deeds were done by Roane and other enterprise members, including Johnson, in part at least in furtherance of the enterprise's policy of treating affronts to any of its members as affronts to all, of reacting violently to them and of thereby furthering the reputation for violence essential to maintenance of the enterprise's place in the drug-trafficking business. The evidence also sufficed to support further findings that participation in this sort of group retaliatory action in behalf of fellow enterprise members was critical to the maintenance of one's position in the enterprise.

[41] So considered, the evidence sufficed to show the requisite purpose as to each of these appellants. We agree with the Second Circuit that this purpose can be shown by proof that "a defendant who holds a position in a RICO enterprise ... committed an underlying crime of violence with a motive of retaining or enhancing that position"; that such "self-promotion" need not be "the defendant's only or primary concern"; and that evidence suffices if from it a jury "could properly infer that the defendant committed his violent crime because he knew it was expected of him by reason of his membership in the enterprise or that he committed it in furtherances of that membership." *United*

*States v. Concepcion,* 983 F.2d 369, 381 (2d Cir.1992).

Here, the jury properly could have inferred from the evidence of the enterprise's policies of mutual support, violent retaliatory action, and group expectations of its members that both Johnson and Roane participated in the killing of Brown and the contemporaneous wounding of McCoy as "an integral aspect of [their] membership" in the enterprise and in furtherance of its policies. *See id.* As to Johnson, who had no personal grievance against either Brown or McCoy, the evidence clearly suffices to show "maintenance of his position" in the enterprise as the sole or certainly dominant purpose of his conduct. As to Roane, we agree with the Government that although the evidence clearly established private revenge as his primary purpose, it also supported a finding that once he had enlisted the aid of his fellow enterprise members in his behalf, he acted not only for himself but as a member of the enterprise in furthering its policies of retaliatory violence against any who sufficiently antagonized any of its members, and in order to maintain his position in it.

### G.

[42] Appellants contend, and the Government concedes, that their several convictions and sentences on the § 848 CCE and § 846 conspiracy counts cannot both stand because the § 846 conspiracy as charged is a lesser included offense within the § 848 CCE as charged. We agree. *Rutledge v. United States,* — U.S. —, 116 S.Ct. 1241, 134 L.Ed.2d 419 (1996) (so holding); *see also United States v. Butler,* 885 F.2d 195, 202 (4th Cir.1989) (same). Accordingly, we must remand for vacatur of the § 846 judgments against each of the appellants.

### H.

We have considered the various other challenges made by appellants to guilt-phase rulings of the district court,[16] and find no reversible error with respect to any.

---

16. These include the court's failure to define the term "reasonable doubt" in its guilt phase instructions; its refusal to remove juror Cooke because of exposure to mid-trial publicity; and

its denial of appellants' motions to dismiss all the capital charges because of a violation of 21 U.S.C. § 848(o)'s guarantee of a "Right ... to justice without discrimination."

## IV.

We next consider a number of challenges to the district court's conduct of the capital-penalty phase of the trial.

### A.

[43] Appellants contend that the district court erred in denying their several motions for severance of their trials in the capital-penalty phase. They point to social science studies suggesting that joint trials in this phase lead to a higher percentage of death verdicts and to less individualized decision-making, and to the Supreme Court's recognition of the constitutionally-grounded need for "a greater degree of reliability when the death sentence is imposed," *Lockett v. Ohio*, 438 U.S. 586, 604, 98 S.Ct. 2954, 2964, 57 L.Ed.2d 973 (1978), as confirming that heightened vigilance in applying severance principles is required in the capital-penalty phase. Roane Br. 116–17. More specifically, they argue that joint capital-penalty trials necessarily reduce the jury's ability to give individualized consideration to aggravating and mitigating factors, and that, in particular, 21 U.S.C. § 848(m)(8), which requires the jury to consider as a mitigating factor that "[a]nother defendant ... equally culpable ... will not be punished by death," perversely operates against jointly-tried defendants in the penalty phase by encouraging juries to finesse the difficult relative culpability inquiry by simply sentencing all to death. Roane Br. 118–19.

From all this, appellants contend that "joint capital sentencing hearings are *prima facie* inconsistent with the Eighth Amendment." Roane Br. 117. By this we understand them to concede that such joint trials are not *per se* unconstitutional and to assert only that discretion as to severance in this particular context is ultimately subject to constitutional constraints derived from the Supreme Court's "individualized consideration" jurisprudence as embodied in *Gregg v. Georgia*, 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976), and its progeny. Without accepting the *"prima facie* unconstitutional" characterization, we basically agree with the position that trial court discretion as to severance in the capital-penalty phase

must be considered so constitutionally constrained at its outer limits and, as a corollary, that our standard of review is for abuse of a discretion so constrained. *Cf. Sampley v. Attorney Gen.*, 786 F.2d 610, 613 (4th Cir. 1986) (Sixth Amendment right to counsel ultimately constrains discretion in ruling on continuance motions).

Reviewing under that standard, we cannot find abuse of discretion here. The concerns raised by appellants are legitimate ones. But there are countervailing considerations that properly may be weighed in the discretionary balance. Because the relevant statutory provision, § 848(i)(1)(A), requires that, except in situations not present here, the penalty hearing shall be conducted before the same jury that determined guilt, severance here would have required three separate, largely repetitive penalty hearings before this jury. The same considerations of efficiency and fairness to the Government (and possibly the accused as well) that militate in favor of joint trials of jointly-charged defendants in the guilt phase, *see Lockhart v. McCree*, 476 U.S. 162, 181, 106 S.Ct. 1758, 1769, 90 L.Ed.2d 137 (1986); *Richardson v. Marsh*, 481 U.S. 200, 210, 107 S.Ct. 1702, 1708–09, 95 L.Ed.2d 176 (1987), must remain generally in play at the penalty phase. The district court was therefore entitled to weigh those considerations in the balance.

More important of course than any consideration of inconvenience or possible unfairness to the Government from sequential separate trials are the possibilities of unfairness to the accused persons from a joint penalty-phase trial—specifically the threat posed to individualized consideration of their situations, and in particular the quite different mitigating factors relevant to each. While such a potential risk was certainly present here, as it will be in any case involving multiple defendants, it could not of course have been entirely removed by conducting three sequential, largely repetitive hearings before the same jury. More critically, we are satisfied that the court's frequent instructions on the need to give each defendant's case individualized consideration sufficed to reduce the risk to acceptable levels. At the outset of the penalty phase, the

court—obviously aware of the special risk—admonished the jurors that they "must consider each defendant individually." JA 4137. In its concluding instructions on the jury's duty "to decide whether each individual defendant shall live or die," JA 4810–11, the court reiterated that the duty was "to make a decision regarding each defendant and each capital case," JA 4817. Further, in its instructions on the critical weighing process, the court especially emphasized the need for individualized consideration by pointing out that "not all aggravating factors alleged are alleged against each of the three defendants, or in reference to each capital offense," JA 4794, and that each defendant relied on mitigating factors specific to his case. JA 4803. This critical point was further emphasized by the court's submission of separate packets of penalty verdict forms for each defendant. JA 4813. Still further emphasis occurred in the court's remonstrances to Government counsel to "be specific" and to "do it individually," whenever objections were made to Government counsels' references to the defendants collectively. JA 4770–72, 4775.

[44] We are entitled, in the absence of any directly negating evidence, to presume that the jury heard, understood, and did follow these instructions. *See Richardson*, 481 U.S. at 206, 107 S.Ct. at 1706–07. And we are bolstered in the general presumption by the results of this jury's deliberations. Only Johnson was sentenced to death on all of the capital murder counts on which he was convicted. Tipton was sentenced to death on three of the six on which he was convicted; Roane on one of three.

We therefore find no abuse of discretion in conducting a joint penalty-phase trial in this case.

**B.**

Appellants make a number of interrelated facial and as-applied constitutional challenges to certain of the capital sentencing provisions of § 848, hence to the death sentences each received upon jury recommendation for violations of the capital-murder provisions of § 848(e). We preface our discussion of the challenges with a summary of the most directly relevant provisions and their applications in this case.

In general the provisions at issue prescribe a "weighing-process" involving jury consideration of "information" designed to establish the existence of aggravating and mitigating factors as the basis for deciding whether to recommend a death sentence. Non-exclusive "statutory" lists of both aggravating and mitigating factors are provided in subsections (n) and (m) respectively. Only those statutory and non-statutory aggravating factors of which a defendant has been given prior written notice by the Government may be considered by the jury, § 848(h)-(j), while any statutory or non-statutory mitigating factor may be considered, § 848(j), (m). In the weighing process, jurors may only consider those aggravating factors found unanimously to exist beyond a reasonable doubt, but any juror may consider any mitigating factor found by him to exist by a preponderance of the evidence, without regard to whether it has been found by any other. § 848(k). The prescribed weighing process is a sequential one. The jury first must determine that at least one of the four aggravating factors listed in subsection (n)(1) exists. *Id.* These (n)(1) factors all relate to the particular intention had by the defendant in relation to the § 848(e) murder of which he has been convicted: that he (A) "intentionally killed"; (B) "intentionally inflicted serious bodily injury which resulted in ... death"; (C) "intentionally engaged in conduct intending that the victim be killed or that lethal force be employed against the victim, which resulted in the death of the victim"; or (D) "intentionally engaged in conduct which [he] knew would create a grave risk of death to a person, other than one of the participants in the offense and [which] resulted in the death of the victim." If (somehow) none of these (n)(1) factors is unanimously found to exist, the jury proceeds no further and the death sentence may not be imposed. § 848(k). If any of the (n)(1) factors is unanimously found to exist, the jury then considers whether one or more of the other statutory factors listed in (n)(2)-(12) also exists. If it does not so find, it proceeds no further and the death sentence may not be imposed. *Id.* If it does find at

least one additional statutory aggravating factor to exist, it may then also consider whether any properly noticed non-statutory aggravating factors also exist. *Id.* If they find one (n)(1) aggravating factor, plus one further (n)(2)-(12) statutory aggravating factor to exist, the jurors may then weigh all the statutory and non-statutory aggravating factors they have unanimously found to exist against all mitigating factors properly being taken into account by individual jurors to determine "whether the aggravating factors .... sufficiently outweigh any mitigating factor or factors" to warrant imposition of a death sentence. If the jurors unanimously so find, they may, but need not, recommend the death sentence. *Id.* If the jury so recommends, the court "shall sentence the defendant to death"; if the jury does not so unanimously recommend, the court may only impose a sentence other than death. § 848(e).

Following this prescribed process, the Government re-introduced, in transcript form, all the guilt-stage evidence of the capital-murders of which appellants severally had been convicted. Further, it introduced evidence respecting various post-trial episodes in which, while in prison, each of the appellants had threatened reprisal against one or another of the witnesses who testified against him at trial. Finally, the Government introduced records of prior criminal convictions of Johnson and Roane.

Each of the appellants introduced testimonial evidence designed to establish statutory and non-statutory mitigating factors. Principally, in each case, this evidence involved histories of childhood abuse in dysfunctional, unstable family situations and various forms of mental disorders and disabilities.

Following the district court's comprehensive instructions on the application of these sentencing provisions to the aggravating and mitigating factor information before it, *see* JA 3963-95, the jury returned the several verdicts previously noted in the form of special findings and ultimate recommendations. With respect to each of the seven § 848(e) murders for which Johnson had been convicted, the six for which Tipton had been convicted, and the three for which Roane had been

convicted, the jury unanimously found as statutory aggravating factors all four of the (n)(1) factors, plus the (n)(8) factor that each of the murders was "the result of substantial planning and premeditation." With respect to the murders of Chiles and Thorne for which Tipton and Johnson had been convicted, the jury additionally found the (n)(5) factor—creation of a grave risk of death to persons other than the victim—to exist. With respect to the Talley murder for which Tipton was convicted, the jury also found the (n)(12) aggravating factor—commission of murder in an especially heinous, cruel, or depraved manner involving serious physical abuse—to exist. Further, as to each of the appellants with respect to each of the capital murders for which he had been convicted, the jury found as additional nonstatutory aggravating factors the commissions of multiple murders, substantial criminal histories, and memberships in a conspiracy that had as a goal the murders of persons other than the victims of the capital murders in issue. Finally, as to both Johnson and Tipton with respect to each of the capital murders for which they had been convicted, the jury found as an additional non-statutory aggravating factor that each had seriously wounded two other persons in the course of committing those murders.

Some or all of the jurors found as to Johnson 18 mitigating factors; as to Tipton, 12; and as to Roane nine.

On verdict Decision Forms which recited compliance in detail with the court's instructions on the weighing process, the jury unanimously recommended the death sentence for Johnson on all seven of the § 848(e) capital murders for which he had been convicted, those of Louis Johnson, Long, Carter, Armstrong, Thorne, Chiles, and Peyton Johnson; unanimously recommended the death sentence for Tipton on three of the capital murders, those of Talley, Chiles, and Thorne, of the six for which he had been convicted; and unanimously recommended the death sentence for Roane on one of the capital murders, that of Moody, of the three for which he had been convicted. As to the other three murders of which Tipton had been convicted, those of Long, Armstrong, and Carter, and

as to the other two of which Roane had been convicted, those of Louis Johnson and Peyton Johnson, the jury reported itself "not unanimously persuaded" on the evidence and in light of the court's instructions that the death sentence should be imposed upon those defendants. Sentences were imposed accordingly.

1.

[45] Appellants jointly challenge, as facially unconstitutional, the § 848 sentencing provisions, § 848(h)(1)(B), (j), and (k), which permit nonstatutory aggravating factors to be considered. Specifically, they contend that by delegating authority to Government prosecutors to introduce such factors for consideration in sentencing, Congress violated separation-of-powers principles, thereby invalidating the whole process.

We disagree. Assuming, without deciding, that by specifically authorizing consideration of non-statutory aggravating factors noticed by prosecutors, Congress actually delegated a legislative function to the Executive Branch, as opposed to merely recognizing a traditionally shared function with that branch, see *United States v. Pretlow*, 779 F.Supp. 758, 765–67 (D.N.J.1991), any delegation involved was sufficiently circumscribed by "intelligible principles" to avoid violating separation of power principles. *See Mistretta v. United States*, 488 U.S. 361, 390, 109 S.Ct. 647, 664, 102 L.Ed.2d 714 (1989); *accord United States v. McCullah*, 76 F.3d 1087, 1106–07 (10th Cir.1996).

2.

[46] Appellants jointly claim that the (n)(8) aggravating factor—that "the defendant committed the offense after substantial planning and premeditation"—is unconstitutionally vague. Because the death penalty imposed upon each of them was based in part upon the jury's finding of that factor's existence, they contend that those death sentences are, as to each of them, invalid.

[47] We disagree. No objection on this basis was made in the district court, so we review the claim only for plain error under the stringent Rule 52(b) standard as defined

in *Olano*. *See supra* Part II.A. And, because mathematical precision in defining eligibility and selection factors often is not possible, "vagueness review" is quite "deferential" in any event. *See Tuilaepa v. California*, —— U.S. ——, ——, 114 S.Ct. 2630, 2635, 129 L.Ed.2d 750 (1994). Under such deferential review, an aggravating factor such as the (n)(8) factor "is not unconstitutional if it has some 'common sense core of meaning ... that criminal juries should be capable of understanding.'" *See id.* at —— —— ——, 114 S.Ct. at 2635–36 (quoting *Jurek v. Texas*, 428 U.S. 262, 279, 96 S.Ct. 2950, 2959–60, 49 L.Ed.2d 929 (1976) (White, J., concurring)).

The specific claim of vagueness here is directed at use of the word "substantial" as a modifier of "planning and premeditation" in defining the (n)(8) factor. "Substantial," the argument runs, is not sufficiently precise in meaning to serve the discretion-channeling function constitutionally required for applying eligibility factors in capital sentencing. *See id.* at ——, 114 S.Ct. at 2635; *Arave v. Creech*, 507 U.S. 463, 470–71, 113 S.Ct. 1534, 1540–41, 123 L.Ed.2d 188 (1993).

We disagree. While, as the Supreme Court has recognized, "substantial" may have quite different, indeed almost contrary, meanings depending upon its context, *see Pierce v. Underwood*, 487 U.S. 552, 564, 108 S.Ct. 2541, 2549, 101 L.Ed.2d 490 (1988) (either, *e.g.*, "large," or, *e.g.*, "in the main"); *Victor v. Nebraska*, 511 U.S. 1, ——, 114 S.Ct. 1239, 1250, 127 L.Ed.2d 583 (1994) (either "not seeming or imaginary," or "to a large degree"), context, including clarifying jury instructions, may supply the needed "common sense core of meaning ... that criminal juries should be capable of understanding." *Compare, e.g., Cage v. Louisiana*, 498 U.S. 39, 41, 111 S.Ct. 328, 329–30, 112 L.Ed.2d 339 (1990) (in total context of reasonable doubt instruction, "substantial doubt" would be "commonly understood [to] suggest a higher degree of doubt than [would 'reasonable' alone]") *with Victor*, 511 U.S. at ——, 114 S.Ct. at 1250 (in total context of reasonable doubt instruction, "substantial doubt" not likely to have been interpreted as higher degree than "reasonable").

Here, we are satisfied that in total context of the statutory text and the district court's instructions on the (n)(8) aggravating factor, "substantial" as a modifier of "planning and premeditation" could only have been understood by the jury to mean a higher degree of planning than would have the words "planning and premeditation" alone—*i.e.*, more than the minimum amount sufficient to commit the offense. The district court instructed in essentially this vein, that "substantial planning means planning that is considerable, or ample for the commission of a crime at issue in this case: murder." JA 4796. We are therefore satisfied that the (n)(8) aggravating factor's use of the word "substantial" to modify "planning and premeditation" does not render § 848(n)(8) unconstitutionally vague, but instead, conveys with adequate precision a commonly understood meaning of "considerable," or "more than merely adequate," thereby ensuring that the (n)(8) factor served sufficiently to channel the jury's discretion in assessing eligibility for the death penalty. *See McCullah*, 76 F.3d at 1110, 1111 (accord).[17]

3.

Appellants Roane and Tipton each claim that even if the (n)(8) aggravating factor is constitutionally valid, the information before the jury was insufficient to support the findings of its existence as to Roane's murder of Moody, and Tipton's murders of Chiles and Thorne. We review such insufficiency claims under the same *Jackson v. Virginia* standard applied to guilt findings. *Lewis v. Jeffers*, 497 U.S. 764, 110 S.Ct. 3092, 111 L.Ed.2d 606 (1990).

[48] Roane's contention as to the Moody murder is that the information before the jury showed only that his involvement in Moody's murder was confined to an unplanned, spontaneous effort to prevent Moody's escape following his gun-shot wounding by Tipton. In essence, his claim is that only unpremeditated, reflexive action on his part, not "substantial planning and premeditation" preceded his stabbing murder of the fleeing Moody.

We disagree. This account of the relevant information before the jury respecting Roane's murder of Moody substantially understates the relevant circumstances revealed by the trial evidence. The jury had before it information that well before Moody's murder, a motive for it, to which Roane was privy with Tipton and Cory Johnson, had developed. Specifically, trial evidence showed that Moody and his superior, Peyton Johnson, a rival drug dealer, were thought by Tipton, Cory Johnson, and Roane to be standing in the way of their taking over the Newtowne drug market whose development was Roane's special function. Evidence from the guilt phase revealed that Roane had in fact stated that Tipton and Johnson "and them didn't want Maurice [Peyton Johnson] and 'Little Doug' [Moody] to work in that area ... selling cocaine." JA 3382. From this and other information respecting the details of Moody's murder, the jury properly could find that the visit of Roane and Tipton to Moody's apartment on the night of his murder was for the preplanned, premeditated purpose of murdering him. It showed that they went there armed with the pistol used by Tipton in wounding Moody although members of the enterprise did not as a matter of policy ordinarily carry weapons. It showed that Moody's initial wounding and eventual killing were in the pattern of the comparable enterprise-related, cold-blooded assassinations of Talley some ten days earlier and of Moody's superior, Peyton Johnson, the night after Moody was killed. If consideration were narrowly confined only to Roane's conduct in killing Moody when he fled following Tipton's failed murder attempt, there might be a serious question whether that specific reactive con-

---

17. Appellants relatedly argue, though they did not object below, that in its jury instructions, *see* JA 4795, the district court erroneously indicated that in considering the (n)(8) factor, the jury need find only substantial planning and not, also, substantial premeditation. That this was necessarily the meaning conveyed is not that clear. Even assuming that it was, we could not find in

such a slip plain error requiring correction under the *Olano* standard. It is not conceivable that a jury which had found substantial planning of a murder would not also, if properly instructed, *see Walton v. Arizona*, 497 U.S. 639, 654, 110 S.Ct. 3047, 3057, 111 L.Ed.2d 511 (1990), have found substantial premeditation of its commission.

duct involved "substantial planning and premeditation." But of course the issue was whether the murder, not its exact means, was the result of substantial planning and premeditation by Roane. And on that issue the jury had ample information upon which to base its finding beyond a reasonable doubt that Moody's murder was "substantially planned and premeditated" by Roane in concert with Tipton.

Tipton's contention as to the murders of Chiles and Thorne is, as the Government points out, simply a reiteration of his argument that the evidence was insufficient to support his convictions on those two murder counts. We have rejected that argument in Part III.F.2., *supra*, and the reasons given apply to this argument as well. Specifically, the information before the sentencing jury sufficed to support its finding that Tipton, in concert with Cory Johnson, substantially planned and premeditated those murders in which he and Johnson actively participated.

### 4.

Appellants jointly challenge the constitutionality of the (n)(1) aggravating factor both facially and as applied. They are correct that if this challenge succeeds on either basis, their several death sentences must be vacated because this particular factor's existence is an absolute prerequisite to imposition of the death penalty under the § 848 capital-sentencing scheme earlier summarized.

[49] Consideration of the facial challenge requires close attention to the statutory text of (n)(1) and to its intended functioning within the weighing process prescribed by § 848's capital-sentencing scheme. Under that scheme, a jury must, in order to recommend the death penalty, first find as an aggravating factor under (n)(1) that

(1) The defendant—

(A) intentionally killed the victim;

(B) intentionally inflicted serious bodily injury which resulted in the death of the victim;

(C) intentionally engaged in conduct intending that the victim be killed or that lethal force be employed against the victim, which resulted in the death of the victim;

(D) intentionally engaged in conduct which—

(i) the defendant knew would create a grave risk of death to a person, other than one of the participants in the offense; and

(ii) resulted in the death of the victim.

Appellants' facial challenge is based on the claim that the (n)(1) aggravating factor fails, as is constitutionally required, adequately to guide and channel sentencing discretion in imposing the death penalty. Roane Br. 133. We disagree.

Appellants properly point out that under the Supreme Court's decision in *Arave*, "[w]hen the purpose of a statutory aggravating circumstance is to enable the sentencer to distinguish those who deserve capital punishment from those who do not, the circumstance must provide a principled basis for doing so. If the sentencer fairly could conclude that an aggravating factor applies to *every* defendant eligible for the death penalty, the circumstance is constitutionally infirm." 507 U.S. at 474, 113 S.Ct. at 1542 (citations omitted). And, they also point out, correctly we may assume, that the four separate circumstances, (A)-(D), set out as bases for finding the (n)(1) aggravating factor to exist essentially replicate the threshold mental states constitutionally required for death-penalty eligibility under *Tison v. Arizona*, 481 U.S. 137, 158, 107 S.Ct. 1676, 1688, 95 L.Ed.2d 127 (1987), and *Enmund v. Florida*, 458 U.S. 782, 788, 792, 102 S.Ct. 3368, 3371–72, 3374, 73 L.Ed.2d 1140 (1982). From these two propositions, they then contend that because "every murderer must constitutionally satisfy one of these requirements to be subject to the death penalty," the several (n)(1) circumstances that merely replicate the required threshold eligibility states fail under *Arave* to provide a principled basis for distinguishing those who deserve capital punishment from those who do not.

This contention fails in its conclusion. The four (n)(1) circumstances do essentially replicate the required mental states for constitutional imposition of the death penalty, but in

doing so they reflect four distinctly different levels of moral culpability, ranging downward from direct "intentional killing," (A), to intentionally engaging in conduct with known potential for causing death that did in fact cause it, (D). Depending upon the evidence, a properly instructed jury which has returned an unspecific general verdict of guilty on a § 848(e) capital-murder count may have found either that the defendant "intentionally kill[ed]" or only "counsel[led], command[ed], induce[d], procure[d], or cause[d]" or "aid[ed] and abet[ted]" the intentional killing. § 848(e)(1)(A); 18 U.S.C. § (2)(a).[18]

In requiring the jury at sentencing then to address and make findings respecting these different circumstances—some of which are necessarily implicit in any guilty verdict on a § 848(e)(1)(A) murder count— § 848(n)(1) provides precisely the constitutionally required, principled basis for further distinguishing between those murderers thought deserving of death and those not thought to be. *See Arave*, 507 U.S. at 475–76, 113 S.Ct. at 1543 (degree of culpability, as measured by specific mental state, is proper basis for making death penalty choices among murderers); *Tison*, 481 U.S. at 157–58, 107 S.Ct. at 1688 ("highly culpable mental state ... may be taken into account in making a capital sentencing judgment"). They might well, for example, guide a discretionary decision to recommend death for one defendant found

guilty under § 848(e) because he "intentionally killed," *i.e.*, was a direct executioner, but not to recommend death for another defendant also found guilty not because he had been the actual executioner of a victim but because he had "caused" or "procured" his intentional killing by another and thereby had "intentionally engaged in conduct intending that the victim be killed."

We therefore reject appellants' facial challenge to the constitutionality of § 848(n)(1).[19]

5.

[50] Appellants jointly contend that, in any event, the (n)(1) aggravating factor was unconstitutionally applied as to each of them in the sentencing phase, thereby invalidating the several death sentences imposed upon them. The contention is a serious one, and we conclude that error did occur in the district court's submission and instructions respecting this factor, but we further conclude that the error was harmless beyond a reasonable doubt as to each appellant.

Over appellants' objections, JA 4688, 4786, the district court, by its verdict forms and its instructions, allowed the jury, if it chose, to find more than one of the specific circumstances, (A)–(D), as a basis for its determination of the (n)(1) aggravating factor's existence. The special verdict forms listed these circumstances—as does the statute[20]—as if

18. The alternative means to "intentional killing" that are provided in § 848(e)(1)(A) as elements of the offense simply replicate—for whatever reason—the alternative means, in addition to aiding and abetting, that make one "punishable as a principal" under the generally applicable provisions of 18 U.S.C. § 2(a).

19. We understand the appellants' facial constitutional challenge to be confined to the "failure-to-channel-discretion" theory discussed and rejected in the text. *See* Roane Br. (as adopted) 133–37. Picking up on an assertion in appellants' argument that repeating a guilt-phase element (intent) as an aggravating factor ((n)(1)) "increases the bias in favor of the death penalty," *id.* at 136, the Government relies on *Lowenfield v. Phelps*, 484 U.S. 231, 108 S.Ct. 546, 98 L.Ed.2d 568 (1988), as foreclosing any such "impermissible-duplication" claim. The appellants, however, expressly disavow that this is an independent basis of their challenge, asserting that it is "much more than that," hence not affected by *Lowenfield.* Roane Br. 137, n.100. We have, as

indicated, so understood their position, but to the extent an "impermissible-duplication" claim inheres as such in their challenge, we agree with the Government that *Lowenfield* forecloses it. *See Chandler*, 996 F.2d at 1092–93 & n. 4 (accord).

20. *See ante* at 897–98. As there indicated, § 848(n)(1) in listing the (A) & (D) circumstances contains no conjunction signalling whether it was intended that only one of the circumstances should be found or that more than one might be. Predictably, this regrettable omission quickly has led to uncertainty on the point among district courts making early applications of the statute. In addition to the district court in this case, the district court in *McCullah*, 76 F.3d 1087, apparently had assumed that cumulative findings should be allowed. Other district courts, however, seemingly have assumed that only one should be allowed. *See, e.g., Chandler*, 996 F.2d at 1082; *United States v. Pitera*, 795 F.Supp. 546, 556 (E.D.N.Y.1992); *Pretlow*, 779 F.Supp. at 771.

they might be found cumulatively, *see* JA 414 (Tipton form), and the court instructed that "you must find *at least one* from the first category [the (n)(1) category] of aggravators." JA 4793, 4794 (emphasis added). Following the apparent authorization thus given, the jury, as previously noted, found all four circumstances as to each of the murders for which each of the appellants had been convicted, including of course those for which it then recommended death sentences.

Appellants contend that allowing such a cumulation of "multiple overlapping aggravating factors, based upon a single element of the crime" to be considered in the weighing process unconstitutionally skewed the process in favor of death. And they argue that skewing was further exacerbated by the court's instruction to the jury that having already necessarily found in the guilt phase that each of the murders in issue was intentional, the purpose of requiring a re-finding of at least one of the specific intentions embodied in the (A)-(D) circumstances was simply "to insure that this factor was considered by you at the first phase, or guilt phase." JA 4793.

We agree with appellants that the district court's verdict submission and instructions respecting the purpose of the (n)(1) factor(s) and their proper application by the sentencing jury was erroneous. The court's instructions misconstrued the essential purpose of the specific (A)-(D) circumstances set out as discrete alternative bases for making the required (n)(1) finding. That purpose, as earlier discussed, is not the anomalous one of merely re-confirming (or, by not confirming,

impeaching?) the jury's earlier finding of intent in the guilt phase. It is instead to focus the jury's attention upon the different levels of moral culpability that these specific circumstances might reasonably be thought to represent, thereby channeling jury discretion in the weighing process.[21] To allow cumulative findings of these intended alternative circumstances, all of which do involve different forms of criminal intent, runs a clear risk of skewing the weighing process in favor of the death penalty and thereby causing it to be imposed arbitrarily, hence unconstitutionally. *Stringer v. Black,* 503 U.S. 222, 230–32, 112 S.Ct. 1130, 1136–37, 117 L.Ed.2d 367 (1992). On this basis, the Tenth Circuit recently has vacated a death sentence imposed for a § 848(e) capital murder where the district court had erroneously, in the Tenth Circuit's view, allowed the jury to find both the (C) and (D) circumstances to exist as (n)(1) aggravating factors. *McCullah,* 76 F.3d at 1111 ("while the factors are not identical per se, [one] necessarily subsumes the [other]," and so impermissibly duplicates).

We agree with the *McCullah* court that such a submission (here of all four (n)(1) circumstances) that permits and results in cumulative findings of more than one of the (n)(1) circumstances as an aggravating factor is constitutional error. As earlier indicated, however, we further conclude, as we properly may in appellate review, *Stringer,* 503 U.S. at 232, 112 S.Ct. at 1137, that the error was harmless beyond a reasonable doubt.[22]

In considering whether the error was so harmless, we keep in mind the two possible ways in which it could have prejudiced—not

Correctly pointing out that the statute does not in terms prohibit multiple findings, the Government contends on this appeal, as presumably it did in the district court, that the district court's submission for multiple findings was proper. Gov't Br. 126 n.80. We observe, however, that perhaps aware of the difficulty created by such an interpretation, the Government, in summarizing the (n)(1) provisions, elsewhere suggests that a disjunctive reading should be implied. *Id.* at 122 (implying an "or" reading).

For reasons following, we simply disagree with that position.

21. In fairness to the district court, it should be observed that the court also indicated in supplemental instructions to the jury that the (n)(1)

circumstances served the function, beyond that of merely re-confirming its guilt-phase criminal intent finding, of pointing up specific levels of culpability depending upon the factual basis for the guilt finding. But, the court then, erroneously we conclude, reiterated that the jury could find more than one circumstance. JA 4837–39.

22. The Tenth Circuit in *McCullah* recognized its power to conduct harmless error review of a comparable error, but for unstated reasons declined to do so and remanded for reweighing and resentencing by the district court. 76 F.3d at 1112; *see Clemons v. Mississippi,* 494 U.S. 738, 754, 110 S.Ct. 1441, 1451, 108 L.Ed.2d 725 (1990).

been harmless—in producing the challenged death sentences: first, by causing the jury to assess the weight of the (n)(1) circumstances it found on an unfair quantitative basis that gave four-fold effect to what was essentially a single factor—criminal intent; second, by allowing the jury to find a more morally culpable circumstance than was supported by the sentencing information, including the guilt-phase evidence, that was before it. With those two possible sources of actual prejudice in mind, we then ask what the record indicates the jury would have done had it been properly instructed on its consideration of the critical (n)(1) factor. If the answer is that it would surely have done just what it did in the end under the erroneous instruction—recommended each of the death sentences now challenged—harmlessness is thereby demonstrated as to each. *See Clemons*, 494 U.S. at 754, 110 S.Ct. at 1451 (so stating proper harmlessness test).

To get at this, we have first to establish what a proper instruction would have been as to those murders for which the challenged death sentences were imposed. Fortunately, we need not decide for the limited purpose at hand whether as a general proposition a proper (n)(1) instruction would always submit for jury consideration only those (n)(1) circumstances, (A)-(D), for which there was sufficient evidentiary support before the jury.[23] Here, though on a mistaken legal premise, that was indeed done as to each of the murders for which the death sentence was imposed. For as to each there was evidentiary support for all four of the circumstances submitted, including (A), the most culpable. Critically for our purpose, however, a proper instruction would also have directed that from among those circumstances, (A)-(D), submitted for consideration as alternatives, only one should be found as the basis of the required (n)(1) aggravating factor. Accordingly, the harmless-error question for us becomes whether if the jury had been instructed properly that as to each of the murders in issue it might consider circumstance (A) and one or more of (B), (C), and (D), but could

only find one of these as the basis for its (n)(1) finding, it would have reached the same result it reached under the erroneous instruction. We are so convinced.

First off, it is obvious that as to each of the murders in issue, the jury under a proper instruction would have found circumstance (A), intentional killing, as the sole basis for its (n)(1) finding. It did, after all, find this as the most culpable of the circumstances actually submitted to it; it is inconceivable that if confined to finding one, it would not have so found. Might it, however, having found only that one circumstance as an (n)(1) aggravating factor, then have accorded it so much less weight than it did to the four circumstances it improperly found that it would have come out differently in its weighing process? We are satisfied that it would not have, for several reasons.

First, because, as the Government points out, each of the other three (n)(1) circumstances, (B), (C), and (D), that the jury found is necessarily subsumed as merely a "lesser-included" aspect of the (A)—"intentionally killed"—circumstance. That being so obviously the case, we cannot believe that the jury gave any greater weight to the aggregate of overlapping mental-state circumstances than it would have to the all-embracing (A) circumstance alone. We are bolstered in this conviction by the district court's careful instructions which emphasized both the impropriety of quantitative weighing of factors, and the overlapping, "lesser-included" relationship between the (A) & (D) circumstances it allowed the jury to find. In its original sentencing instructions, the court emphasized that the weighing process "is not a mechanical" one; that it is not "determined by raw numbers"; and that "[i]nstead, you must consider them qualitatively." JA 4810. In supplemental instructions, responding to a jury inquiry, the court pointed out that one who under its instructions might be found to have "intentionally engaged in conduct intending that the victim be killed" under (C), might also

---

**23.** We need not decide it because of the fortuity noted, but we would be amiss not to note the obvious potential for prejudicial error if a jury were permitted to consider and find the (A) circumstance when the guilt-phase evidence sufficed only to convict a defendant as a marginal aider and abettor who did not participate directly in the killing. *See* note 24.

be found, if he followed through on that intention with an "actual stabbing and shooting," to have "intentionally killed" under (A). JA 4837–38. While, as indicated, this instruction was given on the erroneous premise that more than one such circumstance could properly be found, it nevertheless served to convey to the jury that, as necessarily subsumed circumstances, they were not to be given cumulative weight.

Most critical, however, to our assessment that the jury did not in recommending the challenged death sentences give more weight to the aggregate of (n)(1) circumstances than it would have to the (A) circumstance alone under a proper instruction, is the actual result it reached on the various murders for which it had severally convicted the appellants. Though it found *all* the (n)(1) circumstances as to *each* appellant on *each* of these murders, it only recommended the death sentence in respect of those murders as to which the evidence supported a finding either that the particular appellant was the actual killer or was physically present as an active participant in the killing. This clearly indicates to us that whatever misapprehensions the jury may have received from the court's allowance of cumulative findings of (n)(1) circumstances, the jury properly accorded the weight it should have to the (A) circumstance in those cases where, under a proper instruction, it would have been found as the sole (n)(1) factor.[24]

Neither, on this assessment, is there any possibility of the other potential prejudice from erroneously allowing multiple (n)(1) findings: that this permitted the finding of a higher degree of culpability than was supported by the evidence. As to each of the murders for which the death sentence was imposed, the evidence clearly (and uniquely) supported a finding of the (A) circumstance.

We therefore conclude that beyond a reasonable doubt the district court's error in allowing the jury to find all of the (n)(1) circumstances as an aggravating factor was harmless in respect of the several death sentences imposed.

## C.

We have carefully considered appellants' other claims of error in the capital sentencing phase[25] and find no error warranting correction or discussion.

## V.

[51] We consider last the Government's cross-appeal from the district court's order staying execution of the death sentences severally imposed upon appellants pending congressional authorization of the means of execution.

At the time these death sentences were imposed, no federal statute provided authori-

---

**24.** We do not overlook that the jury clearly was under misapprehension—not only as to the propriety of making multiple findings on the (n)(1) factor, but as to the relationship between the basis upon which it had found guilt for a particular murder and the (n)(1) circumstance which reflected that basis. Obviously worried about what (n)(1)(A)'s "intentionally killed" embraced, the jury requested supplemental instruction on the point. In response, the district court gave instructions which in ways were accurate and helpful, but it concluded with an unfortunate summation that clearly led the jury to believe that having found guilt, on whatever basis, whether as principal or aider and abettor, they had necessarily found, for (n)(1) purposes, that a defendant had "intentionally killed," so that any and all of the (n)(1) circumstances might appropriately be found. JA 4837–39. This might well have prejudiced any defendant who received the death sentence for a murder in whose commission he was not a direct participant, but of course we are not presented with such a claim,

there being no such defendant in this case. Our question is only whether, all things considered, such a misapprehension could possibly have prejudiced a defendant who had been found guilty because the jury determined that he had directly participated in the murder's commission, and we are convinced that the answer to that question is, beyond a reasonable doubt, no.

**25.** These include, *inter alia*, facial challenges to the use of two nonstatutory aggravating factors—substantial criminal histories and participation in a conspiracy having murder as a purpose—; failure to define reasonable doubt in the capital-sentencing instructions; failure to hold the Government to penalty-phase discovery and proof requirements; failure to instruct on proper use of mental and neurological impairments evidence; failure to declare a mistrial because of a prosecutor's comment on Tipton's failure to testify; and failure to order a new penalty-phase trial because of the Government's withdrawal of death-penalty notice against a co-defendant.

zation for the specific means of executing such sentences. Before enactment of the Sentencing Reform Act of 1984 (the "Sentencing Guidelines"), 18 U.S.C. § 3566 had provided that with respect to death sentences imposed under the few then extant federal capital offenses the means of execution should be that "prescribed by the laws of the place within which the sentence is imposed," or, failing such laws, as prescribed by the law of another state designated by the sentencing court. Section 3566, however, was repealed upon enactment of the Sentencing Reform Act and had not been replaced by any other generally applicable provision when these death sentences were imposed.

Effective on February 18, 1993, however, the Attorney General of the United States had promulgated regulations providing that as to death sentences imposed under § 848(e), "[e]xcept to the extent a court orders otherwise, a sentence of death shall be executed ... [b]y intravenous injection of a lethal substance or substances in a quantity sufficient to cause death." 58 Fed.Reg. 4898, 4901–02 (1993) (codified at 28 C.F.R. § 26.3). Invoking these regulations as authority, the Government moved for issuance of an order of execution that would permit a United States Marshal to carry out appellants' several death sentences at a time and place to be designated by the Director of the Bureau of Prisons. The appellants objected to issuance of such an order, contending that the Attorney General's regulations were *ultra vires* its powers, hence provided no authority for judicial issuance of such an order; that Congress possessed the exclusive power to prescribe, as a legislative matter, the means by which federal death sentences should be executed; and that in the absence of congressional authorization, the appellants' death sentences could not be executed. The district court agreed and entered an order affirmatively staying the executions until such time as Congress provided specific authorization of means.

Since entry of that order, Congress has enacted the Federal Death Penalty Act of 1994 as part of the Violent Crime Control and Law Enforcement Act of 1994, Pub.L. No. 103–322, 108 Stat. 1796. This legislation created a number of new capital offenses, and contained capital-sentencing provisions for the new capital offenses and for previously existing ones which, unlike 21 U.S.C. § 848(e), did not contain them. It also included a general implementation provision, 18 U.S.C. § 3596 (Supp.1996), which authorized the execution of any defendant "sentenced to death *pursuant to this chapter,*" *id.* (emphasis added), essentially as was provided in former 18 U.S.C. § 3566, *i.e.,* under the law of the state of imposition or of a court-designated state. This provision, however, does not by its terms apply to death sentences imposed under § 848(e).

At the present time, therefore, the situation remains as it was when the district court issued its stay of execution order: The only formal authorization for the means of execution is the regulation issued by the Attorney General. We therefore address the correctness of the district court's holding that this regulation is not constitutionally valid because it purports to exercise a power which, being legislative, is exclusively that of Congress. And, we disagree with that holding.

We conclude, first off, that although Congress clearly may, if it chooses, preemptively legislate the means of executing federal death sentences, its power to do so is not exclusive of the power of the executive branch, where Congress has not acted preemptively, to provide those means as an aspect of its constitutional power to see "that the laws be faithfully executed." U.S. Const. art. II, § 3. Congress has itself authorized the Attorney General to "prescribe regulations for the government of [her] department, ... [and] the distribution of its business ...," 5 U.S.C. § 301 (1996), has vested all functions of the Department of Justice in the Attorney General, and has authorized officers, employees, and agencies of the Department to perform those functions, 28 U.S.C. §§ 509, 510 (1996). Among those agencies are the United States Marshals, whose legislatively conferred obligation is to "obey, execute, and enforce all orders of the United States District Courts," 28 U.S.C. § 566(a) (1993). We conclude that, absent directly preempting congressional action, the Attorney General had constitutional and stat-

utory authority to provide by regulation the means for executing death sentences imposed under 21 U.S.C. § 848(e), there being no claim made here that lethal injection is itself an unconstitutional means.

Next, we conclude that Congress has not, either expressly or by necessary implication, preempted the power of the executive branch, through the Attorney General, to authorize the means at issue. There is of course no claim that Congress has expressly provided some other means for executing § 848(e) death sentences, nor that it has expressly reserved that power to itself, nor that it has expressly forbidden exercise of the power by the Attorney General. Appellants essentially claim, however, that Congress has by necessary implication asserted its exclusive power to provide the means, thereby preempting any power otherwise possessed by the Attorney General to act in the absence of express congressional legislation. We disagree.

The claims of implied preemption are based essentially on the fact that from time to time Congress has exercised exclusive power in the matter (before repeal of § 3566) and an almost exclusive power (since enactment of the Violent Crime Control and Law Enforcement Act of 1994). But we know of no constitutional or separation-of-powers principle which dictates that where branches share power in a matter, the exercise of that power at any time and to any extent by the branch having primary power acts totally and for all time to preempt exercise of the power by the other branch in areas not expressly preempted by the former. *Cf. Wilkerson v. Utah*, 99 U.S. 130, 137, 25 L.Ed. 345 (1879) (in absence of statutory prescription for means of execution of sentence, sentencing court had authority to prescribe).

Finally, we reject appellants' contention that even if the Attorney General had power to issue the regulation in issue, its application to appellants would violate the Ex Post Facto Clause because it was promulgated after the commissions of the capital offenses at issue. We agree with the Eleventh Circuit in *Chandler*, 996 F.2d at 1095–96, that this contention is foreclosed by *Dobbert v. Florida*, 432 U.S. 282, 97 S.Ct. 2290, 53 L.Ed.2d 344

(1977) (application of constitutionally adequate capital-sentencing provision enacted after commission of offense not violative of Ex Post Facto Clause because procedural).

## VI.

We affirm the convictions and sentences of all appellants in all respects except for their several convictions and sentences on the Count 1 conspiracy count under 21 U.S.C. § 846. We vacate those convictions and sentences for reasons given in Part III.G. of this opinion.

On the Government's cross-appeal, we vacate the district court's order staying execution of the several death sentences imposed upon each of the appellants and remand with instructions to enter appropriate orders for the executions in accordance with regulation promulgated by the Attorney General.

*SO ORDERED.*



**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**James Ronson TAYLOR; Jamel Earleen
White Taylor, Claimants–
Appellants,**

**and**

**$61,433.04 U.S. Currency; One Tract of Real Property (Consisting of Two Lots) located in Wilson County, Wilson Creek Township, having the Street Address of 1699 Bynwood Circle, Wilson, North Carolina, and being more particularly described in a deed recorded in Book 1336, Page 902 of the Wilson County**

they might be found cumulatively, *see* JA 414 (Tipton form), and the court instructed that "you must find *at least one* from the first category [the (n)(1) category] of aggravators." JA 4793, 4794 (emphasis added). Following the apparent authorization thus given, the jury, as previously noted, found all four circumstances as to each of the murders for which each of the appellants had been convicted, including of course those for which it then recommended death sentences.

Appellants contend that allowing such a cumulation of "multiple overlapping aggravating factors, based upon a single element of the crime" to be considered in the weighing process unconstitutionally skewed the process in favor of death. And they argue that skewing was further exacerbated by the court's instruction to the jury that having already necessarily found in the guilt phase that each of the murders in issue was intentional, the purpose of requiring a re-finding of at least one of the specific intentions embodied in the (A)-(D) circumstances was simply "to insure that this factor was considered by you at the first phase, or guilt phase." JA 4793.

We agree with appellants that the district court's verdict submission and instructions respecting the purpose of the (n)(1) factor(s) and their proper application by the sentencing jury was erroneous. The court's instructions misconstrued the essential purpose of the specific (A)-(D) circumstances set out as discrete alternative bases for making the required (n)(1) finding. That purpose, as earlier discussed, is not the anomalous one of merely re-confirming (or, by not confirming,

impeaching?) the jury's earlier finding of intent in the guilt phase. It is instead to focus the jury's attention upon the different levels of moral culpability that these specific circumstances might reasonably be thought to represent, thereby channeling jury discretion in the weighing process.[21] To allow cumulative findings of these intended alternative circumstances, all of which do involve different forms of criminal intent, runs a clear risk of skewing the weighing process in favor of the death penalty and thereby causing it to be imposed arbitrarily, hence unconstitutionally. *Stringer v. Black*, 503 U.S. 222, 230–32, 112 S.Ct. 1130, 1136–37, 117 L.Ed.2d 367 (1992). On this basis, the Tenth Circuit recently has vacated a death sentence imposed for a § 848(e) capital murder where the district court had erroneously, in the Tenth Circuit's view, allowed the jury to find both the (C) and (D) circumstances to exist as (n)(1) aggravating factors. *McCullah*, 76 F.3d at 1111 ("while the factors are not identical per se, [one] necessarily subsumes the [other]," and so impermissibly duplicates).

We agree with the *McCullah* court that such a submission (here of all four (n)(1) circumstances) that permits and results in cumulative findings of more than one of the (n)(1) circumstances as an aggravating factor is constitutional error. As earlier indicated, however, we further conclude, as we properly may in appellate review, *Stringer*, 503 U.S. at 232, 112 S.Ct. at 1137, that the error was harmless beyond a reasonable doubt.[22]

In considering whether the error was so harmless, we keep in mind the two possible ways in which it could have prejudiced—not

---

Correctly pointing out that the statute does not in terms prohibit multiple findings, the Government contends on this appeal, as presumably it did in the district court, that the district court's submission for multiple findings was proper. Gov't Br. 126 n.80. We observe, however, that perhaps aware of the difficulty created by such an interpretation, the Government, in summarizing the (n)(1) provisions, elsewhere suggests that a disjunctive reading should be implied. *Id.* at 122 (implying an "or" reading).

For reasons following, we simply disagree with that position.

21. In fairness to the district court, it should be observed that the court also indicated in supplemental instructions to the jury that the (n)(1)

circumstances served the function, beyond that of merely re-confirming its guilt-phase criminal intent finding, of pointing up specific levels of culpability depending upon the factual basis for the guilt finding. But, the court then, erroneously we conclude, reiterated that the jury could find more than one circumstance. JA 4837–39.

22. The Tenth Circuit in *McCullah* recognized its power to conduct harmless error review of a comparable error, but for unstated reasons declined to do so and remanded for reweighing and resentencing by the district court. 76 F.3d at 1112; *see Clemons v. Mississippi*, 494 U.S. 738, 754, 110 S.Ct. 1441, 1451, 108 L.Ed.2d 725 (1990).

been harmless—in producing the challenged death sentences: first, by causing the jury to assess the weight of the (n)(1) circumstances it found on an unfair quantitative basis that gave four-fold effect to what was essentially a single factor—criminal intent; second, by allowing the jury to find a more morally culpable circumstance than was supported by the sentencing information, including the guilt-phase evidence, that was before it. With those two possible sources of actual prejudice in mind, we then ask what the record indicates the jury would have done had it been properly instructed on its consideration of the critical (n)(1) factor. If the answer is that it would surely have done just what it did in the end under the erroneous instruction—recommended each of the death sentences now challenged—harmlessness is thereby demonstrated as to each. *See Clemons*, 494 U.S. at 754, 110 S.Ct. at 1451 (so stating proper harmlessness test).

To get at this, we have first to establish what a proper instruction would have been as to those murders for which the challenged death sentences were imposed. Fortunately, we need not decide for the limited purpose at hand whether as a general proposition a proper (n)(1) instruction would always submit for jury consideration only those (n)(1) circumstances, (A)-(D), for which there was sufficient evidentiary support before the jury.[23] Here, though on a mistaken legal premise, that was indeed done as to each of the murders for which the death sentence was imposed. For as to each there was evidentiary support for all four of the circumstances submitted, including (A), the most culpable. Critically for our purpose, however, a proper instruction would also have directed that from among those circumstances, (A)-(D), submitted for consideration as alternatives, only one should be found as the basis of the required (n)(1) aggravating factor. Accordingly, the harmless-error question for us becomes whether if the jury had been instructed properly that as to each of the murders in issue it might consider circumstance (A) and one or more of (B), (C), and (D), but could

only find one of these as the basis for its (n)(1) finding, it would have reached the same result it reached under the erroneous instruction. We are so convinced.

First off, it is obvious that as to each of the murders in issue, the jury under a proper instruction would have found circumstance (A), intentional killing, as the sole basis for its (n)(1) finding. It did, after all, find this as the most culpable of the circumstances actually submitted to it; it is inconceivable that if confined to finding one, it would not have so found. Might it, however, having found only that one circumstance as an (n)(1) aggravating factor, then have accorded it so much less weight than it did to the four circumstances it improperly found that it would have come out differently in its weighing process? We are satisfied that it would not have, for several reasons.

First, because, as the Government points out, each of the other three (n)(1) circumstances, (B), (C), and (D), that the jury found is necessarily subsumed as merely a "lesser-included" aspect of the (A)—"intentionally killed"—circumstance. That being so obviously the case, we cannot believe that the jury gave any greater weight to the aggregate of overlapping mental-state circumstances than it would have to the all-embracing (A) circumstance alone. We are bolstered in this conviction by the district court's careful instructions which emphasized both the impropriety of quantitative weighing of factors, and the overlapping, "lesser-included" relationship between the (A) & (D) circumstances it allowed the jury to find. In its original sentencing instructions, the court emphasized that the weighing process "is not a mechanical" one; that it is not "determined by raw numbers"; and that "[i]nstead, you must consider them qualitatively." JA 4810. In supplemental instructions, responding to a jury inquiry, the court pointed out that one who under its instructions might be found to have "intentionally engaged in conduct intending that the victim be killed" under (C), might also

23. We need not decide it because of the fortuity noted, but we would be amiss not to note the obvious potential for prejudicial error if a jury were permitted to consider and find the (A) circumstance when the guilt-phase evidence sufficed only to convict a defendant as a marginal aider and abettor who did not participate directly in the killing. *See* note 24.

be found, if he followed through on that intention with an "actual stabbing and shooting," to have "intentionally killed" under (A). JA 4837–38. While, as indicated, this instruction was given on the erroneous premise that more than one such circumstance could properly be found, it nevertheless served to convey to the jury that, as necessarily subsumed circumstances, they were not to be given cumulative weight.

Most critical, however, to our assessment that the jury did not in recommending the challenged death sentences give more weight to the aggregate of (n)(1) circumstances than it would have to the (A) circumstance alone under a proper instruction, is the actual result it reached on the various murders for which it had severally convicted the appellants. Though it found *all* the (n)(1) circumstances as to *each* appellant on *each* of these murders, it only recommended the death sentence in respect of those murders as to which the evidence supported a finding either that the particular appellant was the actual killer or was physically present as an active participant in the killing. This clearly indicates to us that whatever misapprehensions the jury may have received from the court's allowance of cumulative findings of (n)(1) circumstances, the jury properly accorded the weight it should have to the (A) circumstance in those cases where, under a proper instruction, it would have been found as the sole (n)(1) factor.[24]

Neither, on this assessment, is there any possibility of the other potential prejudice from erroneously allowing multiple (n)(1) findings: that this permitted the finding of a higher degree of culpability than was supported by the evidence. As to each of the murders for which the death sentence was imposed, the evidence clearly (and uniquely) supported a finding of the (A) circumstance.

We therefore conclude that beyond a reasonable doubt the district court's error in allowing the jury to find all of the (n)(1) circumstances as an aggravating factor was harmless in respect of the several death sentences imposed.

### C.

We have carefully considered appellants' other claims of error in the capital sentencing phase[25] and find no error warranting correction or discussion.

### V.

[51] We consider last the Government's cross-appeal from the district court's order staying execution of the death sentences severally imposed upon appellants pending congressional authorization of the means of execution.

At the time these death sentences were imposed, no federal statute provided authori-

---

**24.** We do not overlook that the jury clearly was under misapprehension—not only as to the propriety of making multiple findings on the (n)(1) factor, but as to the relationship between the basis upon which it had found guilt for a particular murder and the (n)(1) circumstance which reflected that basis. Obviously worried about what (n)(1)(A)'s "intentionally killed" embraced, the jury requested supplemental instruction on the point. In response, the district court gave instructions which in ways were accurate and helpful, but it concluded with an unfortunate summation that clearly led the jury to believe that having found guilt, on whatever basis, whether as principal or aider and abettor, they had necessarily found, for (n)(1) purposes, that a defendant had "intentionally killed," so that any and all of the (n)(1) circumstances might appropriately be found. JA 4837–39. This might well have prejudiced any defendant who received the death sentence for a murder in whose commission he was not a direct participant, but of course we are not presented with such a claim,

there being no such defendant in this case. Our question is only whether, all things considered, such a misapprehension could possibly have prejudiced a defendant who had been found guilty because the jury determined that he had directly participated in the murder's commission, and we are convinced that the answer to that question is, beyond a reasonable doubt, no.

**25.** These include, *inter alia*, facial challenges to the use of two nonstatutory aggravating factors—substantial criminal histories and participation in a conspiracy having murder as a purpose—; failure to define reasonable doubt in the capital-sentencing instructions; failure to hold the Government to penalty-phase discovery and proof requirements; failure to instruct on proper use of mental and neurological impairments evidence; failure to declare a mistrial because of a prosecutor's comment on Tipton's failure to testify; and failure to order a new penalty-phase trial because of the Government's withdrawal of death-penalty notice against a co-defendant.

zation for the specific means of executing such sentences. Before enactment of the Sentencing Reform Act of 1984 (the "Sentencing Guidelines"), 18 U.S.C. § 3566 had provided that with respect to death sentences imposed under the few then extant federal capital offenses the means of execution should be that "prescribed by the laws of the place within which the sentence is imposed," or, failing such laws, as prescribed by the law of another state designated by the sentencing court. Section 3566, however, was repealed upon enactment of the Sentencing Reform Act and had not been replaced by any other generally applicable provision when these death sentences were imposed.

Effective on February 18, 1993, however, the Attorney General of the United States had promulgated regulations providing that as to death sentences imposed under § 848(e), "[e]xcept to the extent a court orders otherwise, a sentence of death shall be executed ... [b]y intravenous injection of a lethal substance or substances in a quantity sufficient to cause death." 58 Fed.Reg. 4898, 4901–02 (1993) (codified at 28 C.F.R. § 26.3). Invoking these regulations as authority, the Government moved for issuance of an order of execution that would permit a United States Marshal to carry out appellants' several death sentences at a time and place to be designated by the Director of the Bureau of Prisons. The appellants objected to issuance of such an order, contending that the Attorney General's regulations were *ultra vires* its powers, hence provided no authority for judicial issuance of such an order; that Congress possessed the exclusive power to prescribe, as a legislative matter, the means by which federal death sentences should be executed; and that in the absence of congressional authorization, the appellants' death sentences could not be executed. The district court agreed and entered an order affirmatively staying the executions until such time as Congress provided specific authorization of means.

Since entry of that order, Congress has enacted the Federal Death Penalty Act of 1994 as part of the Violent Crime Control and Law Enforcement Act of 1994, Pub.L. No. 103–322, 108 Stat. 1796. This legislation created a number of new capital offenses, and contained capital-sentencing provisions for the new capital offenses and for previously existing ones which, unlike 21 U.S.C. § 848(e), did not contain them. It also included a general implementation provision, 18 U.S.C. § 3596 (Supp.1996), which authorized the execution of any defendant "sentenced to death *pursuant to this chapter*," *id.* (emphasis added), essentially as was provided in former 18 U.S.C. § 3566, *i.e.*, under the law of the state of imposition or of a court-designated state. This provision, however, does not by its terms apply to death sentences imposed under § 848(e).

At the present time, therefore, the situation remains as it was when the district court issued its stay of execution order: The only formal authorization for the means of execution is the regulation issued by the Attorney General. We therefore address the correctness of the district court's holding that this regulation is not constitutionally valid because it purports to exercise a power which, being legislative, is exclusively that of Congress. And, we disagree with that holding.

We conclude, first off, that although Congress clearly may, if it chooses, preemptively legislate the means of executing federal death sentences, its power to do so is not exclusive of the power of the executive branch, where Congress has not acted preemptively, to provide those means as an aspect of its constitutional power to see "that the laws be faithfully executed." U.S. Const. art. II, § 3. Congress has itself authorized the Attorney General to "prescribe regulations for the government of [her] department, ... [and] the distribution of its business ...," 5 U.S.C. § 301 (1996), has vested all functions of the Department of Justice in the Attorney General, and has authorized officers, employees, and agencies of the Department to perform those functions, 28 U.S.C. §§ 509, 510 (1996). Among those agencies are the United States Marshals, whose legislatively conferred obligation is to "obey, execute, and enforce all orders of the United States District Courts," 28 U.S.C. § 566(a) (1993). We conclude that, absent directly preempting congressional action, the Attorney General had constitutional and stat-

utory authority to provide by regulation the means for executing death sentences imposed under 21 U.S.C. § 848(e), there being no claim made here that lethal injection is itself an unconstitutional means.

Next, we conclude that Congress has not, either expressly or by necessary implication, preempted the power of the executive branch, through the Attorney General, to authorize the means at issue. There is of course no claim that Congress has expressly provided some other means for executing § 848(e) death sentences, nor that it has expressly reserved that power to itself, nor that it has expressly forbidden exercise of the power by the Attorney General. Appellants essentially claim, however, that Congress has by necessary implication asserted its exclusive power to provide the means, thereby preempting any power otherwise possessed by the Attorney General to act in the absence of express congressional legislation. We disagree.

The claims of implied preemption are based essentially on the fact that from time to time Congress has exercised exclusive power in the matter (before repeal of § 3566) and an almost exclusive power (since enactment of the Violent Crime Control and Law Enforcement Act of 1994). But we know of no constitutional or separation-of-powers principle which dictates that where branches share power in a matter, the exercise of that power at any time and to any extent by the branch having primary power acts totally and for all time to preempt exercise of the power by the other branch in areas not expressly preempted by the former. Cf. *Wilkerson v. Utah,* 99 U.S. 130, 137, 25 L.Ed. 345 (1879) (in absence of statutory prescription for means of execution of sentence, sentencing court had authority to prescribe).

Finally, we reject appellants' contention that even if the Attorney General had power to issue the regulation in issue, its application to appellants would violate the Ex Post Facto Clause because it was promulgated after the commissions of the capital offenses at issue. We agree with the Eleventh Circuit in *Chandler,* 996 F.2d at 1095–96, that this contention is foreclosed by *Dobbert v. Florida,* 432 U.S. 282, 97 S.Ct. 2290, 53 L.Ed.2d 344

(1977) (application of constitutionally adequate capital-sentencing provision enacted after commission of offense not violative of Ex Post Facto Clause because procedural).

## VI.

We affirm the convictions and sentences of all appellants in all respects except for their several convictions and sentences on the Count 1 conspiracy count under 21 U.S.C. § 846. We vacate those convictions and sentences for reasons given in Part III.G. of this opinion.

On the Government's cross-appeal, we vacate the district court's order staying execution of the several death sentences imposed upon each of the appellants and remand with instructions to enter appropriate orders for the executions in accordance with regulation promulgated by the Attorney General.

*SO ORDERED.*



**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**James Ronson TAYLOR; Jamel Earleen
White Taylor, Claimants–
Appellants,**

and

**$61,433.04 U.S. Currency; One Tract of
Real Property (Consisting of Two Lots)
located in Wilson County, Wilson Creek
Township, having the Street Address of
1699 Bynwood Circle, Wilson, North
Carolina, and being more particularly
described in a deed recorded in Book
1336, Page 902 of the Wilson County**

**MOTION UNDER 28 USC § 2255 TO VACATE, SET ASIDE, OR CORRECT SENTENCE BY A PERSON IN FEDERAL CUSTODY**

| **United States District Court** | District |
|---|---|
| | Eastern District of Virginia |

| Name of Movant | Prisoner No. | Case No. |
|---|---|---|
| James H. Roane, Jr. | 206197 | 92CR68 —3 |

| Place of Confinement | |
|---|---|
| Mecklenburg Correctional Center, Boydton, VA | 3:98CV360 |

UNITED STATES OF AMERICA     V.    James Roane

(name under which convicted)

## MOTION

1. Name and location of court which entered the judgment of conviction under attack **United States District Court, Eastern District of Virginia, Richmond, VA**

2. Date of judgment of conviction **June 1, 1993**

3. Length of sentence **Death, with concurrent sentences of life imprisonment**

4. Nature of offense involved (all counts) **CCE Murder, 21 U.S.C.Sec. 848(e) (three counts); engaging in CCE, 21 U.S.C. Sec. 848(a) (one count); conspiracy to possess cocaine base with intent to distribute, 21 U.S.C. Sec. 846 (one count); violence in aid of racketeering, 18 U.S.C. Sec. 1959 (five counts); use of firearm, 18 U.S.C. Sec. 924(c) (four counts); possession of cocaine base with intent to distribute, 21 U.S.C. Sec. 841(a)(1) (one count).**

5. What was your plea? (Check one)
   (a) Not guilty  XX
   (b) Guilty  ☐
   (c) Nolo contendere  ☐

   If you entered a guilty plea to one count or indictment, and a not guilty plea to another count or indictment, give details:

   _____

   _____

6. If you pleaded not guilty, what kind of trial did you have? (Check one)
   (a) Jury  XX
   (b) Judge only  ☐

7. Did you testify at the trial?
   Yes ☐ No XX

8. Did you appeal from the judgment of conviction?
   Yes XX No ☐

FILED
JUN 1 1998
CLERK, U.S. DISTRICT COURT
RICHMOND, VA

RECEIVED
JUN - 1 1998
CLERK, U.S. DISTRICT COURT
RICHMOND, VA

AO 243 (Rev. 5/85)

9. If you did appeal, answer the following:

(a) Name of court___U.S. Court of Appeals, Fourth Circuit_____

(b) Result _____Affirmance_____

(c) Date of result ___July 8, 1996 (rehearing denied October 28, 1996, and certiorari denied June 2, 1997)_____

10. Other than a direct appeal from the judgment of conviction and sentence, have you previously filed any petitions, applications or motions with respect to this judgment in any federal court?
Yes ☐ No ☒

11. If your answer to 10 was "yes," give the following information:

(a)(1) Name of court _____

(2) Nature of proceeding _____

(3) Grounds raised_____

(4) Did you receive an evidentiary hearing on your petition, application or motion?
Yes ☐ No ☐

(5) Result_____

(6) Date of result _____

(b) As to any second petition, application or motion give the same information:

(1) Name of court _____

(2) Nature of proceeding _____

(3) Grounds raised_____

(4) Did you receive an evidentiary hearing on your petition, application or motion?
Yes ☐ No ☐

(5) Result_____

(6) Date of result _____

(c) Did you appeal, to an appellate federal court having jurisdiction, the result of action taken on any petition, application or motion?
(1) First petition, etc.  Yes ☐ No ☐
(2) Second petition, etc.  Yes ☐ No ☐

(d) If you did not appeal from the adverse action on any petition, application or motion, explain briefly why you did not:

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

12. State *concisely* every ground on which you claim that you are being held in violation of the constitution, laws or treaties of the United States. Summarize briefly the facts supporting each ground. If necessary, you may attach pages stating additional grounds and facts supporting same.

CAUTION: If you fail to set forth all ground in this motion, you may be barred from presenting additional grounds at a later date.

For your information, the following is a list of the most frequently raised grounds for relief in these proceedings. Each statement preceded by a letter constitutes a separate ground for possible relief. You may raise any grounds which you have other than those listed. However, you should raise in this motion all available grounds (relating to this conviction) on which you based your allegations that you are being held in custody unlawfully.

Do not check any of these listed grounds. If you select one or more of these grounds for relief, you must allege facts. The motion will be returned to you if you merely check (a) through (j) or any one of the grounds.

(a) Conviction obtained by plea of guilty which was unlawfully induced or not made voluntarily or with understanding of the nature of the charge and the consequences of the plea.

(b) Conviction obtained by use of coerced confession.

(c) Conviction obtained by use of evidence gained pursuant to an unconstitutional search and seizure.

(d) Conviction obtained by use of evidence obtained pursuant to an unlawful arrest.

(e) Conviction obtained by a violation of the privilege against self-incrimination.

(f) Conviction obtained by the unconstitutional failure of the prosecution to disclose to the defendant evidence favorable to the defendant.

(g) Conviction obtained by a violation of the protection against double jeopardy.

(h) Conviction obtained by action of a grand or petit jury which was unconstitutionally selected and impanelled.

(i) Denial of effective assistance of counsel.

(j) Denial of right of appeal.

A. Ground one: Denial of effective assistance of counsel.

Supporting FACTS (state *briefly* without citing cases or law) Trial counsel unreasonably failed to: move for change of venue; conduct an adequate investigation of evidence relating to guilt or innocence; adequately interpose objections to or challenge the government's evidence at the guilt phase; protect Mr. Roane's right to presence during voir dire; conduct an adequate investigation of possible mitigating evidence for use at the sentencing phase; present an adequate mitigation case at the sentencing phase.

B. Ground two: Discrimination against women in selection of jury.

Supporting FACTS (state *briefly* without citing cases or law): At trial, the prosecution disproportionately exercised peremptory strikes against women. Mr. Roane expects that discovery will demonstrate that there was no neutral rationale for the exercise of peremptory strikes, and that the strikes represented intentional exclusion of female jurors.

C. Ground three: Denial of statutory right to justice without discrimination.

Supporting FACTS (state *briefly* without citing cases or law): African Americans such as Mr. Roane have been disproportionately and discriminatorily selected for prosecution under federal death penalty legislation, in contravention of their right to justice without discrimination.

D. **Ground four:** Prosecutorial misconduct

**Supporting FACTS (state *briefly* without citing cases or law):** On information and belief, prosecutors in the case: misled the court and defense counsel about whether witnesses were in Witness Protection Program or protective custody; failed to provide defense counsel with exculpatory evidence in the possession of the government; and made use of evidence they knew or should have known was perjurious.

SEE ATTACHMENT

13. If any of the grounds listed in 12A, B, C, and D were not previously presented, state briefly what grounds were not so presented, and give your reasons for not presenting them: _____

Ineffective assistance of counsel: not presented on appeal because 4th Circuit law precludes raising issue on direct appeal and requires reserving it for Sec. 2255 proceedings. Prosecutorial misconduct: not presented on appeal because information supporting it was not available in the trial record; and further discovery remains necessary. SEE ATTACHMENT

14. Do you have any petition or appeal now pending in any court as to the judgment under attack?
Yes ☐ No ☒

15. Give the name and address, if known, of each attorney who represented you in the following stages of the judgment attacked herein:

(a) At preliminary hearing David P. Baugh, 233 South Cherry St., Richmond, VA 23241
Arnold R. Henderson, 2509 E. Broad Street, Richmond, VA 23223

(b) At arraignment and plea David P. Baugh, 233 South Cherry St., Richmond VA 23241
Arnold R. Henderson, 2509 E. Broad Street, Richmond, VA 23223

(c) At trial David P. Baugh, 233 South Cherry St., Richmond, VA 23241
Arnold R. Henderson, 2509 E. Broad Street, Richmond, VA 23223

(d) At sentencing David P. Baugh, 233 South Cherry St., Richmond, VA 23241
Arnold R. Henderson, 2509 E. Broad Street, Richmond, VA 23223

(e) On appeal  David P. Baugh, 223 South Cherry St., Richmond, VA 23241

Seth P. Waxman, 2555 M St., N.W., Washington, D.C. 20037

Scott L. Nelson, 2555 M St., N.W., Washington, D.C. 20037

(f) In any post-conviction proceeding

N/A

(g) On appeal from any adverse ruling in a post-conviction proceeding     N/A

16. Were you sentenced on more than one count of an indictment, or on more than one indictment, in the same court and at approximately the same time?
Yes ☒ No☐

17. Do you have any future sentence to serve after you complete the sentence imposed by the judgment under attack?
Yes ☐ No ☒

(a) If so, give name and location of court which imposed sentence to be served in the future: _____

(b) Give date and length of the above sentence: _____

(c) Have you filed, or do you contemplate filing, any petition attacking the judgment which imposed the sentence to be served in the future?
Yes ☐ No ☐

Wherefore, movant prays that the Court grant him all relief to which he may be entitled in this proceeding.

_____
Signature of Attorney (if any)

I declare under penalty of perjury that the foregoing is true and correct. Executed on

   5-29-98
     (date)

_____
Signature of Movant

**ATTACHMENT**

12. (continued)[1]

    E.    Ground Five: Juror Misconduct

        Supporting FACTS:  On information and belief, jurors in this case were exposed to extrinsic information that biased their consideration of the case.

    F.    Ground Six: Actual Innocence

        Supporting FACTS:  James Roane is actually innocent of the murder of Douglas Moody, and of the CCE convictions.

    G.    Ground Seven:  Petitioner Roane adopts all additional claims raised by his copetitioners, Richard Tipton and Corey Johnson, to the extent those claims are applicable to him.

---

[1] By order dated May 26, 1998, the Court granted Petitioner a two-week extension, until June 15, 1998, to file his petition under § 2255. In an abundance of caution, in view of the statute of limitations imposed by § 2255, Petitioner is filing this petition on June 1, 1998. Petitioner will file a Memorandum in Support of the petition, containing additional factual material and legal argument, on or before June 15, 1998.

13. (continued)

Ground E (Juror Misconduct) was not presented on appeal because information supporting it was not available in the trial record, and further discovery remains necessary.

Ground F (Actual Innocence) was not presented on appeal because it relies on information not available in the trial record.

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION

MAR 1 5 1999

CLERK, U.S. DISTRICT COURT
RICHMOND, VA

|  |  |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| JAMES H. ROANE, Jr. | ) |
| | ) |
| Defendant. | ) |

Criminal No. 92CR68

Civil No. 97CV895

## MOTION OF JAMES H. ROANE, Jr. TO AMEND HIS MOTION TO VACATE, SET ASIDE OR CORRECT SENTENCE PURSUANT TO 28 U.S.C. § 2255

James H. Roane, Jr., a prisoner in the custody of the United States, under

sentence of death, now being held at Sussex State Prison, Waverly, Virginia, respectfully

requests that he be permitted to amend his Motion to Vacate, Set Aside or Correct Sentence

Pursuant to 28 U.S.C. § 2255. Co-movants Richard Tipton and Corey Johnson amended

their petitions prior to the filing of the government's opposition, and Mr. Roane's

amended motion would incorporate the new grounds for relief contained in the amended

motions of Messrs. Tipton and Johnson, which the government has already addressed in

its opposition.[1] Amendment of the motion will not prejudice the government, will allow

Mr. Roane to present additional grounds for relief, and will avoid the possibility of

inconsistent results between Mr. Roane on one hand, and Messrs. Tipton and Johnson on the

---

[1] Mr. Roane's amended motion asserts that the testimony of Priscilla Greene was false in a manner not addressed in the amended motions of Messrs' Tipton and Johnson; *i.e.*, that she lied about her whereabouts on the night Douglas Moody was murdered, and about who she saw at the scene of that murder. Mr. Roane has no objection to the government's filing an additional response to that allegation.

A-182

other. The government advises counsel for Mr. Roane that it takes no position with regard to this motion to amend.

For the reasons stated, Mr. Roane respectfully requests that the Court accept the attached Amended Motion to Vacate, Set Aside or Correct Sentence Pursuant to 28 U.S.C. § 2255.

Dated: March 15, 1999

Respectfully submitted,

JAMES H. ROANE, Jr.

By:

Scott L. Nelson
Paul F. Enzinna
Michael J. Barta (VSB # 30706)
MILLER, CASSIDY, LARROCA
   & LEWIN, L.L.P.
2555 M Street, N.W.
Washington, D.C. 20037
(202) 293-6400

<u>Counsel for James H. Roane, Jr.</u>

A-2183

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### RICHMOND DIVISION

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Criminal No. 92CR68 |
| v. | ) | |
| | ) | Civil No. 97CV895 |
| JAMES H. ROANE, Jr. | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## <u>ORDER</u>

This matter is before the Court on the motion of James H. Roane, Jr., for

leave to amend his Motion to Vacate, Set Aside or Correct Sentence Pursuant to 28 U.S.C.

§ 2255. Having shown good cause, the Court hereby GRANTS the motion, and directs that

James Roane's Amended Motion to Vacate, Set Aside or Correct Sentence Pursuant to 28

U.S.C. § 2255 be filed with the Clerk of the Court.

Let the Clerk send a copy of this Order to all counsel of record.

And it is SO ORDERED.

_____
United States District Judge


Dated: _____



IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Criminal No. 92CR68 |
| v. | ) | |
| | ) | Civil No. 97CV895 |
| JAMES H. ROANE, Jr. | ) | |
| | ) | |
| Defendant. | ) | |

### AMENDED MOTION OF JAMES H. ROANE, Jr. TO VACATE, SET ASIDE OR CORRECT SENTENCE PURSUANT TO 28 U.S.C. § 2255

James H. Roane, Jr., a prisoner in the custody of the United States, under sentence of death, now being held at Sussex State Prison, Waverly, Virginia, hereby amends his previous Motion to Vacate, Set Aside or Correct Sentence Pursuant to 28 U.S.C. § 2255, and the memorandum in support thereof. Mr. Roane incorporates in this motion and memorandum (1) the entirety of his initial motion and memorandum in support; (2) each of the grounds for relief stated by his codefendants, Richard Tipton and Corey Johnson; and (3) the following grounds for relief:

### I. THE SUBSEQUENT TRIAL OF MR. ROANE'S CODEFENDANT VERNON LANCE THOMAS REVEALED ADDITIONAL FACTS SUPPORTING MR. ROANE'S CLAIMS FOR RELIEF

Vernon Lance Thomas was indicted along with Richard Tipton, Corey Johnson, and Mr. Roane. However, Thomas' case was severed, and he was tried separately. United States v. Thomas, No. 9268CR04 (E.D. Va.). The transcript of Mr. Thomas' trial reveals significant evidence supporting Mr. Roane's claims for relief.

A-185



RECEIVED

MAR 15 1999

CLERK, U.S. DISTRICT COURT
RICHMOND, VA

### A. Priscilla Greene's Testimony

James Roane received the death penalty for a single murder, that of Douglas Moody. The critical evidence tying Roane to that murder was supplied by Priscilla "Pepsi" Greene.[1] Greene's testimony was particularly crucial in Roane's case. She claimed that Moody was killed "because [Johnson] and [Tipton] and them didn't want [Moody] to work in that area . . . [s]elling cocaine." Trial Transcript, United Staes v. Roane ["Tr."] at 2553. This testimony – the basis for which was never established – was the *only* evidence that Moody was killed in furtherance of the CCE, and is therefore the single piece of evidence supporting Roane's death sentence.

It is readily apparent that Ms. Greene lied at Roane's trial regarding her role as a drug seller. See Richard Tipton's First Amendment to Initial Petition for Writ of Habeas Corpus Pursuant to 28 U.S.C. § 2255 and to Memorandum in Support of Petition at 4-7. At Roane's trial, she stated flatly that she "never sold cocaine." Tr. 2546. However, in the Thomas trial, she admitted her involvement in cocaine sales. Trial Transcript, United States v. Thomas, Exhibit A hereto, at 421-22. Had this information

---

[1] In addition to Ms. Greene, Denise Berkeley also testified that Roane killed Moody. She testified at Roane's trial that on the night of Moody's murder, she and "Mousey" Armstrong had gone to see a man whose name she could not recall, and were smoking crack cocaine with him and another woman in the front apartment of the house where Moody was shot. Tr. 1694-96. At Thomas' trial, Ms. Berkeley recalled that the man in whose apartment she smoked crack that night was Stanley Smithers. Exh. A at 223. Smithers was a witness at Roane's trial, but was never asked about events the night Moody was killed.

In addition to Berkeley and Greene, Robert "Papoose" Davis testified that one or two days before Mr. Moody's murder, he gave Roane a pistol. This pistol was never linked to the Moody murder, nor was there any evidence that Roane used, or even was armed with, *any* pistol at the time of the murder. Davis also stated that on the night Mr. Moody was killed, Roane and Tipton came to Davis' house "running, huffing and puffing," saying "I got him," and that they couldn't stay at Davis' house because it was "hot." Tr. 1896.

been known to the defense, counsel might well have undermined fatally the credibility of this most critical witness. But more importantly, in addition to her lie on this subject, Ms. Greene lied about the Moody murder.

The government theorized that Mr. Moody was shot in an apartment at the back of a house, and that he then leapt through a window, after which James Roane stabbed him. Ms. Greene testified at Roane's trial that on the night of the murder, she was on the corner across the street, when she heard gun shots, after which Roane and Tipton came out of the house. Tr. 2548-49. She testified that she then went back in the house from which Moody, Tipton and Roane had just come, to "straighten up." She claimed that Roane then came in the house and asked her for a knife. Tr. 2550. According to Ms. Greene, she then went back outside, and after Roane "finished killing" Mr. Moody,[2] he asked her to dispose of the knife. Tr. 2548, 2551.

However, Ms. Greene's testimony in the subsequent trial of Vernon Lance Thomas reveals that her testimony against James Roane was not true. Ms. Greene testified at Thomas' trial that prior to the killing, she was in fact *inside* the apartment in which Moody allegedly was shot. Exh. A at 426. In addition, she revealed in Thomas' trial what she had concealed in Roane's – that Curt Thorne was also in the apartment at the time Moody was shot. Ms. Greene claimed that "they excused [her] out of the house," and she went out to the corner. She then heard gunshots, after which *Thorne* ran out of the house, followed by Roane, who "ran up the street." Id. Then, she claimed, Moody jumped out the window, and lay on the porch, while Ms. Greene returned to the

_____

[2] Despite her claim that Roane "finished killing" Mr. Moody, Greene admitted that she did not see Roane use the knife on Mr. Moody. Tr. 2551.

apartment to "clean up." She claimed that while she was "clean[ing] up," Roane asked her for the knife. Id. at 426-27.

The discrepancies in Ms. Greene's accounts are critical. Her testimony at Thomas' trial regarding her own and Curt Thorne's presence in the apartment where Moody was shot would have further undermined her already shaky credibility. Thorne was Ms. Greene's boyfriend, Tr. 2544, and, as Ms. Greene finally revealed in the Thomas trial, she helped him sell drugs. Exh. A at 421-22. Ms. Greene's obvious motive to lie – to prevent exposure of Thorne's and, possibly, her own role in the murder – was hidden from the defense in Roane's trial. Ms. Greene's credibility is all the more important in light of the fact that an eyewitness to the Moody murder has come forward to say that James Roane did not commit the killing. See Declaration of Paul F. Enzinna, Exhibit B to Reply Memorandum in Support of Motion of James H. Roane, Jr. to Vacate, Set Aside or Correct Sentence Pursuant to 28 U.S.C. § 2255.

## B.     Prosecutorial Misconduct

Ms. Greene testified in Mr. Thomas' trial on April 28, 1993. It simply strains credulity to believe that, when she testified at Mr. Roane's trial barely three months earlier, the government was unaware of her drug selling activities, or that she and her boyfriend/drug-selling partner Curt Thorne were in the apartment where Douglas Moody was shot.[3] Moreover, James Roane was sentenced to death *after* Ms. Greene's

---

[3] In any event, James Roane is entitled to discovery to determine whether the prosecution in fact knew at the time she testified that Ms. Greene's testimony was false. See Bracy v. Gramley, 117 S.Ct. 1793, 1799 (1997) ("[w]here specific allegations before the court show reason to believe that the petitioner may, if the facts are fully developed, be able to demonstrate that he is . . . entitled to relief, it is the duty of the courts to provide the necessary facilities and procedures for an adequate inquiry" (citation omitted)).

testimony in the <u>Thomas</u> case, and after prosecutors unquestionably knew of the discrepancies in her testimony.

"The government violates its duty to deal fairly with a defendant where it either solicits testimony it knew or should have known to be false or allows such testimony to pass uncorrected." <u>United States v. Ellis</u>, 121 F.3d 908, 927 (4th Cir. 1997); <u>United States v. Kelly</u>, 35 F.3d 929, 933 (4th Cir. 1994). Reversal is required where "there is any reasonable likelihood that the false testimony could have affected the judgment of the jury." <u>Ellis</u>, 121 F.3d at 927 (quoting <u>United States v. Agurs</u>, 427 U.S. 97, 103 (1976)).

There is no question that Ms. Greene's false testimony "could have" affected the judgment of the jury in this case. Ms. Greene claimed that James Roane killed Moody after he and Tipton emerged from the apartment where Moody was shot. Had the jury known that, as Greene testified in the <u>Thomas</u> trial, Greene and her boyfriend – with whom Greene sold cocaine – were in the apartment prior to the killing, and that Greene's boyfriend emerged from the apartment after the shooting, the jury most likely would have discounted her testimony in its entirety. Granted, Denise Berkeley also claimed that Roane stabbed Douglas Moody, but as noted, Ms. Greene's testimony that "[Johnson] and [Tipton] and them didn't want . . . 'Little Doug' to work in that area . . . selling cocaine," Tr. 2553, was the *only* evidence that Moody had been killed "in furtherance" of the alleged CCE. Had the jury known of her changing story, it is at least "reasonably likely" the jury would have found no evidence sufficient to support James Roane's death penalty for this murder.

"The proper role of the criminal prosecutor is not simply to obtain a conviction, but to obtain a *fair* conviction." Brown v. Borg, 951 F.2d 1011, 1015 (9th Cir. 1991) (emphasis in original). Prosecutors have an affirmative duty to come forward and correct misleading testimony, e.g., Brown v. Wainwright, 785 F.2d 1457, 1464 (11th Cir. 1986), and the use of tainted testimony is "viewed seriously and its effects are exceedingly carefully scrutinized." Borg, 951 F.2d at 1015 (citation omitted). This is even more so where the testimony at issue is critical to the government's case. Rickman v. Dutton, 864 F. Supp. 686, 705 (M.D. Tenn. 1994). Ms. Greene's testimony was absolutely central to Mr. Roane's death sentence, and the fact that her testimony was false demands that the sentence be set aside.

## II. THE PROSECUTION VIOLATED 18 U.S.C. § 201(C)(2) BY PURCHASING TESTIMONY FROM COOPERATING WITNESSES

### A. The Prosecution Violated 18 U.S.C. § 201(C)(2)

Section 201(c)(2) of Title 18 of the United States Code punishes:

> Whoever . . . directly or indirectly, gives, offers or promises anything of value to any person, for or because of the testimony under oath or affirmation given or to be given by such person as a witness upon a trial, hearing or other proceeding, before any court . . . .

There can be no question that at James Roane's trial, the prosecution gave "anything of value" to key witnesses against Mr. Roane, "for or because of" their testimony. James Roane's death sentence rests on testimony purchased by the prosecution in violation of § 201(c)(2), and must therefore be set aside. United States v. Singleton, No. 97-3178 (10th Cir. July 1, 1998), 144 F.3d 1343, vacated, 144 F.3d 1361 (10th Cir. July 10, 1998),

decision of District Court affirmed, No. 97-3178 (10th Cir. Jan. 8, 1999);[4] United States v. Fraguela, Cr. No. 96-0339 (E.D. La. Aug. 27, 1998), 1998 U.S. Dist. LEXIS 14347; United States v. Lowery, 15 F. Supp.2d 1348 (S.D. Fla. 1998); but see United States v. Reid, 19 F. Supp. 2d 534 (E.D. Va. 1998).

Nearly every fact witness against Mr. Roane received a "thing of value" from the government in exchange for his or her testimony. Some witnesses were immunized, some placed in the Witness Protection Program, and some received governmental assistance in obtaining reduced sentences. The following are merely examples of the tainted testimony against Mr. Roane.

Mr. Roane's death sentence, imposed under 21 U.S.C. § 848(e)(1), is dependent upon a finding that Mr. Roane committed murders while "engaging in or working in furtherance of a continuing criminal enterprise," and the government pinned its claim that the defendants engaged in such a highly-organized "continuing criminal enterprise" in large part upon the testimony of Greg Scott. Scott's testimony concerned events occurring in New York and New Jersey – in which James Roane concededly had no part. In his opening statement, Mr. Vick advised the jury explicitly that the government's CCE case would be proved by evidence of events in New York and New Jersey. Mr. Vick promised that Scott would testify that the "New York Boyz":

> [S]at around in New Jersey, in Trenton, and had meetings and discussed what physical acts of retaliation they should take against people who had wronged them and decided whether it would hurt business to hit this person or whether it would not hurt business.

---

[4] A copy of the Tenth Circuit's original decision in Singleton is attached as Exhibit B.

Tr. 789-90. In closing, the government made explicit its theory that "the New York Boyz continued their actions here in the City of Richmond." Tr. 2962. To prove the required element of supervision, the government turned to Greg Scott's testimony, asking the jury to superimpose the New York/New Jersey organization on the Richmond events. Tr. 2983. Prosecutors also turned to Scott's testimony to connect Torrick Brown's murder to racketeering, arguing that other "New York Boyz" joined James Roane in a domestic killing in order to maintain their position in the CCE:

> Remind yourself again of the testimony of Greg Scott.
> Remember what he told you about the New York Boyz?
> ... [W]hen they got together for protection, each and every member of the New York Boyz had to go in on a crime of violence or they were no longer a member of the New York Boyz.

Tr. 3004; see also Tr. 3005, 3007.

Most critically, James Roane's death sentence is premised entirely on the supposed New York – Richmond connection. The *only* evidence supporting the claim that Douglas Moody was killed in furtherance of the CCE was "Pepsi" Greene's bald assertion – unsupported by any facts – that the killing was drug-related. Tr. 2553. In closing, the government buttressed that testimony with Scott's:

> Remember, Doug Moody worked for Peyton Maurice Johnson. They didn't want anyone else operating in their territory, *consistent with the testimony of Greg Scott.*

Tr. 2995 (emphasis added).

Moreover, in the penalty phase, the evidence supporting the government's claim that Moody was murdered after "substantial planning and premeditation" was paltry. There was no evidence that James Roane had ever expressed an intention to kill Moody prior to the murder. In fact, Denise Berkley testified for the government that

she heard that *Moody* instigated the confrontation, and that Moody had been purchasing drugs from Corey Johnson. Tr. 1700-02. In order to bolster its case on this essential aggravating factor, the government once again turned to Scott:

> Remind yourself of that credo following them down here from New York, from New Jersey, with the New York Boyz, where they clearly intended to take over blocks in New Jersey. They brought that mind set, that modus operandi, that way of operating, to Richmond. And indeed, they implemented it in the most violent fashion that they could. They laid waste the bodies that they promised they would lay waste in order to take over. Clear premeditation.

Tr. 3886-87.

Sterling Hardy also provided critical, inflammatory testimony against James Roane. He testified that James Roane shot Louis Johnson, Tr. 2171, because he "didn't like the guy." Tr. 2174. He also testified to the shooting of Martha McCoy and Torrick Brown, stating that when Anthony Mack said that Martha McCoy had not been killed, James Roane assured him that "'[t]he bitch is dead' because he knows he can shoot." Tr. 2184. Finally, Hardy testified to jailhouse conversations in which the killing of witnesses was allegedly discussed. Tr. 2191. These allegations regarding Martha McCoy and "the fact that from jail, while incarcerated, these defendants continued to try to have people killed" became a centerpiece of the government's argument for the death penalty. Tr. 3892.

Jerry Gaiters' testimony was similarly damning to James Roane. He testified that Mr. Roane supervised at least six underlings in the alleged CCE, Tr. 2324, and proof of such supervision was a necessary element of the CCE allegations. Gaiters also testified to Mr. Roane's involvement in the shooting of Louis Johnson, Tr. 2334, and helped tie Mr. Roane to the murder of Peyton Maurice Johnson. Tr. 2328. Finally,

Gaiters testified that Mr. Roane told him that Roane, Tipton and Johnson were "planning on taking over" the Newtowne area. Tr. 2330. As discussed above, this testimony was critical to the government's case in favor of the death penalty. Tr. 3886-87.

All of this testimony, upon which James Roane's death sentence rests, was bought and paid for by the prosecution.[5] Scott testified that in exchange for his testimony, the government "will speak up for me in behalf of somehow I'll get a deal." Tr. 897. Specifically, the government agreed to seek a downward departure for Scott, in exchange for his testimony. Tr. 898. Hardy and Gaiters also testified in exchange for the government's promise of a motion for downward departure. Tr. 2192, 2226-28, 3139-40. Hardy testified that he "anticipate[d]" a reduction in sentence in return for his testimony, Tr. 2228, and Gaiters acknowledged Mr. Vick's statement that, in exchange for his testimony, the government would advise the court sentencing him of his cooperation. Tr. 2192.

This kind of bartering for favorable testimony is illegal. Section 201(c)(2), by its terms, expressly forbids it. By its use of the unmodified term "[w]hoever," the statute's broad language clearly applies to the actions of prosecutors, and this Court is "bound to take Congress at its word." Oubre v. Entergy Operations, Inc., 118 S.Ct. 838, 841 (1998). As the Supreme Court stated in Brogan v. United States, 118 S.Ct. 805, 809-12 (1998):

> [I]t is not, and cannot be, our practice to restrict the
> unqualified language of a statute to the particular evil that
> Congress was trying to remedy — even assuming that it is
> possible to identify that evil from something other than the

---

[5] Section 201(c)(2) requires no showing of corrupt intent or intent to influence. United States v. Johnson, 621 F.2d 1073, 1076. Thus, the statute is violated even if the government acted in good faith, without intent to influence the witnesses' testimony.

text of the statute itself. . . . Courts may not create their own limitations on legislation, no matter how alluring the policy arguments for doing so.

Section 201(c)(2) "could not be more clear." Singleton, Exh. B at 3. Moreover, the statute is to be broadly construed to further its purpose of deterring corruption. United States v. Hernandez, 731 F.2d 1147, 1149 (5th Cir. 1984); United States v. Evans, 572 F.2d 455, 480 (5th Cir. 1978).

Section 201(c)(2) operates "to prevent fraud upon the federal courts in the form of inherently unreliable testimony," Singleton, Exh. B at 3, and to do so, must govern the actions not only the actions of the defendant, but also those of the prosecution. The statute "indicates Congress's belief that justice is undermined by giving, offering, or promising anything of value for testimony. If justice is perverted when a criminal defendant seeks to buy testimony from a witness, it is no less perverted when the government does so." Id.

There can be no serious dispute that leniency is a "thing of value." Again, the statutory term "anything of value" is unmodified, and "must be broadly construed to carry out its congressional purpose." See United States v. Williams, 705 F.2d 603, 622-23 (2d Cir. 1983). Courts have consistently rejected arguments that the term "anything of value" is limited to tangible things of monetary value. United States v. Marmolejo, 89 F.3d 1185, 1191 (5th Cir. 1996); Williams, 705 F.2d at 622-23. In fact, "[i]t is difficult to imagine a greater motivation to lie than the inducement of a reduced sentence." United States v. Cervantes-Pacheco, 826 F.2d 310, 315 (5th Cir. 1987); see also United States v. Meinster, 619 F.2d 1041, 1045 (4th Cir. 1980) ("[w]e think it obvious that promises of

immunity or leniency premised on cooperation in a particular case may provide a strong inducement to falsify in that case").

**B.      Mr. Roane's Trial Counsel Were Ineffective in Failing to Object**

A claim of ineffective assistance of counsel requires that the defendant show first, that "counsel's representation fell below an objective standard of reasonableness," and second, that he was prejudiced by the deficient performance. Turner v. Williams, 35 F.3d 872, 894 (4th Cir. 1994) (quoting Strickland v. Washington, 466 U.S. 668, 687-88 (1984)). While the standard of effective representation is constant, the severity of the sentence faced by the defendant should be considered in determining whether counsel's performance meets this standard. Vela v. Estelle, 708 F.2d 954, 964 (5th Cir. 1983), cert. denied, 464 U.S. 1053 (1984).

Prejudice is shown where there is "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Pruett v. Thompson, 771 F. Supp. 1428, 1445 (E.D. Va. 1991), cert. denied, 510 U.S. 984 (1993) (citation omitted); Turner, supra, 35 F.3d at 894. Where the defendant challenges a death sentence:

> [P]rejudice is established when "there is a reasonable
> probability that, absent [counsel's] errors, the sentencer –
> including an appellate court, to the extent it independently
> reweighs the evidence – would have concluded that the
> balance of aggravating and mitigating circumstances did
> not warrant death."

Turner, supra, 35 F.3d at 894 (citation omitted). Finally, where, as is the case with respect to the Moody murder and Roane's death sentence, a verdict is "only weakly supported by the record," errors by counsel are more likely to have prejudiced the defendant. Strickland, 466 U.S. at 696; see also Blackburn v. Foltz, 828 F.2d 1177, 1186

(6th Cir. 1987) (fact that evidence was "not overwhelming" makes prejudice more likely).

James Roane's trial counsel fell below an objective standard of reasonableness in failing to object to the government's use of testimony procured in violation of 18 U.S.C. § 201(c)(2). As described above, it was apparent from the witnesses' testimony that the government had provided them "anything of value" in exchange for their testimony, in clear and obvious violation of the terms of § 201(c)(2).

This failing by trial counsel severely prejudiced Mr. Roane. Nearly every fact witness against him was compensated for his or her testimony in violation of § 201(c)(2). Moreover, as described above, testimony bought by the government was pivotal to his conviction. There can be no question that, had his trial counsel not failed to object, and had they excluded these tainted witnesses, the outcome of Mr. Roane's trial would have been vastly different.

Dated: March 15, 1999

Respectfully submitted,

JAMES H. ROANE, Jr.

By:

Scott L. Nelson
Paul F. Enzinna
Michael J. Barta (VSB # 30706)
MILLER, CASSIDY, LARROCA
   & LEWIN, L.L.P.
2555 M Street, N.W.
Washington, D.C. 20037
(202) 293-6400

Counsel for James H. Roane, Jr.



IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION

---------------------------------------

UNITED STATES OF AMERICA,

                        Plaintiff;

                                        CRIMINAL ACTION
        v.                               9268CR04

VERNON LANCE THOMAS,

                        Defendant.

---------------------------------------

                    VOLUME II

                   April 28, 1993
                   Richmond, Virginia
                      9:30 a.m.


BEFORE:          HONORABLE JAMES R. SPENCER
                 United States District Judge


APPEARANCES:     HOWARD C. VICK, JR., ESQ.
                 WILLIAM H. PARCELL, III, Esq.
                 Office of the United States Attorney
                 Main Street Centre
                 Richmond, Virginia  23219
                          Counsel for Government;

                 REGINALD M. BARLEY, ESQ.
                 2025 East Main Street
                 Richmond, Virginia 23223;
                 CARY B. BOWEN, ESQ.
                 304 West Broad Street
                 Richmond, Virginia  23219
                          Counsel for Defendant.

                 JEFFREY B. KULL
                 OFFICIAL COURT REPORTER

                 P-R-O-C-E-E-D-I-N-G-S

A    It was mostly "O" and "V" and "J.R."

Q    Was Doug Talley a worker or partner?

A    He was mostly a worker.

Q    I direct your attention to January 13th, 1992. On that day, are you familiar with the fact that an individual by the name of Doug Moody was killed?

A    Yes, I was.

Q    And were you present in the house where Doug Moody was killed?

A    Yes.  I was present in the front of the house from the house in the back where he was.

Q    Could you tell the ladies and gentlemen of the jury what occurred?

A    It was me, "Mousey," and some other people, two other people was in the house.  And all of a sudden we heard glass break.  And a few minutes later, we heard a gunshot.  Me and "Mousey," we went outside, went around to the back and we seen Doug Moody standing on the porch and he was hollering and holding his hand up, stop "J.R.," don't do that no more, stab me know more.  And he just kept on stabbing him.

Q    "J.R." was stabbing Doug Moody?

A    Yes.

Q    How many different times would you say you saw

"J.R." stab Doug Moody?

A    At least 19, 20 times.

Q    And where were you in the house in relation to where you heard the glass break and heard a shot?

A    Where was I?

Q    Yes.

A    It was on the corner of Clay and  --  I forgot the name of the street.  But the house is white.  It has got a red door in the front.  It has got a fence around the sides.

Q    All right.  And who lived  --  were there two parts to this house?

A    Yes, there was.

Q    Who lived in the front part?

A    It was staining heir.

Q    Is he also known as Stanley Smithers?

A    Yes.

Q    Is that where you were when you heard the noise?

A    Yes, I was.

Q    Who lived in the back part of the house?

A    It was Curt and "Pepsi."

Q    Is that where Doug Moody was?

A    Yes.

Q    All right.  After you saw James Roane stab Doug

Moody, what happened?

A    He came running over to where me, "Mousey," "Pepsi," Linwood, Curt, and Sandra was.

Q    Who is he?  Who came running over to you?

A    "J.R."

Q    What happened when he came running over?

A    He gave the knife to "Pepsi," and told "Pepsi," to get rid of it.

Q    What kind of knife was it?

A    It looked like a kitchen butcher knife.

Q    Where was Doug Moody at that point?

A    He was like trying to get off the porch.  He was stumbling and staggering off the porch and he was over by the fence between the fence and an alley.

Q    After "J.R." came and gave the knife to "Pepsi," and said get rid of it, what did you do?

A    Me and "Mousey" stayed and Linwood, "J.R.," Sandra, Curt, and "Pepsi," got in the car and left.

Q    Did you go to 1212 West Moore Street after witnessing that murder?

A    First we went to Hancock Street.  "Mousey's" brother 's house.  We told him what had happened.  Then we went to Moore Street.

Q    Who was at Moore Street when you got there?

A    When we got there, it was "J.R." -- no, it was

"V," "E.B.," "O," and some other guys.

Q    Did "Whitey" go?

A    Yes.  "Whitey" was there.

Q    Did you hear "Whitey" talk about the killing of Doug Moody?

A    "Whitey" was  --  he was all excited, he was happy.  He said that him and Doug Moody had gotten to fighting, and you know, he said something about Doug Moody was trying to hurt him so he was trying to hurt him back.

Q    Who was he saying this to?

A    He was saying it to all of us.

Q    Was "V" one of the ones he was saying it to?

A    Yes.

Q    And did "V" say anything to "Whitey?"

A    He told him, the rest of them told him you need to  --

MR. BARLEY:  I object.  I think he specifically asked first did "V" and he said did the others.  Could we get one answer at a time?

BY MR. VICK:

Q    What did "V" say for "Whitey?"

A    He told him he had to leave for awhile.

Q    Why did "V" think he had to leave?

MR. BARLEY:  Objection.

THE COURT:  Sustained.

BY MR. VICK:

Q    What exact exactly did "V" say?

A    He just told him he had to leave for awhile.  He had to stay in hiding.

Q    What were they talking about at the time "V" said you had to leave for awhile?

A    They was talking about Doug Moody, what happened with him and Doug Moody got to fighting, whatever.

Q    Do you know why Doug Moody was killed?

A    It had something to do with something about some drugs or some tapes.

Q    I direct your attention to the next day, January 14th, 1993 three 1992.  On that day, did you have occasion while on Norton Street to see "J.R." and "V?"

A    Yes.

Q    Did they have anything with them on that day?

A    Yes.  They had came in the house on Norton Street with guns.

Q    What kind of guns?

A    They was two handguns and two long guns, like Uzis.

Q    Did they ask you to do anything for them?

A    Yes.  After they got the guns out and they was

Q    Your hearing has been affected by your being shot, also?

A    Yes.  I'm completely deaf on the left ear.

Q    If you have problems hearing me, just ask me to speak up.  I'll yell it.

A    Okay.

Q    When did you meet "O" for the first time?

A    When did I meet him?

Q    When?  When was it?

A    When I met him?

Q    Right.

A    About three or four months before I was shot.

Q    Did you know an individual by the name of Curt Thorne?

A    Yes.

Q    Tell the ladies and gentlemen of the jury who Curt Thorne is?

A    Curt Thorne was my boyfriend.

Q    Do you know how Curt Thorne supported himself?

A    Yes.  Curt sold drugs for "Whitey" and "O."

Q    What kind of drugs did he sell for "Whitey" and "O?"

A    Crack, cook-'em-up.

Q    Did you help Curt in any way sell the drugs?

A    Yes.

Q     What did you do for him?

A     Well, people come to the door, and maybe sometimes I would pass the cocaine to them and get the money.

Q     Did "J.R." ever ask you if you wanted to sell drugs for him?

A     Yes.  I met "J.R." before I met the rest of the boys.  He asked me to sell drugs and I told him no.

Q     Why didn't you want to sell drugs for him?

A     Because I was a user.  I told him I would bring people to him but I wouldn't sell it.

Q     Do you know where "J.R." or "Whitey," "C.O.," and "V" got the drugs that they sold?

A     Yes.  They got their drugs from New York.

Q     Do you know who took them to New York to get their drugs?

A     Well, yes.  Linwood took them, and another guy took them.  I can't think of his name right offhand.

Q     What kind of car did he drive, do you remember?

A     A gray car.

        MR. VICK:  Could I see Government Exhibit 1?

        (Document proffered to witness.)

BY MR. VICK:

Q     I'm going to show you what's been marked

Government Exhibit Number 1. Is that the kind of car that the other fellow drove?

A    Yes. That's the car. Yes.

Q    Based upon  --  how long were you involved with Curt in the selling of cocaine?

A    How long was I involved?

Q    You said you met "O," and when did you meet "J.R.?"

A    I met "J.R." on Hancock Street. I met "J.R." and "O"  --  no, "J.R." came down selling drugs first by himself before "O" and them came down.

Q    When did you meet "Whitey?"

A    I met "Whitey" through Curt, because "Whitey" was bringing drugs to Curt and Curt was selling them for him.

Q    When was it that you met "Whitey." what time frame?

A    Like the month? About three or four months before  --

Q    Before you got shot?

A    Yes, all of this was before I got shot.

Q    Would this have been November or December?

A    Most likely it was November.

Q    Of 1991?

A    Yes.

Q    When did you meet "V?"

A    I met "V" about a month or two after.  Like "V" came down from New York when they went up to get the drugs, and he came back.  Him and "E.B." came back down with them.

Q    From November when you met them, sometime in that time frame, to when you were shot on February 19th, 1992, were you involved through Curt with "O," "Whitey," "V," and "J.R." for that whole time?

A    Yes.

Q    Did you come to find out what their business relationship was, what the relationship was between "O" and "Whitey" and "J.R." and "V?"

A    Drugs.

Q    Did Curt --

A    Okay.  Curt, "Papoose," "Mousey," all of them, all of us were just  --  all of them were actually sellers.  They was like the head people.

Q    Who were the head people?

A    Who?

        MR. BARLEY:  He is cutting her off.

BY MR. VICK:

Q    Who were the head people?

A    "Whitey," "O,"  --  "Whitey," "O," "J.R.," "V." because "V," mostly, after he came down he mostly

controlled the drugs.

MR. BARLEY: I object unless she has seen it or has personal knowledge of it.

MR. VICK: She was just getting ready to tell us about that.

BY MR. VICK:

Q   Continue.

A   Thank you. Me and Curt went up to the house on Moore Street, and "V," he controlled the drugs because he had it bagged up and gave it out to the people to sell.

Q   Did "Mousey" sell drugs for them?

A   Yes, she did.

Q   Did "Papoose?"

A   Yes.

Q   All right. Did you know Denise Berkley?

A   Yes.

Q   Did Denise work with them in some way?

A   She used to clean the house for them.

Q   Did she get drugs for that?

A   Yes, she got drugs for it.

Q   Now, do you know an individual by the name of Doug Talley? Excuse me, "Little Doug" Moody?

A   Yes.

Q   And what happened to "Little Doug" Moody?

A    He got killed.

Q    Who killed him?

A    "J.R." -- well, "J.R." and "Whitey." Can I tell the story?

Q    Tell the story.

A    Okay. We was at Curt's house and they excused me out of the house because they all was in the house. And "Little Doug," he came in the house with "J.R." I was standing on the corner with Sandra.

Q    Sandra who?

A    I don't know, Reavis? Something like that.

Q    "J.R.'s" girlfriend?

A    "J.R.'s" girlfriend. And I was standing object the corner with her. And about 15 minutes later, I heard a gunshot about three times. And Curt came out of the house and he went around the corner. All right, then "J.R.," he ran out of the house, ran up the street. And "Little Doug" jumped through the window and he was laying on the porch.

Q    When he was laying on the porch, what happened to him?

A    Okay. So Curt came back. Curt came back, I told Curt I was going in the house and clean up because I didn't have any reason to run. Then "J.R.," he came back around the corner and he told me

give him the knife.  I was in there cleaning up the stuff they had mess the up.  I had the knife, I took the stuff in the kitchen.  He asked me for the knife and I gave him the knife.

Q    What knife?

A    It was a black knife, along knife with a black handle.

Q    Where had you gotten that knife?

A    I got it, Curt, they had gave, brought the knife and a couple times before and gave it to Curt.  It had blood on it.  And Curt got the blood off.  I got the knife off the dresser.

Q    Who had given the knife to Curt before when it had blood on it?

A    "Whitey" and "O," all of them was together when they brought the knife to him.

Q    Did Curt keep that knife for them?

A    Yes, he did.

Q    Cleaned the blood off of it?

A    Yes, sir.

Q    When "J.R." asked you to bring him the knife, did you know what knife he was talking about?

A    It was on the dresser.  Yes, I did.

Q    Did you go get it for him?

A    I was carrying the stuff in the kitchen.  I just

gave him the knife as I was going into the kitchen.

Q    What did he do when he got that knife?

A    He took the knife -- well, I didn't see it because I didn't want to see it. I heard it. He was on the porch and he slapped "Little Doug" three or four times. I guess he chased him out of the yard, across the fence, and stabbed him with the knife.

Q    After "J.R." stabbed "Little Doug" with the knife, did he give that knife back to you?

A    He gave it to me and told me to throw it away. All I did was took and threw it across the fence. I didn't know what to do with it.

Q    Was the knife covered in blood?

A    Blood was on the knife.

Q    You just threw it away?

A    Yes.

Q    Where did you go after is that?

A    Norton Street to the house that "J.R." had up on Norton Street.

Q    Who lived at that house?

A    "J.R." was living there.

Q    With anyone else?

A    Well, "O," "Whitey," all them used to stay up there. If they weren't there they were on Moore Street.

Q    Where on Moore Street?

A    I think it was 1212 West Moore Street.

Q    Did "V" live in either one six those?

A    "V" was there with them.

Q    Norton Street and 1212 west newer?

A    Yes, back and forth.

Q    Do you know why "J.R." killed "Little Doug" Moody?

A    Yes.  Because he didn't want them to sell drugs on Harrison Street.

Q    Didn't want who?

A    Didn't want "Little Doug," Maurice.

Q    Peyton Maurice Johnson?

A    Yes.

Q    Were they drug salesmen?

A    Yes.  "Little Doug," he was helping Maurice sell drugs.

Q    Were they rifle drug salesmen to "O" and "Whitey" and "V" and "J.R.?"

A    Was they what?

Q    Were they rifles?  Were they selling drugs in the same area as "O," "Whitey," and "V" and "J.R.?"

A    Yes.

Q    Do you know what happened to Peyton Maurice Johnson?



| Keyword | Case | Docket | Date: Filed / Added |     WP (101936 bytes)     RTF (106006 bytes)

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**



| | |
|---|---|
| UNITED STATES OF AMERICA, Plaintiff-Appellee, v. SONYA EVETTE SINGLETON, Defendant-Appellant. | No. 97-3178 |

**APPEAL FROM THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF KANSAS**

**(D.C. No. 96-10054-05-FGT)**

John V. Wachtel, Klenda, Mitchell, Austerman & Zuercher L.L.C., Wichita, Kansas, for Defendant-Appellant.

Michael G. Christensen, Assistant United States Attorney (Jackie N. Williams, United States Attorney, with him on the brief), Wichita, Kansas, for Plaintiff-Appellee.

Before **SEYMOUR**, Chief Judge, **EBEL**, and **KELLY**, Circuit Judges.

**KELLY**, Circuit Judge.

Section 201(c)(2) of Title 18 of the United States Code prohibits giving, offering, or promising anything of value to a witness for or because of his testimony. Defendant-Appellant Sonya Singleton argues the government violated this statute by promising leniency to a witness in return for his testimony against her. Ms. Singleton was convicted of one count of conspiracy to distribute cocaine, see 21 U.S.C. §§ 841(a)(1), 846, and seven counts of money laundering, see 18 U.S.C. § 1956(a)(1)(B)(i). The district court sentenced her to forty-six months imprisonment on each count, to be served concurrently, and to be followed by three years of supervised release.

Ms. Singleton appeals her convictions, arguing the district court erred (1) in denying her motion to suppress testimony allegedly obtained in violation of 18 U.S.C. § 201(c)(2) and Kansas Rule of Professional Conduct 3.4(b), and (2) in denying her motion for judgment of acquittal on both the conspiracy and money laundering counts. Our jurisdiction arises under 28 U.S.C. § 1291. We reverse and remand for a new trial.

Background

In April 1992, a detective of the Wichita Police Department contacted local Western Union agents to determine if drug dealers were using Western Union services to transfer drug money. He found a large number of wire transfers over $1000 which bore similar identifiers, including similar names of recipients, and similar names, addresses and phone numbers of senders. The records led authorities to a group of people whom they believed were involved in a conspiracy to sell drugs. Further investigation indicated the drug business was begun by men who had moved from California to Wichita. They recruited local women to wire proceeds of drug sales back to California to pay for more cocaine; some of these women also received wire transfers on behalf of the conspiracy and transported cocaine from California to Wichita. Ms. Singleton was

identified as one who transferred and received money for the conspiracy. She was the common-law wife of Eric Johnson, who regularly bought, packaged, and sold drugs, and she was listed as either the sender or recipient on eight wire transfers suspected to have been sent on behalf of the conspiracy. Handwriting experts confirmed that her handwriting was present on paperwork accompanying the eight wire transfers.

Ms. Singleton and others were charged in a superseding indictment with multiple counts of money laundering and conspiracy to distribute cocaine. Before trial she moved to suppress the testimony of Napoleon Douglas, a coconspirator who had entered into a plea agreement with the government. The basis for her motion was that the government had impermissibly promised Mr. Douglas something of value--leniency--in return for his testimony, in violation of 18 U.S.C. § 201(c)(2) and Kansas Rule of Professional Conduct 3.4(b), which prohibits offering unlawful inducements to a witness. The district court denied the motion, ruling that § 201(c)(2) did not apply to the government.

At trial Mr. Douglas testified against Ms. Singleton. He stated that the government, through an assistant United States attorney, had promised to file a motion for a downward departure if he testified truthfully. See IV R. 204-06. His testimony of the government's promise in this regard is somewhat confused, however, and in Mr. Douglas's written plea agreement the government made no firm promise to file a motion for a downward adjustment. The agreement merely stated the government would file a motion under USSG § 5K1.1 or 18 U.S.C. § 3553(e) if, in its sole discretion, Mr. Douglas's cooperation amounted to substantial assistance. See I R. doc. 109, at 2. Both the testimony and plea agreement make clear Mr. Douglas understood that the actual grant of any downward adjustment was entirely within the purview of the sentencing court.

The plea agreement does, however, state three specific promises made by the government to Mr. Douglas in return for his explicit promise to testify. See id. at 1-3. First, the government promised not to prosecute Mr. Douglas for any other violations of the Drug Abuse Prevention and Control Act stemming from his activities currently under investigation, except perjury or related offenses. See id. at 1-2. Second, it promised "to advise the sentencing court, prior to sentencing, of the nature and extent of the cooperation provided" by Mr. Douglas. Id. at 2. Third, the government promised "to advise the Mississippi parole board of the nature and extent of the cooperation provided" by Mr. Douglas. Id. Mr. Douglas agreed, "in consideration of the items listed in paragraph 2 above . . . [to] testify[] truthfully in federal and/or state court . . . ." Id. at 2-3.

## Discussion

The issues before us are (1) whether the government's conduct was prohibited either by § 201(c)(2) or Kansas Rule of Professional Conduct 3.4(b); (2) if it was, whether Mr. Douglas's testimony should have been suppressed; and (3) whether the record contains sufficient evidence to remand for a new trial.

### I. Statutory Construction of 18 U.S.C. § 201(c)(2)

#### A. The Language and Plain Meaning

We review de novo the district court's interpretation of a federal statute. See Utah v. Babbitt, 53 F.3d 1145, 1148 (10th Cir. 1995). Our inquiry begins with the language of the statute, see Ardestani v. INS, 502 U.S. 129, 135 (1991), which "must ordinarily be regarded as conclusive." Consumer Prod. Safety Comm'n v. GTE Sylvania, Inc., 447 U.S. 102, 108 (1980). "The 'strong presumption' that the plain language of the statute expresses congressional intent is rebutted only in 'rare and exceptional circumstances,' when a contrary legislative intent is clearly expressed." Ardestani, 502 U.S. at 135-36 (citation omitted) (quoting Rubin v. United States, 449 U.S. 424, 430 (1981)). In the absence of that rare and exceptional circumstance, "we are bound to take Congress at its word." Oubre v. Entergy Operations, Inc., 118 S. Ct. 838, 841 (1998).

The Supreme Court has recently emphasized the primacy of statutory plain language. In Salinas v. United States, 118 S. Ct. 469, 473-74 (1997), the Court concluded that a bribe need not affect federal funds to violate the federal bribery statute, 18 U.S.C. § 666, because the "expansive, unqualified" plain language of the statute criminalized the acceptance of a bribe by a covered official in connection with "any" transaction involving $5,000 or more. Id. at 473. The statute made no mention of federal funds, and the court emphatically refused to rewrite Congress's enactment or judicially add elements to the crime. See id. at 473-75. Similarly, in Brogan v. United States, 118 S. Ct. 805, 809 (1998), the Court invalidated the longstanding "exculpatory no" doctrine under 18 U.S.C. § 1001 "[b]ecause the plain language of § 1001 admits of no exception" for the doctrine. Id. at 812. Section 1001, which imposes criminal liability for making a false statement to federal investigators, had long been interpreted by the courts of appeal to exclude liability for a suspect's mere denial of wrongdoing. The Court, however, rejected "the broad proposition that criminal statutes do not have to be read as broadly as they are written," and stated:

it is not, and cannot be, our practice to restrict the unqualified language of a statute to the particular evil that Congress was

trying to remedy--even assuming that it is possible to identify that evil from something other than the text of the statute itself. . . . Courts may not create their own limitations on legislation, no matter how alluring the policy arguments for doing so.

Id. at 809-12. Most recently, the Court in Oubre found that where a general waiver of all causes of action against an employer by an employee did not conform to specific enumerated requirements for waivers under the Age Discrimination in Employment Act (ADEA), 29 U.S.C. § 626, the waiver did not release the employee's ADEA claims. See Oubre, 118 S. Ct. at 842. The Court wrote, "Courts cannot with ease presume ratification of that which Congress forbids." Id. at 841.

Section 201(c)(2) could not be more clear. It says:

Whoever . . . directly or indirectly, gives, offers or promises anything of value to any person, for or because of the testimony under oath or affirmation given or to be given by such person as a witness upon a trial, hearing, or other proceeding, before any court . . . authorized by the laws of the United States to hear evidence or take testimony . . . shall be fined under this title or imprisoned for not more than two years, or both.

18 U.S.C. § 201(c)(2). We note at the outset that § 201 is to be broadly construed to further its legislative purpose of deterring corruption. See United States v. Hernandez, 731 F.2d 1147, 1149 (5th Cir. 1984); United States v. Evans, 572 F.2d 455, 480 (5th Cir.), cert. denied, 439 U.S. 870 (1978).

The class of persons who can violate the statute is not limited. "Whoever" completes the following elements commits a crime. 18 U.S.C. § 201(c)(2). First, the statute requires a gift, offer, or promise, either direct or indirect, to a person. See id. Second, the gift, offer, or promise must be "of value." Id. Third, the gift, offer, or promise must be made "for" or "because of" the person's sworn testimony at a trial or other proceeding before an authorized court. Id. The state of mind required to violate the statute is knowledge that the thing of value is given for or because of testimony. See United States v. Campbell, 684 F.2d 141, 150 (D.C. Cir. 1982) (construing parallel subsection); United States v. Brewster, 506 F.2d 62, 82 (D.C. Cir. 1974) (quoting United States v. Brewster, 408 U.S. 501, 527 (1972)) (same).

The first issue facing us is whether the assistant United States attorney, acting on behalf of the government, is within the statutory class "whoever." The Supreme Court has recognized a limited canon of construction which provides that statutes do not apply to the government or affect governmental rights unless the text expressly includes the government. See Nardone v. United States, 302 U.S. 379, 383 (1937); United States v. Herron, 87 U.S. (20 Wall.) 251, 255 (1873). The canon applies only to two classes of cases, however. See Nardone, 302 U.S. at 383. The first class in which the government is presumptively excluded from general statutory language involves statutes which would deprive the sovereign of "a recognized or established prerogative title or interest." Id. A classic example is the exemption of the sovereign from statutes of limitation. The second class is comprised of those statutes which would create an absurdity if applied to the government, as, for example, a speed limit applied to a policeman pursuing a suspect. See id. at 384.

Even if § 201(c)(2) could be said to deprive the sovereign of an established prerogative, two further exceptions remove § 201(c)(2) from this class of statutes. First, the presumption that the sovereign is excluded unless named does not apply "where the operation of the law is upon the agents or servants of the government rather than on the sovereign itself." Id. at 383. See United States v. Arizona, 295 U.S. 174, 184 (1935); Dollar Sav. Bank v. United States, 86 U.S. (19 Wall.) 227, 239 (1873); see also City of Buffalo v. Hanna Furnace Corp., 305 N.Y. 369, 376 (1953). In the case before us, § 201(c)(2) does not restrict any interest of the sovereign itself; it operates only upon an agent of the sovereign, limiting the way in which that agent carries out the government's interests. "There is no presumption that regulatory and disciplinary measures do not extend to such officers. Taken at face value the language indicates the purpose of Congress to govern conduct of its own officers and employees as well as that of others." Arizona, 295 U.S. at 184 (holding that the Secretary of the Interior was clearly subject to a law prohibiting "any person" from constructing a dam on navigable waterways without the consent of Congress).

The second exception provides that the government is subject to a statute, even if it infringes upon a recognized government prerogative, if the statute's purpose is to prevent fraud, injury, or wrong. Nardone, 302 U.S. at 384; Herron, 87 U.S. (20 Wall.) at 255-56. Nardone itself relied upon this principle to hold that federal agents were covered by the statutory term "anyone" in the 1934 federal wiretap statute. See Nardone, 302 U.S. at 382-84. The anti-gratuity provision of § 201(c)(2) indicates Congress's belief that justice is undermined by giving, offering, or promising anything of value for testimony. If justice is perverted when a criminal defendant seeks to buy testimony from a witness, it is no less perverted when the government does so. Because § 201(c)(2) addresses what Congress perceived to be a wrong, and operates to prevent fraud upon the federal courts in the form of inherently unreliable testimony, the proscription of § 201(c)(2) must apply to the government. See id. at 384. Further, the interests of the United States as sovereign militate in favor of applying § 201(c)(2) against federal prosecutors. The sovereign's interests are in the enforcement of its laws and the just administration of its

judicial system; applying § 201(c)(2) to all parties in that judicial system advances both interests.

Having escaped the first class of cases in which the canon applies, we determine whether our case falls within the second: cases in which "public officers are impliedly excluded from language embracing all persons" because such a reading would "work obvious absurdity." Id. A brief overview of legal principles and the common law will confirm the rationality of the statute's result and indicate the scope of the tradition behind its application to the government. See Kuzma v. IRS, 821 F.2d 930, 932 (2d Cir. 1987) ("[E]stablished principles of statutory construction compel us to seek a rational and sensible construction of the language in question . . . .").

One of the very oldest principles of our legal heritage is that the king is subject to the law. See Romans 13. King John was taught this principle at Runnymede in A.D. 1215, when his barons forced him to submit to Magna Carta, the great charter that imposed limits on the exercise of sovereign power. See William Sharp McKechnie, Magna Carta, 36-42 (1914). One of the first modern expositions of this hallowed principle is found in Lex, Rex,[1] whose title indicated the fundamental shift in our legal heritage toward the primacy of the law and the subordinate position of the king. Justice Brandeis expounded as follows on the principle:

Decency, security and liberty alike demand that government officials shall be subjected to the same rules of conduct that are commands to the citizen. In a government of laws, existence of the government will be imperilled if it fails to observe the law scrupulously. Our Government is the potent, omnipresent teacher. For good or for ill, it teaches the whole people by its example. Crime is contagious. If the Government becomes a lawbreaker, it breeds contempt for law; it invites every man to become a law unto himself; it invites anarchy. To declare that in the administration of the criminal law the end justifies the means--to declare that the Government may commit crimes in order to secure the conviction of a private criminal--would bring terrible retribution. Against that pernicious doctrine this Court should resolutely set its face.

Olmstead v. United States, 277 U.S. 438, 485 (1928) (Brandeis, J., dissenting). This venerable principle will not give way to the expediency of the government's present practices without legislative authorization. See Arizona v. Maricopa County Med. Soc'y, 457 U.S. 332, 354 (1982).

The policy expressed in § 201(c)(2) has long been enforced at common law. See Hamilton v. General Motors Corp., 490 F.2d 223, 227-28 (7th Cir. 1973).[2] The public policy against payments to fact witnesses is expressed in the majority of states in both the law of contracts and in ethical rules, which we address below. The policy is weighty enough that contracts to pay fact witnesses are void as violative of public policy. See 6A Arthur Linton Corbin, Corbin on Contracts § 1430 (1962); Restatement of Contracts § 552(1) (1932); Restatement (Second) of Contracts, § 73 cmt. b (1981); 7 Richard A. Lord, Williston on Contracts § 15:6 (4th ed. 1997). Such contracts also fail for lack of consideration. See, e.g., Williston, supra, at § 15:6. Every citizen has the legal duty to testify to facts within his knowledge, and any witness may be compelled to do so by subpoena and civil contempt proceedings. We note that agreements for testimony are not always used in federal prosecutions. In United States v. Bambulas, 471 F.2d 501, 505 (7th Cir. 1972), the court held:

From the testimony at trial and the sentences imposed on Bambulas and Russell, there is no indication that immunity or a promise of leniency had been offered by federal authorities to Russell. In addition, Fortner testified that federal agents had emphatically stated to him that there would be "no deals" as reward for his testimony.

Id. See also United States v. Meinster, 619 F.2d 1041, 1045 (4th Cir. 1980). The judicial process is tainted and justice cheapened when factual testimony is purchased, whether with leniency or money. Because prosecutors bear a weighty responsibility to do justice and observe the law in the course of a prosecution, it is particularly appropriate to apply the strictures of § 201(c)(2) to their activities.

The United States Attorney is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done. As such, he is in a peculiar and very definite sense the servant of the law, the twofold aim of which is that guilt shall not escape nor innocence suffer.

Young v. United States ex rel. Vuitton et Fils S.A., 481 U.S. 787, 803 (1987) (quoting Berger v. United States, 295 U.S. 78, 88 (1935), overruled on other grounds by Stirone v. United States, 361 U.S. 212 (1960)). We conclude the statute's application to government officials, far from being absurd, is at the center of our legal tradition.

Because of our duty to harmonize apparently conflicting statutes whenever possible, see Chemical Weapons Working Group, Inc. v. Department of the Army, 111 F.3d 1485, 1490 (10th Cir. 1997), we consider whether applying § 201(c)(2) to federal prosecutors works an absurdity in view of the federal immunity statute, 18 U.S.C. §§ 6001-6005. Although it could be argued

that §§ 6001-6005 authorize federal prosecutors to give immunity for testimony while § 201(c)(2) criminalizes offering anything of value for testimony, we believe the statutes operate in sufficiently separate spheres to avoid both conflict and absurdity. The immunity statute allows removal of a witness's Fifth Amendment privilege so that a silent witness may be forced to speak. Under §§ 6001-6005 the government does not give immunity directly for the witness's testimony; the government may move the court to grant immunity, which in turn removes the witness's testimonial privilege so the ordinary compulsion may be brought to bear to require the witness to testify. Both statutes can operate fully and independently; together they manifest a Congressional intent to allow testimony obtained by the court's grant of immunity, but to criminalize the gift, offer, or promise of any other thing of value for or because of testimony. It is not necessary to our decision to further explore the interplay between §§ 6001-6005 and § 201(c)(2), and we leave for other courts the "classic judicial task of reconciling many laws enacted over time, and getting them to 'make sense' in combination . . . ." United States v. Fausto, 484 U.S. 439, 453 (1988).

We note that if the assistant United States attorney were not covered by the statutory term "whoever," then the statute would not prohibit her even from bribing a witness with money in exchange for favorable testimony, which the government concedes the statute prohibits. See Aplees. Brief at 8; see also United States v. Gorman, 807 F.2d 1299, 1304-06 (6th Cir. 1986) (affirming conviction of assistant United States attorney for taking illegal gratuity under parallel subsection), cert. denied, 484 U.S. 815 (1987). We conclude § 201(c)(2) applies to federal prosecutors who make promises for or because of testimony on behalf of the government.

The assistant United States attorney made at least three promises to Napoleon Douglas. Because it is not clear that the government promised to move for a downward adjustment in return for his testimony, we rely for our analysis only on the three promises specifically made in the plea agreement: (1) the promise not to prosecute Mr. Douglas for certain offenses, (2) the promise to inform Mississippi authorities of his cooperation, and (3) the promise to inform the district court of his cooperation. These promises were made "for" his testimony: Mr. Douglas promised to testify "in consideration of" the three promises. See I R. doc 109, at 2-3 (Plea Agreement). The statute's "for or because of" language does not require a quid pro quo relation between the testimony and the promises, but merely requires that the promises be motivated by the testimony, even though the testimony might have been given without the promises. See United States v. Johnson, 621 F.2d 1073, 1076 (10th Cir. 1980) (construing parallel subsection); Evans, 572 F.2d at 479-82; United States v. Alessio, 528 F.2d 1079, 1082 (9th Cir.) (same), cert. denied, 426 U.S. 948 (1976); Brewster, 506 F.2d at 71-72 (same). Here, however, the record indicates the testimony and the promises mutually induced one another, a relation stronger than the "for or because of" required by § 201(c)(2). See United States v. Sun-Diamond Growers, 138 F.3d 961, 966 (D.C. Cir. 1998) (construing parallel language in § 201(c)(1)(A)).

It remains only to determine whether the promises fall within the scope of the statutory term "anything of value." Because the term is not specifically defined in the statute, we assume the ordinary meaning of the words expresses the legislative purpose, and we interpret them according to their everyday meaning. See Russello v. United States, 464 U.S. 16, 21 (1983); United States v. Pommerening, 500 F.2d 92, 97 (10th Cir.), cert. denied, 419 U.S. 1088 (1974). "Value" embodies notions of worth, utility, and importance generally. Congress could have, but did not limit or modify the word in any way. Accordingly, courts have recognized that "anything of value" under § 201 must be broadly construed to carry out its congressional purpose. See, e.g., United States v. Williams, 705 F.2d 603, 622-23 (2d Cir.) (noting that the phrase "has consistently been given a broad meaning"), cert. denied, 464 U.S. 1007 (1983). Our sister circuits have interpreted the phrase synonymously with "thing of value," and have noted that the pervasive use of the term in criminal statutes of both the states and the federal government has made it a term of art, covering intangible as well as tangible things. See United States v. Nilsen, 967 F.2d 539, 542-43 (11th Cir. 1992) (construing 18 U.S.C. § 876), cert. denied, 507 U.S. 1034 (1993); United States v. Schwartz, 785 F.2d 673, 679-81 (9th Cir.) (construing 18 U.S.C. § 1954), cert. denied, 479 U.S. 890 (1986); United States v. Girard, 601 F.2d 69, 71 (2d Cir.) (construing 18 U.S.C. § 641), cert. denied, 444 U.S. 871 (1979).

The government argues that cases involving § 201(c) have all involved monetary payments. However, courts have uniformly rejected arguments that "anything of value" should be restricted to things of monetary, commercial, objective, actual, or tangible value. See Schwartz, 785 F.2d at 679-81; United States v. Marmolejo, 89 F.3d 1185, 1191 (5th Cir. 1996) (construing 18 U.S.C. § 666), aff'd sub nom. Salinas v. United States, 118 S. Ct. 469 (1997), and cert. denied, 118 S. Ct. 599 (1997); Nilsen, 967 F.2d at 542-43 ("This broad interpretation is based upon a recognition that monetary worth is not the sole measure of value."); Williams, 705 F.2d at 622-23 (holding "anything of value" under § 201 is not limited to what objectively has actual value); Girard, 601 F.2d at 71.

Value has been accorded a broader, more common interpretation. See Schwartz, 785 F.2d at 679. We agree with those circuits which have held that the test of value is whether the recipient subjectively attaches value to the thing received. See United States v. Picquet, 963 F.2d 54, 55 (5th Cir.) (construing 18 U.S.C. § 1029), cert. denied, 506 U.S. 902 (1992);

Gorman, 807 F.2d at 1304-05; Schwartz, 785 F.2d at 680; Williams, 705 F.2d at 623 (holding that proper construction of § 201 focuses on whether recipient subjectively attached value to the thing received). But cf. United States v. Sheker, 618 F.2d 607, 609 (9th Cir. 1980) (declining to adopt the view, under 18 U.S.C. § 912, that anything of value includes anything that has subjective value to the defendant, and instead requiring that the value be recognized or appreciated by others).

Courts construing the phrase have held a variety of intangibles to be things of value, including information regarding the whereabouts of a witness, information contained in DEA reports, assistance in arranging a merger, a witness's testimony, conjugal visits, amusement, the promise to reinstate an employee, and the promise not to run in a primary election. See Sheker, 618 F.2d at 609; Girard, 601 F.2d at 70-71; Schwartz, 785 F.2d at 679; United States v. Zouras, 497 F.2d 1115, 1121 (7th Cir. 1974) (construing 18 U.S.C. § 876); Marmolejo, 89 F.3d at 1191; Giomi v. Chase, 132 P.2d 715, 716-17 (N.M. 1942) (construing "thing of value" in state gambling statute); People ex rel. Dickinson v. Van De Carr, 84 N.Y.S. 461, 463-64 (N.Y. App. Div. 1963) (construing "thing of value" in state bribery statute); People v. Hochberg, 404 N.Y.S.2d 161, 167 (N.Y. App. Div. 1978) (same).

Although this precedent alone would require a conclusion that the promises made to Mr. Douglas are of value, four further considerations confirm the matter. First, much of the precedent cited construes the phrase "thing of value"; and the use in § 201 of "anything of value" indicates an even broader scope of coverage.

Second, much of the precedent construes statutory language in which the term appears at the end of a series of enumerated specifics, such as "any fee, kickback, commission, gift, loan, money, or thing of value." Schwartz, 785 F.2d at 679 (construing 18 U.S.C. § 1954, and noting that legislative history indicated the enumeration was one of illustration, not limitation); see Marmolejo, 89 F.3d at 1191 (construing "anything of value of $5,000 or more"); Nilsen, 967 F.2d at 542 (construing "any money or other thing of value"); Picquet, 963 F.3d at 55; Girard, 601 F.2d at 70-71. That these courts have broadly construed the phrase to include intangibles in spite of the interpretive canon ejusdem generis indicates the strength of the term's plain meaning. In contrast to these cases and statutes, "anything of value" in § 201(c)(2) stands alone, unlimited by any enumeration.

Third, the purpose of the statute confirms Congress's broad language. One obvious purpose of the blanket prohibition in § 201 is to keep testimony free of all influence so that its truthfulness is protected. See United States v. Biaggi, 853 F.2d 89, 101 (2d Cir. 1988), cert. denied, 489 U.S. 1052 (1989); Evans, 572 F.2d at 480. The promise of intangible benefits imports as great a threat to a witness's truthfulness as a cash payment. See United States v. Cervantes-Pacheco, 826 F.2d 310, 315 (5th Cir. 1987) ("It is difficult to imagine a greater motivation to lie than the inducement of a reduced sentence . . . ."), cert. denied, 484 U.S. 1026 (1988); Schwartz, 785 F.2d at 680 ("A violation of trust which is influenced by the offer of an intangible service is no less damaging . . . than if the influence was in the form of a cash kickback."); United States v. Meinster, 619 F.2d 1041, 1045 (4th Cir. 1980) ("We think it obvious that promises of immunity or leniency premised on cooperation in a particular case may provide a strong inducement to falsify in that case."); see also United States v. Kimble, 719 F.2d 1253, 1255-57 (5th Cir. 1983) (stating witness "admitted lying in over thirty different statements motivated by his sense of self-preservation" under plea arrangement requiring his testimony in return for lenient sentence), cert. denied, 464 U.S. 1073 (1984).

Fourth, § 201(c)(1) opens by providing "otherwise than as provided by law for the proper discharge of official duty." In contrast, § 201(c)(2) includes no such exemption for official acts authorized by law. Because Congress specifically exempted public duties from one subsection but did not exempt them from the subsection at issue in this case, we should interpret the plain language of the statute to cover promises of leniency by prosecutors.

We find no basis in law, policy, or common sense to judicially limit "anything of value" to things reducible to monetary or tangible value. Justice Holmes's words are appropriate: "[T]here is no canon against using common sense in construing laws as saying what they obviously mean." Roschen v. Ward, 279 U.S. 337, 339 (1929).

In this light we apply the statutory phrase "anything of value" to the promises made to Mr. Douglas. The obvious purpose of the government's promised actions was to reduce his jail time, and it is difficult to imagine anything more valuable than personal physical freedom. See Cervantes-Pacheco, 826 F.2d at 315. Although the information promised by the government would certainly not guarantee Mr. Douglas's release, it was an invaluable step toward that end. The Ninth Circuit, in holding that information can be a thing of value, indicated by example the broad rationale of its holding: "For instance, state secrets might trade hands without cash consideration. Information obtained for political advantage might have value apart from its worth in dollars." Schwartz, 785 F.2d at 679 (quoting Sheker, 618 F.2d at 609); see also United States v. Fowler, 932 F.2d 306, 309-10 (4th Cir. 1991) (joining Second and Sixth Circuits in holding information can be a thing of value under 18 U.S.C. § 641). But see United States v. Tobias, 836 F.2d 449, 451 (9th Cir.), cert. denied, 485 U.S. 991 (1988). The information and intervention promised by the government for Mr. Douglas's legal advantage was of great value. See, e.g.,

Sheker, 618 F.2d at 609. In the case of the promise not to prosecute, the value was even greater: besides guaranteed physical freedom he was guaranteed freedom from the burden of defending himself and from the stigma of prosecution and conviction as well.

Our basis for determining these promises were of value is that the record indicates Mr. Douglas subjectively valued them. They were all he bargained for in return for his testimony and guilty plea. See Nilsen, 967 F.2d at 543 ("[T]he conduct and expectations of a defendant can establish whether an intangible objective is a 'thing of value.'"). In addition, he testified that he wanted the government's assistance to help "everything work out for [him]." IV R. 206. In these circumstances the promises made to him fall well within the statutory term "anything of value." Having fulfilled every statutory element, we conclude the government's conduct was covered by the plain language and meaning of § 201(c)(2).

### B. The Structure of § 201

Our construction of the particular statutory language at issue is fortified by the language and structure of the statute as a whole. See K Mart Corp. v. Cartier, Inc., 486 U.S. 281, 291 (1988); Russello, 464 U.S. at 22-26. Section 201 addresses corruption of public officials and witnesses, and its provisions have been divided generally into bribery prohibitions and gratuity prohibitions. See, e.g., Johnson, 621 F.2d at 1076 (quoting United States v. Strand, 574 F.2d 993, 995 (9th Cir. 1978)). The bribery prohibitions, collected under § 201(b), are distinguished by their statutory requirements of corruptness on the part of the giver and intent to influence the receiver's action. The gratuity prohibitions collected under § 201(c), on the other hand, contain no requirements of corruption and intent to influence the receiver, and Congress attached concomitantly lesser penalties to their violation. See United States v. Irwin, 354 F.2d 192, 197 (2d Cir. 1965) (construing current statutory language under prior subsection),[3] cert. denied, 383 U.S. 967 (1966). The gratuity prohibitions have been held to be lesser included offenses of the bribery provisions. See, e.g., Brewster, 506 F.2d at 67-76.

The statute at issue in this case, § 201(c)(2), is a gratuity prohibition, and like every other gratuity provision in § 201(c)(2), it contains no requirements of corruptness or intent to influence. See Johnson, 621 F.2d at 1076; Brewster, 506 F.2d at 71-72; Irwin, 354 F.2d at 197; Golden Door Jewelry Creations, Inc. v. Lloyds Underwriters Non-Marine Ass'n, 865 F. Supp. 1516, 1523 (S.D. Fla. 1994), aff'd in part, rev'd in part, and remanded, 117 F.3d 1428 (11th Cir. 1997).

In contrast, a separate bribery provision under § 201(b), dealing with bribery of witnesses, does require heightened intent. Section 201(b)(3) provides that whoever "corruptly gives, offers, or promises anything of value to any person . . . with intent to influence the testimony under oath or affirmation of such . . . person as a witness" shall be fined or imprisoned. Congress thus deliberately included the corruptness and intent-to-influence elements in § 201(b)(3) and excluded them from § 201(c)(2). "'[W]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion.'" Brown v. Gardner, 513 U.S. 115, 120 (1994) (quoting Russello, 464 U.S. at 23). Moreover, the predecessor statute to § 201(c)(2) did require an agreement that the testimony would be influenced by the thing of value. See 18 U.S.C. § 209 (1952). Congress deliberately deleted that language, and it is not our place to reinsert it.

Section 201(d) further illumines the plain meaning of § 201(c)(2). This subsection provides:

Paragraphs (3) and (4) of subsection (b) and paragraphs (2) and (3) of subsection (c) shall not be construed to prohibit the payment or receipt of witness fees provided by law, or the payment, by the party upon whose behalf a witness is called and receipt by a witness, of the reasonable cost of travel and subsistence incurred and the reasonable value of time lost in attendance at any such trial, hearing, or proceeding, or in the case of expert witnesses, a reasonable fee for time spent in the preparation of such opinion, and in appearing and testifying.

18 U.S.C. § 201(d). The existence of § 201(d) as a specific exception to § 201(c)(2) indicates that § 201(c)(2) would otherwise prohibit travel and other witness fees, which are given to witnesses because of their testimony.

We find no clearly expressed legislative intention contradicting the statute's language. The legislative history confirms Congress's purpose that giving or receiving anything of value by "witnesses 'for' or 'because of' . . . testimony . . . should also be prohibited." H.R. Rep. No. 87-748, at 16 (1961). The committee report also indicates Congress's policy: "The conduct which is forbidden has the appearance of evil and the capacity of serving as a cover for evil." Id. at 19. The purpose and policy of the statute confirm its plain language and structure. We conclude § 201(c)(2) prohibited the government's promises to Mr. Douglas of leniency and intervention on his behalf in return for his testimony. See Dixson v. United States, 465 U.S. 482, 496 (1984) ("Congress' longstanding commitment to a broadly drafted federal bribery statute, its expressed desire to continue that tradition with the 1962 revisions, its affirmative adoption of the language at issue in this case, and the House Report[] . . . combine to persuade us that Congress never intended § 201(a)[] . . . to be given the cramped reading proposed

by petitioners."). The Supreme Court's more recent words are instructive as well: "No rule of construction . . . requires that a penal statute be strained and distorted in order to exclude conduct clearly intended to be within its scope. . . ." See Salinas v. United States, 118 S. Ct. 469, 475 (1997) (citing United States v. Raynor, 302 U.S. 540, 552 (1938)).[4]

## II. The Law Enforcement Justification

The government asserts, without argument or authority, that agreements for testimony between the government and a witness are not contemplated by this statute. Its position is that its agreement in return for testimony was justified and legitimate, and that Congress could not have intended § 201(c)(2) to hamper the punishment of crime by bringing within its sweep this government practice. Even assuming such a practice, our answer is that the matter was one of policy for Congress to decide. See Nardone, 302 U.S. at 383. In Nardone the Court rejected an argument that the government should be exempt from the federal wiretap statute, suggesting, "Congress may have thought it less important that some offenders should go unwhipped of justice than that officers should resort to methods deemed inconsistent with ethical standards and destructive of personal liberty." Id. We likewise discern what § 201(c)(2) contemplates from its language, and its language makes no exception for the government's conduct. Although the government's apparent practice of giving inducements for testimony, as opposed to other forms of cooperation, and the judiciary's seeming approval of such practice give us pause, they do not alter the words of a clear statute. See Brogan v. United States, 118 S. Ct. 805, 811 (1998). "The execution of the federal laws under our Constitution is confided primarily to the Executive Branch of the Government, subject to applicable constitutional and statutory limitations and to judicially fashioned rules to enforce those limitations." Hampton v. United States, 425 U.S. 484, 490 (1976) (quoting United States v. Russell, 411 U.S. 423, 435 (1973).

To answer the government's vague argument that some overriding policy should prevent application of this statute to the government's conduct, we will raise sua sponte the justification of law enforcement authority. "Criminal prohibitions do not generally apply to reasonable enforcement actions by officers of the law." Brogan, 118 S. Ct. at 811. If the justification applies, conduct which violates the terms of a criminal statute is nevertheless not forbidden. The justification can be generally described as follows: a peace officer, prison guard, or private citizen authorized to act as a peace officer may, to the extent necessary to make an arrest, prevent an escape, or prevent the commission of a crime, violate a criminal statute if the conduct which constitutes the violation is reasonable in relation to the gravity of the evil threatened and the importance of the interest to be furthered. See Paul H. Robinson, Criminal Law Defenses § 142(a) (1984). The government's conduct does not fall within this justification for at least two reasons: it was not undertaken by a peace officer or one acting in that capacity, and it was not required by an exigent need to make an arrest or prevent an escape or other crime.

The Supreme Court's more general statement of the rule that "[c]riminal prohibitions do not generally apply to reasonable enforcement actions by officers of the law," embraces field enforcement activity. Brogan, 118 S. Ct. at 811. The Court has held, for example, that the government's limited undercover participation in an unlawful drug operation is "a recognized and permissible means of investigation." United States v. Russell, 411 U.S. 423, 432 (1973); see Lewis v. United States, 385 U.S. 206, 208-09 (1966). Brogan itself states that 18 U.S.C. § 1001 "does not make it a crime for an undercover narcotics agent to make a false statement to a drug peddler." Brogan, 118 S. Ct. at 811 (internal quotes and alterations omitted); see United States v. Monaco, 700 F.2d 577, 580-81 (10th Cir. 1983) ("To obtain evidence of certain crimes undercover agents frequently must participate in illegal activities."); United States v. Szycher, 585 F.2d 443, 449 (10th Cir. 1978) ("Government officers can, of course, employ appropriate artifice and deception to ferret out illegal activities."); cf. United States v. Duggan, 743 F.2d 59, 83-84 (2d Cir. 1984) (holding defense of public authority requires government agent to have actual authority to authorize statutory violation); United States v. Anderson, 872 F.2d 1508, 1516 (11th Cir.) (holding because CIA agents have no authority to violate federal statutes, defense fails), cert. denied, 493 U.S. 1004 (1989); Fed. R. Crim. P. 12.3 (regulating presentation of law enforcement defense).

The conduct of police, investigators, and law enforcement agents is regularly evaluated against the standard of what is legitimate and reasonably necessary to enforce the law. See, e.g., United States v. Mosley, 965 F.2d 906, 908-15 (10th Cir. 1992); United States v. Warren, 747 F.2d 1339, 1341-44 & nn.4-10 (10th Cir. 1984) (collecting cases); Monaco, 700 F.2d at 580-81; United States v. Biswell, 700 F.2d 1310, 1314 (10th Cir. 1983); Szycher, 585 F.2d at 449; see also United States v. Asencio, 873 F.2d 639, 640-41 (2d Cir. 1989). But we have found no case in which prosecutors, in their role as lawyers representing the government after the initiation of criminal proceedings, have been granted a justification to violate generally applicable laws. See United States v. Ryans, 903 F.2d 731, 739-40 (10th Cir.) (holding that disciplinary rule applies to prosecutors upon commencement of criminal proceedings), cert. denied, 498 U.S. 855 (1990).

The law enforcement justification exists to allow field officers a practically necessary means to detect and prevent crime, and to apprehend suspects. It is justified by the difficulties inherent in detecting certain types of crime. See Russell, 411 U.S. at 432 (narcotics); United States v. Kelly, 707 F.2d 1460, 1468 (D.C. Cir.) (public corruption), cert. denied, 464 U.S. 908

(1983); Monaco, 700 F.2d at 580-81 (prostitution). The government's violation of § 201(c)(2), however, is entirely unrelated to detecting crime. Once the exigencies of field enforcement are satisfied, we can find no policy by which prosecutors may be excused from statutes regulating testimony presented to the federal courts. Although there are difficulties inherent in proving certain types of crimes, violating § 201(c)(2) is not necessary to overcome those difficulties: compulsory process is lawful and available, and avoids the taint on truthfulness which attends unlawful witness gratuities. The law enforcement justification has never altered the playing field on which crimes are proved in court. We decline to expand the meaning of "enforcement action" beyond its historical scope of detection, apprehension, and prevention of crime.

Because the government's statutory violation occurred not in a field investigation but in the context of testimony which was to be presented to the court, we further hold its action was not "reasonable." Brogan, 118 S. Ct. at 811. The chasm between the government's present conduct and reasonable law enforcement actions can be illustrated by analogy to the FBI's Abscam operation, under which operatives and undercover agents offered bribes to public officials and arrested those who accepted the bribes. See Kelly, 707 F.2d at 1461-63. Although Abscam created controversy and dissent in the courts, it was held a legitimate means of detecting public corruption. See, e.g., id. at 1469-71. The government's present inducement for testimony goes much further. Reasonable law enforcement actions stop with detecting crime and observing enough to prove it. The government's statutory violation unreasonably exceeds this purpose, and is the more egregious because the intended product of the violation is testimony presented in court. We conclude the government's violation of § 201(c)(2) was neither "reasonable" nor an "enforcement action." Brogan, 118 S. Ct. at 811. Consequently it falls outside the scope of legitimate investigatory practices and is not justified by law enforcement authority.

Cases involving the application of ethical rules to federal prosecutors fortify our conclusion. The Department of Justice attempted, first through a policy statement known as the Thornburgh Memorandum, then through a federal regulation, 28 C.F.R. pt. 77 (1997), to exempt its litigators from state ethical rules prohibiting ex parte communication with represented parties. The federal courts have unanimously rejected the notion that federal prosecutors are exempt from these ethical rules. (5) See, e.g., United States ex rel. O'Keefe v. McDonnell Douglas Corp., 132 F.3d 1252, 1257 (8th Cir. 1998); United States v. Lopez, 4 F.3d 1455, 1458-63 (9th Cir. 1993). In doing so, courts have rejected arguments that the rule "was not intended to apply to prosecutors pursuing investigations," or that their contact "was authorized by law." Lopez, 4 F.3d at 1458; see also Matter of Doe, 801 F. Supp. 478, 484-87 (D.N.M. 1992). If federal prosecutors are bound by an ethical rule governing ex parte contact in the course of a prosecution, we think it even more clear that they are bound by a federal statute regulating the evidence presented in federal court. The Supreme Court has reiterated, in another context, the prevailing rule that "a federal official may not with impunity ignore the limitations which the controlling law has placed on his powers." Butz v. Economou, 438 U.S. 478, 489 (1978).

### III. Section 201(c)(2) in Relation to Other Statutes

The government argues that several provisions of law authorized it to make its agreement with Mr. Douglas. The government apparently refers to an unwritten agreement with Mr. Douglas to make a sentence reduction recommendation. See Aplees. Brief at 7, 9. Although any such agreement is not before us because it is not clear from the record that it was made, we will construe the government's argument as one that it had statutory authorization for the three written promises it did make to Mr. Douglas for his testimony.

The federal criminal sentencing statute, 18 U.S.C. § 3553(e), provides, "Upon motion of the Government, the court shall have the authority to impose a sentence below a level established by statute as minimum sentence so as to reflect a defendant's substantial assistance in the investigation or prosecution of another person who has committed an offense." In addition, 28 U.S.C. § 994(n) instructs the United States Sentencing Commission to ensure that guidelines reflect "the general appropriateness of imposing a lower sentence than would otherwise be imposed, including a sentence that is lower than that established by statute as a minimum sentence, to take into account a defendant's substantial assistance in the investigation or prosecution of another person who has committed an offense." Accordingly, USSG § 5K1.1 provides that the government may move for a downward departure from the guidelines if it determines the defendant has "provided substantial assistance in the investigation or prosecution of another person who has committed an offense . . . ." USSG § 5K1.1. "The appropriate reduction shall be determined by the court for reasons stated that may include . . . the truthfulness, completeness, and reliability of any information or testimony provided by the defendant." Id. at § 5K1.1(a)(2). The government also cites Fed. R. Crim. P. 35(b), which says, "The court, on motion of the Government made within one year after the imposition of the sentence, may reduce a sentence to reflect a defendant's subsequent, substantial assistance in the investigation or prosecution of another person who has committed an offense . . . ."

Each of these provisions of law authorizes only that substantial assistance can be rewarded after it is rendered; none authorizes the government to make a deal for testimony before it is given, as the government did with Mr. Douglas.

Consequently the statutes cannot justify the government's promises in this case.

However § 201(c)(2) prohibits even the rewarding of testimony after it is given: it prohibits anything of value to be given, offered or promised "because of" testimony "given." 18 U.S.C. § 201(c)(2). The sentencing provisions may thus appear to conflict by authorizing something of value (a motion for and grant of sentence reduction) to be given "because of" testimony rendered. We believe the statutes can be read together in this way: in light of § 201(c)(2), "substantial assistance" does not include testimony. Congress enacted the sentencing provisions against the backdrop of its general prohibition against giving anything of value for or because of testimony. See generally 2B Norman J. Singer, Sutherland Statutory Construction § 53.01 (5th ed. 1992). Against this background, § 994 authorizes the Sentencing Commission to reward all forms of substantial assistance other than testimony.

Our reading of the statutes will not impair the substantial assistance provisions, because a defendant can substantially assist an investigation or prosecution in myriad ways other than by testifying. Nor will our holding drastically alter the government's present practices. The government may still make deals with accomplices for their assistance other than testimony, and it may still put accomplices on the stand; it simply may not attach any promise, offer, or gift to their testimony. Because the operation of the sentencing statutes is not positively repugnant to § 201(c)(2), we must give effect to both. See Connecticut Nat'l Bank v. Germain, 503 U.S. 249, 253 (1992). The question whether USSG § 5K1.1(a)(2) exceeds statutory authority or conflicts with § 201(c)(2) by making testimony, as opposed to other forms of cooperation, a basis for a finding of substantial assistance is not directly before us, and we do not decide it.

The government's reliance on the substantial assistance sentencing statutes is, in essence, an argument that they impliedly amend or repeal the plain prohibition of § 201(c)(2). Courts generally and quite consistently disfavor implied repeals and amendments. See, e.g., United States v. Estate of Romani, 118 S. Ct. 1478, 1486 (1998) (declining to consider implied amendment or repeal, and instead harmonizing statutes); 1A Norman J. Singer, Sutherland Statutory Construction § 22.13 (5th ed. 1992) ("Amendments by implication, like repeals by implication, are not favored and will not be upheld in doubtful cases . . . ."); id. at § 23.09 ("Courts are reluctant to find repeal by implication even when the later statute is not entirely harmonious with the earlier one. If two statutes conflict somewhat, the court must, if possible, read them so as to give effect to both . . . ."). Courts will generally not find an implied repeal or amendment unless either the text or legislative history indicates Congress's intent to obviate the legal power of the earlier statute. See id. at § 23.10. We find no glimmer of such an indication in the sentencing statutes or their legislative history.

## IV. Precedent

Although neither party cited any case in which a criminal defendant argued the government violated §201(c)(2) by offering leniency or other inducements to a witness, we have been able to find three such reported cases. We find each unpersuasive.

In United States v. Isaacs, 347 F. Supp. 763 (N.D. Ill. 1972), one of the defendants in a prosecution for conspiracy, bribery, and other offenses argued that the government violated § 201(h), the identical predecessor of § 201(c)(2), by exercising influence on state officials to procure something of value for a witness. The United States Attorney, in cooperation with the Department of Justice, allegedly went to California and met with state officials to persuade them to grant the witness a license to become a director of the Hollywood Park Turf Club without a public hearing and in spite of the witness's implication in the bribery. See id. at 767. It was necessary to avoid a public hearing on the license so the witness would not be subject to cross-examination on her involvement in the bribery. See id.

The defendant, relying only on newspaper reports, argued the government had violated § 201(h) by giving something of value to a witness for her testimony, and requested an evidentiary hearing to develop facts on the matter. In making its ruling, the court mischaracterized § 201(h), stating the defendant's argument was based on an inference that the award of the license to the witness was "a bribe intended to influence her testimony . . . ." Id. at 767. The statute is abundantly clear that it proscribes gratuities regardless of intent to influence testimony. The court then denied the defendant's motion on two grounds. First, it held the conjectural allegations based on newspaper reports were insufficient to warrant an evidentiary hearing. See id. Second, it held that Giglio v. United States, 405 U.S. 150 (1972) indicated that suppression was not an appropriate remedy when the government promises leniency to a witness in return for her testimony. See Isaacs, 347 F. Supp. at 767.

Giglio held the government must disclose a promise of leniency made to a key witness in return for his testimony. See Giglio, 405 U.S. at 153-54. Section 201(h) was not implicated in Giglio; the defendant there argued only that the promise was material exculpatory evidence going to the credibility and reliability of the key witness, and that he was entitled to a new trial to present the evidence to the jury. The Supreme Court agreed, holding that due process was violated when the jury was erroneously told no promises of leniency were made to the witness, because evidence of the promise was "relevant to his credibility and the jury was entitled to know of it." Id. at 155. The Isaacs court took this statement to preclude application of

§ 201(h).

We believe Giglio's holding--that Brady v. Maryland, 373 U.S. 83 (1963) applies to impeachment evidence--is not dispositive of the statutory question before us, a question not presented to the Court in Giglio. It is quite clear that due process as interpreted in Brady and Giglio, as well as federal legislation, see Jencks Act, 18 U.S.C. § 3500, require a large class of materials to be turned over to the defense in a criminal case. Evidence of the government's valuable promises to a witness falls within this class. But this does not prohibit Congress from also criminalizing certain conduct within the class. For example, the government in a criminal case must disclose known perjury to the defense. See United States v. Agurs, 427 U.S. 97, 103-04 (1976). Yet the occurrence of perjury remains a crime. See 18 U.S.C. §§ 1621, 1623. Likewise the criminality of offering anything of value for testimony is not inconsistent with Giglio's rule that the offer be disclosed. An unambiguous statute is before us, and within constitutional boundaries we have no authority to refuse to apply it. Consequently we must reject Isaac's inference from Giglio that § 201(c)(2) does not apply in this situation.

Section 201(h) was also raised by the defendant in United States v. Barrett, 505 F.2d 1091, 1100-02 (7th Cir. 1974), cert. denied, 421 U.S. 964 (1975), in which the government entered into a plea agreement similar to its agreement with Mr. Douglas. In Barrett, the primary witness against the defendant pled guilty and agreed to testify in return for the government's recommendation of an extraordinarily lenient sentence, transactional immunity, and civil tax immunity. The witness's testimony was that he paid large bribes to various public officials; in return for this testimony, he was exempted from paying tax and penalties on the money constituting the bribes. The defendant moved to suppress on the ground that this arrangement violated § 201(h). The district court denied the motion but allowed the government's bargain to be used to impeach the witness's credibility. See id.

The Seventh Circuit approved this disposition and in a footnote repeated Isaacs's inference from Giglio. See id. n.9. It went on to state that the premise of the defendant's § 201(h) argument was that the government had no authority to grant civil tax immunity in return for testimony. The defendant conceded the government did not violate § 201(h) by granting criminal immunity, because the United States Code authorizes the government to grant such immunity. See 18 U.S.C. § 6002. Following this reasoning, the court found a provision of the tax code authorizing the government to settle any tax case, 26 U.S.C. § 7122, and held that because Congress authorized the government to settle tax liability, it could settle tax liability in return for testimony. See Barrett, 505 F.2d at 1101-02.

We believe this conclusion is incorrect because both the court and the parties reasoned from a faulty premise. Section 201(h) did not prohibit the government from giving unauthorized things of value for testimony; it proscribed giving anything of value for testimony. To read the section as prohibiting only the giving of unauthorized things (besides ignoring its plain language) is to read it right out of the code. It is a truism that the government may not do unauthorized things. And it is § 201(h) that makes gifts, offers, and promises unauthorized in certain circumstances. If the section is to have any meaning it must be read to prohibit giving otherwise authorized things "for" or "because of" testimony. Otherwise, under Barrett's reasoning, the government's authorization to expend money means the government may pay money to a witness for his testimony. We will not eviscerate the statute in this way. Section 201(c)(2) discriminates not on the basis of what things of value are authorized, but on whether the thing of value is given "for" or "because of" testimony.

Finally, the Sixth Circuit addressed an argument like Ms. Singleton's in United States v. Blanton, 700 F.2d 298, 310-11 (6th Cir.), reheard in part, 719 F.2d 815 (6th Cir. 1983),[6] cert. denied, 465 U.S. 1099 (1984), in which the former governor of Tennessee, Leonard Blanton, was convicted on various charges of corruption. The primary witness against him received a liquor license through a corrupt arrangement with Mr. Blanton. In return for the witness's truthful testimony, the United States persuaded Tennessee's Alcoholic Beverage Commission not to revoke his liquor license. The witness wanted the government's persuasion because fraud in procuring a liquor license was ground for its revocation. See id.

Mr. Blanton argued the witness's testimony should have been suppressed because the government procured it in return for something of value, in violation of § 201(h). The court rejected his argument, holding the "purported 'thing of value'--a liquor license--was not offered by the government." Id. at 311. It supported this by stating that the government used only persuasion and exercised no coercive power. Further, it held the government did not "give" a thing of value because it merely preserved the status quo: the witness kept the license he previously had. See id.

Neither ground of the holding persuades us. It seems apparent to us that the issue was whether the government's persuasion, which was offered and given, was a thing of value. The court's focus on the liquor license and on the state's control of it obscures this point: the government's intangible persuasion might have been enormously valuable to the witness, since he sought it and it was effective in the goal of retaining his license. We are likewise unpersuaded that preservation of the status quo cannot constitute a thing of value. The persuasion of the United States was brought to bear in return for testimony at a

time when the witness's status quo (which happened to be ill-gotten gain) was about to change drastically for the worse. We find no principled basis in Blanton on which to hold the government's conduct in our case was not covered by the unambiguous prohibition of § 201(c)(2). "We have stated time and again that courts must presume that a legislature says in a statute what it means and means in a statute what it says there." Connecticut Nat'l Bank v. Germain, 503 U.S. 249, 253-54 (1992).

We further disagree with the Eleventh Circuit to the extent it has held that § 201(c)(2) is violated only when the resultant testimony is false. See Golden Door Jewelry Creations, Inc. v. Lloyds Underwriters Non-Marine Ass'n, 117 F.3d 1328, 1335 n.2 (11th Cir. 1997); United States v. Moody, 977 F.2d 1420, 1424-25 (11th Cir. 1992), cert. denied, 507 U.S. 944 (1993). It seems the court in Golden Door took out of context Moody's statement that § 201(c)(2) "obviously proscribes a bribe for false testimony; persons of ordinary intelligence would come to no other conclusion." Moody, 977 F.2d at 1425. Moody upheld § 201(c)(2) against overbreadth and vagueness challenges by a defendant who had paid a witness to fabricate a story in court. The court held that as applied to these facts the statute was not vague or overbroad: no one of ordinary intelligence could contest that the statute clearly prohibited this conduct. See id. at 1424. Moody nowhere intimated the statute applied only to false testimony. In the context of the as-applied challenge, the court had no occasion to determine what other conduct the statute proscribed, and the defendant did not demonstrate any real or substantial unconstitutional applications. See Moody, 977 F.2d at 1424-25.

Moreover, requiring false testimony under § 201(c)(2) would interpose elements not required even by the bribery provisions, which do not require the bribe recipient's action to be influenced in fact. See United States v. Hernandez, 731 F.2d 1147, 1149 (5th Cir. 1984); Johnson, 621 F.2d at 1076. "We ought not to open the door to an evasion of the statute by this device." Oubre v. Entergy Operations, Inc., 118 S. Ct. 838, 842 (1998). It is anomalous to require under a gratuity provision both that testimony actually be given, and that it be false, when the bribery provisions require neither. See Hernandez, 731 F.2d at 1149 ("The crime [of bribery] is consummated whether or not the offer is accepted by the offeree.").

We conclude that under § 201(c)(2) the promise need not be intended to affect, and need not actually affect, the testimony in any way. Promising something of value to secure truthful testimony is as much prohibited as buying perjured testimony. See Shuttlesworth v. Housing Opportunities Made Equal, 873 F. Supp. 1069, 1078 (S.D. Ohio 1994). In a similar gratuity provision prohibiting gifts, promises, or offers to a public official for or because of an official act, Irwin held, "It is not necessary for the Government to show that the gift caused or prompted or in any way affected the happening of the official act or had anything to do with its nature or extent or the manner or means by which it was performed." Irwin, 354 F.2d at 197. We believe there is no principled basis on which to judicially add elements to the statute when Congress has chosen not to include them. "[W]here the words of a law, treaty, or contract, have a plain and obvious meaning, all construction, in hostility with such meaning, is excluded. This is a maxim of law, and a dictate of common sense . . . ." Green v. Biddle, 21 U.S. (8 Wheat.) 1, 89-90 (1823).

### V. Kansas Professional Rule 3.4(b)

Ms. Singleton argues the government violated Kansas Professional Rule 3.4(b) in presenting the testimony of Mr. Douglas. The rule, adopted by the Supreme Court of Kansas, provides, "A lawyer shall not . . . offer an inducement to a witness that is prohibited by law." Kansas Rule of Professional Conduct 3.4(b) (1997). Commentary to the Model Rules, as adopted by the Supreme Court of Kansas, states, "The common law rule in most jurisdictions is that it is improper to pay an occurrence witness any fee for testifying . . . ." Kansas Rule of Professional Conduct 3.4(b) cmt. (1997). We have already established, in agreement with our sister circuits, that intangible value can be equivalent to financial value, and that the promise of leniency is an equal or greater incentive to lie than is cash. Moreover, because we have held that the government's promises ran afoul of 18 U.S.C. § 201(c)(2), and were thus prohibited by law, we must conclude the government violated Rule 3.4(b).

### VI. Remedy

In the circumstances before us, the appropriate remedy for the testimony obtained in violation of § 201(c)(2) is suppression of its use in Ms. Singleton's trial.[7] "[T]he principal reason behind the adoption of the exclusionary rule was the Government's 'failure to observe its own laws.'" United States v. Russell, 411 U.S. 423, 430 (1973) (quoting Mapp v. Ohio, 367 U.S. 643, 659 (1961)). The exclusionary rule has been applied to constitutional, statutory, and procedural rule violations to deter unlawful conduct. See United States v. Blue, 384 U.S. 251, 255 (1966). The Supreme Court itself has applied the rule to various statutory violations, see Sabbath v. United States, 391 U.S. 585, 586, 588-90 (1968); Miller v. United States, 357 U.S. 301, 313-14 (1958); Nardone v. United States, 308 U.S. 338, 339-41 (1939); Nardone v. United States, 302 U.S. 379, 380-84 (1937), and has held open this application while denying use of the rule for certain regulatory violations, see United States v. Caceres, 440 U.S. 741, 754-55 & n.21 (1979). Likewise the courts of appeals have held suppression

appropriate where federal statutes have been violated. See, e.g., United States v. Marts, 986 F.2d 1216, 1218-19 (8th Cir. 1993); United States v. Rivieccio, 919 F.2d 812, 816 (2d Cir. 1990), cert. denied, 501 U.S. 1230 (1991); United States v. Chemaly, 741 F.2d 1346, 1353-54 & n.2 (11th Cir. 1984), reh'g en banc vacated and panel opinion reinstated, 764 F.2d 747 (11th Cir. 1985) (en banc); United States v. Soto-Soto, 598 F.2d 545, 550 (9th Cir. 1979); United States v. Genser, 582 F.2d 292, 307-09 (3d Cir. 1978). Although its application to statutory violations is not automatic, see Weiss v. Commissioner, 919 F.2d 115, 116 (9th Cir. 1990), we believe the policies of the rule require its use in this context.

Suppression is a judicially fashioned rule whose primary purpose is to deter official misconduct. See United States v. Peltier, 422 U.S. 531, 542 (1975); United States v. Calandra, 414 U.S. 338, 347-48 (1974). We must balance the good of preventing future unlawful conduct with the evil of disallowing relevant evidence of guilt in an individual case. See United States v. Duchi, 944 F.2d 391, 396 (8th Cir. 1991).

We believe exclusion will effectively deter the unlawful conduct before us. Agreements to seek leniency or refrain from filing charges in return for testimony are entered into with the intention of presenting to a court the testimony so acquired. Excluding that tainted testimony removes the sole purpose of the unlawful conduct and leaves no incentive to violate § 201(c)(2). Cf. id. Courts declining to apply the exclusionary rule for violation of statutes have done so on the ground that it is "inappropriate until such time as 'widespread and repeated violations'" of the statute exist, United States v. Roberts, 779 F.2d 565, 568 (9th Cir.) (quoting United States v. Wolffs, 594 F.2d 77, 85 (5th Cir. 1979)), cert. denied, 479 U.S. 839 (1986), and they have specifically held the remedy available for that situation, see United States v. Griley, 814 F.2d 967, 976 (4th Cir. 1987). This approach is appropriate because deterrence is a preventive function which cannot be served unless there is a significant likelihood of future violations to be deterred. See Calandra, 414 U.S. at 347-48. We have exactly that situation. "No practice is more ingrained in our criminal justice system than the practice of the government calling a witness who is an accessory to the crime for which the defendant is charged and having that witness testify under a plea bargain that promises him a reduced sentence." Cervantes-Pacheco, 826 F.2d at 315. This ingrained practice of buying testimony indicates that suppression is necessary to compel respect for the statutory protections Congress has placed around testimony in federal courts. Exclusion is also necessary to remove the incentive to disregard the statute. See Calandra, 414 U.S. at 347 (quoting Elkins v. United States, 364 U.S. 206, 217 (1960)). The benefits of deterrence outweigh the evil of excluding relevant evidence, and the balance falls heavily in favor of suppression.

A secondary policy protected by the exclusionary rule is "the imperative of judicial integrity." Elkins, 364 U.S. at 222. Courts will not be made party to lawlessness by permitting unhindered use of the fruits of illegality. See Terry v. Ohio, 392 U.S. 1, 12-13 (1968); Mapp, 367 U.S. at 660. Although this basis for the exclusionary rule exerts limited force, see Stone v. Powell, 428 U.S. 465, 485 (1976); see also John Kaplan, The Limits of the Exclusionary Rule, 26 Stan. L. Rev. 1027, 1036 & n.53 (1974); Henry P. Monaghan, The Supreme Court 1974 Term--Foreword: Constitutional Common Law, 89 Harv. L. Rev. 1, 5-6 & n.33 (1975), we find it relevant because of the substance of the policy codified in § 201(c)(2).

The Second Circuit has written, regarding parallel provisions in § 201 prohibiting bribes and gratuities in the context of public officials,

[T]here is no reason to infer that the policy and purpose behind the 'corrupt intent to influence' offenses [are] substantially different from [those] underlying the 'for or because of' offenses. . . . '[E]ven if corruption is not intended by either the donor or the donee, there is still a tendency in such a situation to provide conscious or unconscious preferential treatment of the donor by the donee . . . .'"

Biaggi, 853 F.2d at 101 (second and third alterations in original) (quoting United States v. Biaggi, 674 F. Supp. 86, 89 (E.D.N.Y. 1987) (quoting United States v. Evans, 572 F.2d 455, 480 (5th Cir.), cert. denied, 439 U.S. 870 (1978))). We find this comparison of policy applicable between the witness bribery and gratuity prohibitions. Congress evidenced an intent in § 201(c)(2) to remove the temptation inherent in a witness's accepting value from a party for his testimony. See Evans, 572 F.2d at 480. That temptation, even if unconscious, is to color or falsify one's testimony in favor of the donor. The law already imposes on every witness the solemn and fundamental duty to testify truthfully, and accepting unlawful gratuities or inducements from a party compromises that solemn duty. When testimony tainted in this way is presented to the courts of the United States, judicial integrity is directly impugned in a way it is not by tangible evidence whose reliability is unaffected by an underlying illegality. And when the statutory policy of Congress is to protect courts and parties from that taint, suppression is particularly appropriate because it effectuates that purpose.

For this reason we are unpersuaded by cases holding suppression inappropriate for statutory violations on the ground that where Congress has established other penalties the courts should not create a judicial remedy. See, e.g., United States v. Benevento, 836 F.2d 60, 69-70 (2d Cir. 1987), cert. denied, 486 U.S. 1043 (1988); United States v. Michaelian, 803 F.2d 1042, 1049-50 (9th Cir. 1986); United States v. Kington, 801 F.2d 733, 737-38 (5th Cir. 1986), cert. denied, 481 U.S. 1014

(1987); see also United States v. Thompson, 936 F.2d 1249, 1251-52 (11th Cir. 1991), cert. denied, 502 U.S. 1075 (1992). Unlike all of these cases, the violation of § 201(c)(2) at issue in our case directly tainted the reliability of the evidence. To permit this unlawfully obtained evidence "to be made the basis of a conviction in the federal courts would stultify the policy which Congress has enacted into law." United States v. Mitchell, 322 U.S. 65, 67 (1944) (quoting McNabb v. United States, 318 U.S. 332, 345 (1943)).

We emphasize that the rule we apply today rests in no way on the Constitution; it is a creature solely of statute. The constitutional boundaries of testimony like that presented in this case have been amply delineated in Hoffa v. United States, 385 U.S. 293, 297-99, 310-12 (1966), Brady, 373 U.S. at 86-91, Giglio, 405 U.S. at 155-56, Cervantes-Pacheco, 826 F.2d at 312-16, and the lines of cases they represent. Our holding today is unrelated to them.

## VII. Sufficiency of the Evidence

Having concluded Ms. Singleton's motion to suppress should have been granted, we address her claim that the district court erred in denying her motion for judgment of acquittal as to both her conspiracy and money laundering convictions. We hold at the outset that the failure to suppress Mr. Douglas's testimony was not harmless error as to either the conspiracy or the money laundering convictions. The government relied on Mr. Douglas as its principal witness, and, considering the entire record, we are entirely unable to say that the admission of his testimony did not influence the verdict. See Kotteakos v. United States, 328 U.S. 750, 764-65 (1946).

The remaining question is whether the record contains sufficient other evidence upon which a jury could find guilt beyond a reasonable doubt. If the evidence, excluding the testimony of Mr. Douglas, is legally insufficient to support her convictions, a new trial is prohibited by double jeopardy principles. See United States v. McAleer, 1998 WL 101804, at *4 (10th Cir. 1998) (citing Burks v. United States, 437 U.S. 1, 18 (1978)). If, however, the record contains sufficient evidence to support a conviction without Mr. Douglas's testimony, then justice requires a new trial. See United States v. Tateo, 377 U.S. 463, 465 (1964).

We review de novo the denial of a motion for judgment of acquittal. See United States v. Lampley, 127 F.3d 1231, 1242 (10th Cir. 1997), cert. denied, 118 S. Ct. 1098 (1998). Our standard is whether the evidence is sufficient to sustain a conviction. See Fed. R. Crim. P. 29(a). Excluding the testimony of Mr. Douglas and viewing the remaining evidence and all reasonable inferences from it in the light most favorable to the government, we conclude that a rational jury could have found Ms. Singleton guilty beyond a reasonable doubt of both the conspiracy and money laundering charges. See United States v. Leos-Quijada, 107 F.3d 786, 794 (10th Cir. 1997); see also United States v. Coleman, 7 F.3d 1500, 1502-03 (10th Cir. 1993); United States v. Ruiz-Castro, 92 F.3d 1519, 1531 (10th Cir. 1996).

REVERSED and REMANDED for a new trial.

---

## FOOTNOTES
Click footnote number to return to corresponding location in the text.

1. Samuel Rutherford, Lex, Rex, or The Law and the Prince (1644) (Sprinkle Publications 1982).

2. From the general rule against payments to fact witnesses, Hamilton excepts reimbursements for travel, subsistence, and the reasonable value of time lost in attendance. Hamilton, 490 F.2d at 227. These exceptions track 18 U.S.C. § 201(j), currently renumbered as § 201(d), which provide the corollary statutory exceptions from § 201(c)(2) for such reimbursements.

3. Section 201, with its present statutory language, was enacted in 1962. In 1986 Congress renumbered § 201 into its present form. See Criminal Law & Procedure Technical Amendments Act of 1986, Pub. L. 99-646, § 46(h), 100 Stat. 3592, 3603 (1986). The pre-1986 statute, which Irwin interpreted, contained the same distinctions between bribery and gratuity provisions. Section 201(c)(2), which was designated § 201(h) before 1986, has not been altered since its enactment in 1962.

4. The argument that § 201(c)(2) applies to government inducements for testimony appears first to have been made (excepting several older cases which we address later) in an article by a former government prosecutor. See J. Richard Johnston, Paying the Witness: Why Is It OK for the Prosecution, but Not the Defense?, 12 WTR Crim. Just. 21 (1997).

5. A subcommittee of Congress also expressed its disapproval of the Department of Justice's position:

We disagree with the Attorney General's attempts to exempt departmental attorneys from compliance with ethical

requirements adopted by the State bars to which they belong and in the rules of the Federal courts before which they appear. While recognizing that it is ultimately the courts who finally decide disputes over such authority, we nevertheless urge reconsideration and withdrawal of the Attorney General's June 8, 1989 memorandum, "Communication with Persons Represented by Counsel."

H.R. Rep. No. 101-986, at 32 (1990).

6. Although the mandate of the panel opinion was vacated when the Sixth Circuit reheard the case en banc, the rehearing was limited to issues unrelated to § 201(h). The en banc opinion specifically adopted the panel's dispositions and reasoning on all other issues, including the § 201(h) matter. See Blanton, 719 F.2d at 817, 833.

7. The suppression remedy we apply rests wholly on the government's statutory violation, not on the prosecutor's violation of Kansas Professional Rule 3.4(b).

 | Keyword | Case | Docket | Date: Filed / Added |   WP (101936 bytes)    RTF (106006 bytes)

*Comments to: WebMaster, ca10@law.wuacc.edu.*
*Updated: July 2, 1998.*
*HTML markup Copyright © 1998, Washburn University School of Law.*
*URL: http://lawlib.wuacc.edu/ca10/cases/1998/07/97-3178.htm.*

## CERTIFICATE OF SERVICE

I hereby certify that on this 15th day of March, 1999, I caused the foregoing

MOTION OF JAMES H. ROANE, JR. TO AMEND HIS MOTION TO VACATE, SET ASIDE

OR CORRECT SENTENCE PURSUANT TO 28 U.S.C. § 2255; AMENDED MOTION OF

JAMES H. ROANE, JR. TO VACATE, SET ASIDE OR CORRECT SENTENCE PURSUANT

TO 28 U.S.C. § 2255; and proposed ORDER to be served by first-class mail, postage prepaid,

upon:

Robert J. Erickson
United States Department of Justice
10th & Constitution Ave., N.W.
Washington, DC 20530

_____
Paul F. Enzinna

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION



**F I L E D**

OCT – 1 1999

CLERK, U.S. DISTRICT COURT
RICHMOND, VA

| | |
|---|---|
| UNITED STATES OF AMERICA, )<br><br>Plaintiff, )<br><br>v. )<br><br>JAMES H. ROANE, Jr. )<br><br>Defendant. ) | Criminal No. 92CR68<br><br>Civil No. 97CV895 |

### SECOND AMENDED MOTION OF JAMES H. ROANE, Jr. TO VACATE, SET ASIDE OR CORRECT SENTENCE PURSUANT TO 28 U.S.C. § 2255

James H. Roane, Jr., a prisoner in the custody of the United States, under sentence of death, now being held at the United States Penitentiary, Terre Haute, Indiana, hereby amends his previous Motion to Vacate, Set Aside or Correct Sentence Pursuant to 28 U.S.C. § 2255, and the memorandum in support thereof. Mr. Roane incorporates in this motion and memorandum (1) the entirety of his initial motion and memorandum in support; (2) the entirety of his first amended motion and memorandum in support; (3) to the extent applicable, each of the grounds for relief stated by his codefendants, Richard Tipton and Corey Johnson, in their petitions and amended petitions; and (4) the following grounds for relief:

### I. THE TRIAL COURT FAILED PROPERLY TO INSTRUCT THE JURY ON THE ESSENTIAL ELEMENTS OF THE CCE STATUTE

In *Richardson v. United States*, 119 S. Ct. 1707 (1999), the United States Supreme Court held that in order to convict under the federal Continuing Criminal Enterprise

("CCE") statute, 21 U.S.C. § 848, it is insufficient for the jury to agree merely that the defendant committed a "continuing series of violations [of the federal drug laws]." Rather, the *Richardson* Court held, the jury must be unanimous with regard to which specific violations make up the "continuing series of violations." 119 S. Ct. at 1713. The *Richardson* Court noted that this ruling would "make a difference where . . . the government introduces evidence that the defendant has committed more underlying crimes than legally necessary to make up a 'series.'" *Id.* at 1709-10. The *Richardson* Court specifically reserved the question whether a failure to require unanimity may be "harmless." *Id.* at 1721.

At trial in this case, this Court instructed the jury that it could find "the defendants" to have committed a "continuing series of violations" on the basis of numerous specific acts, including five in which James Roane was alleged to have participated: Counts 1 (conspiracy), 5 (murder of Douglas Moody), 8 (murder of Peyton Johnson), 11 (murder of Louis Johnson) and 32 (drug possession).[1] Tr. 3210-11. The Court failed to instruct the jury – as required by *Richardson* – that it could not find that James Roane had participated in a CCE unless it agreed *unanimously* on the specific underlying violations committed by Mr. Roane giving rise to the CCE. The decision in *Richardson* makes clear that this was error.

Mr. Roane raised this issue on direct appeal, prior to the decision in *Richardson*. The Fourth Circuit, reviewing the claim for plain error, questioned whether there was error at all, but held that even if it was error to fail to instruct the jury on the need for unanimity, Mr. Roane was not prejudiced by that failure because the jury unanimously convicted him of at least three

---

[1] By failing to treat the defendants separately, and by advising the jury that it must find that the "continuing series of violations" was undertaken "by the defendants," the instructions in this case were particularly likely to confuse the jury, and permit a conviction absent the necessary finding that *each* defendant personally committed a "continuing series of violations."

underlying offenses.[2] 90 F.3d at 885. *Richardson* makes clear that the failure to instruct was error. Moreover, it was "structural" error, and therefore subject to automatic reversal, without any inquiry into prejudice.

"Although most constitutional errors have been held amenable to harmless error analysis, some will always invalidate the conviction." *Sullivan v. Louisiana*, 508 U.S. 275, 279 (1993). Errors that "necessarily render a trial fundamentally unfair," and which "deprive defendants of 'basic protections' without which 'a criminal trial cannot reliably serve its function as a vehicle for determination of guilt or innocence . . . and no criminal punishment may be regarded as fundamentally fair,'" require reversal in all cases, independent of any showing of actual prejudice. *Neder v. United* States, 119 S. Ct. 1827, 1833 (1999) (*quoting Rose v. Clark*, 478 U.S. 570, 577-78 (1986)).

The error at issue here – the Court's failure to instruct the jury that to convict James Roane of involvement in a CCE, it was required to agree unanimously on which specific "violations" committed by him made up the "continuing series of violations" required by the CCE statute – was not in the class of "trial errors which occur 'during the presentation of the case to the jury, and which may therefore be quantitatively assessed in the context of other evidence presented.'" *Sullivan, supra*, 508 U.S. at 281. Rather, it belongs to the class of "structural defects in the constitution of the trial mechanism, which defy analysis by 'harmless-error' standards." *Id*.

A criminal defendant is, of course, entitled to have a jury consider the evidence, and decide whether the defendant's acts constitute a crime. But errors occurring in the course of

---

[2] Even though this issue was decided on direct appeal, Mr. Roane may raise it again on collateral review by virtue of the intervening change in law represented by *Richardson*. *Davis v. United States*, 417 U.S. 333, 342 (1974).

trial, such as the improper admission of particular evidence, may be assessed under the harmless error standard because an appellate court reviewing the case "simply reviews the remainder of the evidence against the defendant to determine whether the admission of the [improper evidence] was harmless beyond a reasonable doubt." *Arizona v. Fulminante*, 499 U.S. 279, 310 (1991).

In addition, however, a criminal defendant is entitled to acquittal unless the jury determines guilt *unanimously*. By contrast to situations in which an appellate court may determine for itself whether, in light of properly admitted evidence, the improper admission of particular evidence was harmless beyond a reasonable doubt, a jury that does not act unanimously "produces 'consequences that are necessarily unquantifiable and indeterminate,'" and therefore not amenable to harmless error analysis. *Neder, supra*, 119 S. Ct. at 1834 (*quoting Sullivan, supra*, 508 U.S. at 282). For example, a general verdict of guilty rendered by a jury that had been instructed that a simple majority was sufficient for conviction could not be upheld under harmless error analysis, no matter how strong the evidence against the defendant. This is so because the question facing the appellate court is "not whether, in a trial that occurred without the error, a guilty verdict would surely have been rendered, but whether the guilty verdict actually rendered . . . was surely unattributable to the error." *Sullivan, supra*, 508 U.S. at 279.

The right to a unanimous verdict is so critical that it is one of the few rights that may not be waived, in any circumstances. *United States v. Ullah*, 976 F.2d 509, 513 (9th Cir. 1992); *United States v. Gipson*, 553 F.2d 453, 456 n.4 (5th Cir. 1977). As then-Judge Kennedy stated, the requirement of a unanimous verdict underlies the very framework of our criminal system:

> The dynamics of the jury process are such that often only one or two members express doubt as to view held by a majority at the outset of deliberations. A rule which insists on unanimity furthers the deliberative process by requiring the minority view to be examined and, if possible, accepted or rejected by the entire jury. The requirement of jury unanimity thus has a precise effect on the fact-finding process, one which gives particular significance and conclusiveness to the jury's verdict. Both the defendant and society can place special confidence in a unanimous verdict . . . .

*United States v. Lopez*, 581 F.2d 1338, 1341 (9th Cir. 1978). In our system, it is insufficient for conviction that a jury merely agree that the defendant is an evildoer. *See, e.g., Lanzetta v. New Jersey*, 306 U.S. 451 (1939). Since the criminal law punishes acts, rather than persons, the jury must first agree, unanimously, on "just what a defendant did as a step preliminary to determining whether the defendant is guilty of the crime charged." *United States v. Gipson*, 553 F.2d 453, 457-58 (5th Cir. 1977).

In affirming the convictions on direct appeal, the Fourth Circuit wrote that Mr. Roane was not prejudiced by any error in the trial court's failure to give a unanimity instruction because the fact that he was convicted of more than three underlying offenses demonstrates that the jury agreed unanimously on at least three such violations. 90 F.3d at 885. However, three violations alone are not sufficient to make up a "continuing series of violations;" rather, to show a "continuing series," the government must prove that the violations are *related. United States v. Hall*, 93 F.3d 126, 129 (4th Cir. 1996). Since the "continuing series" is an element of the offense, the jury necessarily must agree unanimously that at least three violations are "related." Even if, as the Fourth Circuit held, the jury's findings indicate that it unanimously found that Mr. Roane committed the Count 1 conspiracy, the Count 32 possession charge, and three CCE murders, there is no indication in the jury's findings that the jury unanimously agreed that at least three of those violations were *related* and, if so, which ones.

In the circumstances of this case, it is not possible for a reviewing court to "simply review[] the remainder of the evidence" and determine whether the trial court's error was harmless. It is simply not possible to determine whether, as required, the jurors unanimously agreed that Mr. Roane committed at least three, specific, related "violations." The consequences of the error are "'necessarily unquantifiable and indeterminate,'" and therefore not amenable to harmless error analysis. *Neder, supra,* 119 S. Ct. at 1834 (*quoting Sullivan, supra,* 508 U.S. at 282).

## CONCLUSION

By failing to instruct the jury that, to convict, it was required to agree unanimously on which three or more specific "violations" committed by James Roane constituted the "continuing series of violations" required for conviction under the CCE statute, and that those specific violations were related, the trial court deprived Mr. Roane of his right to trial by jury under the Sixth Amendment. His conviction should be set aside and the requested relief granted.

Respectfully submitted,

JAMES H. ROANE, Jr.

By: _____
Scott L. Nelson
Paul F. Enzinna
Michael J. Barta (VSB # 30706)
MILLER, CASSIDY, LARROCA
   & LEWIN, L.L.P.
2555 M Street, N.W.
Washington, D.C. 20037
(202) 293-6400

Dated: September 30, 1999    <u>Counsel for James H. Roane, Jr.</u>

## CERTIFICATE OF SERVICE

I hereby certify that on this 30th day of September, 1999, I caused the foregoing SECOND AMENDED MOTION OF JAMES H. ROANE, Jr. TO VACATE, SET ASIDE OR CORRECT SENTENCE PURSUANT TO 28 U.S.C. § 2255 to be served by first-class mail, postage prepaid, upon:

> Robert J. Erickson
> United States Department of Justice
> 10th & Constitution Ave., N.W.
> Washington, DC 20530
>
> Wingate Grant
> Assistant United States Attorney
> 600 E. Main St.
> Suite 1800
> Richmond, VA 23219
>
> Donald R. Lee, Jr.
> 1015 E. Main St.
> 4th Floor
> Richmond, VA 23219
>
> Barbara L. Hartung
> 1001 E. Main St.
> Suite 504
> Richmond, VA 23219

Paul F. Enzinna

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION

F I L E
JUN 2 5 2001
CLERK, U.S. DISTRICT COURT
RICHMOND, VA

|  |  |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| JAMES H. ROANE, Jr. | ) |
| | ) |
| Defendant. | ) |

Criminal No. 92CR68

Civil No. 97CV895

### MOTION OF JAMES H. ROANE, Jr. TO AMEND HIS MOTION TO VACATE, SET ASIDE OR CORRECT SENTENCE PURSUANT TO 28 U.S.C. § 2255

James H. Roane, Jr., a prisoner in the custody of the United States, under sentence of death, now being held at the United States Penitentiary, Terre Haute, Indiana, respectfully requests that he be permitted to amend his Motion to Vacate, Set Aside or Correct Sentence Pursuant to 28 U.S.C. § 2255, to include as an additional ground for relief the denial of his rights under the Grand Jury Clause of the Fifth Amendment. The grounds for this motion are as follows:

1.    In Counts 5, 8 and 11 of the indictment, Mr. Roane was charged with killing three individuals "while engaged in and working in furtherance of a Continuing Criminal Enterprise," in violation of 21 U.S.C. § 848(e). That statute provides that any person committing such a murder may be punished by a term of imprisonment (between 20 years and life) or the death penalty, but before the death penalty may be imposed, the statute requires that the jury find the existence of certain aggravating factors enumerated in 21 U.S.C. § 848(n). 21 U.S.C. §§ 848(g), (k). Absent such a finding, the statute requires that "a sentence, other than death" be imposed. Id. Neither the original indictment nor either of the superseding indictments in this case made any reference whatsoever to the aggravating factors required to be proved before the death

penalty may be imposed under 21 U.S.C. § 848. However, following the indictment, the prosecution filed a notice of its intention to seek the death penalty against Mr. Roane for Counts 5, 8 and 11, specifying the aggravating factors on which the government would rely in seeking the death penalty. After deliberating for four days following the penalty phase of the trial, the jury imposed the death penalty against Mr. Roane on Count 5, for the murder of Douglas Moody.

2.    In Apprendi v. New Jersey, 530 U.S. 466 (2000), the Supreme Court's recently held that "facts that expose a defendant to a punishment greater than that otherwise legally prescribed [are] by definition 'elements' of a separate legal offense," which must be charged by the grand jury and found by the petit jury beyond a reasonable doubt. Id. at 483 n.10. In Counts 5, 8 and 11, Mr. Roane was charged by the grand jury with simple murder, but convicted by the petit jury of capital murder, on the strength of aggravating factors not charged by the grand jury, but merely alleged by the prosecution. Because the aggravating factors on which his convictions depend are essential elements of the crimes for which Mr. Roane was convicted on Count 5, 8 and 11, and because those essential elements were not charged by the grand jury, Mr. Roane's convictions on these counts violate the Fifth Amendment. Id.

3.    The decision in Apprendi announced a "watershed change in constitutional law." Apprendi v. New Jersey, 530 U.S. 466, 524 (O'Connor, J., dissenting); see also J. K. Robinson, *Preface to the Thirtieth Annual Review Of Criminal Procedure*, 89 Geo. L. J. 1045, 1046 (Apprendi "may have altered the pre-existing practices governing the charging, prosecution, and sentencing of criminal defendants in the United States"); A. Ellis, P. Goldberger, J. Feldman, Jr., K. Landau, *Apprehending And Appreciating Apprendi*, Criminal Justice (Winter 2001) (Apprendi "is arguably one of the most important and far-reaching criminal cases decided by the [Supreme] Court in years"). Prior to Apprendi, no court had intimated that the Grand Jury

DC01:296866.1

- 2 -

A-239

Clause requires that the aggravating factors required for a capital murder conviction must be charged in the indictment; in fact, the courts that had considered the question had held that aggravating factors need not be charged in the indictment. See United States v. Peters, 778 F. Supp. 431, 445-46 (N.D. Ill. 1991); Dufour v. Florida, 495 So. 2d 154, 163 (Fla. 1986); Illinois v. Davis, 447 N.E.2d 353, 366-67 (Ill. 1983); Talamantez v. Superior Ct. of San Diego County, 122 Cal. App. 3d 629, 634-35 (Cal. Ct. App. 1981); North Carolina v. Dixon, 361 S.E.2d 562, 564 (N.C. 1987). Thus, the Supreme Court's decision in Apprendi brought about a fundamental shift in the legal landscape, making Mr. Roane's claim available for the first time.

4. The Supreme Court decided Apprendi on June 26, 2000, less than one year ago. See 28 U.S.C. § 2255 (motion under §2255 must be made within one year on which right is initially recognized by Supreme Court). Mr. Roane has pursued this claim with all reasonable dispatch, and the government will not be prejudiced by the proposed amendment.

For the reasons stated, Mr. Roane respectfully requests that the Court accept the attached Third Amended Motion to Vacate, Set Aside or Correct Sentence Pursuant to 28 U.S.C. § 2255.

Dated: June 25, 2001

Respectfully submitted,

JAMES H. ROANE, Jr.

By: _____
Paul F. Enzinna
Michael J. Barta (VSB # 30706)
Gregory J. Golden (VSB # 40139)
BAKER BOTTS, L.L.P.
1299 Pennsylvania Ave., N.W.
Washington, D.C. 20004
(202) 639-7700

Dated: June 25, 2001

Counsel for James H. Roane, Jr.

## CERTIFICATE OF SERVICE

I hereby certify that on this 25th day of June, 2001, I caused the foregoing

(1)     Motion of James H. Roane, Jr. to Amend his Motion to Vacate, Set Aside or Correct Sentence Pursuant to 28 U.S.C. § 2255;

(2)     Third Amended Motion of James H. Roane, Jr. to Vacate, Set Aside or Correct Sentence Pursuant to 28 U.S.C. § 2255; and

(3)     Memorandum in Support of the Third Amended Motion of James H. Roane, Jr. to Vacate, Set Aside or Correct Sentence Pursuant to 28 U.S.C. § 2255.

to be served by first-class mail, postage prepaid, upon:

> Robert J. Erickson
> United States Department of Justice
> 10th & Constitution Ave., N.W.
> Washington, DC 20530
>
> Wingate Grant
> Assistant United States Attorney
> 600 E. Main St.
> Suite 1800
> Richmond, VA 23219
>
> Frederick R. Gerson
> 7102 Three Chopt Road
> Richmond, Virginia 23226
>
> Barbara L. Hartung
> 1001 E. Main St.
> Suite 504
> Richmond, VA 23219

Paul F. Enzinna

A-241

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | Criminal No. 92CR68 |
| v. ) | |
| ) | Civil No. 97CV895 |
| JAMES H. ROANE, Jr. ) | |
| ) | |
| Defendant. ) | |
| ) | |

## THIRD AMENDED MOTION OF JAMES H. ROANE, Jr.
## TO VACATE, SET ASIDE OR CORRECT
## SENTENCE PURSUANT TO 28 U.S.C. § 2255

James H. Roane, Jr., a prisoner in the custody of the United States, under sentence of

death, now being held at the United States Penitentiary, Terre Haute, Indiana, hereby amends his

previous Motion to Vacate, Set Aside or Correct Sentence Pursuant to 28 U.S.C. § 2255 (June 1,

1998), his Amended Motion to Vacate, Set Aside or Correct Sentence Pursuant to 28 U.S.C. § 2255

(March 15, 1999), and his Second Amended Motion to Vacate, Set Aside or Correct Sentence

Pursuant to 28 U.S.C. § 2255 (Oct. 1, 1999), to add the following Ground for Relief, under

paragraph 12:



RECEIVED JUN 25 2001 CLERK, U.S. DISTRICT COURT RICHMOND, VA

> **Ground Eight:**[1] Denial of Fifth Amendment right to indictment by grand
> jury.
>
> In _Apprendi v. New Jersey_, 530 U.S. 466 (2000), the United States Supreme
> Court held that "facts that expose a defendant to a punishment greater than
> that otherwise legally prescribed [are] by definition 'elements' of a
> separate legal offense," and must be charged in the indictment. _Id._ at 483.
> Mr. Roane was charged, convicted and sentenced to death for murder in
> furtherance of a continuing criminal enterprise, 21 U.S.C. § 848(e).

[1] Mr. Roane's initial Motion raised seven grounds for relief. His Amended Motion
provided additional support for those grounds.

However, the indictment failed to charge necessary elements of *capital* murder under the statute; *i.e.*, the aggravating factors which, under 21 U.S.C. § 848(n), must be charged and proved in order to render a violation of § 848(e) subject to the death penalty. Mr. Roane's convictions for capital murder, and his death sentence, are therefore invalid.

The grounds for this claim are fully set forth in the accompanying Memorandum in Support.

Dated: June 25, 2001

Respectfully submitted,

JAMES H. ROANE, Jr.

By:  Paul F. Enzinna
Michael J. Barta (VSB # 30706)
Gregory J. Golden (VSB # 40139)
BAKER BOTTS, L.L.P.
1299 Pennsylvania Ave., N.W.
Washington, D.C. 20004
(202) 639-7700

<u>Counsel for James H. Roane, Jr.</u>

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

FILED
MAY – 1 2003
CLERK, U.S. DISTRICT COURT
RICHMOND, VA

UNITED STATES OF AMERICA )
)
v. )    CASE NO. 3:92CR68
)
JAMES ROANE. a/k/a "J.R." )

## FINAL ORDER

In accordance with the accompanying Findings of Fact and Conclusions of Law it is ordered that:

1. Claim VIII is dismissed;

2. Roane is granted relief on that portion of Claim IV.B.2 discussed in the accompanying Findings of Fact and Conclusions of Law;

3. Roane's convictions and sentences on Counts Five, Six, and Seven are vacated;

4. If no appeal is taken from this Order, within sixty days from the date of entry hereof, the United States must inform the Court whether it requests that Roane be resentenced or whether it intends to retry Roane on the vacated Counts.

The Clerk is directed to send a copy of this Final Order and the Findings of Fact and Conclusions of Law to counsel of record and counsel for the United States.

It is so ORDERED.

_James R. Spencer_
United States District Judge

Richmond, Virginia
Date: 5-1-03

A-244

UNITED STATES OF AMERICA )
)
v. ) CASE NO. 3:92CR68
)
JAMES ROANE, a/k/a "J.R." )

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

### A. Procedural History

Richard Tipton, Cory Johnson, and James Roane were indicted on a series of federal crimes, including multiple capital murders, growing out of their concerted drug-trafficking activities, principally in Richmond, Virginia. Count Five charged that on or about January 13, 1992, Richard Tipton and James Roane while engaged in and working in furtherance of a Continuing Criminal Enterprise caused the intentional killing of Douglas Moody in violation of 21 U.S.C. § 848(e)(1)(a). Count Six charged Tipton and Roane with a violation of 18 U.S.C. § 924(c) in conjunction with the murder of Douglas Moody. Count Seven charged Tipton and Roane with violating 18 U.S.C § 1959 by murdering Douglas Moody. The jury convicted Roane on Counts Five, Six, and Seven, but acquitted Tipton on those same counts. Following a penalty hearing, the jury recommended that Roane be sentenced to death on Count Five, for the murder of Douglas Moody. This Court sentenced Roane to death in accordance with the jury's recommendation.

After filing an unsuccessful appeal, Roane filed a motion for relief pursuant to 28 U.S.C. § 2255 with this Court. The United States moved for summary judgment. Upon review of the record and the parties' submissions, the Court concluded that Roane was entitled to an

1

evidentiary hearing on his claim that he was denied effective assistance of counsel in conjunction with the charges related to the murder of Douglas Moody (Claim IV.B.2) and his claim that he is actually innocent of the charges related to the murder of Moody (Claim VIII). The Court conducted an evidentiary hearing on those claims on June 21, 2002.

## B.  Roane's Claims

In Claim IV.B.2, Roane asserts that he was denied effective assistance of counsel by counsel's failure to locate a favorable eyewitness to the murder and adduce available testimonial and documentary evidence to support an alibi defense. In Claim VIII, Roane contends that he is actually innocent of the murder of the Douglas Moody. Roane bases this claim of actual innocence on his alibi evidence that counsel failed to introduce and on the testimony of the purported eyewitness who swears that Roane did not murder Moody.[1]

## C.  Findings Of Fact

1.  In early 1992, Ronita Hollman and Doug Moody were selling drugs in the Newtowne area of Richmond, Virginia, for Peyton Maurice Johnson. Tr. at 1992-93; 2553. Richard Tipton, Cory Johnson, and James Roane decided to take over the drug trade in Newtowne. Tr. at 1156-58, 2330.

2.  As part of this plan, Roane and Tipton approached Hollman to lure her away from her association with Peyton Johnson and to sell drugs for them. Tr. at 1962-63. Tipton told Hollman about his plans for the Newtowne area and informed her that they were willing to kill people to accomplish those plans. Tr. at 1963.

3.  On or about January 6, 1992, Cory Johnson and Roane left two handguns with their underling, Robert Papoose Davis. Tr. at 1894. On January 11 or January 12, 1992, Roane retrieved one of the guns from Davis. Tr. at 1895.

4.  Douglas Moody was murdered around 12:00 a.m. on January 13, 1992. See Gov't Trial Exhibit 119.

---

[1] Tr. refers to the trial transcript. Hr. Tr. refers to the evidentiary hearing transcript. Hr. Ex. refers to exhibits introduced at the evidentiary hearing.

5. On January 14, 1992, Roane and Cory Johnson retrieved a bag of weapons they had left at the residence of Robert Davis earlier that day. Roane and Cory Johnson then went looking for Peyton Maurice Johnson. Roane located Peyton Maurice Johnson in a tavern.

6. Roane left the tavern and reported what he had seen to Cory Johnson. Within minutes, Cory Johnson entered the tavern and fatally shot Peyton Maurice Johnson with an automatic weapon.

7. In January of 1992, Louis Johnson was acting as bodyguard for a rival drug dealer in the Newtowne area. While acting in this capacity, Louis Johnson threatened Cory Johnson. On January 29, 1992, Roane got out of his car and shot Louis Johnson. Immediately thereafter, Cory Johnson and Lance Thomas exited Roane's car and continued to shoot Louis Johnson until he was dead.

8. The murders of Douglas Moody, Peyton Maurice Johnson, and Louis Johnson were part of the general plan of Roane, Tipton, and Johnson to take over the drug trade in the Newtowne area.

9. At trial, Denise Berkley testified that, shortly before Douglas Moody was murdered, she was smoking crack at a building on the corner of Clay and Harrison Streets. Tr. at 1694. Berkley heard a shot followed by the breaking of a window from the back of the building. Tr. at 1695-96.

10. Berkley further testified that she went outside and saw Roane stab Doug Moody "18 or 19 times" while Moody pleaded for Roane to stop. Tr. at 1697-98. The knife looked like a butcher's knife. Tr. at 1697. Roane then approached Pepsi Greene, gave her the knife and told her to get rid of it. Tr. at 1699.

11. Finally, Berkley testified that Sandra Reavis was present when Moody was killed. Tr. at 1698-99. Berkley testified that she saw Reavis, Roane, Curt Thorne, Linwood Chiles, and Pepsi Greene leave the scene of the murder in Chiles' station wagon. Tr. at 1699.

12. When the police arrived at the scene of the murder, they found a broken window and a bullet hole in the back of the building where Berkley first heard the sounds of a struggle. Tr. at 1824; Gov't Exs. 9-2 through 9-4, 119.

13. The autopsy of Moody's body reflected that he had been shot twice and stabbed 18 times. The stab wounds were inflicted by a single edged blade. Tr. at 2070-74.

14. At trial, Priscilla "Pepsi" Greene testified that she was on the corner of Clay and Harrison Street when she heard two or three shots. Tr. at 2549. Greene then saw Roane and Tipton exit the house from where the shots were fired. Tr. at 2549. After five or ten

3

minutes, Greene, accompanied by Roane, went to Curt Thorne's house, where Roane directed Pepsi to get him the big knife he stored there. Tr. at 2550-51, 2572-3. Later that night, Roane returned the knife, now covered with blood, to Greene and told her to dispose of it. Tr. at 2551-52. Greene threw the knife over a fence. Tr. at 2551.

15. Greene's physical description of the knife was largely consistent with Berkley's testimony and the medical evidence. Tr. at 2583, Gov't Ex. 146.

16. Greene testified that following the murder, Linwood Chiles drove her, Curt Thorne, Roane, and Reavis to Norton Street. Tr. at 2552, 2576. Thereafter, Greene and Thorne stayed on Norton Street, and Roane, Reavis, and Chiles left that location. Tr. at 2576.

17. Robert Davis lived close to the scene of the Moody murder. Tr. at 1893, 2560. Davis testified that, immediately following the Moody murder, he saw Tipton and Roane by the steps near his house and heard them conversing as follows, "Yeah, I got him, I got him . . . we can't stay out here, man. This is hot anyway." Tr. at 1896.

18. The testimony of Berkley, Davis, and Greene was credible and was corroborated by the physical evidence of murder including the autopsy and the crime scene video. See Gov't Ex. 119. Greene's testimony was and remains particularly compelling.

19. Roane was represented at trial by David Baugh and Arnold Henderson.

20. At trial, Baugh called Gina Taylor, a neighbor who had attempted to aid the wounded Moody.[2] Taylor testified that she had seen an individual jabbing the prostrate Moody. Tr. 2902. Taylor testified that the assailant was only about five feet six inches tall and was definitely not Roane. Tr. 2905-6. However, the exculpatory value of Taylor's testimony was undermined by Taylor's acknowledgment that she could not identify the assailant's gender or see the assailant's face. Tr. 2905-6. Additionally, Taylor's credibility was diminished by her evasive manner on cross-examination and her admission she had "kind of" dated Tipton. Tr. at 2906.

Baugh followed up Taylor's testimony by presenting evidence that two hours before the murder, a person named Keith had come to Moody's mother's house looking for him, and that a week prior, Keith's friends, armed with machine guns, had kicked in the door of Moody's mother's residence while attempting to find Moody. Tr. at 2930-31. Detective Dalton conceded that foregoing information initially had led the police to suspect Keith Barley, a small featured black juvenile male, as Moody's murderer. Tr. at 2928.

---

[2] The knife that appears in the crime scene video, Gov't Ex. 119, is not the murder weapon. Taylor brought this knife out of her home to cut Moody's clothes off so that she could administer first aid. Tr. at 1827-28; 2903-4.

4

21. Prior to trial, Roane told Baugh that he did not participate in the murder of Douglas Moody. Hr. Tr. at 66.

22. Baugh was convinced that Roane did not participate in the Moody murder. Hr. Tr. at 66, 88.

23. Roane told Baugh that on the night of January 12, 1992, he was in a hotel room at the Howard Johnson (hereinafter "the hotel") with codefendant, Sandra Reavis. Hr. Tr. at 66-68, 70-71.

24. The Howard Johnson was located a couple of miles from where Douglas Moody was murdered. The hotel is now a Holiday Inn. Hr. Tr. at 7-8.

25. Roane told Baugh that he and Sandra Reavis were driven to the Howard Johnson hotel by Linwood Chiles. Tr. at 51, 67.

26. Roane told Baugh that Carmella Cooley accompanied them to the hotel. Hr. Tr. at 51, 67.

27. Roane told Baugh that Linwood Chiles registered and paid for the hotel room in cash. Hr. Tr. at 67.

28. In an effort to confirm Roane's alibi, Baugh spoke with Carmella Cooley and attempted to obtain records of Roane's visit to the hotel. Tr. 66-68.

29. Carmella Cooley indicated to Baugh that she had once accompanied Roane and Reavis to the Howard Johnson. Hr. Tr. at 68, 72. However, Cooley could not verify Roane's story that he went to the hotel on January 12, 1992. Hr. Tr. at 68. Baugh concluded that Cooley's ignorance of the date and her apparent hostility made her a bad defense witness. Hr. Tr. at 68.

30. Baugh contacted the Howard Johnson's and asked if the hotel had a record of Linwood Chiles renting a room on January 12, 1992. Hr. Tr. at 66, 71. When Baugh received a negative response from the hotel management, he went to the hotel and attempted to find such a record himself. Hr. Tr. at 66-67.

31. Baugh limited his search to looking for a record of a room rental under the name of Linwood Chiles for the night of January 12, 1992. Hr. Tr. 70-71. Baugh was unsuccessful in finding any such record. Hr. Tr. at 70. Neither Baugh nor the record before the Court suggest that constraints of time or resources played a part in his decision to terminate his search for records corroborative of Roane's alibi.

32. Alfred Brown is an investigator employed by Roane in conjunction with his 28 U.S.C. § 2255 motion. In May of 1998, Brown obtained permission from the hotel management to

5

review the occupancy records for January of 1992. Brown was pointed to several boxes that contained the relevant records. Hr. Tr. at 5. Within three hours, Brown found two registration cards that had been signed by Linwood Chiles. Hr. Tr. at 11; Pet. Hr. Ex. 3. The first card indicates that "Chiles, Linwood" had checked into a room for the night of January 2, 1992 and checked out on January 3, 1992. Pet. Hr. Ex. 3. The second card indicates that "Chiles, Larry" had checked into a room on January 12, 1992, and checked out on January 13, 1992. Pet. Hr. Ex. 3. Brown also obtained a receipt from the hotel indicating that a "Chiles, Larry" had checked in January 12, 1992, checked out January 13, 1992, and had paid cash for his room. Pet. Hr. Ex. 3. Linwood Chiles' address appears on the face of the receipt and the registration records. Hr. Tr. at 49.

33. In 1992 or 1993, Baugh could have located the same documents discovered by Brown, if he had subpoenaed the records or if he had spent three hours looking through the hotel records.

34. Roane was amenable to testifying in his own defense. Hr. Tr. at 72-73. Baugh advised Roane not to testify unless Baugh could discover some objective confirmation of his alibi for the Moody murder. Hr. Tr. 59; 72-73.

35. If Baugh had discovered the hotel records discussed above, he would have advised Roane to testify. Hr. Tr. at 85-86; 91. Roane would have testified consistent with his testimony at the evidentiary hearing.

36. At the evidentiary hearing, Roane testified that: on the night of January 12, 2002, he, Linwood Chiles, Sandra Reavis, and Carmella Cooley drove to the Howard Johnson in Chiles' station wagon , Hr. Tr. at 45-50; Chiles registered for the room and paid cash, Hr. Tr. at 48; shortly after paying for the room, Chiles and Cooley left, Hr. Tr. 50; Roane and Reavis remained in the room all night and left the next morning, Hr. Tr. at 50

37. Roane further stated that he "didn't have a weapon at all" in the day or two preceding the murder of Douglas Moody. Hr. Tr. at 37. Roane denied that Davis ever kept a gun for him. Hr. Tr. at 58.

38. Based on Roane's demeanor and the details of his account, the Court finds that Roane's testimony that he was at a hotel at the time of the Moody murder, although not compelling, was tenable.

39. At the evidentiary hearing, Sandra Reavis testified that: on the night of January 12, 1992, she, James Roane, Linwood Chiles, and Carmella Cooley drove to the Howard Johnson in Chiles' station wagon, Hr. Tr. at 14-16; she, Roane and Chiles remained in the car while Cooley registered for a room, Hr. Tr. at 16; thereafter Chiles and Cooley left, Hr. Tr. 16-17. Reavis further testified that Roane stayed in the hotel room with her until they left the hotel at around 10:00 a.m. the next morning, January 13, 1992, Hr. Tr. at 17. Reavis'

6

A-250

testimony was flat and unpersuasive.

40.. Reavis could not recall when she first told anybody that she was at a hotel with Roane on the night Doug Moody was killed. Hr. Tr. at 24.

41. The Government introduced a letter that Roane had written to Reavis while he was incarcerated awaiting trial. In that letter, Roane indicated that Reavis had requested him to lie and exonerate her by "tak[ing] [the] conspiracy case for [her]". Gov't Hr. Ex. 1 at 2.

42. Prior to the conclusion of her direct appeal, Reavis would not have been willing to waive her Fifth Amendment right to remain silent and provide Roane with an alibi for the Moody murder.

43. At the evidentiary hearing, Demetrius Lavone Rowe testified that at about 8:30 p.m., on January 12, 1992, she had seen Sandra Reavis in the Newtowne area. Hr. Tr. at 97. Rowe testified that Reavis told her she was going to eat with James Roane and then the two of them were going to a hotel. Hr. Tr. at 97. Rowe testified that shortly thereafter she saw Reavis and Roane leave the area. Hr. Tr. at 97. Rowe testified that Reavis and Roane left the area, not in Chiles' station wagon, but in cab. Hr. Tr. 105-107. Rowe did not see Roane again that night. Hr. Tr. at 99-102.

44. Rowe further testified that she had witnessed the murder of Douglas Moody. Hr. Tr. at 92. Rowe testified that she was on a porch drinking when she heard the sounds of fighting from a nearby house. Hr. Tr. at 94-95. Rowe testified that she then witnessed Doug Moody, Pepsi Greene, Curt Thorne, Richard Tipton, Cory Johnson, and a man she did not recognize spill out of the house across the street. Hr. Tr. at 95-99. Rowe testified that as they came out of the house, Johnson was struggling with Moody. Hr. Tr. 95-99. Rowe testified that Johnson continued to attack Moody after Moody had fallen to the ground. Hr. Tr. at 100. Rowe testified that although she did not recognize the unidentified male, she was sure it was not James Roane. Hr. Tr. at 95.

45. Prior to trial, Rowe did not tell the police or anyone associated with Roane's trial defense what she had witnessed. Roane Third Amend. Memo. Ex. A, Clerk Record #849.

46. Roane failed to present any evidence to suggest that a reasonable investigation by trial counsel would have led to the discovery of Rowe as a witness to the murder of Douglas Moody.

47. Rowe's testimony, to the extent it exculpated James Roane for the murder of Doug Moody, was not credible and would carry no weight with a jury. This conclusion is based on Rowe's demeanor, the fact that Rowe's current version of events conflicts with the earlier versions provided to § 2255 counsel and to the Court, wherein she swore that

7

Pepsi Greene was not at the scene of the murder of Douglas Moody. Roane Third Amend. Memo. Ex. A, Clerk Record #849; Roane Reply Memo. Ex. B.

**D. Conclusions of Law**

1. Ineffective Assistance of Counsel

a.　　In Strickland v. Washington, 466 U.S. 668 (1984), the Supreme Court held that to demonstrate the ineffective assistance of counsel, a defendant first must show that counsel's representation was deficient and, then, must establish that the deficient performance prejudiced the defense. Id. at 687. To satisfy the deficient performance facet of Strickland, the defendant must demonstrate that "counsel's representation fell below an objective standard of reasonableness." Id. at 687-88. The prejudice facet of the Strickland test requires the defendant to demonstrate "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. at 694.

b.　　Roane contends counsel was deficient for not calling Rowe as witness and for failing to present an alibi defense. Roane has failed to demonstrate that counsel was deficient for failing to discover Rowe was a witness or that he was prejudiced by the failure to present her testimony. See Findings of Fact 43-47. However, Roane has provided substantial proof for his charge that counsels' investigation of, and subsequent failure to present, an alibi were unreasonable. The Supreme Court has provided the following pertinent guidance for such a claim:

> 'strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments.

Strickland, 466 U.S. at 690-91. The Court further emphasized what investigation decisions are reasonable depends on the information known to counsel and "critically" on the information supplied to counsel by the defendant. Id. Counsel obviously had a duty to investigate Roane's alibi and counsel did take steps to confirm that alibi. The critical question here is whether counsel's investigation of the hotel records was reasonable in light of the information known to counsel. See id. For the reasons set forth below, the Court concludes that it was not.

Prior to trial, counsel had substantial information that indicated Roane's claim

8

that he was at a hotel at the time of the Moody murder was credible. First, counsel had the testimony of an apparently disinterested eyewitness, Gina Taylor, who insisted that Roane did not commit the murder. Second, counsel had the detailed account of the alibi from his client. Roane's candor with counsel regarding his other criminal acts assured counsel that the alibi was true. Third, counsel's initial investigation, corroborated the details of the account provided by Roane. Although Carmella Cooley could not provide a specific date, she confirmed to counsel that she had accompanied Roane and Reavis to a hotel. With all this information in hand, counsel had every reason to believe the hotel records would provide objective evidence to corroborate Roane's story. Under such circumstances, counsel was obliged to thoroughly review the hotel's records to determine whether they could yield support for an alibi defense. See Brown v. Sternes, 304 F.3d 677, 694-96 (7th Cir. 2002)(concluding based on facts known to counsel, counsel was required to conduct an "in depth" investigation of mental health defense).

The record indicates that counsel did not follow through and seek the records with the vigor demanded by the situation. See id.; Hoots v. Allsbrook, 785 F.2d 1214, 1219-20 (4th Cir. 1986)(assuming counsel was deficient when he decided not to carry his investigation of possible eyewitnesses past review of police reports where client pressing an alibi defense); Cf. United States v. Russell, 221 F.3d 615, 621 (4th Cir. 2000) (concluding counsel was deficient for relying on the government's representation of defendant's criminal record where his client has informed him that such record was not accurate). The Court does not doubt counsel's testimony that he called the hotel a couple of times and on one occasion he went to the hotel to find the records. However, counsel did not volunteer any details regarding his search and the quantum of evidence presented at the evidentiary hearing indicates the search was very limited in scope and duration. Counsel was looking only for a hotel registration record in the name of Linwood Chiles for January 12, 1992. Hr. Tr. at 70-71. When his search did not readily yield such a record, counsel simply terminated his investigation, discarded the alibi defense and concentrated on the misidentification defense.

Under the circumstances facing trial counsel, reasonably competent counsel would have filed a subpoena demanding all records held by the hotel pertaining to a Mr. Chiles for January of 1992 or spent a few hours going through all the records at the hotel to assure himself that no records corroborative of his client's alibi existed. See Nealy v. Cabana, 764 F.2d 1173, 1178-1180 (5th Cir. 1985)(criticizing counsel for not utilizing a subpoena to confirm his client's alibi). Counsel failed to take such actions and that failure was constitutionally deficient. Hooper v. Garraghty, 845 F.2d 471, 474-75 (4th Cir. 1988)(concluding counsel was deficient when he discarded insanity defense after limited exploration of that defense); Proffit v. Waldron, 831 F.2d 1245, 1248-49 (5th Cir. 1987)(concluding counsel was deficient where counsel made some exploration of a defense but failed to take an obvious and readily available investigatory step which would have made the defense viable); Sullivan v. Fairman, 819 F.2d 1382, 1391-92 (7th Cir. 1987)(concluding perfunctory attempts to contact witnesses were not reasonable). The Court finds that counsel's failure to obtain corroborative records of Roane's alibi and the subsequent failure to present an alibi defense at trial is attributable to the unreasonably

9

limited amount of time and resources counsel devoted to looking for corroborative hotel records. See Brown v. Sternes, 304 F.3d 677, 694-96 (7th Cir. 2002)(concluding counsel was deficient for prematurely abandoning mental health defense); Jennings v. Woodford, 290 F.3d 1006, 1015 (9th Cir. 2002)(counsel was ineffective when he ruled out mental health defense in favor of alibi defense after only preliminary investigation into mental health defense).

c.      "[A]n error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment." Strickland, 466 U.S. at 691. The defendant must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.[of the trial]." Id. at 694. In the present case, Roane has met that burden.

Had counsel conducted an adequate investigation, he would have found the records which offered some objective support for Roane's assertion that he was at a hotel when Douglas Moody was murdered. Findings of Fact 32-33. Armed with these records, Roane would have testified that he was at a hotel at the time of the murder of Douglas Moody. Findings of Fact 34-35. The alibi would have been somewhat corroborated by the introduction of the hotel records that indirectly supported that testimony. Of course, the impact of this evidence must be evaluated in light of the strength of the government's case at trial. Strickland, 466 U.S. at 697.[3] As recited above, see Findings of Fact 1-18, although the evidence of Roane's guilt was strong, it was neither undisputed nor overwhelming and hinged primarily on the testimony of Pepsi Greene and Denise Berkley. But for counsel's deficiency, Roane would have presented an alibi defense consisting of Roane's testimony and marginally corroborative hotel records. See Findings of Fact 32, 34-38, 42. Although thin, the foregoing alibi evidence would have bolstered Roane's plausible misidentification defense and is of sufficient credence to create a reasonable probability that Roane would have been acquitted of the charges related to the murder of Douglas Moody. See Griffin v. Warden, 970 F.2d 1355, 1358-60 (4th Cir. 1992) (emphasizing the strength of an alibi to challenge an eyewitness

---

[3] In evaluating the potential prejudice of omitted evidence, the Court must also consider any negative aspects that would accompany its introduction. Whitley v. Bair, 802 F.2d 1487, 1494-97 (4th Cir. 1986). Taking the stand was an occasion fraught with peril for Roane. To maintain any semblance of credibility before a jury, if questioned, Roane would have to acknowledge among other things his participation in the plans to take over the drug trade in the Newtowne area and in the murders of Peyton Maurice Johnson and Louis Johnson. However, the Government forsook the opportunity to bolster its theory that Moody's murder was the first in a series of murders related to the plans to take over the drug trade in the Newtowne area. At the evidentiary hearing, the Government did not require Roane to provide details regarding his participation in the plans to take over the drug trade in the Newtowne area and the murders of Peyton and Louis Johnson.

10

identification); Nichols v. Butler, 953 F.2d 1550, 1553-54 (11th Cir. 1992)(concluding defendant was prejudiced by counsel's actions which prevented defendant from testifying on his own behalf); Sullivan v. Fairman, 819 F.2d 1382, 1392-1393 (7th Cir. 1987). Accordingly, Roane is granted relief on his claim that he was denied effective assistance of counsel with regard to the murder of Douglas Moody.

2.    Actual Innocence

a.    "Claims of actual innocence, whether presented as freestanding ones, see Herrera v. Collins, 506 U.S. 390, 417, (1993), or merely as gateways to excuse a procedural default, see Schlup v. Delo, 513 U.S. 298, 317 (1995), should not be granted casually." Wilson v. Greene, 155 F.3d 396, 404 (4th Cir. 1998). Here, the Court reviews Roane's claim under the more lenient standard for gateway claims set forth in Schlup v. Delo, 513 U.S. 298 (1995). The proper test for whether a petitioner has established that his case is "extraordinary" enough to fall into that "narrow class of cases," which "implicat[e] a fundamental miscarriage of justice," is whether that petitioner has shown that, "it is more likely than not that no reasonable juror would have convicted him in light of the new evidence." Id. at 315, 327; see also O'Dell v. Netherland, 95 F.3d 1214, 1249-50 (4th Cir. 1996)(en banc). It is not, however, this Court's "independent judgment as to whether reasonable doubt exists that the standard addresses; rather the standard requires the district court to make a probabilistic determination about what reasonable, properly instructed jurors would do." Schlup, 513 U.S. at 329. This standard is more demanding than the standard for demonstrating prejudice under Strickland v. Washington, 466 U.S. 668, 694 (1984). Schlup, 513 U.S. at 327 n. 45; Sullivan v. Freeman, 819 F.2d 1382, 1392-4 (7th Cir. 1987).

b.    The Supreme Court has emphasized that to be credible a claim of actual innocence must be supported with "new reliable evidence--whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence--that was not presented at trial. Because such evidence is obviously unavailable in the vast majority of cases, claims of actual innocence are rarely successful." Schlup, 513 U.S. at 324. The Court then must evaluate "petitioner's innocence 'in light of all the evidence, including that alleged to have been illegally admitted (but with due regard to any unreliability of it) and evidence tenably claimed to have been wrongly excluded or to have become available only after the trial.'" Id. at 328 (quoting Friendly, Is Innocence Irrelevant? Collateral Attack on Criminal Judgments, 38 U. Chi. L. Rev. 142, 160 (1970)).

d.    Viewed alongside the other evidence, Roane's new evidence fails to demonstrate that no reasonable juror would have convicted Roane of the offenses related to the murder of Douglas Moody. See Wilson v. Greene, 155 F.3d 396, 404-05 (4th Cir. 1998). Roane's assertion of innocence relies primarily on the testimony of three witnesses, Demetrius Rowe, Sandra Reavis, and James Roane, none of whom are particularly trustworthy. See

11

Schlup, 513 U.S. at 324. As discussed above, Rowe's testimony appears to be a fabrication and would carry no exculpatory weight with a reasonable juror. See Findings of Fact 43-47. Indeed, the only impact Rowe's testimony would have upon a reasonable juror would be to view with greater skepticism Roane's proffered alibi. Both Roane and Reavis testified that Linwood Chiles drove them to the hotel in his station wagon. Rowe testified that she saw Roane and Reavis leave to go to the hotel, not in Chiles' station wagon, but in a cab. See Finding of Fact 40.

Next, a reasonable juror would have to weigh the testimony of Reavis and Roane. The credibility of their testimony is enhanced by the fact that they both agreed on the basic details of the alibi. For example, both Roane and Reavis testified that they were accompanied to the hotel by Carmella Cooley and Linwood Chiles and that Chiles and Cooley left them alone at the hotel for the night. A juror also would consider significant that hotel records confirmed Roane's statement that Linwood Chiles had paid cash for a room early in the evening on January 12, 1992. However, the value of those records would be diminished by the fact that according to Berkley and Greene, Reavis and Roane continued to employ Chiles as chauffeur after the time of check-in and used his services to depart the scene of the murder. Thus, acceptance of Roane's alibi would turn primarily on whether a juror believed the naked testimony of Reavis and Roane that they did not leave the hotel room until after Moody had been killed.

A reasonable juror would regard with skepticism Reavis' testimony because she was Roane's lover and his lackey in the criminal enterprise and two witnesses had placed her at the murder scene in the company of Roane. Such skepticism would be furthered deepened in light of the late hour of Reavis' testimony and her inability to recall when she first told someone that she was at the hotel with Roane when Doug Moody was murdered. See Finding of Fact 40. Cf. Herrera v. Collins, 506 U.S. 390, 423 (1993)(O'Connor, J.)(concurring)(noting that courts treat last minute affidavits with some skepticism, because "[i]t seems that, when a prisoner's life is at stake, he often can find someone new to vouch for him."). Finally, a juror would be confronted by correspondence between Roane and Reavis which indicated Reavis' desire that Roane tailor his story to exonerate her. See Finding of Fact 41. All these circumstances, along with Reavis' demeanor, would cause a juror to harbor serious doubts about Reavis' veracity.

Roane's self-serving testimony of an alibi unsupported by a credible, unbiased witness or firm objective proof is not the sort of evidence one would deem inherently reliable or trustworthy. See Schlup, 513 U.S. at 324. However, Roane's demeanor at the evidentiary hearing and his ability to recall many of the specific details of the events surrounding the murder of Douglas Moody lent some credence to his testimony. See Finding of Fact 38. Nevertheless, Roane's thin alibi, even when coupled with Gina Taylor's testimony, and the evidence suggesting third parties wished to do Moody harm, is not sufficiently compelling to preclude many a reasonable juror from finding Roane guilty of murdering Moody in light of the formidable direct and circumstantial evidence of Roane's guilt.

Three credible witnesses placed Roane at or around the scene of the murder: Robert Davis testified that he saw Tipton and Roane in the vicinity of the murder shortly

12

after the murder[4], Finding of Fact 12; Denise Berkley gave a detailed account of the events leading up to the murder and actually saw Roane stab Moody; and Pepsi Greene's compelling testimony largely corroborated the details of Berkley's account and placed the bloody murder weapon in Roane's hand immediately following the slaying. A reasonable juror would tend to credit the foregoing testimony in light of Greene and Berkley's demeanor and because their accounts were largely consistent with each other, the evidence at the crime scene, and the autopsy. Findings of Fact 9-15. Furthermore, Roane's new evidence of innocence does not diminish the substantial evidence that indicated Roane stabbed Moody to death as part of a plan to take over the drug traffic in the Newtowne area. See Findings of Fact 1-8. Specifically, that evidence demonstrated that Roane was involved in the initial planning to take over the drug trade in the Newtowne area. In furtherance of that plan, the day after Moody was killed, Roane participated in executing Moody's superior in the drug trade, Peyton Maurice Johnson. Then, roughly two weeks later, Roane participated in killing another individual who was an obstacle to the plan to take over the drug trade in Newtowne area, Louis Johnson. Roane's assertion that he spent the night of Moody's murder languishing in a hotel room with his girlfriend, does not sit comfortably alongside Roane's proven participation in the other aspects of the plan to take over the drug trade in the Newtowne area. Accordingly, Roane has failed to demonstrate that, in light of all the evidence, no reasonable juror would have found him guilty of the charges related to the murder of Douglas Moody. Claim VIII will be dismissed.

An appropriate Order will issue.

James R. Spencer
United States District Judge

Richmond, Virginia
Date: 5-1-03

---

[4] Moody was shot and stabbed. Davis testified that Roane had acquired a firearm shortly before Moody was murdered.

13

are hereby vacated and the case is remanded for further proceedings consistent with this opinion.

*VACATED and REMANDED*



UNITED STATES of America, Plaintiff–Appellant,

v.

James H. ROANE, Jr., Defendant–Appellee.

United States of America, Plaintiff–Appellee,

v.

James H. Roane, Jr., Defendant–Appellant.

United States of America, Plaintiff–Appellee,

v.

Cory Johnson, Defendant–Appellant.

United States of America, Plaintiff–Appellee,

v.

Richard Tipton, Defendant–Appellant.

Nos. 03–13, 03–25, 03–26, and 03–27.

United States Court of Appeals, Fourth Circuit.

Argued: May 6, 2004.

Decided: Aug. 9, 2004.

**Background:** Defendants were convicted of multiple offenses arising from drug trafficking scheme, including capital murders, and were sentenced to death. After convictions and sentences were affirmed on direct appeal, 90 F.3d 861, defendants moved to vacate sentences. The United States District Court for the Eastern District of Virginia, James R. Spencer, J., granted relief to one defendant as to claims arising from one of charged murders, on basis that his counsel was ineffective in investigating alibi defense, and denied other claims. Defendants appealed, and government appealed from grant of relief.

**Holdings:** The Court of Appeals, King, Circuit Judge, held that:

(1) counsel was not ineffective in failing to object to allegedly discriminatory use of peremptory challenges against female prospective jurors;

(2) claimed ineffectiveness of counsel in failing to request certain instructions was not prejudicial;

(3) alleged presentation of perjured testimony by prosecution did not provide basis for relief;

(4) prosecution did not violate its duties under *Brady*;

(5) counsel was not ineffective in presenting mitigating evidence at sentencing;

(6) defendant was not mentally retarded, and thus ineligible for execution; and

(7) counsel did not perform deficiently in making investigation into defendant's potential alibi defense.

Affirmed in part and reversed in part.

1. Criminal Law ⚖1139, 1158(1)

In its consideration of district court's rulings on motion to vacate sentence, Court of Appeals reviews its legal conclusions de novo and its findings of fact for clear error. 28 U.S.C.A. § 2255.

2. Criminal Law ⚖1139

Court of Appeals reviews de novo mixed questions of law and fact addressed by the district court in ruling on motion to vacate sentence, including the issue of whether a lawyer's performance was constitutionally adequate. U.S.C.A. Const. Amend. 6; 28 U.S.C.A. § 2255.

**3. Criminal Law ⬤⟶1155**

Court of Appeals reviews for abuse of discretion a district court's decision to deny a post-trial request to interview jurors.

**4. Criminal Law ⬤⟶1147**

Court of Appeals reviews for abuse of discretion district court's rulings on a discovery request made in connection with motion to vacate sentence. 28 U.S.C.A. § 2255.

**5. Criminal Law ⬤⟶1439**

Claims by defendants that had already been addressed and rejected on direct appeal could not be raised in their motions to vacate sentence, where no intervening change in the warranted reconsideration of claims. 28 U.S.C.A. § 2255.

**6. Criminal Law ⬤⟶1433(2)**

Claim of impermissible gender discrimination by prosecution in its use of peremptory challenges against female potential jurors, which was addressed on direct appeal, could not be raised by defendants in motion to vacate sentence. U.S.C.A. Const.Amend. 5; 28 U.S.C.A. § 2255.

**7. Criminal Law ⬤⟶641.13(2.1)**

Failure of counsel to object to prosecution's allegedly discriminatory use of peremptory challenges against female prospective jurors as resulting in impermissible gender-based discrimination, in violation of equal protection clause, did not constitute ineffective assistance, where at time of trial, Supreme Court had not yet extended rationale of *Batson* to gender-based peremptory challenges, and Court of Appeals for circuit in which trial was held had explicitly rejected attempts to extend *Batson* to gender. U.S.C.A. Const. Amends. 6, 14.

**8. Controlled Substances ⬤⟶40**

To convict a defendant of participating in a continuing criminal enterprise (CCE), government is required to prove five elements: (1) defendant committed a felony violation of the federal drug laws, (2) such violation was part of a continuing series of violations of the drug laws, (3) the series of violations were undertaken by defendant in concert with five or more persons, (4) defendant served as an organizer or supervisor, or in another management capacity with respect to those other persons, and (5) defendant derived substantial income or resources from the continuing series of violations. Comprehensive Drug Abuse Prevention and Control Act of 1970, § 408(c), 21 U.S.C.A. § 848(c).

**9. Criminal Law ⬤⟶641.13(2.1)**

Failure of counsel for defendants convicted of participating in a continuing criminal enterprise (CCE) to request instruction that jury was required to unanimously agree on three predicate violations supporting continuing series element of crime did not result in prejudice, and thus could not support grant of relief based on ineffective assistance of counsel, where reviewing court on direct appeal determined that defendants were not prejudiced by lack of such an instruction. U.S.C.A. Const. Amend. 6; Comprehensive Drug Abuse Prevention and Control Act of 1970, § 408(c), 21 U.S.C.A. § 848(c).

**10. Criminal Law ⬤⟶872.5**

Jury need not unanimously agree on which five persons were organized, supervised, or managed by the defendant in order to convict defendant of participating in a continuing criminal enterprise (CCE). Comprehensive Drug Abuse Prevention and Control Act of 1970, § 408(c), 21 U.S.C.A. § 848(c).

**11. Criminal Law ⚖=641.13(2.1)**

Counsel for defendants charged with participating in a continuing criminal enterprise (CCE) was not ineffective in failing to request special unanimity instruction on the CCE charge regarding the identities of the "five or more persons" that each defendant was alleged to have supervised, as unanimous agreement on the identity of each supervisee is not required to support CCE conviction. U.S.C.A. Const.Amend. 6; Comprehensive Drug Abuse Prevention and Control Act of 1970, § 408(c), 21 U.S.C.A. § 848(c).

**12. Criminal Law ⚖=641.13(2.1)**

Failure of counsel for defendants charged with participating in a continuing criminal enterprise (CCE) to request instruction that certain categories of persons, such as drug kingpins, cannot as a matter of law be supervisees, and that certain types of relationships, such as buyer-seller, cannot constitute supervision, for purposes of CCE charge, did not constitute ineffective assistance, where court gave instruction regarding definition of terms "organizer," "supervisory position," and "position of management" as used in CCE statute. U.S.C.A. Const.Amend. 6; Comprehensive Drug Abuse Prevention and Control Act of 1970, § 408(c), 21 U.S.C.A. § 848(c).

**13. Controlled Substances ⚖=40**

Proof that a defendant charged with participating in a continuing criminal enterprise (CCE) exercised some degree of control over others is not required to show that he acted as an organizer. Comprehensive Drug Abuse Prevention and Control Act of 1970, § 408(c), 21 U.S.C.A. § 848(c).

**14. Criminal Law ⚖=706(2)**

To prevail on claim that prosecution knowingly introduced perjured testimony, in violation of due process clause, defen-

dant is required to demonstrate that (1) the testimony was false, (2) the prosecution knew the testimony was false, and (3) there is a reasonable probability that the false testimony could have affected the verdict. U.S.C.A. Const.Amend. 5.

**15. Constitutional Law ⚖=268(9)**

**Criminal Law ⚖=706(2)**

Defendants failed to establish that prosecution knew or should have known that allegedly perjured testimony of prosecution witness during trial on drug and murder charges was false, as required to demonstrate that prosecution had engaged in prosecutorial misconduct in violation of due process clause by presenting such testimony. U.S.C.A. Const.Amend. 5.

**16. Criminal Law ⚖=1655(7)**

Conclusory accusations that the government should have known that a statement was false, without more, do not warrant an evidentiary hearing or offer escape from summary judgment, for purposes of motion to vacate sentence in which defendant alleges that government knowingly presented perjured testimony in violation of due process clause. U.S.C.A. Const. Amend. 5; 28 U.S.C.A. § 2255.

**17. Constitutional Law ⚖=268(9)**

**Criminal Law ⚖=706(2)**

No showing was made by defendants who were convicted of murder and drug offenses that allegedly perjured testimony presented by government affected the outcome of their trial, as required to establish due process violation arising from presentation of such testimony, where government presented extensive trial evidence of defendants' gang-related activities and involvement with drugs. U.S.C.A. Const. Amend. 5.

**18. Criminal Law ⊕1550**

Defendants charged with murder failed to show that testimony of witness regarding murder was false, as required to prevail on motion to vacate sentence in which they alleged that government had presented perjured testimony in violation of due process clause; witness's testimony was consistent with the facts observed at the crime scene. U.S.C.A. Const.Amend. 5; 28 U.S.C.A. § 2255.

**19. Criminal Law ⊕700(6)**

Murder defendant failed to show that prosecution was aware that prosecution witness had denied receiving a knife from defendant, as required to establish *Brady* violation based on prosecution's failure to disclose such information. U.S.C.A. Const. Amend. 5.

**20. Criminal Law ⊕700(2.1)**

Where the exculpatory information is not only available to the defendant but also lies in a source where a reasonable defendant would have looked, a defendant is not entitled to the benefit of the *Brady* doctrine.

**21. Criminal Law ⊕700(2.1)**

Information actually known by the defendant falls outside the ambit of the *Brady* rule. U.S.C.A. Const.Amend. 5.

**22. Criminal Law ⊕700(3)**

Defendant obviously knew who he was with on night of charged murder, so that failure of prosecution to disclose statements by witnesses which allegedly provided defendant with an alibi did not constitute *Brady* violation. U.S.C.A. Const. Amend. 5.

**23. Criminal Law ⊕1590**

Good cause for discovery exists in connection with motion to vacate sentence where specific allegations before the court show reason to believe that the petitioner may, if the facts are fully developed, be able to demonstrate that he is entitled to relief. 28 U.S.C.A. § 2255.

**24. Criminal Law ⊕1590**

District court did not abuse its discretion by denying defendants' requests for discovery, apart from authorizing forensic testing of knife found at murder scene, in connection with motions to vacate sentence filed by defendants convicted of drug and murder charges, where court carefully considered each claim asserted by the defendants, and assessed whether they had shown good cause for discovery. 28 U.S.C.A. § 2255.

**25. Criminal Law ⊕1590**

Defendants who were convicted on drug and murder charges failed to proffer any evidence that jurors engaged in misconduct, or that they were improperly exposed to outside influences, and thus, district court properly denied defendants' request for leave to interview jurors in connection with their motions to vacate sentence. 28 U.S.C.A. § 2255.

**26. Jury ⊕131(8)**

A "*Witherspoon* inquiry" during voir dire seeks to determine whether a potential juror would always refuse to impose the death penalty, while a "reverse-*Witherspoon* inquiry" is utilized to determine the existence of pro-death-penalty bias on the part of a prospective juror.

> See publication Words and Phrases for other judicial constructions and definitions.

**27. Criminal Law ⊕641.13(1)**

Under deficient performance prong of *Strickland* test for ineffective assistance of counsel claims, court applies a strong presumption that a trial counsel's strategy and tactics fall within the wide range of reasonable professional assistance.

**28. Criminal Law ⬅641.13(1)**

For a lawyer's trial performance to be deficient, and thus to constitute ineffective assistance, his errors must have been so serious that he was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. U.S.C.A. Const. Amend. 6.

**29. Criminal Law ⬅641.13(1)**

For purposes of ineffective assistance claim, reasonableness of a lawyer's trial performance must be evaluated from counsel's perspective at the time of the alleged error and in light of all the circumstances, and the standard of reasonableness is highly deferential. U.S.C.A. Const. Amend. 6.

**30. Criminal Law ⬅641.13(1)**

To establish prejudice arising from counsel's deficient performance, defendant must show that there is a "reasonable probability," or a probability sufficient to undermine confidence in the outcome, that, but for counsel's unprofessional errors, the result of the proceeding would have been different. U.S.C.A. Const.Amend. 6.

> See publication Words and Phrases for other judicial constructions and definitions.

**31. Criminal Law ⬅641.13(6)**

Claimed ineffectiveness of counsel for defendants charged with murder and drug offenses in failing to adequately investigate their alleged gang activities in New York and New Jersey, which purportedly would have led to the discovery of impeaching evidence on certain prosecution witnesses, did not result in prejudice, as would support relief based on ineffective assistance, where substantial negative repercussions would have resulted to defendants from introduction of such impeachment evidence. U.S.C.A. Const.Amend. 6.

**32. Criminal Law ⬅641.13(2.1)**

Claimed ineffectiveness of counsel for capital murder defendants in failing to request a specific "reverse-*Witherspoon*" inquiry of all prospective jurors to determine the existence of pro-death-penalty bias did not result in prejudice, where reviewing court on direct appeal found that trial court's inquiry into death penalty attitudes was sufficient to cull out any prospective juror who would always vote for death penalty. U.S.C.A. Const.Amend. 6.

**33. Jury ⬅131(8)**

A capital defendant has the right to an voir dire inquiry sufficient to ensure—within the limits of reason and practicality—a jury none of whose members would unwaveringly impose death after a finding of guilt, and hence would uniformly reject any and all evidence of mitigating factors, no matter how instructed on the law.

**34. Criminal Law ⬅641.13(7)**

Counsel for capital murder defendants were not ineffective in failing to present mitigating evidence at sentencing regarding the prison conditions defendants would face if sentenced to life imprisonment without the possibility of parole, where if such evidence had been introduced prosecution would simply have been afforded another opportunity to remind jurors that defendants had a proven inclination to engineer murders from behind prison walls. U.S.C.A. Const.Amend. 6.

**35. Criminal Law ⬅641.13(2.1)**

Attorneys for capital murder defendant were not deficient in failing to urge jury to acquit defendant on basis of testimony of pathologist that defendant, who was right-handed, could not have been victim's murder, based on location of stab wounds, where pathologist's testimony did not suggest that defendant could not have stabbed victim in manner which actually occurred. U.S.C.A. Const.Amend. 6.

**36. Criminal Law ☞641.13(6)**

Counsel for capital murder defendant was not ineffective in failing to interview and call as a witness individual who allegedly would have contradicted prosecution witness who claimed that he had driven defendant and accomplice to individual's house shortly after murder, where there was no evidence that defendant had advised counsel that individual could contradict witness's testimony. U.S.C.A. Const. Amend. 6.

**37. Criminal Law ☞641.13(6)**

Defendant's failure to inform counsel that prospective witnesses could exonerate him from charges of involvement in murder precluded claim that counsel was ineffective in failing to call witnesses as alibi witnesses. U.S.C.A. Const.Amend. 6.

**38. Criminal Law ☞641.13(7)**

Counsel was not ineffective in failing to present adequate mitigation evidence regarding defendant's unfortunate childhood during penalty phase of capital murder trial, where counsel did present extensive mitigating evidence, which was sufficiently compelling to convince jury to return non-death verdicts on three of six capital counts against him, despite existence of numerous and weighty aggravating factors. U.S.C.A. Const.Amend. 6.

**39. Criminal Law ☞641.13(7)**

Counsel for capital murder defendant was not ineffective in failing to contest—and indeed, in effectively conceding—sufficiency of government's proof of the aggravating factor that murder involved substantial planning and premeditation, where evidence of planning and premeditation was ample, and best hope for defendant was to emphasize evidence in mitigation rather than challenge prosecution's solid case on aggravating factor. U.S.C.A. Const.Amend. 6.

**40. Criminal Law ☞641.13(2.1)**

Capital murder defendant was not prejudiced by claimed ineffectiveness of his trial attorney in waiving defendant's right to be present during portions of jury selection process; defendant made no suggestion of prejudice beyond conclusory assertion of presumptive prejudice. U.S.C.A. Const.Amend. 6.

**41. Sentencing and Punishment ☞1642**

Capital murder defendant was not mentally retarded, and thus ineligible for execution; psychologist who examined defendant testified that his IQ was 77, which is above level which places person in mentally retarded category, and that he was aware of significance of score above that level and double-checked his numbers and consulted colleagues before reaching his conclusion. Immigration and Nationality Act, § 408($l$), 21 U.S.C.A. § 848($l$).

**42. Criminal Law ☞641.13(7)**

Counsel for capital murder defendant was not ineffective in failing to assert at sentencing possibility that IQ-score inflation had allowed defendant's IQ to be assessed at just above level which would allow him to be classified as mentally retarded, and thus ineligible for death penalty, where counsel was presented with mental health report, which he had no obligation to second-guess. U.S.C.A. Const. Amend. 6; Immigration and Nationality Act, § 408($l$), 21 U.S.C.A. § 848($l$).

**43. Criminal Law ☞641.13(6)**

To provide effective assistance, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary, and a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to

counsel's judgments. U.S.C.A. Const. Amend. 6.

**44. Criminal Law ⊂⊃1139, 1158(1)**

Court of Appeals reviews de novo district court's conclusion in connection with motion to vacate sentence that defense counsel was constitutionally ineffective, and defers to its findings of fact unless they are clearly erroneous. U.S.C.A. Const.Amend. 6.

**45. Criminal Law ⊂⊃641.13(6)**

Counsel for capital murder defendant did not perform deficiently in making investigation into defendant's potential alibi defense, where upon learning of information that could provide an alibi defense, counsel had interviewed potential alibi witness but determined that her incomplete memory and apparent hostility would make her a poor witness, and went to hotel and performed unsuccessful search for hotel records for single night in question that could provide additional support for alibi. U.S.C.A. Const.Amend. 6.

**46. Criminal Law ⊂⊃641.13(6)**

A criminal defense lawyer possesses a duty to conduct a pretrial investigation that is reasonable under prevailing professional norms.

**47. Criminal Law ⊂⊃641.13(6)**

Strategic decision of defense counsel on the extent of his investigation into an alibi defense must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments.

**48. Criminal Law ⊂⊃641.13(1)**

In considering ineffective assistance of counsel claim, court is obligated by law to make every effort to avoid the distorting effects of hindsight, and should evaluate counsel's performance from counsel's perspective at the time of the alleged error and in light of all the circumstances. U.S.C.A. Const.Amend. 6.

_____

Nos. 03–13 & 03–25. ARGUED: Robert John Erickson, Criminal Division, Appellate Section, United States Department of Justice, Washington, D.C., for Appellant/Cross–Appellee. Paul Francis Enzinna, Baker Botts, Washington, D.C., for Appellee/Cross–Appellant. ON BRIEF: Paul J. McNulty, United States Attorney, Alexandria, Virginia; G. Wingate Grant, Assistant United States Attorney, Richmond, Virginia, for Appellant/Cross Appellee. Michael J. Barta, Jamie Kilberg, Cheryl Crumpton, Baker Botts, Washington, D.C., for Appellee/Cross–Appellant. No. 03–26. ARGUED: Barbara Lynn Hartung, Richmond, Virginia, for Appellant. Robert John Erickson, Criminal Division, Appellate Section, United States Department of Justice, Washington, D.C., for Appellee. ON BRIEF: Edward E. Scher, Thorsen & Scher, L.L.P., Richmond, Virginia, for Appellant. Paul J. McNulty, United States Attorney, Alexandria, Virginia; G. Wingate Grant, Assistant United States Attorney, Richmond, Virginia, for Appellee. No. 03–27. ARGUED: Stephen Atherton Northup, Troutman Sanders, L.L.P., Richmond, Virginia, for Appellant. Robert John Erickson, Criminal Division, Appellate Section, United States Department of Justice, Washington, D.C., for Appellee. ON BRIEF: ON BRIEF: Frederick R. Gerson, Robinson & Gerson, P.C., Richmond, Virginia, for Appellant. Paul J. McNulty, United States Attorney, Alexandria, Virginia; G. Wingate Grant, Assistant United States Attorney, Richmond, Virginia, for Appellee.

Before WILKINSON, KING, and DUNCAN, Circuit Judges.

Affirmed in part and reversed in part by published opinion. Judge KING wrote the opinion, in which Judge WILKINSON and Judge DUNCAN joined.

## OPINION

KING, Circuit Judge:

In February 1993, James Roane, Cory Johnson, and Richard Tipton were convicted in the Eastern District of Virginia for an array of criminal activity, including several capital murders, arising out of drug-trafficking operations in and near Richmond. Each received at least one death sentence for his crimes, plus various terms of imprisonment. After unavailing direct appeals to this Court, *United States v. Tipton,* 90 F.3d 861 (4th Cir.1996), Roane, Johnson, and Tipton (the "Defendants") sought habeas corpus relief in the district court. The Government sought summary judgment on their claims, which the district court awarded, except for two claims raised by Roane. *See United States v. Tipton,* No. 3:92CR68 (E.D.Va. May 1, 2003) (the "Opinion"). After discovery proceedings and an evidentiary hearing on Roane's remaining two claims, the court granted relief on his Sixth Amendment claim of ineffective assistance of counsel ("IAC claim"), vacating Roane's convictions and sentences relating to the murder of Douglas Moody. *See United States v. Roane,* No. 3:92CR68 (E.D.Va. May 1, 2003) (the "Roane Opinion"). Finally, the court rejected Roane's claim of actual innocence of the Moody murder. *Id.*

We are now presented with four separate appeals, which we have consolidated. In Appeal No. 03–13, the Government appeals the district court's award of relief to Roane on his Sixth Amendment IAC claim. In No. 03–25, Roane cross-appeals the court's rulings in favor of the Government on certain of his other claims. And in Nos. 03–26 and 03–27, Johnson and Tipton

appeal the award of summary judgment to the Government on certain of their claims. As explained below, we affirm the rulings in favor of the Government in Nos. 03–25, 03–26, and 03–27, and we reverse the award of relief to Roane in No. 03–13.

### I.

### A.

In our comprehensive 1996 opinion rejecting the Defendants' direct appeals, Judge Phillips aptly summarized the relevant facts underlying the prosecution of Johnson, Tipton, and Roane. *See Tipton,* 90 F.3d at 868–70. Because we are unable to improve on that summary, it is set forth *in haec verba:*

Recounted in summary form and in the light most favorable to the Government, the core evidence revealed the following. Tipton, Roane, and Cory Johnson were principal "partners" in a substantial drug-trafficking conspiracy that lasted from 1989 through July of 1992. The conspiracy's operations began in Trenton, New Jersey where Johnson and Tipton, both from New York City, became members. In August of 1990, the conspiracy expanded its operations to Richmond, Virginia where Roane joined the conspiracy in November of 1991. The Trenton-based operation came to an end on June 4, 1991 when police confiscated a large quantity of crack cocaine and firearms. In late 1991, the conspiracy's operations were expanded from the Central Gardens area of Richmond to a second area in Richmond called Newtowne.

During the period of the conspiracy's operation, its "partners", including appellants, obtained wholesale quantities of powdered cocaine from suppliers in New York City, converted it by "cooking" [it] into crack cocaine, then packaged it, di-

vided it among themselves, and distributed it through a network of 30–40 street level dealers, "workers." Typically, the appellants and their other partners in the conspiracy's operations took two-thirds of the proceeds realized from street-level sales of their product.

Over a short span of time in early 1992, Tipton, Cory Johnson, and Roane were variously implicated in the murders of ten persons within the Richmond area— all in relation to their drug-trafficking operation and either because their victims were suspected of treachery or other misfeasance, or because they were competitors in the drug trade, or because they had personally offended one of the "partners."

On January 4, 1992, Tipton and Roane drove Douglas Talley, an underling in disfavor for mishandling a drug transaction, to the south side of Richmond. Once there, Roane grabbed Talley from the rear while Tipton stabbed him repeatedly. The attack lasted three to five minutes and involved the infliction of eighty-four stab wounds to Talley's head, neck, and upper body that killed him.

On the evening of January 13, 1992, Tipton and Roane went to the apartment of Douglas Moody, a suspected rival in their drug-trafficking area, where Tipton shot Moody twice in the back. After Moody fled by jumping through a window, both Tipton and Roane pursued. Roane, armed with a military-style knife retrieved from an apartment where the knife was kept for co-conspirator Curtis Thorne, caught up with Moody in the front yard of the apartment where he stabbed him eighteen times, killing him.

On the night of January 14, 1992, Roane, Cory Johnson, and a third person retrieved a bag of guns that they had left at an apartment earlier that day.

Roane then located Peyton Johnson, another rival drug dealer, at a tavern. Shortly after Roane left the tavern, Cory Johnson entered with another person and fatally shot Peyton Johnson with a semiautomatic weapon.

On January 29, 1992, Roane pulled his car around the corner of an alley, got out of the vehicle, approached Louis Johnson, whom appellant Johnson thought had threatened him while acting as bodyguard for a rival dealer, and shot him. Cory Johnson and co-conspirator Lance Thomas then got out of Roane's car and began firing at Louis Johnson. As Louis Johnson lay on the ground, either Cory Johnson or Thomas shot him twice at close range. Louis Johnson died from some or all of these gunshot wounds.

On the evening of February 1, 1992, Cory Johnson and Lance Thomas were told that Roane had gone to the apartment of Torrick Brown, with whom Roane had been having trouble. Johnson and Thomas armed themselves with semiautomatic weapons and went to the apartment where they joined appellant Roane outside. The three then knocked on Brown's door and asked his half-sister, Martha McCoy, if Brown was there. She summoned Brown to the door and Cory Johnson, Roane, and Thomas opened fire with semiautomatic weapons, killing Brown and critically wounding McCoy.

In late January, 1992, after being threatened by Cory Johnson for not paying for a supply of crack cocaine, Dorothy Armstrong went to live with her brother, Bobby Long. On February 1, Cory Johnson learned from Jerry Gaiters the location of Long's house. Thereafter, Tipton and an unidentified "young fellow" picked up Gaiters and Cory Johnson who were then driven by

Tipton to a house where the group obtained a bag of guns. After dropping off the unidentified third party, the group proceeded to Long's house. Upon arriving at Long's house, Cory Johnson and Gaiters got out of the car and approached the house. While Tipton waited in the car, Cory Johnson and Gaiters went to the front door. When Long opened the door, Cory Johnson opened fire, killing both Dorothy Armstrong and one Anthony Carter. Bobby Long fled out the front door, but was fatally shot by Cory Johnson in the front yard.

In early February 1992, Cory Johnson began to suspect that Linwood Chiles was cooperating with the police. On February 19, 1992, Johnson borrowed Valerie Butler's automobile and arranged to meet with Chiles. That night, Chiles, Curtis Thorne, and sisters Priscilla and Gwen Greene met Cory Johnson and drove off together in Chiles's station wagon. Chiles parked the car in an alley, and Tipton soon drove in behind it in another car, got out, and came up alongside the stationwagon. With Tipton standing by, Cory Johnson told Chiles to place his head on the steering wheel and then shot Chiles twice at close range. Additional shots were fired, killing Thorne and critically wounding both of the Greene sisters. The autopsy report indicated that Thorne had been hit by bullets fired from two different directions.

Tipton was charged under 21 U.S.C. § 848(e) and 18 U.S.C. § 2 with capital murder for eight of these killings (Talley, Moody, Louis Johnson, Long, Carter, Armstrong, Thorne, and Chiles); Cory Johnson, with seven (Louis Johnson, Long, Carter, Armstrong, Thorne, Chiles, and Peyton Johnson); and Roane, with three, (Moody, Louis Johnson, and Peyton Johnson).

The jury convicted Tipton of six of the eight capital murders with which he was charged under § 848(e) (Talley, Armstrong, Long, Carter, Chiles, and Thorne). One of the other two § 848(e) charges was dismissed (Louis Johnson) and the other resulted in acquittal (Moody). Tipton was also convicted of conspiracy to possess cocaine base with the intent to distribute (21 U.S.C. § 846), engaging in a [continuing criminal enterprise ("CCE")] (21 U.S.C. § 848(a)), eight counts of committing acts of violence (the eight killings charged under § 848(e)) in the aid of racketeering activity (18 U.S.C. § 1959), two counts of using a firearm in relation to a crime of violence or a drug-trafficking crime (18 U.S.C. § 924(c)), and two counts of possessing cocaine base with intent to distribute (21 U.S.C. § 841(a)(1)).

The jury convicted Cory Johnson of all seven of the capital murders with which he was charged under § 848(e) (Louis Johnson, Long, Carter, Armstrong, Thorne, Chiles, and Peyton Johnson). He was also convicted of conspiracy to possess cocaine base with the intent to distribute (21 U.S.C. § 846), engaging in a CCE (21 U.S.C. § 848(a)), eleven counts of committing acts of violence (including the seven killings charged under § 848(e)) in aid of racketeering activity (18 U.S.C. § 1959), five counts of using a firearm in relation to a crime of violence or drug-trafficking offense (18 U.S.C. § 924(c)), and two counts of possession of cocaine base with the intent to distribute (21 U.S.C. § 841(a)(1)).

The jury convicted Roane of all three of the capital murders with which he was charged under § 848(e) (Moody, Peyton Johnson, and Louis Johnson.) He was also convicted of conspiracy to possess cocaine base with the intent to distribute (21 U.S.C. § 846), engaging in a CCE

(21 U.S.C. § 848(a)), five counts of committing acts of violence (including the three killings charged under § 848(e)) in aid of racketeering activity (18 U.S.C. § 1959), four counts of using a firearm in relation to a crime of violence or a drug trafficking offense (18 U.S.C. § 924(c)), and one count of possession of cocaine base with the intent to distribute (21 U.S.C. § 841(a)(1)).

Following a penalty hearing on the capital murder counts, the jury recommended that Cory Johnson be sentenced to death on all of the seven § 848(e) murders of which he had been convicted; that Tipton be sentenced to death for three of the six § 848(e) murders of which he was convicted (Talley, Chiles, and Thorne); and that Roane be sentenced to death for one of the three of which he was convicted (Moody). The district court sentenced Johnson, Tipton, and Roane to death in accordance with the jury's recommendations pursuant to 21 U.S.C. § 848(l), and imposed various sentences of imprisonment upon each of the appellants for the several noncapital counts on which they were convicted and for those capital murder counts on which Tipton and Roane had been convicted but were not given death sentences.

On appellants' motion, the district court refused to order execution of the several death sentences on the grounds that Congress had neither directly authorized the means by which the death sentences imposed under § 848 should be carried out, nor properly delegated to the Attorney General the authority to issue the implementing regulations that were invoked by the Government. In consequence, the district court stayed execution of the death sentences it had imposed until such time as Congress had authorized the means of execution.

*Id.*

When the Defendants initially appealed their convictions and sentences to this Court, the Government cross-appealed the district court's stay of their death sentences. In our *Tipton* opinion, we analyzed and disposed of approximately sixty issues, including challenges by the Defendants to aspects of the jury-selection process, the trial's guilt phase, and the trial's penalty phase. *See id.* at 870–901. In rejecting nearly all these challenges, we affirmed the convictions and sentences of the Defendants, except for their convictions for violating 21 U.S.C. § 846 (conspiracy to commit drug offenses), which we vacated on double jeopardy grounds. Finally, on the Government's cross-appeal, we vacated the stay of their death sentences and remanded for the executions to proceed in accordance with regulations promulgated by the Attorney General. *Id.* at 901–03.

### B.

Following our decision in *Tipton*, the Defendants persisted in seeking relief from their convictions and sentences. On May 8, 1998, they sought leave to interview jurors, pursuant to Local Rule 83.5 of the district court, which was denied. *Johnson v. Pruett*, No. 3:97CV895 (E.D. Va. June 10, 1998). On June 1, 1998, the Defendants sought relief under 28 U.S.C. § 2255, filing motions to vacate, set aside, or correct their sentences.[1] The Government sought summary judgment on these motions, and the Defendants, in June 1999, requested leave to conduct discovery. The court granted the discovery request in

---

1. Pursuant to § 2255 of Title 28, a federal prisoner claiming his "sentence was imposed in violation of the Constitution or laws of the United States ... may move the court which imposed the sentence to vacate, set aside or correct the sentence."

part, authorizing Tipton to conduct certain forensic testing. *Johnson v. Pruett,* No. 3:97CV895 (E.D.Va. May 3, 2000).

In its Opinion disposing of the § 2255 motions, the district court awarded summary judgment to the Government except on Roane's claims that: (1) he was denied effective assistance of counsel in connection with the Moody murder, and (2) he was actually innocent of that murder. *See* Opinion at 114. The Defendants thereafter filed a joint motion to alter the Opinion, which the court denied. *United States v. Tipton,* No. 3:92CR68 (E.D.Va. July 15, 2003). Johnson and Tipton then moved for the issuance of certificates of appealability, which the district court awarded on November 26, 2003, as to all claims raised in their § 2255 motions. *United States v. Tipton,* No. 3:92CR68 (E.D.Va. Nov. 26, 2003). Johnson and Tipton have filed timely appeals, and we possess jurisdiction pursuant to 28 U.S.C. §§ 1291 and 2253(a).

### C.

On June 21, 2002, the district court conducted an evidentiary hearing on Roane's IAC claim and on his claim of actual innocence. In the Roane Opinion of May 1, 2003, the court made findings of fact regarding the representation rendered by Roane's trial attorney. *See* Roane Opinion at 2–8. In so doing, the court first addressed the evidence implicating Roane in the Moody murder, finding as follows:

- Denise Berkley testified that on the night of the Moody murder, she watched Roane stab Moody "18 or 19 times" while Moody pleaded for his life; that she then saw Sandra Reavis, Roane, Curt Thorne, Linwood Chiles, and Priscilla "Pepsi" Greene leave the scene of the murder in Chiles's station wagon; and that Roane took the knife he used to stab Moody and gave it to Pepsi Greene, asking her to get rid of it;

- Pepsi Greene testified that she heard two or three shots and then saw Roane and Tipton exit the house from which the shots were fired; that Roane then directed her to get him a knife; and that later that night, Roane returned the knife, then covered with blood, and told her to get rid of it; and

- Robert Davis testified that, immediately following the Moody murder, he saw Tipton and Roane by the steps near his house and heard them stating, "Yeah, I got him, I got him ... we can't stay out here, man. This is hot anyway."

*Id.* at 3–4. Importantly, the court found the testimony of these witnesses to be "credible and ... corroborated by the physical evidence of murder including the autopsy and the crime scene video." *Id.* at 4. Indeed, the court found Greene's testimony to be "particularly compelling." *Id.*

The court then focused on the evidence of Gina Taylor, who observed the Moody murder. Taylor had testified at trial that Roane was not involved. *Id.* The court found, however, that the value of Taylor's evidence was undermined by (1) her acknowledgment that she could not identify the assailant's gender and that she did not see his face, (2) the fact that she was evasive on cross-examination, and (3) her acknowledgment that she had "kind of" dated Tipton. *Id.*

The court then made findings regarding Roane's alibi for the Moody murder. According to the court, Roane had advised his lawyer prior to trial of the following: (1) he did not participate in the murder of Moody; (2) on January 12, 1992—the night of the murder—he was in a Howard Johnson hotel room with codefendant Sandra Reavis; (3) he and Reavis were driven to the hotel by Linwood Chiles; (4) Carmella Cooley accompanied them to the hotel; and (5) Chiles had registered and paid

cash for the hotel room. *Id.* at 5. The court found that the lawyer, David Baugh, "was convinced that Roane did not participate in the Moody murder" and that the hotel was a "couple of miles from where Douglas Moody was murdered." *Id.*

In addressing Mr. Baugh's pretrial investigation into Roane's alibi, the court found the following: (1) Mr. Baugh interviewed Cooley, who said that she had once accompanied Roane and Reavis to the Howard Johnson but could not verify the date; (2) Mr. Baugh concluded that Cooley's ignorance of the date and apparent hostility would make her a bad witness; (3) Mr. Baugh contacted the hotel seeking records of Linwood Chiles renting a room on January 12, 1992; (4) when the hotel manager advised that there were no such records, Mr. Baugh went to the hotel and personally sought to locate such records; (5) Mr. Baugh limited his search to the name "Linwood Chiles," and searched only for records of January 12, 1992; and (6) Mr. Baugh found no records of Linwood Chiles being registered at the hotel on January 12, 1992. *Id.*

The court analyzed the sufficiency of Mr. Baugh's pretrial investigation and concluded that it was constitutionally deficient. In so ruling, it found that: (1) an investigator hired by Roane's habeas corpus lawyer went to the Howard Johnson and looked through boxes of occupancy records for three hours; (2) the investigator found a card with the name "Chiles, Linwood" from the night of January 2, 1992, and a card with the name "Chiles, Larry" from the night of January 12, 1992; (3) in his trial preparation, Mr. Baugh could have subpoenaed the Howard John-

son records, or he could have devoted more effort to searching for them; (4) if Mr. Baugh had utilized the subpoena process or searched more diligently, he could have located the records found by the investigator; and (5) Roane was amenable to testifying in his own defense but was advised by Mr. Baugh not to testify unless his alibi defense could be objectively corroborated. *Id.* at 5–6.

Finally, the court made several findings on the evidence presented in the habeas corpus evidentiary hearing, to the following effect: (1) Roane's testimony was "tenable but not compelling"; (2) although Reavis confirmed Roane's alibi, her testimony was "flat and unpersuasive"; (3) because she would not waive her Fifth Amendment rights, Reavis would not have testified at trial; (4) Demetrius Rowe testified that, at about 8:30 p.m. on the night of the Moody murder, Reavis told Rowe that she was going to a hotel with Roane; (5) Rowe saw Reavis and Roane leave the area—not in Chiles's station wagon (as Roane claimed) but in a cab; (6) Rowe witnessed the murder of Moody and was sure Roane was not present; (7) Rowe did not provide anyone with this information before trial; and (8) to the extent it exculpated Roane, Rowe's evidence was "not credible" and "would carry no weight with a jury." *Id.* at 7.

Assessing all these findings in the context of the case, the court concluded that Mr. Baugh was constitutionally ineffective in his investigation of Roane's alibi. It therefore vacated Roane's convictions and sentences on the three counts related to the Moody murder, that is, Counts Five, Six, and Seven.[2] *Id.* at 13. Finally, the

---

2. On Count Five, Roane was convicted of killing Moody while engaged in or working in furtherance of a CCE, in violation of 21 U.S.C. § 848(e)(1)(A). On Count Six, Roane was convicted of using a firearm in relation to

the killing of Moody, in violation of 18 U.S.C. § 924(c). And on Count Seven, Roane was convicted of killing Moody in order to maintain or increase his position in a racketeering enterprise, in violation of 18 U.S.C. § 1959.

court denied relief on Roane's claim of actual innocence.[3] *Id.*

The Government appealed the court's ruling in favor of Roane on his IAC claim, and Roane sought a certificate of appealability on certain of the claims resolved against him, which the district court issued. *United States v. Tipton,* No. 3:92CR68 (E.D.Va. Nov. 26, 2003). Roane then cross-appealed, and we possess jurisdiction pursuant to 28 U.S.C. §§ 1291 and 2253(a).

## II.

**[1–4]** In our consideration of the district court's rulings, we review its legal conclusions de novo and its findings of fact for clear error. *Monroe v. Angelone,* 323 F.3d 286, 299 (4th Cir.2003); *see also Quesinberry v. Taylor,* 162 F.3d 273, 276 (4th Cir.1998). We review de novo mixed questions of law and fact addressed by the district court—including the issue of whether a lawyer's performance was constitutionally adequate. *Smith v. Angelone,* 111 F.3d 1126, 1131 (4th Cir.1997). We review for abuse of discretion the district court's decision to deny a post-trial request to interview jurors, *United States v. Gravely,* 840 F.2d 1156, 1159 (4th Cir. 1988), as well as its rulings on a discovery request. *See Thomas v. Taylor,* 170 F.3d 466, 474 (4th Cir.1999).

## III.

The Defendants raise multiple issues on appeal, and the district judge has awarded a certificate of appealability on each of them.[4] Under the applicable statute, an appeal may not be taken from a final order of a district court in a § 2255 proceeding unless a certificate of appealability has been issued. 28 U.S.C. § 2253(c)(1)(B). A certificate of appealability may only be issued "if the applicant has made a substantial showing of the denial of a constitutional right," *id.* § 2253(c)(2), and the judge must specify the issues on which the certificate has been granted, *id.* § 2253(c)(3). In this instance, the district judge issued certificates of appealability to the Defendants and explained, "[u]pon consideration of the Defendants' claims and the arguments offered in support thereof, the Court concludes that the issues for which the Defendants seek a certificate of appealability are adequate to deserve encouragement to proceed further." *United States v. Tipton,* No. 3:92CR68 (E.D.Va. Nov. 26, 2003).

**[5]** Although some of the issues raised on appeal are common to the Defendants, certain issues pertain to only two of the Defendants or solely to a particular defendant.[5] Each of their contentions, however, falls into one of six categories:

(1) claims that the prosecution unconstitutionally discriminated against women in the jury selection process;

(2) challenges to their § 848 CCE convictions—including claims that the trial court erred in failing to instruct and counsel were ineffective in failing to request an instruction that (a) the jury had to unanimously agree on which predicate violations constituted a "continuing series"; (b) the jury had to unanimously agree on the identities of the "five or

---

3. Roane does not appeal the court's rejection of his claim of actual innocence.

4. In Part III of this opinion, we spell out and address those issues raised by the Defendants in Nos. 03–25, 03–26, and 03–27. In Part IV, we address the Government's appeal (No. 03–

13) from the award of relief to Roane on his IAC claim.

5. When all three Defendants have raised the same issue on appeal, we refer to "the Defendants." Otherwise, we identify by name the defendant raising a particular issue.

more persons" that each Defendant supervised; and (c) certain categories of persons and certain types of relationships cannot constitute supervision;

(3) claims of prosecutorial misconduct during trial—including claims that (a) the prosecution knowingly introduced perjured testimony from witnesses Gregg Scott, Maurice Saunders, and Hussone Jones; and (b) the prosecution improperly withheld exculpatory evidence regarding witnesses "Wildman" Stevens, John Knight, and Stoodie Green;

(4) challenges to the court's conduct of the habeas corpus proceedings—including (a) challenges to the standard employed by the court in assessing the Defendants' discovery requests; (b) the contention that the court abused its discretion in granting summary judgment without allowing further discovery; and (c) Johnson and Tipton's claim that the court erroneously denied their motion for leave to interview jurors;

(5) IAC claims not otherwise addressed—including (a) that their lawyers should have further investigated their alleged gang activities in New York and

New Jersey; (b) Johnson and Tipton's claim that their lawyers should have requested a voir dire inquiry on whether prospective jurors had a tendency to favor the death penalty; (c) Johnson and Tipton's claim that their lawyers failed to present mitigating evidence regarding prison conditions; (d) Tipton's claims that his lawyers failed to present adequate defenses to the Talley and Stoney Run murders;[6] (e) Tipton's claim that his lawyers failed to present an adequate case-in-mitigation; (f) Roane's claim that his lawyers conceded certain aggravating factors; and (g) Roane's claim that his lawyers waived his right to attend the voir dire proceedings; and

(6) Johnson's Eighth Amendment claim that he is mentally retarded and cannot constitutionally be executed, and that his counsel were ineffective in failing to address this issue at sentencing and on direct appeal.[7]

We assess these various issues in turn.[8]

## A.

[6] At trial, the Government utilized two of its peremptory challenges to strike men from the jury panel, and it used eight

---

6. In the Talley murder, Tipton and Roane had driven Douglas Talley to Richmond's southside in January 1992, where Tipton stabbed Talley eighty-four times in the head, neck, and upper body. In the Stoney Run murders, Cory Johnson and Tipton, in February 1992, shot into Linwood Chiles's stationwagon, killing Chiles and Curtis Thorne, and seriously wounding the Greene sisters, Priscilla ("Pepsi") and Gwen.

7. The Defendants raise four other claims that were already addressed and rejected on direct appeal. Those claims are: (1) Defendants' contention that they were denied their rights to "justice without discrimination," in violation of 21 U.S.C. § 848(o) and the Fifth and Eighth Amendments, see Tipton, 90 F.3d at 891 n. 16; (2) Johnson and Tipton's contention that § 848(h) constitutes an unconstitutional delegation of legislative authority to

prosecutors by allowing them to allege non-statutory aggravating factors, see id. at 895; (3) Johnson and Tipton's claim that the evidence at trial was insufficient to show that they supervised five or more persons, as required by § 848, see id. at 890; and (4) Johnson and Tipton's claim of misconduct by juror Cooke due to mid-trial publicity, id. at 891 n. 16. Because the Defendants have not pointed to any change in the law that warrants our reconsideration of these claims, we agree with the district court that they cannot relitigate these issues. See Opinion at 2–3; see Boeckenhaupt v. United States, 537 F.2d 1182, 1183 (4th Cir.1976) (explaining that defendant cannot relitigate issues previously rejected on direct appeal).

8. The Defendants also maintain that, pursuant to Ring v. Arizona, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002), their death

peremptory challenges to strike prospective women jurors. The Defendants, however, failed to object at trial to the Government's use of its peremptory challenges. After trial, but before Defendants' direct appeal, the Supreme Court held that intentional gender discrimination by use of peremptory challenges contravenes the Equal Protection Clause. *J.E.B. v. Alabama,* 511 U.S. 127, 114 S.Ct. 1419, 128 L.Ed.2d 89 (1994) (extending its holding in *Batson v. Kentucky,* 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986) from racial discrimination to gender discrimination). The Defendants, in their direct appeal, raised the issue of sex discrimination in jury selection. In rejecting their claim, we explained that they had produced no evidence to support their claim, other than "raw figures" of men versus women stricken by the prosecution, and such raw figures were insufficient to make a prima facie showing of gender discrimination. *Tipton,* 90 F.3d at 881 & n. 11. Because we addressed this issue on direct appeal in *Tipton,* the Defendants cannot raise their *J.E.B.* claim again in these § 2255 proceedings.[9]

[7] The Defendants also maintain that the failure of their counsel to object to the prosecution's use of its peremptory challenges constitutes ineffective assistance of counsel. At the time of their trial, however, the Supreme Court had not granted certiorari in *J.E.B.,* and the Ninth Circuit was the only federal appellate court to extend the *Batson* principle to gender discrimination. *See United States v. De Gross,* 960 F.2d 1433, 1437–43 (9th Cir. 1992) (en banc). Indeed, we had explicitly rejected attempts to extend *Batson* to gender. *See United States v. Hamilton,* 850 F.2d 1038, 1042 (4th Cir.1988) ("[W]e reject appellants' suggestion that the Equal Protection Clause compels us to extend *Batson* to apply to peremptory challenges exercised on the basis of gender."). In light of this precedent, the Defendants are unable to demonstrate that their counsel's failure to object to the prosecution's use of peremptory strikes against prospective female jurors fell below the range of professionally competent performance. *See United States v. McNamara,* 74 F.3d 514, 517 (4th Cir.1996) (explaining counsel not deficient for following controlling circuit precedent at time of trial). Accordingly, we must affirm the court's ruling on the IAC claims premised on the lack of an objection at trial to the prosecution's use of its peremptory strikes.

## B.

[8] We turn next to the Defendants' multiple claims of error regarding their

---

sentences are constitutionally invalid under the Fifth Amendment because the Indictment failed to allege the statutory aggravating factors under 21 U.S.C. § 848(n)(1)-(12) that define eligibility for the death penalty. *See Ring,* 536 U.S. at 589, 122 S.Ct. 2428 (explaining that a capital defendant is entitled, under the Sixth Amendment, to a jury determination of any fact that increases the maximum penalty from life imprisonment to death); *United States v. Higgs,* 353 F.3d 281, 297 (4th Cir.2003) (explaining that *Ring* dictates that any factor required to be submitted to the jury must be included in the indictment pursuant to the Fifth Amendment Indictment Clause). After oral argument in this case, the Court held that *"Ring* announced a new procedural rule that does not apply retroactively to cases already final on direct review." *Schriro v. Summerlin,* — U.S. ——, ——, 124 S.Ct. 2519, 2526, 159 L.Ed.2d 442 (2004). And although *Schriro* involved the Sixth Amendment aspect of *Ring,* its reasoning—that *Ring* is procedural and does not classify as a rule worthy of retroactive effect—applies equally here.

9. Because we have already considered Defendants' *J.E.B.* claim on direct appeal and therefore will not reconsider it, we do not reach the district court's conclusion that the claim was defaulted by Defendants' failure to raise it at trial. *See* Opinion at 12.

convictions on the CCE counts. In order to convict a defendant of a CCE offense, the Government is required to prove five elements:

> (1) [the] defendant committed a felony violation of the federal drug laws; (2) such violation was part of a continuing series of violations of the drug laws; (3) the series of violations were undertaken by defendant in concert with five or more persons; (4) defendant served as an organizer or supervisor, or in another management capacity with respect to those other persons; and (5) defendant derived substantial income or resources from the continuing series of violations.

*United States v. Ricks,* 882 F.2d 885, 890–91 (4th Cir.1989); *see also* 21 U.S.C. § 848(c). On appeal here, and in their § 2255 proceedings in district court, the Defendants focus on the second, third, and fourth of these elements.

### 1.

In their direct appeals, the Defendants asserted that the trial court had plainly erred in failing to instruct the jury that it was required to unanimously agree on three predicate violations supporting the "continuing series" element of § 848(c).[10] Assuming that unanimity was required, we rejected this claim and explained that "the record plainly indicates that appellants could have suffered no actual prejudice from the lack of a special unanimity instruction on the predicate violation element" because "[b]y its verdict, it is clear that the jury unanimously found each guilty of at least five predicate violations...." *Tipton,* 90 F.3d at 885.

After we rendered our *Tipton* decision, the Supreme Court confirmed what we had assumed there. It held that, in a CCE prosecution, the jury must unanimously agree on the specific violations that make up the "continuing series." *Richardson v. United States,* 526 U.S. 813, 816, 119 S.Ct. 1707, 143 L.Ed.2d 985 (1999). The Defendants now contend that the trial court's failure to give the *Richardson* instruction constitutes a structural defect in their trial and that they are therefore not required to show prejudice. In the alternative, they assert that they have demonstrated prejudice. Johnson and Tipton also maintain that their lawyers were ineffective in failing to object to the lack of a unanimity instruction. As explained below, we agree with the district court that these claims lack merit.

We have recognized that a trial court's failure to give a *Richardson* instruction is a procedural defect rather than a structural one. *United States v. Stitt,* 250 F.3d 878, 883 (4th Cir.2001) (rejecting assertion that *Richardson* error is structural defect); *United States v. Brown,* 202 F.3d 691, 699 (4th Cir.2000) (same). As explained in *Stitt,* a trial court's failure to give a *Richardson* instruction is subject to harmless error analysis, and a defendant raising such an issue must therefore demonstrate prejudice. *Stitt,* 250 F.3d at 883. We ruled on the Defendants' direct appeal that the trial court's failure to give a *Richardson*-type instruction did not prejudice them, *see Tipton,* 90 F.3d at 885, and we must therefore affirm the district court on this point.

[9] In addition to their substantive *Richardson* claims, Johnson and Tipton maintain that their counsel's failure to request a *Richardson*-type instruction at trial constitutes ineffective assistance, in violation of the Sixth Amendment. Again,

---

**10.** In *Richardson v. United States,* 526 U.S. 813, 818, 119 S.Ct. 1707, 143 L.Ed.2d 985 (1999), the Court assumed, without deciding, that the necessary number to make up a "continuing series" is three. The parties do not dispute this number here.

our decision on direct appeal forecloses this contention. In order to prevail on an IAC claim, a defendant must demonstrate that: (1) counsel's performance was deficient; and (2) such deficient performance prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Because we decided in *Tipton* that the Defendants were not prejudiced by the lack of a *Richardson* instruction, Johnson and Tipton are unable to satisfy the second prong of *Strickland*. Accordingly, we affirm the court's ruling on this claim as well.

### 2.

[10] Relying on *United States v. Jerome*, 942 F.2d 1328, 1330–31 (9th Cir. 1991), Johnson and Tipton next contend that they were entitled to a special unanimity instruction on the CCE charge regarding the identities of the "five or more persons" that each of them was alleged to have supervised. *See* 21 U.S.C. § 848(c). Not only has this claim been inexcusably defaulted by Johnson and Tipton's failure to raise it either at trial or on direct appeal, it also fails because, in *Stitt*, we held that *Richardson* did not change the rule "that the jury need not unanimously agree on which five persons were organized, supervised, or managed by the defendant." *Stitt*, 250 F.3d at 886.

[11] Johnson and Tipton nevertheless claim that their attorneys were constitutionally ineffective in failing to raise this unanimity issue at trial. Because *Stitt* stands for the proposition that unanimous agreement on the identity of each supervisee is not required, we agree with the district court that the lawyers were not ineffective in failing to seek such an instruction. *See* Opinion at 21–25.

### 3.

[12] Johnson and Tipton next contend that the trial court erred in failing to instruct—and counsel were ineffective in failing to request—that certain categories of persons (i.e., drug kingpins) cannot as a matter of law be supervisees, and that certain types of relationships (i.e., buyer-seller) cannot constitute supervision. *See United States v. Barona*, 56 F.3d 1087, 1096–97 (9th Cir.1995) (finding error in failing to instruct that certain individuals who were on list of potential supervisees given to jury were incapable, as a legal matter, of counting as supervisees). This claim has been defaulted by the failure of Johnson and Tipton to raise it either at trial or on direct appeal. *See Bousley v. United States*, 523 U.S. 614, 622, 118 S.Ct. 1604, 140 L.Ed.2d 828 (1998). Like the district court, *see* Opinion at 19, 21–25, however, we will briefly examine this claim in order to assess the contention that counsel's failure to raise it in a timely manner resulted from constitutionally ineffective representation.

[13] The trial court gave the following instruction regarding the supervision element of § 848(c):

> [t]he term "organizer" and the term "supervisory position" and "position of management" are to be given their usual and ordinary meanings. These words imply the exercise of power or authority by a person who occupies some position of management or supervision.

*See* Opinion at 19–20. We upheld this very instruction in *United States v. Hall*, 93 F.3d 126, 130 (4th Cir.1996), two months after our decision in *Tipton*. In *Hall*, the defendant maintained that the jury should have been instructed that he could have neither supervised nor organized individuals with whom he had only a buyer-seller relationship. *Id.* As we explained in *Hall*, [j]urors are competent to

understand and apply ordinary concepts like organizer, supervisor and management." *Id.* at 131. This jury, like the one in *Hall*, was fully capable of understanding the term "supervision." Accordingly, Johnson and Tipton were not prejudiced by the lack of such an instruction, and their counsel were not ineffective in failing to request a more detailed instruction regarding these terms.[11]

### C.

We turn next to the contentions of Johnson and Tipton that their trial was prejudiced by multiple instances of prosecutorial misconduct. They contend that the prosecution knowingly introduced false testimony at trial, in contravention of their due process rights, from witnesses Gregg Scott, Maurice Saunders, and Hussone Jones. And Tipton asserts that the Government contravened the principles of *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), by withholding from them exculpatory evidence pertaining to the witnesses "Wildman" Stevens, John Knight, and Stoodie Greene. We assess these claims in turn.

### 1.

[14] First, Johnson and Tipton contend that the prosecution knowingly introduced perjured testimony from Gregg Scott, Maurice Saunders, and Hussone Jones.

In order to prevail on such a claim, Johnson and Tipton are required to demonstrate that: (1) the testimony was false, *see Boyd v. French*, 147 F.3d 319, 329–30 (4th Cir.1998); (2) the Government knew the testimony was false, *see Thompson v. Garrison*, 516 F.2d 986, 988 (4th Cir.1975); and (3) there is a reasonable probability that the false testimony could have affected the verdict, *Boyd*, 147 F.3d at 330. As explained below, we agree with the district court that this claim must be rejected.

### a.

[15] In support of this habeas corpus claim, Johnson and Tipton submitted affidavits from various gang members in New York, asserting that Gregg Scott had lied at trial when he: (1) testified that the New York Boyz (a gang of which Johnson and Tipton were allegedly members) met to discuss retaliating against individuals who threatened other members of the gang; and (2) testified that he received guns from a man known as "Light."[12] Although Johnson and Tipton raised a factual issue on the falsity of these statements, they offered no proof that the Government knew or should have known this testimony to be false. Opinion at 33–35. And the fact that the evidence may have benefitted the Government is not enough. Such " '[a]iry generalities, conclusory assertions and hearsay statements [do] not suffice' to

---

11. Johnson and Tipton also maintain that the trial court erred in failing to instruct, and that counsel were ineffective in failing to request an instruction, that the Government must prove "management" in order to satisfy the CCE statute's "organizer" or "supervisor" element. This contention ignores our precedent that proof that a CCE defendant exercised some degree of control over others is not required to show that he acted as an organizer. *See Butler*, 885 F.2d at 201. Even if proof of control were required, the trial court properly instructed the jury that supervision constitutes the "exercise of power and

authority by a person who occupies some position of management." Accordingly, this contention is without merit.

12. Johnson and Tipton also submitted affidavits that Greg Scott lied when he: (1) said that he grew up at 155th and Amsterdam in New York; and (2) described the New York Boyz as a gang. The district court found that these statements simply constitute differences of opinion, rather than statements of fact. *See* Opinion at 33. Johnson and Tipton do not contest this finding on appeal.

stave off summary judgment or entitle a habeas petitioner to an evidentiary hearing, because none of these would be admissible evidence at an evidentiary hearing." *Id.* at 35 (quoting *United States v. Aiello,* 814 F.2d 109, 113 (2d Cir.1987)). We therefore affirm the district court's ruling on this claim.

b.

[16] Johnson and Tipton next assert that the Government knew, or that it should have known, that Maurice Saunders testified falsely at trial when he claimed that he saw Light during two trips to New York, and that Light could not have been in New York because he was in fact incarcerated elsewhere during Saunders's visits. Again, Johnson and Tipton proffer no evidence that the Government, at the time of trial, knew or should have known of Light's incarceration. *See Horton v. United States,* 983 F.Supp. 650, 654–55 (E.D.Va.1997) (rejecting assertion that, for *Brady* purposes, federal prosecutor is charged with knowledge of state prison records). And conclusory accusations that the Government should have known that a statement was false, without more, do not warrant an evidentiary hearing or offer escape from summary judgment. *See Aiello,* 814 F.2d at 113–14.

[17] In any event, Johnson and Tipton have made no showing that such testimony about Light's incarceration, even if untrue, could have affected the outcome of their trial. As the district court explained in denying their IAC claim regarding the prosecution's failure to discover Light's incarceration, the Government presented extensive trial evidence of Johnson and Tipton's New York connections and gang-related activities. Opinion at 39 (explaining that the proffered testimony of Light's incarceration does not negate the following: "Anthony Howlen's testimony

that Johnson and Tipton were part of the New York Boyz and sliced him with razors when he interfered with their attempts to sell drugs in New Jersey; the repeated references to the New York Boyz during the course of the Richmond based activities; Tipton's threats to invoke the assistance of his New York associates if retaliatory actions were required; the appearance of New York Boyz Lance Thomas and Hess in Richmond; and the repeated trips by Tipton and Johnson from Richmond to New York to obtain drugs"). We therefore affirm the district court on this claim.

c.

[18] Johnson and Tipton also contend that the witness Hussone Jones lied when he testified about the murder of Douglas Talley. Jones testified at trial that he watched from his own car as Tipton stabbed Talley in Talley's car. Johnson and Tipton assume that this testimony was false because there were no street lights in the area of the crime, and they contend it was too dark for Jones to see anything. The district court found, however, that Jones was within ten to twenty feet of Talley's car, and that the car was illuminated by its dome light. The dome light was lit because, after initially being stabbed, Talley's arms and head prevented the car door from closing. Opinion at 54–55. Jones's testimony was consistent with the facts observed at the crime scene, and Johnson and Tipton have failed to make the requisite showing of falsity.

2.

Tipton also asserts that the prosecution improperly withheld exculpatory evidence from his counsel, in violation of due process and *Brady,* regarding the witnesses "Wildman" Stevens, John Knight, and

Stoodie Green. In order to establish a *Brady* violation, Tipton was required to demonstrate that the information at issue was "favorable to the accused"; that it was "suppressed by the [Government], either willfully or inadvertently"; and that prejudice to the defense ensued. *Strickler v. Greene,* 527 U.S. 263, 281–82, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999). The district court held that Tipton failed to establish a *Brady* violation, *see* Opinion at 57, 63–64, and we agree.

[19] Tipton contends, first of all, that the prosecutors knew, and yet failed to disclose, that the witness Stevens had denied receiving a knife from Tipton, and that this information would have refuted Jones's testimony that Tipton gave Stevens a bloody knife on the night of the Talley murder. As for this claim, the district court found that there was no evidence that Stevens actually conveyed this information to the prosecution. *Id.* at 57. Accordingly, this contention fails under the second *Brady* prong.

[20–22] Second, Tipton asserts that the prosecutors knew of, and yet also failed to disclose, statements by the witnesses John Knight and Stoodie Green providing Tipton an alibi on the night of the Stoney Run murders. Tipton's *Brady* claims must fail, however, because, "where the exculpatory information is not only available to the defendant but also lies in a source where a reasonable defendant would have looked, a defendant is not entitled to the benefit of the *Brady* doctrine." *United States v. Wilson,* 901 F.2d 378, 381 (4th Cir.1990). We have explained that information actually known by the defendant falls outside the ambit of the *Brady* rule. *Fullwood v. Lee,* 290 F.3d 663, 686 (4th Cir.2002). Obviously, Tipton knew who he was with on the evening of the Talley murder—he had no need for the Government to provide him with such information. Thus, no *Brady*

violation has been shown, and we affirm the district court's ruling on the issue.

### D.

We turn next to the Defendants' multiple challenges to the district court's conduct of their habeas corpus proceedings. These contentions include (1) their challenge to the standard utilized by the court in assessing their discovery requests; (2) their contention that the court abused its discretion in awarding summary judgment to the Government without first according them an opportunity to conduct discovery; and (3) their assertion that the denial of their motion for leave to interview jurors was erroneous.

### 1.

[23, 24] Other than authorizing Tipton to conduct forensic testing of a knife found at the Talley murder scene, the court denied the Defendants' broad motions for authority to conduct discovery in their habeas corpus proceedings. *Johnson v. Pruett,* No. 3:97CV895 (E.D.Va. May 3, 2000). Pursuant to Rule 6(a) of the Rules Governing § 2255 Proceedings, a prisoner may engage in discovery only "if, and to the extent that, the judge in the exercise of his discretion and for good cause shown grants him leave to do so, but not otherwise." The Defendants contend that the district court utilized an incorrect legal standard in assessing their discovery requests. And the Defendants assert that, regardless of the standard employed, such discovery should have been authorized. We are constrained to disagree.

In denying the request for discovery, the court explained the standard it was utilizing:

> The Supreme Court determined in *Harris v. Nelson,* 394 U.S. 286, 89 S.Ct. 1082, 22 L.Ed.2d 281 (1969), and its

progeny, *Bracy v. Gramley,* 520 U.S. 899, 117 S.Ct. 1793, 138 L.Ed.2d 97 (1997), that 'good cause' for discovery exists when a petition for habeas corpus establishes a prima facie case for relief. *See Harris v. Nelson,* 394 U.S. at 290, 89 S.Ct. 1082. Specifically, discovery is warranted, "where specific allegations before the court show reason to believe that the petitioner may, if the facts are fully developed, be able to demonstrate that he is . . . entitled to relief." *Bracy,* 520 U.S. at 908–09, 117 S.Ct. 1793 (citing *Harris,* 394 U.S. at 299–300, 89 S.Ct. 1082).

*Johnson v. Pruett,* No. 3:97CV895 (E.D.Va. May 3, 2000). The Defendants assert that the court, in ruling against them, improperly applied a stringent "prima facie" standard under *Harris,* instead of a more forgiving "good cause" standard authorized by *Bracy.* This contention is incorrect. In *Bracy,* the Court cited with approval the discovery standard articulated in *Harris,* merely clarifying the definition of "good cause." *See Quesinberry v. Taylor,* 162 F.3d 273, 279 (4th Cir.1998) (observing that *Bracy* approved the *Harris* standard); *see also Murphy v. Johnson,* 205 F.3d 809, 813 (5th Cir.2000) ("[T]he *Bracy* decision does not lower the grade for discovery in habeas cases, but rather it merely reasserts the standards of *Harris v. Nelson . . . .").* Here, the district court properly applied the good cause standard outlined in *Harris* and *Bracy,* and it did not abuse its discretion in deciding that the Defendants had not shown good cause for the bulk of their discovery requests. The court carefully considered each claim asserted by the Defendants,

and it assessed whether the Defendants had shown good cause for discovery. *See Johnson v. Pruett,* No. 3:97CV895, at 3–12 (E.D.Va. May 3, 2000). Because the court applied the proper standard and did not abuse its discretion, we affirm its rulings on this issue.[13]

2.

Johnson and Tipton next contend that the district court abused its discretion in denying their claims of juror misconduct without first granting them leave to interview the jurors. According to Johnson and Tipton, the jurors were exposed to extraneous information during trial, including extensive media coverage, which clouded their judgment.

We have already assessed and disposed of at least one aspect of this claim. During trial, two jurors admitted reading an inflammatory article about the Defendants. One of those jurors was excused by the trial court, but the other, Mr. Cooke, advised the court that the article would not affect his consideration of the case, and he continued to serve. On direct appeal, the Defendants contended that Cooke should have been removed from the jury because he had been exposed to mid-trial adverse publicity. We specifically considered this claim and found no error in the court's decision with regard to Cooke. *Tipton,* 90 F.3d at 891 n. 16. In addition, we agree with the district court that Johnson and Tipton's remaining media-related claims with respect to the jury have been procedurally defaulted by their failure to raise them either at trial or on direct appeal. *See* Opinion at 3.

---

13. The district court alternatively held that the Defendants were precluded from further discovery by their failure to comply with Federal Rule of Civil Procedure 56(f), which requires a civil litigant opposing summary judgment to attest in an affidavit that he cannot oppose summary judgment without conducting discovery. We need not reach this basis for denial of discovery because the court did not abuse its discretion in finding that the Defendants had failed to demonstrate good cause.

[25] As to their non-media-related juror misconduct claims, the district court carefully explained that they are so speculative as to be "insufficient to survive summary dismissal, much less summary judgment." *United States v. Tipton*, No. 3:92CR68, at 3 (E.D.Va. July 15, 2003). Throughout the trial, the court gave cautionary instructions to the jury concerning both media coverage and other possible outside influences, repeatedly reminding the jurors to avoid such external sources of information. Johnson and Tipton have provided us with nothing to suggest that the jurors violated these instructions. And as we observed in *Gravely*, "[r]equests to impeach jury verdicts by post-trial contact with jurors are disfavored." 840 F.2d at 1159. Before proceeding down the path of impeaching a jury verdict, a § 2255 movant must make a threshold showing of improper outside influence. *Id.* In this instance, the court did not abuse its discretion in finding that no such showing had been made. *Id.* (explaining that denial of jury investigation is subject to abuse of discretion review). Put simply, Johnson and Tipton have failed to proffer any evidence that the jurors engaged in misconduct or that they were improperly exposed to outside influences. We therefore affirm the court's rulings on the Defendants' request to interview the jurors. *See* Opinion at 3; *United States v. Tip-ton*, No. 3:92CR68, at 3 (E.D.Va. July 15, 2003).

### E.

[26] The Defendants also assert multiple other IAC claims, contending that: (1) their lawyers should have further investigated their alleged gang activities in New York and New Jersey; (2) Johnson's and Tipton's lawyers should have requested a "reverse*Witherspoon*" inquiry;[14] (3) Johnson's and Tipton's lawyers failed to present mitigating evidence regarding prison conditions; (4) Tipton's lawyers failed to present adequate defenses to the Talley and Stoney Run murders; (5) Tipton's lawyers failed to make an adequate case-in-mitigation; (6) Roane's lawyers conceded certain aggravating factors; and (7) Roane's lawyers waived his right to voir dire.

As we have explained, the Court in *Strickland* established that an IAC claim has two prongs: (1) that counsel's performance was deficient; and (2) that such deficient performance prejudiced the defense. 466 U.S. at 687, 104 S.Ct. 2052. A defendant asserting an IAC claim must therefore satisfy both prongs, and a failure of proof on either prong ends the matter. *See Williams v. Kelly*, 816 F.2d 939, 946–47 (4th Cir.1987).

[27–29] Under the first prong of *Strickland*, we apply a "strong presumption" that a trial counsel's strategy and tactics fall "within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689, 104 S.Ct. 2052. For a lawyer's trial performance to be deficient, his errors must have been so serious that he was not "functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id.* at 687, 104 S.Ct. 2052. And the reasonableness of a lawyer's trial performance must be "evaluated from counsel's perspective at the time of the alleged error and in light of all the circumstances, and the standard of reasonable-

---

**14.** *See Witherspoon v. Illinois*, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968). *Witherspoon* authorized a voir dire inquiry to determine whether a potential juror would always refuse to impose the death penalty. Conversely, a "reverse-*Witherspoon*" voir dire inquiry is utilized to determine the existence of pro-death-penalty bias on the part of a prospective juror. *See Morgan v. Illinois*, 504 U.S. 719, 729–34, 112 S.Ct. 2222, 119 L.Ed.2d 492 (1992).

ness is highly deferential." *Kimmelman v. Morrison*, 477 U.S. 365, 381, 106 S.Ct. 2574, 91 L.Ed.2d 305 (1986); *see also Strickland*, 466 U.S. at 689, 104 S.Ct. 2052.

[30] In order to establish prejudice under *Strickland* 's second prong, a defendant must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694, 104 S.Ct. 2052. A reasonable probability is a "probability sufficient to undermine confidence in the outcome." *Id.* As explained below, we agree with the district court that the Defendants' remaining IAC claims lack merit, standing alone or viewed in the aggregate.

### 1.

[31] First of all, the Defendants maintain that their lawyers should have further investigated their alleged gang activities in New York and New Jersey, and that this failure constitutes constitutionally ineffective assistance. They assert that such an investigation would have led to the discovery of impeaching evidence on certain prosecution witnesses—i.e., that Light was in jail when Saunders supposedly saw him in New York, and that Scott's testimony about gang-related retaliation was false.

Notwithstanding whether counsel's investigation was reasonable, the Defendants have failed to establish prejudice under *Strickland*'s second prong. As the district court explained, substantial negative repercussions would have resulted to the Defendants from the introduction at trial of such impeachment evidence. Opinion at 38. Many of the purported impeaching witnesses had acknowledged being involved in illegal drug transactions with Johnson and Tipton and in pooling their money with Johnson and Tipton to purchase drugs, and Light did not deny that he was a regular source of Tipton's for

crack cocaine. *Id.* In addition, none of this evidence would have undermined the overwhelming evidence before the jury that the Defendants were involved in a CCE in the Richmond area, and that their enterprise had distributed illegal drugs and killed on several occasions in order to ensure its success. Accordingly, the Defendants could not have been prejudiced by any purported omissions of their counsel in this regard, and these claims must be rejected.

### 2.

[32, 33] Johnson and Tipton next contend that, under the principle established in *Morgan v. Illinois*, 504 U.S. 719, 112 S.Ct. 2222, 119 L.Ed.2d 492 (1992), their counsel were constitutionally ineffective in failing to request a specific "reverse-*Witherspoon* " inquiry of all prospective jurors. Under *Morgan*, a capital defendant has the right to an "inquiry sufficient to ensure—within the limits of reason and practicality—a jury none of whose members would 'unwaveringly impose death after a finding of guilt' and hence would uniformly reject any and all evidence of mitigating factors, no matter how instructed on the law." *Tipton*, 90 F.3d at 878 (quoting *Morgan*, 504 U.S. at 733, 112 S.Ct. 2222). Johnson and Tipton contend that their lawyers failed to ensure that each prospective trial juror was specifically asked whether he or she would always impose a sentence of death. On direct appeal, however, this Court foreclosed the prejudice prong of this contention when, in considering a separate contention concerning voir dire, we concluded that "the district court's inquiry into death penalty attitudes was sufficient to cull out any prospective juror who would *always* vote for the death penalty." *Id.* at 879. Accordingly, Johnson and Tipton are unable to satisfy *Strickland* 's second prong, and their counsel

were not constitutionally ineffective for failing to request a reverse-*Witherspoon* inquiry.

### 3.

[34] Johnson and Tipton next contend that their lawyers were constitutionally ineffective for failing to present mitigating evidence regarding the prison conditions they would face if sentenced to life imprisonment without the possibility of parole. This contention is made in response to a point argued by the prosecutor during closing: "Ask yourself, should they be punished beyond incarceration? I'm not telling you incarceration is nice and a lifetime of incarceration is not punishment. But think about each and every day of their existence in jail. They will wake up, bathe, be fed. They will be able to watch TV, read books. They will be able to use the telephone to talk to their loved ones." Essentially, Johnson and Tipton contend that, had their lawyers explained to the jury that actual prison conditions were more difficult than this benign description would suggest, the jury may have seen a life sentence as sufficient punishment and rejected the death penalty.

As the district court correctly explained, if the lawyers had introduced evidence of prison conditions, the prosecution would simply have been afforded another opportunity to remind the jurors that Johnson and Tipton possessed a "proven inclination to engineer murders from behind prison walls." Opinion at 77. And the Government could have drawn the stark contrast between prison life and the living conditions of the incapacitated Greene sisters who were critically wounded during the Stoney Run murders. Accordingly, the lawyers acted reasonably in deciding not to describe prison conditions as mitigating evidence.

### 4.

Tipton next asserts that his counsel were ineffective in their defense of him on the Talley murder counts (Counts Three and Four), and on the Stoney Run murder counts (Counts Twenty-four and Twenty-five). We reject both of these contentions.

### a.

[35] Tipton maintains that, based on pathologist Dr. Fierro's testimony, Tipton, who is right-handed, could not have been Talley's murderer. Accordingly, Tipton contends that Hussone Jones's eyewitness testimony must have been false and that his counsel were ineffective in failing to exploit this fact. We disagree. The district court expressly found that "Dr. Fierro's testimony did not suggest that Tipton, who was initially sitting on the right of Talley, could not stab Talley on the right side of his body.... Such a diffusion of wounds is consistent with Jones' description...." Opinion at 55. In light of this factual finding, counsel were not deficient in failing to urge the jury to absolve Tipton on the basis of Dr. Fierro's testimony.

[36] Tipton also contends that defense counsel were ineffective in failing to interview and call as a witness "Wildman" Stevens, who, according to an affidavit submitted during the § 2255 proceedings, would have contradicted Jones's testimony that Jones drove Tipton and Roane to Stevens's house immediately after Talley's murder. As the district court found, however, there was no evidence that Tipton had advised his counsel that Stevens could contradict Jones's description. *Id.* at 58; *see Lackey v. Johnson,* 116 F.3d 149, 152 (5th Cir. 1997) (explaining lawyer not ineffective for failing to discover evidence that client knew but withheld). And as the court explained, Tipton's counsel had no reason to believe that it would be fruitful

to interview Stevens, considering the fact that the evidence indicated that Stevens was simply another member of the CCE. Opinion at 58. Accordingly, we affirm the court's determination that counsel were not ineffective in defending Tipton on the Talley murder counts.

#### b.

[37] Tipton also contends that his counsel failed to mount an adequate defense to the Stoney Run murder counts. In particular, Tipton contends that counsel should have called John Knight and Stoodie Green as alibi witnesses. Again, we agree with the district court's denial of this IAC claim. As the court explained, "[c]onspicuously absent from the record is any evidence from Tipton that he told counsel that Stoodie Green or Knight could exonerate him from involvement in the Stoney Run murders." Opinion at 64. We agree with the court that Tipton's counsel was not constitutionally ineffective in his defense of the Stoney Run murders.

#### 5.

[38] Tipton claims that his attorney failed to present an adequate case-in-mitigation at the penalty phase of his trial. In particular, Tipton relies on the absence of evidence from his mother, his paternal grand-mother, and an older woman in whose home he resided in early 1992—specifically contending that these witnesses could have testified to Tipton's unfortunate childhood. Again, we agree with the district court that "[t]he record refutes such a claim," in that counsel presented extensive evidence through both lay and expert witnesses, and succeeded in convincing the jurors to find twelve mitigating factors, a number of which pertained to Tipton's difficult childhood and his mental deficiencies. Opinion at 77–80. Indeed, the mitigating evidence in the trial's penalty phase was sufficiently compelling to convince the jury to return non-death verdicts on three of the six capital counts against Tipton, despite the existence of numerous and weighty aggravating factors. In light of the compelling mitigation case presented by Tipton's counsel in the trial's penalty phase, the court correctly concluded that their performance was not constitutionally deficient and that Tipton was not prejudiced by the absence of additional witnesses.

#### 6.

[39] Roane maintains that his trial counsel rendered ineffective assistance at the trial's penalty phase in failing to contest—and indeed, in effectively conceding—the sufficiency of the Government's proof of the aggravating factor that the murder of Moody involved substantial planning and premeditation. According to Roane, this concession was error because there was no evidence that he manifested a premeditated intent to kill Moody or that there was substantial planning, or any planning at all. The district court disagreed, and we agree with the district court. The court found that the evidence of substantial planning and premeditation was ample and that, in light of that evidence, "[t]he best hope for Roane was to emphasize the evidence in mitigation rather than challenge the prosecution's solid case on the substantial planning aggravating factor." Opinion at 71; *see Carter v. Johnson*, 131 F.3d 452, 466 (5th Cir.1997) (concluding that it was reasonable for counsel to concede client's culpability in order to establish credibility with jury); *Bell v. Evatt*, 72 F.3d 421, 429 (4th Cir. 1995) (concluding counsel reasonably conceded defendant's guilt of kidnapping to retain credibility for penalty phase). Because the performance of Roane's counsel

was not constitutionally deficient, we affirm the district court.

### 7.

[40] Relying on *Near v. Cunningham*, 313 F.2d 929, 931 (4th Cir.1963), Roane maintains that a capital defendant may not waive his presence at trial and that his trial attorney was necessarily deficient when, after consulting with Roane, he waived Roane's right to be present during portions of the jury selection process. Roane contends that he was prejudiced as a result because, had he been present throughout voir dire, he would have insisted on using peremptory strikes to remove three jurors who ultimately served on the jury. He maintains that, had those strikes been utilized, the outcome of the trial's penalty phase would likely have been different.

Again, our decision on direct review forecloses this contention. In applying plain error review to Roane's waiver-of-presence claim, we observed that Roane did not offer anything to suggest that he was prejudiced by his intermittent absences from jury voir dire beyond the conclusory assertion that he was presumptively prejudiced. *Tipton*, 90 F.3d at 875–76. Accordingly, Roane is unable to satisfy the second prong of *Strickland*, and we need not consider this issue further.

### F.

Johnson maintains that he is mentally retarded and that, under federal law, he cannot be executed. He further contends that his counsel were ineffective for failing to argue this point during sentencing. The district court rejected these contentions, *see* Opinion at 80–84, and we agree.

### 1.

[41] Under federal law, "[a] sentence of death shall not be carried out upon a person who is mentally retarded." 21 U.S.C. § 848(*l*); *see also Atkins v. Virginia*, 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002) (holding that execution of mentally retarded defendant constitutes cruel and unusual punishment under Eighth Amendment). The district court found, based on data of the American Association on Retardation, that an IQ of 75 or below places a person in the retarded category. *Id.* at 80. At the penalty phase of Johnson's trial, Dr. Dewey Cornell, a psychologist, testified that, on October 10, 1992, he had administered a Wechsler Adult Intelligence Scale Test ("WAIS Test"). Johnson exhibited an IQ of 77, which indicated a "generally impaired intelligence," placing him "just above the level of mental retardation." Importantly, Dr. Cornell testified that he knew the significance of finding Johnson's IQ to be above 75 (i.e., this finding would render Johnson death-eligible), and that he double-checked his numbers and consulted colleagues before reaching this conclusion.

Despite Dr. Cornell's evidence, Johnson asserts that he is in fact mentally retarded. In support of this proposition, Johnson points to evidence offered during the penalty phase that his IQ was somewhere between 69 and 74 in 1985, and he relies on a 1996 publication concluding that the WAIS test tends to inflate IQ scores over the years:

> Individuals appear to gain 3–5 IQ points over a ten year period. Since the WAIS–R was published in 1981, this inflation factor could mean that the average IQ could be as high as 105–107 points rather than the accepted value of 100.

*Id.* at 81 (quoting The Psychological Corporation, *An Introduction to the Wechsler Adult Intelligence Scale*, (3d ed.1996)). Based on these authorities, Johnson main-

tains that his actual IQ is below 75 and that his score of 77 is a product of score inflation. As the district court explained, however, Dr. Cornell's evidence that he double-checked his findings and consulted with colleagues before concluding that Johnson was not mentally retarded "belies the suggestion that Dr. Cornell's analysis did not account for possible variations in his testing instrument." *Id.* at 81-82. Accordingly, Johnson is not barred from execution due to mental retardation.

### 2.

[42, 43] Johnson next contends that his counsel was ineffective for failing to assert possible IQ-score inflation at sentencing. We agree with the district court that Johnson's trial attorney was not ineffective for failing to raise this issue. Under *Strickland*, "counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Strickland*, 466 U.S. at 691, 104 S.Ct. 2052. And "a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." *Id.* In this instance, Johnson's lawyer was presented with a mental health report, and he was under no mandate to second-guess

that report. *See Wilson v. Greene*, 155 F.3d 396, 403 (4th Cir.1998) (rejecting inmate's claim that counsel should have pursued mental health defenses where psychological report indicated inmate was competent to stand trial). In these circumstances, Johnson's counsel was not constitutionally ineffective in this respect.

### IV.

Finally, we turn to the Government's appeal in No. 03-13, challenging the district court's ruling that Roane's counsel, David Baugh, was constitutionally ineffective for failing to properly investigate Roane's alibi defense for the Moody murder. *See* Roane Opinion at 2-11. The court found that Mr. Baugh's investigation into Roane's potential alibi failed both prongs of *Strickland*, i.e., (1) his performance was deficient, and (2) his deficient performance prejudiced the defense. *See Strickland*, 466 U.S. at 687, 104 S.Ct. 2052. Because the district court erred in concluding that Mr. Baugh's representation of Roane was deficient under the first prong of *Strickland*, we reverse its vacatur of Roane's convictions and sentences on Counts Five, Six, and Seven.[15]

The district court concluded that Mr. Baugh had a duty to investigate Roane's

---

**15.** Because Mr. Baugh's performance was not deficient under *Strickland*, we need not decide whether his performance prejudiced the defense. *See Williams v. Kelly*, 816 F.2d 939, 946–47 (4th Cir.1987). We express our considerable doubt, however, on whether prejudice could have ensued here. The court found the testimony of all three witnesses who implicated Roane in the Moody murder—Berkley, Davis, and Pepsi Greene—to be credible and corroborated by physical evidence. And Greene's testimony was deemed to be "particularly compelling." Roane Opinion at 4. Conversely, the court found the testimony of the potential alibi witnesses to be much less credible—Reavis's testimony was "flat and unpersuasive," and she would not have

testified at trial anyway; Roane's testimony was "tenable" but "not compelling"; Rowe's testimony was "not credible" and "would carry no weight with a jury"; and Cooley could not remember the date on which she went to a hotel with Roane. *Id.* at 5–7. It would be difficult for this testimony (not to mention the fact that Roane would have been subject to cross-examination about the other murders and his extensive criminal record), plus one motel receipt, in someone else's name, placing Roane a mere two miles away from the murder scene, to create a reasonable probability that, but for the lack of such evidence, "the result of the proceeding would have been different." *Strickland*, 466 U.S. at 689, 104 S.Ct. 2052.

potential alibi. As the court explained, Mr. Baugh possessed information suggesting that Roane might be telling the truth about staying at the Howard Johnson hotel the night of Moody's murder—(1) Gina Taylor, an eyewitness, claimed that Roane did not commit the murder; (2) Mr. Baugh had received a detailed account of the alibi from Roane, who had been candid about his participation in other crimes; and (3) Carmella Cooley acknowledged that she had visited a hotel with Roane. *See* Roane Opinion at 9. Armed with this information, we agree that Mr. Baugh had reason to believe that the hotel records could generate an alibi for Roane, and Mr. Baugh was therefore obliged to make a reasonable investigation of them. *See Strickland,* 466 U.S. at 690–91, 104 S.Ct. 2052 (explaining that attorney has duty to make reasonable investigation or to make reasonable decision not to investigate). We part company with the district court, however, on its conclusion that Mr. Baugh failed to fulfill this duty.

[44, 45] We review de novo the district court's conclusion that Mr. Baugh was constitutionally ineffective, *Smith v. Angelone,* 111 F.3d 1126, 1131 (4th Cir.1997), and we defer to its findings of fact unless they are clearly erroneous. As the district court found, Mr. Baugh, in keeping with his obligation to investigate: (1) interviewed Cooley, who stated that she once accompanied Roane and Reavis to the Howard Johnson but could not verify the date; (2) concluded that Cooley's ignorance of the date and apparent hostility would make her a poor witness; (3) thereafter contacted the Howard Johnson and asked for records of Linwood Chiles renting a room on the evening of January 12, 1992; (4) went to the hotel himself and attempted to locate the records; (5) limited his search to the name "Linwood Chiles," and searched only for records from January 12,

1992; and (6) found no record of Linwood Chiles being registered at the hotel on the evening of January 12, 1992. Roane Opinion at 5. At this point, Mr. Baugh made the strategic choice to focus on Roane's misidentification defense, with Gina Taylor as his lead witness.

The district court concluded that Mr. Baugh's investigation of the alibi was constitutionally insufficient because he "did not follow through and seek the records with the vigor demanded by the situation." *Id.* at 9. According to the court, "reasonably competent counsel would have filed a subpoena demanding all records held by the hotel pertaining to a Mr. Chiles for January of 1992 or spent a few hours going through all the records at the hotel to assure himself that no records corroborative of his client's alibi existed." *Id.* With all respect to the district court, we disagree.

[46–48] As the Supreme Court has explained, a criminal defense lawyer possesses a duty to conduct a pretrial investigation that is "reasonable[ ] under prevailing professional norms." *Strickland,* 466 U.S. at 688, 104 S.Ct. 2052; *see also Wiggins v. Smith,* 539 U.S. 510, 523, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003). And the strategic decision of Roane's lawyer on the extent of his investigation into the alibi defense "must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." *Strickland,* 466 U.S. at 691, 104 S.Ct. 2052; *see also Byram v. Ozmint,* 339 F.3d 203, 209 (4th Cir.2003) (same); *Tucker v. Ozmint,* 350 F.3d 433, 441–42 (4th Cir.2003) (same). We are obligated by law to make "every effort to avoid the distorting effects of hindsight," *Strickland,* 466 U.S. at 689, 104 S.Ct. 2052, and we should evaluate Mr. Baugh's performance "from counsel's perspective at the time of the alleged error and in light of all the circumstances...." *Kimmelman v. Mor-*

*rison,* 477 U.S. 365, 381, 106 S.Ct. 2574, 91 L.Ed.2d 305 (1986).

Applying these principles to this situation, Mr. Baugh's performance was constitutionally reasonable and thorough. He interviewed Carmella Cooley, who could not remember when she stayed at a hotel with Roane. He called the hotel and requested records of Linwood Chiles from the *only relevant night*—the night of the murder. And when that search was not fruitful, he went to the hotel and searched for the records himself. Only after this final step in his investigation did Mr. Baugh turn to and focus on Roane's misidentification defense. In these circumstances, we decline to act as a Monday-morning quarterback and second-guess Mr. Baugh's efforts, simply because we are now armed with more information and the benefit of hindsight.

Furthermore, the authorities relied upon by the district court miss the mark, involving situations in which a lawyer has failed to investigate a defense *at all* or has performed an investigation so minimal that no strategic reason could be given for the failure to investigate further. *See, e.g., United States v. Russell,* 221 F.3d 615, 621 (4th Cir.2000) (finding ineffective representation when lawyer failed to investigate defendant's criminal record after defendant advised counsel that his convictions had been overturned); *Hooper v. Garraghty,* 845 F.2d 471, 474–75 (4th Cir.1988) (explaining counsel deficient in failing to investigate insanity defense, after learning from client, client's family, and prison psychologist of client's insanity); *Hoots v. Allsbrook,* 785 F.2d 1214, 1219–20 (4th Cir. 1986) (finding lawyer's decision not to interview eyewitnesses unreasonable); *Nealy v. Cabana,* 764 F.2d 1173, 1174 (5th Cir.1985) (finding counsel ineffective in failing to seek evidence from witnesses when client claimed those witnesses committed crime). Unlike the circumstances

underlying those decisions, this case does not involve a situation where counsel neglected to investigate, or where his investigation was so cursory that we can now—eleven years on and with the benefit of hindsight—declare it constitutionally unreasonable.

As the Sixth Circuit aptly explained in *Coe v. Bell,* 161 F.3d 320 (6th Cir.1998), what the lawyer did not miss is "just as (or more) important as what the lawyer missed." *Id.* at 342. Here, Mr. Baugh was diligent and highly effective in his representation of Roane during this litigation—he conferred with Roane, he investigated the crime scene, he located an eyewitness to the Moody murder who provided a physical description of a murderer dissimilar to Roane, he learned that Moody's mother had advised the police that another man had been searching for Moody hours before his murder, and he aggressively and professionally cross-examined the Government's witnesses. Mr. Baugh investigated the possible Moody alibi—a weak one at that—but when the investigation proved unfruitful, he put on a strong misidentification defense. According a "heavy measure of deference" to Mr. Baugh, as we must, his representation of Roane was not constitutionally ineffective. We therefore reverse the vacatur of Roane's convictions and sentences on Counts Five, Six, and Seven.

### V.

Pursuant to the foregoing, we affirm the award of summary judgment to the Government in Nos. 03–25, 03–26, and 03–27, and we reverse the district court's award of relief to Roane in No. 03–13.

*AFFIRMED IN PART AND RE-VERSED IN PART*

