IN THE  UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA,<br>          Respondent | )<br>)<br>)<br>) | No. 09-8 |
|      v.<br><br>JAMES H. ROANE, JR.,<br>          Movant | )<br>)<br>)<br>)<br>)<br>)<br>) | OPPOSITION OF THE UNITED STATES<br>TO MOTION FOR LEAVE TO FILE A<br>SECOND OR SUBSEQUENT MOTION<br>FOR RELIEF UNDER 28 U.S.C. § 2255 |

The United States of America, by and through the United States Attorney

for the Eastern District of Virginia and the undersigned attorney of the Department

of Justice Criminal Division, hereby opposes the application of James R. Roane,

Jr.,  for leave to file in the Eastern District of Virginia a second or subsequent

petition for federal habeas relief under 28 U.S.C. 2255.  Although Roane alleges

the existence of newly discovered evidence establishing his actual innocence of

the murder of Douglas Moody for which he was capitally convicted and sentenced

to death, the core of his actual innocence claim – that drug dealer Keith Barley had

a motive to kill Moody and that an eyewitness to the crime stated that Moody was

killed by a slightly-built individual, and not by Roane – was presented at trial and

evidently rejected by the jury.  Moreover, Roane later unsuccessfully asserted his

actual innocence of the Moody murder in his initial Section 2255 petition,

bolstering the exculpatory evidence presented at trial with the testimony of a second purported eyewitness who stated that Moody was killed by someone other than Roane and by "new" alibi evidence. In rejecting Roane's actual innocence claim, the district court specifically found that the testimony of the government's three witnesses who offered testimony directly inculpating Roane in Moody's murder was "credible" (Mov. App. 248) and that the contrary evidence advanced by Roane was "not sufficiently compelling to preclude many a reasonable juror from finding Roane's guilt of murdering Moody in light of the formidable direct and circumstantial evidence of Roane's guilt" (Mov. App. 256). As we demonstrate below, the additional evidence proffered by Roane to support his latest actual innocence claim is likewise insufficient to satisfy the stringent standards in 28 U.S.C. 2244(b) and 2255(h) to warrant the filing of a second Section 2255 petition.

STATEMENT

1. **The Government's Trial Evidence.** The underlying facts are summarized both in this Court's' decision on direct review, *United States v. Tipton*, 90 F.3d 861, 868-869 (4th Cir. 1996), and in its later decision on collateral review, *United States v. Roane*, 378 F.3d 382, 389-391 (4th Cir. 2004) . Movant Roane and codefendants Cory Johnson and Richard Tipton were principal partners

2

in a continuing criminal enterprise (the "New York Boyz") that trafficked large quantities of cocaine between 1990 and 1992 in the Richmond area.  The conspiracy became exceedingly violent in its later stages.  Thus, as this Court stated, during a six-week period in early 1992, Roane, Tipton, and Johnson  "were variously implicated in ten murders within the Richmond area – all in relation to their drug-trafficking operation and either because their victims were suspected of treachery or other malfeasance, or because they were competitors in the drug trade, or because they had personally offended one of the 'partners.'" 90 F.3d at 868. Included among their murder victims were Douglas Moody (a rival drug dealer)[1] and Linwood Chiles (a co-conspirator suspected of cooperating with the police). For his part, Roane was convicted on three capital murders (he was implicated, but uncharged in a fourth) and on one non-capital murder.

a. *The Uncharged Talley Murder*.  On January 4, 1992, Tipton and Roane drove underling Douglas Talley to a deserted area in South Richmond.  Talley had recently mishandled the proceeds of a $1,000 crack cocaine consignment and was additionally suspected of being a police informant.  After briefly exiting Talley's car to confer with one another, Roane and Tipton re-entered the car, with Tipton getting into the front seat with Talley and Roane getting into the back seat

---

[1] Moody is also known as Kareem Abdul Hakim.

immediately behind Talley.  While Roane grabbed Talley from the rear, Tipton stabbed Talley to death (in all, 84 stab wounds were inflicted to Talley's head, neck, and upper body).  Tipton was convicted and sentenced to death for the Talley murder; however Roane was not substantively charged with the Talley murder.

b. *The Moody Murder (Count 5)*.  On successive nights in mid-January 1992, rival drug dealers Douglas Moody and Peyton Maurice Johnson were killed in order to eliminate unwanted competition.  A day or two before Moody was killed, Roane retrieved a pistol that underling Robert "Papoose" Davis stored for Johnson.  Thereafter, in the early morning hours of January 13, 1992, Roane and Tipton went to Moody's apartment, where Tipton twice shot Moody in the back; however, Moody escaped from the apartment by jumping through a window. Roane and Tipton pursued Moody, with Roane stopping off at a nearby apartment to retrieve a military-style knife that underling Priscilla "Pepsi" Greene kept for the partners' use.  Roane and Tipton found Moody in the yard outside the apartment.  Roane followed Moody into an adjoining alley, where he stabbed Moody to death.  Roane immediately returned the knife to "Pepsi" Greene and instructed her to dispose of it.  Roane and Tipton then went to "Papoose" Davis' house, telling Davis that they had "got him" and that it was "hot" on the street.

4

"Pepsi" Greene (JA 5272-5277, 5294-5300, 5304)[2] and Denise Berkley (JA 4423-4432, 4492), another underling in the partners' drug trafficking enterprise, both testified as eyewitnesses to Roane's fatal stabbing of Moody, and "Papoose" Davis (JA 4623-4626) testified both as to his provision of a pistol to Roane shortly before the murder and as to the incriminating statements made by Roane and Tipton when they visited his house immediately after the murder. Another co-conspirator, Sterling Hardy, testified that he overheard a jailhouse conversation between Roane and Tipton in which they were trying to figure out the identity of a woman to whom they had given a knife. JA 4916-4918.

In addition to impeaching both Greene (JA 5292-5304) and Berkley (JA 4485-4495), Roane's trial co-counsel presented evidence suggesting that Moody's murder had been committed by someone other than Roane. For example, Gina Taylor, a neighbor of Moody's, testified that she saw a short, thin assailant stabbing Moody in the alleyway outside his house. Although she could not identify the assailant, she stated that the assailant could not have been Roane because of the assailant's diminutive size. JA 5626-5631, 5636. A police detective confirmed that Taylor had described the killer as a short, thin black male

---

[2] "JA" refers to the joint appendix filed in this Court in connection with Roane's previous Section 2255 appeal. See Case Nos. 03-13 & 03-25. Excerpts from this appendix are being filed with the Court as part of this response.

during an interview soon after the murder.  JA 5652-5654.  Another police detective testified that he had been told by Moody's mother that a person named "Keith" had been looking for her son shortly before he was murdered; that some of "Keith's" friends had broken into her house a week earlier while armed with automatic weapons; and that her son was hiding from a person named Maurice on the day he was killed.  JA 5655-5656, 5659-5660.  Based on the information obtained from Moody's mother, the detective stated that the initial focus of the Moody murder investigation had been on "Little Keith" Barley, a small-featured black male (JA 5652-5655), but that the focus changed once "Pepsi" Greene gave her account of the murder a few weeks later.   Roane did not testify at trial regarding his whereabouts at the time of the Moody murder or about any other aspect of his CCE-related activities.

c.  *The Peyton Maurice Johnson Murder (Count 8)*.  Later in the day on January 13, 1992, Roane promised to supply crack cocaine to Pam Williams if she would purchase semi-automatic firearms for him.  Williams agreed.  Roane accompanied Williams to a gun store, where he pointed out three 9mm. semi-automatic pistols that he wanted her to purchase.  Williams filled out the federal firearms transaction forms.  JA 4568-4574, 4587.  On January 14, 1992, after her 24-hour identification check had been completed, Williams picked up the three

firearms, paying $1,492 in cash that Roane had given her.  Roane, Johnson, and an associate known only as "E.B." thereafter placed the weapons in a tote bag and delivered them to "Papoose" Davis for safe keeping.  JA 4433-4437, 4575-4582, 4596-4598, 4626-4628, 5411-5414.

Several hours later, on the night of January 14, 1992, Roane, Johnson, and "E.B." retrieved the weapons from Davis.  JA 4437-4439, 4628.  Roane then searched the neighborhood for Peyton Maurice Johnson, finally locating him in an illegal tavern run by Stanley Smithers.  Roane left the tavern after learning that it was not yet open for business.  Two minutes after Roane's departure, Johnson and an unidentified accomplice entered the tavern, produced semi-automatic weapons, and shot Peyton Johnson to death.  Roane, Johnson, and "E.B." then returned the weapons to "Papoose" Davis, instructing him to wipe the weapons for fingerprints.  JA 4628-4629.  Ballistics tests connected the murder weapons to two of the firearms purchased by Roane earlier in the day.

d.  *The Louis Johnson Murder (Count 11)*.  On the evening of January 29, 1992, Roane was riding in his car, along with Johnson and fellow drug kingpin Lance Thomas.  Pulling into an alley, Roane saw Louis Johnson walking with a group of men.  Louis Johnson was a bodyguard for a rival drug dealer and was believed to have threatened Johnson with a shotgun on a previous occasion.  Upon

7

spying Louis Johnson, Roane stopped the car, got out, approached Louis Johnson and shot him.  Johnson and Thomas thereafter joined the fray, firing at Louis Johnson with semi-automatic pistols.  In the end, either Johnson or Thomas shot Louis Johnson twice at close range as he lay wounded on the ground.

e. *The Torrick Brown Murder (Count 14)*.  Finally, on February 1, 1992, Roane, Johnson, and Thomas rendezvoused outside the apartment of Torrick Brown, whom Roane suspected of "messing around" with one of his girlfriends.  Roane knocked on the door, which was answered by Brown's step-sister, and asked to see Brown.  When the step-sister summoned Brown to the door, Roane and his two confederates opened fire with semi-automatic pistols, killing Brown and seriously wounding his step-sister.  Roane was arrested the following day in a police raid, and the semi-automatic weapons that Roane had purchased were seized.  Tipton and Johnson remained at large and committed other CCE-related murders, including a double-killing on February 19, 1992, that resulted in the death of underling Linwood Chiles and the serious wounding of "Pepsi" Greene, who was one of the two eyewitnesses to Roane's murder of Douglas Moody.

2. **Roane's First Section 2255 Petition**.  After his convictions and sentences were affirmed on direct review, Roane filed a first Section 2255 petition, arguing, <u>inter alia</u>, that his two trial counsel – David Baugh and Arnold Henderson

8

– performed deficiently in failing adequately to investigate and defend against the Moody murder charge and that he was actually innocent of the Moody murder. In support of his claims, Roane made an evidentiary proffer that (1) Demetrius Rowe, a purported eyewitness to Moody's murder, stated that the murder was committed by Johnson and Tipton, but that Roane was not present (JA 1172-1173, 2110-2111); (2) Rowe had not seen Denise Berkley on the evening of the Moody murder and had only seen "Pepsi" Greene "much earlier" in the evening, "before the murder occurred" (ibid.); (3) Roane had informed Baugh before trial that he was at a Richmond motel at the time Moody was killed and that a woman (Carmella Cooley) could account for his presence at the motel; (4) Baugh interviewed, but did not call as a witness, the woman identified by Roane, and attempted to obtain, without success, corroborating motel records; and (6) Roane's Section 2255 investigator had found a motel receipt from a Howard Johnson motel in Richmond, showing that a "Larry Chiles," who lived at 1016 Clay Street, checked into the motel for an overnight stay on January 12, 1992 (the night of Moody's murder), and that "Linwood Chiles," who lived at 1016 Clay Street, had checked into the same motel for an overnight stay on January 2, 1992 (JA 1171-1173).

At an ensuing evidentiary hearing on his ineffective assistance of counsel

and actual innocence claims, Roane testified that, although he supported himself through drug trafficking in January of 1992 (JA 2141, 2144) and associated with Tipton, Johnson, and other members of the conspiracy, he had neither been involved in Moody's murder nor had a motive to murder Moody. As Roane explained, Moody was not a drug dealer, much less a rival of the "New York Boyz." JA 2144-2145. Roane instead testified that he and codefendant Sandra Reavis[3] spent the night of Moody's murder together at a Howard Johnson's motel in Richmond and that he did not learn about Moody's murder until after they had checked out of the motel the next morning. JA 2149, 2160. As Roane continued, on the evening of January 12, he, Reavis, and Carmella Cooley (a friend of Reavis) were driven to the motel by Linwood Chiles, and Chiles rented a room with cash that Roane provided. Chiles and Cooley departed soon thereafter. JA 2152-2160, 2166-2167. Roane stated that he and Reavis remained together in the motel room until check-out time the following morning. JA 2169.

Reavis corroborated Roane's alibi, testifying that she and Roane had been taken to the motel by Chiles and Cooley around 9:00 p.m. on the evening of January 12, and that she and Roane thereafter spent the entire night together at the

---

[3] Reavis was jointly tried with Roane, Tipton, and Johnson. She was sentenced to 16 years' imprisonment as a result of her drug trafficking conspiracy conviction. *See United States v. Reavis*, 48 F.3d 763 (4th Cir. 1995).

motel.  JA 2126-2128.  Reavis testified that she could clearly recall the events of that evening because the Richmond police had initially charged her as a participant in the Moody murder.  JA 2128.  Reavis conceded, however, that she had not told police officers during an interview shortly after the murder that she and Roane had been in a motel at the time of the murder or that Chiles and Cooley had knowledge of her's and Roane's whereabouts on the night of the murder.  JA 2130-2131, 2133.

Finally, Demetrius Rowe testified regarding her account of the Moody murder.  Rowe stated that she had been sitting on a porch across from the alley in which Moody was murdered for much of that evening, drinking "pints of gin" with a friend.  JA 2178y-2179.  According to Rowe, she heard loud hollering and the sounds of a fight coming from the house where Moody lived, after which she saw Moody emerge from the doorway of the house while struggling with Johnson.  JA 2179-2181, 2184-2185.  Rowe testified that she also saw "Pepsi" Greene, Curt Thorne ("Pepsi" Greene's boyfriend and a later murder victim of Tipton and Johnson), Tipton, and an unknown person emerge from the house.  JA 2180-2185.  Rowe stated that Roane was not in the group, as she had seen Roane and Reavis leave together in a taxi cab at approximately 8:30 p.m.  JA 2181-2182, 2187-2183, 2190.

11

3.  **The District Court's Section 2255 Ruling**.  On May 1, 2003, the district court (Spencer, J.) issued an opinion and order granting Roane Section 2255 relief, finding that his counsel had been constitutionally deficient in failing to locate the motel receipt and that Roane had been prejudiced by counsel's deficient investigation.  Mov. App. 252-255.  By contrast, the district court rejected Roane's claims that his counsel was deficient in failing to discover and present Demetrius Rowe's testimony at trial (Mov. App. 252) or that he was "actually innocent" of the Moody murder (Mov. App. 255-257).  Accordingly, the district court vacated Roane's convictions and sentences on the three counts related to the Moody murder (Counts 5, 6 and 7) – including his death sentence on the Section 848(e) murder count – and remanded the case for a new trial or resentencing.

By way of fact-finding, the district court found – as had been established at trial – that Moody was selling drugs for Peyton Maurice Johnson in the Newtowne area of Richmond; that Tipton, Johnson, and Roane decided to take over the drug trade in the Newtowne area by means of violence; that Roane reclaimed a pistol that was being held by "Papoose" Davis a day or two before Moody's murder; and that Roane participated in the murders of Peyton Maurice Johnson and Louis Johnson; and that both of those murders, along with Moody's murder, "were part

12

of a general plan of [Roane], Tipton, and Johnson to take over the drug trade in the Newtowne area." Mov. App. 246-247. With regard to the Moody murder, the court found that "Pepsi" Greene, Denise Berkley, and "Papoose" Davis provided testimony directly implicating Roane as the murderer that was both "credible" and "corroborated by the physical evidence." Mov. App. 247-248.[4] In defending against the Moody murder, the district court noted that defense counsel had relied on a misidentification theory, suggesting that Moody had been killed by someone other than Roane. Mov. App. 248. But, the district court continued, counsel had not mounted an alibi defense, even though Roane had told counsel that he had not killed Moody, that he and Reavis had spent the night in a Howard Johnson motel "located a couple of miles from where Douglas Moody was murdered," and that the couple had been accompanied to the motel by Carmella Cooley and Linwood Chiles, the latter of whom had driven the group to the motel and rented the room for cash. Mov. App. 249.

Had Baugh discovered the "Larry Chiles" motel records, the court found that Roane "would have testified consistently with his [exculpating] testimony at the evidentiary hearing." Mov. App. 250. And, based on Roane's "demeanor and

---

[4] The district court found that "Greene's testimony was and remains particularly compelling." Mov. App. 248.

the details of his account," the court found that Roane's "testimony that he was at the hotel at the time of the Moody murder, although not compelling, was tenable." Ibid. At the same time, the court stated that Roane's "self-serving" alibi testimony was "unsupported by a credible, unbiased witness or firm objective proof." Mov. App. 256. It was not, therefore, "the sort of evidence one would deem inherently reliable or trustworthy." Ibid.

The court did not credit either Reavis' or Rowe's hearing testimony. As the court noted, Reavis' corroborating testimony "was flat and unpersuasive" and would be viewed "with skepticism" by jurors and that her credibility was undercut because she was Roane's "lover and lackey," because she had only recently mentioned the alibi, despite an earlier motivation to do so, and because of her post-arrest letter asking Roane to falsely exonerate her on the then-pending conspiracy charge. Mov. App. 250-251.

As for Rowe, the court found that "Rowe's testimony, to the extent it exculpated [Roane], was not credible and would carry no weight with a jury," as it "appear[ed] to be a fabrication" that would have engendered "greater skepticism" among jurors about Roane's claimed alibi. Mov. App. 251-252. In making this adverse credibility determination, the court specifically cited Rowe's demeanor at the hearing and the fact that her hearing testimony substantively conflicted with an

14

earlier affidavit that she had provided to Roane's Section 2255 counsel.  Ibid.

Applying the standard in *Strickland v. Washington*, 466 U.S. 668 (1984), the district court concluded both that trial counsel had been constitutionally deficient in failing to locate the "Larry Chiles" motel receipt and that it was reasonably probable that the outcome of the Moody murder-related counts would have been different but for trial counsel's deficient investigation.  As the court explained, trial counsel "had substantial information that indicated [Roane's] claim that he was at a hotel at the time of the Moody murder was credible."  Mov. App. 252-253.  That information included (1) the apparently disinterested account of Gina Taylor that exonerated petitioner; (2) Roane's own candor with trial counsel regarding his commission of other acts with which he was charged; and (3) counsel's interview of Cooley that "corroborated the details of the account provided by [Roane]."  Ibid.  Although this information gave counsel every reason to believe the hotel records would provide objective evidence to corroborate Roane's story," the district court concluded that trial counsel devoted an "unreasonably limited amount of time and resources" in looking for the corroborative hotel records.  Ibid.

The court further found that trial counsel's deficient investigation was prejudicial.  Mov. App. 254.  The court stated that "the evidence of [Roane's] guilt

15

was strong," but "was neither undisputed nor overwhelming."  Ibid.  The court

further noted that the newly-discovered motel receipt was only "somewhat * * *

indirectly * * * and marginally corroborative" of the asserted alibi, which was

itself "thin" and ultimately turned on the believability of Roane's "naked

testimony."  Mov. App. 251, 256.  Nonetheless, the court concluded that Roane's

asserted "thin" alibi defense would have sufficiently bolstered  the

misidentification defense presented at trial to create a reasonable probability of

acquittal on the Moody murder counts.  Mov. App. 254.

By contrast, the court ruled that the missing motel records and other newly-

presented evidence (i.e., Roane's, Reavis', and Rowe's testimony) did not

establish that Roane was "actually innocent" of the Moody murder.  Mov. App.

255-257.  Specifically, the court found that "none" of the three witnesses upon

whose testimony Roane's actual innocence claim rested – Roane, Reavis, and

Rowe – was "particularly trustworthy."  Mov. App. 255.  And, while the

credibility of the asserted alibi defense was bolstered by the fact that Roane and

Reavis "agreed on the basic details of the alibi" and by the motel records that

"confirmed [Roane's] statement that Linwood Chiles had paid cash for a room

early on the evening of January 12, 1992," the court noted that "the value of those

records would be diminished by the fact that according to Berkley and Greene,

16

Reavis and [Roane] continued to employ Chiles as a chauffeur after the time of check-in and used his services to depart the scene of the murder." Mov. App. 256. Because of the diminished value of the motel records, the court stated that juror "acceptance of [Roane's] alibi would turn primarily" on the believability of "the naked testimony of Reavis and [Roane] that they did not leave the motel room until after Moody had been killed." Mov. App. 256. Assessed in that context, the court concluded that Roane's "thin alibi, even when coupled with Gina Taylor's testimony, and the evidence suggesting third parties wished to do Moody harm, [wa]s not sufficiently compelling to preclude many a reasonable juror from finding Roane guilty of murdering Moody in light of the formidable direct and circumstantial evidence or [petitioner's] guilt." Mov. App. 256-257.

Moreover, the court noted that Roane's "new evidence of innocence d[id] not diminish the substantial evidence that [Roane] stabbed Moody to death as part of a plan to take over the drug traffic in the Newtowne area," which included Roane's demonstrated participation in murdering Moody's superior (Peyton Maurice Johnson) and a second person who was viewed as a drug rival (Louis Johnson). Mov. App. 257. "[Roane's] assertion that he spent the night of Moody's murder languishing in a hotel room with his girlfriend," the court determined, "does not sit comfortably alongside Roane's proven participation in

17

the other aspects of the plan to take over the drug trade in the Newtowne area."

Ibid.

4. **This Court Upholds Roane's Capital Conviction and Death Sentence**.
The court of appeals reversed the district court's grant of Section 2255 relief as to
the Moody murder counts and affirmed the district court's denial of Roane's other
claims for relief. Mov. App. 258-287. With regard to the vacated Moody murder
counts, this Court found that Roane's trial counsel performed in a professionally
competent manner in investigating a potential alibi defense and was otherwise
"diligent and highly effective" in presenting "a strong misidentification defense"
to the Moody murder. Mov. App. 287. In particular, the Court noted that defense
counsel "investigated the crime scene, [] located an eyewitness to the Moody
murder who provided a physical description of a murderer dissimilar to Roane, []
learned that Moody's mother had advised the police that another man had been
searching for Moody hours before his murder, and [] aggressively and
professionally cross-examined the Government's witnesses." Ibid. In light of this
determination that defense counsel's performance was not constitutionally
deficient, the Court found no need to "decide whether his performance prejudiced
the defense." Mov. App. 285, n. 15. Nonetheless, the Court voiced "considerable
doubt" whether Roane could have been prejudiced:

18

> The [district] court found the testimony of all three witnesses who implicated Roane in the Moody murder – Berkley, Davis, and Pepsi Greene – to be credible and corroborated by physical evidence. And Greene's testimony was deemed to be "particularly compelling." Roane Opinion at 4. Conversely, the [district] court found the testimony of the potential alibi witnesses to be much less credible – Reavis's testimony was "flat and unpersuasive," and she would not have testified at trial anyway; Roane's testimony was "tenable" but "not compelling"; Rowe's testimony was "not credible" and "would have carried no weight with the jury"; and Cooley could not remember the date on which she went to a hotel with Roane. Id. at 5-7. It would be difficult for this testimony (not to mention the fact that Roane would have been subject to cross-examination about the other murders and his extensive criminal record), plus one motel receipt, in someone else's name, placing Roane a mere two miles away from the murder scene, to create a reasonable probability that, but for the lack of such evidence, "the result of the proceedings would have been different." *Strickland*, 466 U.S. at 689.

Ibid. Roane did not appeal the district court's denial of his actual innocence claim.

5. **Roane's Application To File a Second 2255 Petition**. On August 6, 2009, Roane filed an application with this Court for leave to file a second Section 2255 petition pursuant to the gateway provisions in 28 U.S.C. 2244(b) and 2255(h). In support of application, Roane submitted numerous affidavits which, he claims, establish his actual innocence by "clear and convincing evidence," so that, "if proven and viewed in light of the evidence as a whole, * * * no reasonable factfinder would have found the [him] guilty of [Moody's murder]." 28 U.S.C.

2255(h).  Those submissions include the following:

a. *Gina Taylor*.  Gina Taylor testified at trial that she witnessed Moody's murder and that the crime was committed by a short, slightly-built black person who could have been either a male or a female.  Although she testified that she did not recognize the person who killed Moody, she expressly stated that it was not Roane.  JA 5625-5631, 5636.  On cross-examination, Taylor admitted that she had previously dated Tipton and was a good friend of Tipton's family.  JA 5633.  Contrary to her trial testimony, Taylor now avers that Keith Barley murdered Moody over some drugs.  Mov. App. 11-12.[5]  According to Taylor's recent declaration, she was aware that Barley "was a very violent and dangerous" drug dealer and was "really scared" that "the same thing would happen to [her]" if she told the police that Barley had killed Moody.  Mov. App. 11.  Hence, Taylor avers that she "tried to give the police a description of the killer * * * without specifically naming Little Keith," in the hope that "the police would figure it out."  Ibid.  Taylor stated that she was providing this information now "because Little Keith is dead" and "[could] no longer hurt [her]."  Mov. App. 12.  Finally,

---

[5] Several weeks after the murder, Taylor states that she was told by Barley that his killing of Moody had related to a drug debt and got the impression from Barley "that [she] should not talk about [her] seeing that [Barley] was the person who killed [Moody]."  Ibid

although she had testified at trial that she "kind of" dated Tipton, Taylor avers that she "was never [Tipton's] girlfriend" but "were just friends." Ibid.

b. *Barley's Inculpatory Admissions*. Lloyd McDaniels (Mov. App. 13-14) and Willie Coley (Mov. App. 15-17), each a friend or acquaintance of Keith Barley, submitted declarations averring that Barley told each of them that he had killed Moody because of an outstanding drug debt.

c. *Richard Coles, Jr*. In his declaration (Mov. App. 18-19), Richard Coles avers that an hour or two before Moody was murdered, Keith Barley, while armed with a gun, kicked in the door of a house where Coles and friends were ingesting drugs. At the time, Barley was looking for Moody because of an outstanding drug debt. When he later heard that Moody had been stabbed to death, Coles avers that he was "sure" Barley was the killer, as Barley "always carried * * * a long thin knife." Mov. App. 19.

d. *Ronita Hollman*. Ronita Hollman testified at trial that she sold drugs for Peyton Maurice Johnson and was solicited by Roane and Tipton to distribute crack cocaine for them instead. JA 4690-4696. In her recent declaration, Hollman avers that Moody "was a heavy drug user," but was "not a dealer," and "always owed people money for drugs." Mov. App. 21. In particular, Hollman avers that Moody "did not work for [Peyton] Maurice Johnson." Ibid. Hollman additionally states

21

that she knew "Little Keith" Barley, a young crack cocaine dealer who "carried himself around the neighborhood in a very tough way."  Ibid.

e.  *Moody as Drug Addict*.  Several other individuals – Lloyd McDaniels (Mov. App. 14); Willie Coley (Mov. App. 15); Harold Coles (Mov. App. 23); Keith Ross (Mov. App. 27) – submitted declarations that Moody was a drug addict, not a dealer.

f.  *Reputation Evidence*.  Several individuals who resided in the Newtowne area in the early 1990s – Aimey Coley (Mov. App. 20); Harold Coles (Mov. App. 23-24); Jeannette Pauley (Mov. App. 25-26); Keith Ross (Mov. App. 27-28); and Wanda Wright (Mov. App. 29) – provided declarations variously attesting to the reputations of Keith Barley and the government's principal witnesses to Moody's murder.  In the main, these declarants stated that (1) Barley was an armed drug dealer who was regarded as a mean and violent person; and (2) that "Pepsi" Greene and Denise Berkley were incorrigible drug addicts who were "unreliable" or "extremely unstable."

g.  *Dr. Marcella Fierro*.  Dr. Fierro, formerly the assistant chief medical examiner, performed the autopsy on Moody (JA 4799) and testified at trial that Moody suffered blunt force trauma and abrasions to the head and left arm, 18 stab wounds caused by a single-edged knife with a blade of approximately 3/4 of an

22

inch in width, and two gunshot wounds (JA . 4800-4804, 4814-4816).  In a post-retirement declaration prepared after being retained as a forensic expert by Roane's counsel (Mov. App. 52-53), Dr. Fierro avers that Denise Berkley's trial testimony that Roane was standing in front of Moody when he began stabbing Moody "was inconsistent with the physical evidence for most of the wounds."  Mov. App. 53-54.  As Dr. Fierro explains, because "all of the stab wounds are on the upper right and middle back," other than "a stab wound to the left forehead and one to the left anterior neck," it was "very unlikely that the back stab wounds in this case were inflicted in a face to face combat situation."  Mov. App. 53.  Rather, Dr. Fierro states that it was "more likely" that Moody "had his back to the perpetrator while being stabbed."  Mov. App. 53-54.  Dr. Fierro states that her conclusion in this regard is consistent with "[t]he multiple abrasions to the front of Mr. Moody's body."  Mov. App. 54.  Furthermore, Dr. Fierro avers that Berkley's trial testimony that Roane used a butcher knife and "Pepsi" Greene's testimony that Roane used a military knife with a "wide" blade of approximately 2-3 inches in width in the attack on Moody "was inconsistent with the physical evidence," as an examination of the size of Moody's stab wounds indicated that he was "stabbed by a cutting instrument with a blade between 1/2 to 3/4 inch in width."  Ibid. Finally, Dr. Fierro regarded Berkley's trial testimony that Moody had been

23

stabbed 18 or 19 times to be "incredible" and "suspect," as it took Dr. Fierro "several hours of examination to determine the total number of wounds" sustained by Moody. Mov. App. 54-55. In Dr. Fierro's view, Berkley "could not have known the exact number of the wounds unless she had seen or been told about [the] autopsy report before she testified." Mov. App. 55.

h. *R. Robert Tressel.* R. Robert Tressel was formerly a homicide officer and a forensic investigator for the Cobb County, Georgia, medical examiner's office. Mov. App. 57. Based on his review of the videotapes and photos of the Moody murder scene, various police reports, the autopsy report, and the trial testimony of persons who either witnessed or investigated Moody's murder, Tressel opined in a sworn declaration that the physical evidence "contradicts the government's [trial] evidence about Mr. Moody's alleged jump through a window and the accuracy of the witnesses who claimed to have observed that jump." Mov. App. 58. As Tressel explains, because only two small panes of glass and one piece of wood trim between those panes were broken, "it would have been physically impossible for an adult male to jump through that window without breaking additional panes of glass and wood trim." Ibid. Tressell also noted that the crime scene photographs show a piece of the window stile and some broken glass on the sidewalk outside the Moody's residence. Based on the distance of

this debris from the residence, Tressel opined that it was "simply not possible" for Moody to have jumped through the window, cover the distance between the building and the sidewalk, and deposit the stile on the sidewalk. Mov. App. 59. In Tressel's view, it was "much more likely" that a flat rock found near the stile was "thrown through the window and caused the stile to travel to the location" where it was found. Ibid. Finally, Tressel noted that there was "no indication that the clothing Mr. Moody was wearing at the time he was killed contained any glass or wood fragments." Ibid. Tressel thus noted his "serious concerns" about the quality of the police department's crime scene investigation that resulted in "a substantial number of items that were apparently never collected and/or never submitted for forensic testing." Ibid.

i. *Alibi Evidence*. Carmella Cooley, who was interviewed by defense counsel prior to trial but not called as a defense witness (see Mov. App. 249),[6] submitted a declaration averring that she and Linwood Chiles accompanied Roane and Reavis to a Howard Johnson hotel and that she and Chiles then left about 15 minutes later. Mov. App, 66. However, Cooley conceded that she could not

---

[6] As the district court noted in connection with Roane's initial Section 2255 action, trial counsel interviewed Cooley, who recalled accompanying Roane and Reavis to the motel on one occasion, but could not recollect the exact date. The court thus stated: "[Trial counsel] Baugh concluded that Cooley's ignorance of the date and her apparent hostility made her a bad defense witness." Ibid.

remember the date of the hotel visit.  <u>Ibid</u>.  So too, convicted co-conspirator Jerry

Gaithers (see JA 5034), submitted an affidavit averring that, although not present

when Moody was murdered, he had been in the Newtowne area a couple of hours

before the murder, but had not seen Roane at that earlier time.  Mov. App. 67-68.

ARGUMENT

ROANE HAS FAILED TO SATISFY THE GATEKEEPING
REQUIREMENTS GOVERNING SECOND OR SUCCESSIVE
PETITIONS UNDER 28 U.S.C. 2255(h) AND 2244(b)(2)

Movant Roane's pre-filing authorization motion ("PFA") for leave to file a

second petition for collateral relief under 28 U.S.C. 2255 is subject to the stringent

"gatekeeping" procedures contained in 28 U.S.C.  2244(b)(2) and 28 U.S.C.

2255(h) (previously Section 2255 para. 8) , which were enacted in their present

form as part of the Antiterrorism and Effective Death Penalty Act of 1996

(AEDPA), Pub. L. No. 104-134, tit VIII, 110 Stat. 1321, 1321-66 (1996).  In order

to prevail on a PFA motion alleging newly-discovered evidence, the movant must

procedurally demonstrate "the existence of facts that could not have been

discovered previously through the exercise of due diligence" and substantively

demonstrate that such newly-discovered evidence, if proven and viewed in light of

the evidence as a whole, would be sufficient to establish by clear and convincing

evidence that no reasonable factfinder would have found the movant guilty of the

26

offense." Section 2244(b)(2)(B); Section 2255(h)(1). *See In re (Billy) Williams*, 330 F.3d 277, 282 (4th Cir. 2003) (*Williams I*). Although Roane need not establish that he will actually succeed on the merits in order to be granted leave to file a second Section 2255 petition, under the "prima facie" standard adopted by this Court, it must "appear[] reasonably likely" from his submissions that he has satisfied each of the AEDPA's substantive and procedural criteria applicable to second or successive Section 2255 petitions. *Williams I*, 330 F.3d at 282. Roane does not satisfy either of these requirements.

A. Roane Has Failed to Demonstrate the Exercise Of "Due Diligence".

The "due diligence" component of Section 2244(b)(2)(B)(i), requires that the movant demonstrate that the factual predicate for his claim was unavailable prior to the filing of his last federal habeas proceeding. *See e.g.*, *In re Williams*, 364 F.3d 235, 238 (4th Cir. 2004) (*Williams II*); *In Re Magwood*, 113 F.3d 1544, 1551 (11th Cir. 1997); The requirement originated in the antecedent decision of the Supreme Court in *McCleskey v. Zant*, 499 U.S. 467 (1991), and was then codified as part of the AEDPA. *See United States v. Winestock*, 340 F.3d 200, 204 (4th Cir. 2003) (discussing genesis of AEDPA limitations). As the *McCleskey* Court explained, this "requirement * * * is based on the principle that the petitioner must conduct a reasonable and diligent investigation aimed at

27

including all relevant claims and grounds for relief in the first federal habeas petition." Id. at 498. *See Williams II*, 364 F.3d at 239-240. Thus, following *McCleskey*, "in evaluating an application under § 2244(b)(2)(B)(i) [the courts] inquire whether a reasonable investigation undertaken before the [previous] habeas motion was litigated would have uncovered the facts the applicant alleges are newly-discovered." *In re Boshears*, 110 F.3d 1538, 1540 (11th Cir. 1997). Accord *Williams II*, 364 F.3d at 239-240 ( because "a prisoner filing a PFA motion must * * * proffer facts that 'could not have been discovered previously,' * * * facts * * * reasonably discoverable at the time of the [last federal proceeding in which the applicant challenged the same criminal judgment] cannot satisfy" the AEDPA's procedural due diligence requirement).

Roane has made no effort to demonstrate why his recently-submitted "new" evidence could not reasonably have been discovered at the time of his initial Section 2255 filing in 1998. Several of the declarants supporting Roane's latest "actual innocence" claim were known to defense counsel as trial witnesses – Gina Taylor (JA 5625); Ronita Hollman (JA 4688); Dr. Marcella Fierro (JA 5168); Jerry Gaithers (JA 5033a); Jeannette Pauley (JA 4125) – and were presumably available to counsel as potential witnesses during Roane's first Section 2255 proceedings. Moreover, the matters addressed by the "newly-discovered" expert

28

declarants – the state of the Moody murder crime scene and the import of Moody's autopsy – pertained to points of contention at trial and likewise should have been reasonably discoverable during the first Section 2255 proceedings. See JA 4563 (testimony regarding the size of the hole in Moody's broken window and whether there was any indication on the night of the murder that someone had jumped through the window); compare JA 4814-4816, with JA 4427, 5292-5294 (conflicting testimony regarding size and width of Moody murder weapon). See *Williams II*, 364 F.3d at 242 (denying petition on due diligence grounds where "Williams was surely aware of these [trial-related] events when they occurred, long before he filed his second PFA motion"). At bottom, the "cause" element of the abuse-of-writ doctrine that informs the AEDPA's current requirements looks to whether "some objective factor external to the defense impeded counsel's efforts to raise the claim," including impediments caused by official interference. *McCleskey*, 499 U.S. at 493-494. In this respect, Roane has presented no evidence tending to demonstrate that the government did (or would have) thwarted post-conviction efforts to develop any of the information upon which he bases his latest "actual innocence" claim. *Cf. In re Boshears*, 110 F.3d at 1541 (finding absence of due diligence where defense counsel had an opportunity to question potential witness, a doctor, about involvement the case and there was no reason to believe

that the doctor would not have responded to questioning).

B. <u>Roane Fails To Demonstrate, By Clear and Convincing Evidence, That No Reasonable Fact-Finder Would Have Convicted Him Based on the Evidence as a Whole</u>.

Roane's failure to demonstrate that he acted with due diligence in uncovering the "newly-discovered" evidence supporting his latest "actual innocence" claim provides this Court with ample basis to deny his motion for a gatekeeping certificate outright. *See Williams II*, 364 F.3d at 242. In any event, Roane fails to satisfy Section 2255(h)(1)'s substantive standards as well.

As a general proposition, in evaluating a PFA application, the courts accept as true the facts underlying the applicant's claim. *See In re Boshears*, 110 F.3d at 1541. Nonetheless, as that court explained (<u>id</u>. at 1541 n.1), "[i]f the record before [the court] conclusively forecloses the existence of the facts underlying the applicant's claim, it would be futile to accept them as true in evaluating the application. Granting the application in such a case would be a mere formality because the district court would dismiss the successive petition, as soon as it read the record." In *Williams I*, 330 F.3d at 283-284, this Court noted that Section 2244(b)(2)(B)(ii) – which essentially parallels the actual innocence component in Section 2255(h)(1) – "substantially incorporates" the test in *Sawyer v. Whitley*, 505 U.S. 333, 336 (1992), for assessing claims of actual innocence. As this Court

in *Williams I* explained:

> The petitioner in *Sawyer* attempted to satisfy the applicable standard by offering several pieces of new evidence, two of which are relevant here. The first was evidence tending to undermine the credibility of a key prosecution witness. The Supreme Court stated that "[t]his sort of latter-day evidence brought forward to impeach a prosecution witness will seldom, if ever, make a clear and convincing showing that no reasonable juror would have believed the heart of [the witness'] account of petitioner's actions." * * * The second piece of evidence was a statement by a child who witnessed the murder of which Sawyer was convicted; although the child claimed that Sawyer had tried to prevent the killing, the Court concluded that this evidence was not compelling in light of other evidence demonstrating that Sawyer willingly participated in the crime.

330 F.3d at 283-284 (internal citation omitted). Applying that same reasoning, this Court in *Williams I* denied a PFA motion where new evidence that one eyewitness had recanted "d[id] not clearly and convincingly outweigh the unimpeached * * * testimony [of a second eyewitness]." Id. at 284. *See also*, *Williams II*, 364 F.3d at 242-243 (denying a PFA motion for similar reasons); *Keith v. Bobby*, 551 F.3d 555, 558-559 (6th Cir. 2009) (PFA motion denied where new evidence (1) that another person had motive to kill the victim, and (2) that an eyewitness' original identification of the defendant may have been suggestive, as the new evidence merely "introduce[d] doubt" and made the eyewitness "marginally less credible," but did not negate evidence that "strongly supports guilt").

31

Moreover, by its plain text, Section 2255(h)(1) requires that the new evidence of actual innocence be assessed "in light of the evidence as a whole." While that assessment might be practically difficult in many cases (*see Williams I*, 330 F.3d at 282, n. 2), this Court has twice before reviewed the facts of this case in detail, particularly focusing on the circumstances surrounding the Moody murder, and the district court has previously rejected on the merits an "actual innocence" claim that replicated the instant claim in important respects. This Court should not ignore that significant exposure to the record in assessing Roane's instant motion.

The linchpin of Roane's latest "actual innocence" claim is Gina Taylor's declaration that, contrary to her trial testimony disavowing an ability to identify the perpetrator (JA 5631, 5636), she in fact recognized "Little Keith" Barley as Moody's murderer and that Barler purportedly killed Moody because of an outstanding drug debt. Mov. App. 11-12. There is less to Taylor's identification of Barley as the killer than meets the eye, however. In the first place, Taylor gave a physical description of the assailant at trial that was similar to Barley's small physique and dissimilar to Roane's larger physique and unequivocally stated that Roane, whom she knew from the neighborhood, was not the killer. JA 5630-5631, 5636. Moreover, Detective Steve Dalton testified that Barley was an early suspect

in light of evidence gathered during the investigation indicating that a person named "Keith" was searching for Moody shortly before he was killed. JA 5652-5656, 5659-5660. Hence, there was evidence at trial from which the jury could have concluded that someone other than Roane killed Moody.[7] Indeed, this Court previously characterized this evidence as constituting "a strong misidentification defense." Mov. App. 287. Nonetheless, the jury rejected that "strong misidentification defense" in light of the government's far stronger evidence of Roane's guilt. The district court similarly rejected Roane's earlier "actual innocence" claim that was based both upon this "strong misidentification" evidence and a "thin" but "tenable" alibi defense, finding that such evidence collectively was "not sufficiently compelling to preclude many a reasonable juror from finding Roane guilty of murdering Moody in light of the formidable direct and circumstantial evidence of Roane's guilt," including the "credible" and "corroborated" testimony of Berkley and Davis and the "particularly compelling"

---

[7] In essence, Taylor's current iteration of her story is identical to what she testified to at trial with the additional element that she now names the person she contends killed Moody. That additional fact is of little import because from the standpoint of establishing Roane's innocence of the crime, the defense only needed to create reasonable doubt that Roane committed the murder, and if the jury was unpersuaded of his non-involvement having heard Taylor testify that someone other than Roane killed Moody, it is highly unlikely that the jury would have reached a different conclusion had Taylor named Barley as the assailant. Taylor's affidavit thus adds nothing to her trial testimony.

testimony of "Pepsi" Greene.  Mov. App. 248, 256-257.[8]  Against this background,

there is simply no basis to conclude that, had Taylor specifically identified Barley

as the murderer at trial, no reasonable juror would have found Roane guilty of

Moody's murder.

That is particularly true in view of the shortcomings inherent in Taylor's

present declaration.  Taylor's identification of a now-deceased individual as the

alleged perpetrator of a long-ago-committed crime is highly suspect.  See *Herrera*

*v. Collins*, 506 U.S. 390, 417-419 (1993).  So too, Taylor's declaration does

nothing to cure the damage done to her credibility by her admission at trial that

"she had 'kind of' dated Tipton" and her "evasive manner on cross-examination."

Mov. App. 248 (district court findings).  Finally, Taylor's declaration fails to

account for evidence showing that Moody was shot by Tipton shortly before being

stabbed to death; that Moody's murder was part of a concerted plan by Roane,

Tipton, and Johnson to take over the crack cocaine trade in the Newtowne area;

that Roane retrieved a gun from "Papoose" Davis a day or two before Moody's

---

[8] Roane argues (Motion 4) that the Court may not make adverse credibility determinations in ruling on his PFA motion; however, the district court made express credibility determinations regarding the government's principal witnesses to the Moody murder in rejecting Roane's previous "actual innocence" claim. There is no reason to disregard those court-made credibility determinations in assessing Roane's successive "actual innocence" claim.

murder and went with Tipton to Davis' house immediately after the murder, where the two made damaging admissions;  and that Roane both  participated in other related murders for the purpose of controlling the Newtowne drug trade (including the murder of Moody's associate, Peyton Maurice Johnson, the night after the Moody murder) and purchased the firearms used in those murders.[9]  "[V]iewed in the light of the evidence as a whole," Taylor's present declaration falls far short of a prima facie showing of clear and convincing evidence of Roane's actual innocence.

Nor do the remainder of Roane's submissions warrant a different conclusion.  For example, the declarations of Lloyd McDaniels (Mov. App. 13-14) and Willie Coley (Mov. App. 15-17) that Barley admitted to them that he murdered Moody because of an outstanding drug debt are not only non-specific and conclusory in content, but are subject to the substantial skepticism that properly adheres to "newly-discovered" evidence that implicates a deceased person in long-ago- committed criminal activity.  Likewise, the various declarations averring that Barley had a reputation as a violent drug dealer or that

_____

[9]  We note that Taylor's declaration is also at odds with the hearing testimony of purported eyewitness Demetrius Rowe that was presented in support of Roane's pervious "actual innocence" claim.  Rowe implicated Johnson, Tipton and an unidentified third male who was not Roane in the fatal attack on Moody. See Mov. App. 251 (district court findings).  She did not implicate Barley.

Moody, Berkley, and "Pepsi" Greene were drug addicts are not the kind of evidence that can ever satisfy Section 2255(h)(1)'s stringent standard. *See Williams I*, 330 F.3d at 283-284; *Keith v. Bobby*, 551 F.3d at 558-559. Finally, although she does not acknowledge it, Ronita Hollman's declaration that Moody did not work for Peyton Maurice Johnson (Mov. App. 21-22) directly contradicts her trial testimony. On Hollman's cross-examination by Roane's trial counsel, the following exchange occurred:

Q. Ma'am, with respect to Douglas Moody, what was his relationship to Peyton Johnson; did he work for Peyton Johnson?

A. At one time he did.

Q. And what was he, as far as his duties, what was he doing for Peyton Johnson?

A. Well, selling drugs.

Q. Selling drugs?

A. Yes.

Q. Crack cocaine?

A. Yes.

JA 4722. And, contrary to her present declaration (Mov. App. 21-22) that "Little Keith" Barley was a violent drug dealer, Hollman denied at trial that "Little Keith"

sold drugs at all. JA 4718.[10] In short, when viewed in light of the evidence as a whole, her declaration hardly constitutes clear and convincing evidence that Moody's murder was unrelated to Roane's and his partners' efforts to control the Newtowne drug trade, particularly as it was the partners' perception of Moody's drug-related activities that counted.

As we have already noted, in rejecting Roane's previous "actual innocence" claim, the district court expressly found that the testimony of the government's three principal witnesses to Moody's murder was "credible" and "corroborated by the physical evidence of murder including the autopsy and the crime scene video" and that "Pepsi" Greene's testimony "was and remains particularly compelling." Mov. App. 248. Those determinations are not negated by the declarations of Dr. Fierro (Mov. App. 52-55)or forensic investigator Tressel (Mov. App. 57-60). Dr. Fierro avers that Berkley's testimony about Moody's stabbing was at odds with the evidence or incredible in two respects: although Berkley testified that Roane

---

[10] Q. Did a gentleman by the name of "Little Keith" * * * sell drugs?

A. No.

Q. "Little Keith" did not sell drugs?

A. No.

Ibid.

and Moody were standing face-to-face when the assault began, Dr. Fierro opined

that Moody's knife wounds to the back were unlikely to have been inflicted in "a

face to face combat situation" and that Berkley could not possibly have known

that Moody sustained 18 or 19 stab wounds, as Dr. Fierro was able to count that

many wounds only after a lengthy examination of Moody's body.

Berkley did not testify, however, that Roane and Moody were face-to-face

during the entirety of the attack:

> Q. When Doug Moody was getting stabbed was he lying down or
> standing up?
>
> A. At first he was standing up.
>
> Q. All right. <u>Is it your testimony that James Roane sat on his chest and
> stabbed him?</u>
>
> A. <u>No, it wasn't my testimony</u>.
>
> Q. All right. How was James Roane , according to your testimony, how
> was his body situated while he was stabbing him?
>
> A. He was standing in front of him.
>
> Q. When he fell down, did James Roane continue to stab him?
>
> A. I think so.

JA 4489-4490 (emphasis added). Berkley's testimony that the knife assault began

while both men were standing and facing one another is corroborated by the fact

that Moody – according to Dr. Fierro's trial testimony (JA 4803) – sustained stab wounds to the forehead, neck, and chest, as well as "cuts to the hand, which would be characterized as defensive-type cuts." Berkley did not describe the relative positions of Roane and Moody once Moody fell to the ground, but denied that Roane sat on Moody's chest once Moody fell to the ground; rather, she merely testified that the knife attack continued after Moody was on the ground. Berkley's testimony in this regard is hardly inconsistent with Dr. Fierro's belief that Moody's back wounds were likely struck from behind. So too, Berkley's testimony about the number of times Moody was stabbed was "based upon [her] own observations" as to "how many times [she] * * * saw James Roane stab Doug Moody." JA 4427. That estimate required only a counting of the number of knife thrusts she observed; it did not depend upon a post-mortem examination of a body to count puncture wounds, such as the examination Dr. Fierro undertook. In short, apart from raw speculation on Dr. Fierro's part, there is nothing in Berkley's account of Moody's stabbing to suggest that it was based on her access to the autopsy report, rather than on her own observations while the murder was being committed, or that Berkley's testimony lacked credibility because her prescient

observations were consistent with the conclusion in the autopsy report.[11]  Finally, Dr. Fierro states that the actual sizes of the multiple knife wounds found on Moody's body were inconsistent with the descriptions given of the murder weapon by both Berkley and "Pepsi" Greene.  That discrepancy, which was explored at trial (compare JA 4814-4816, with JA 4427, 5292-5294 (conflicting testimony regarding size and width of Moody murder weapon)) did not cause the jury to reject Berkley's and "Pepsi" Greene's testimony regarding Moody's murder, and, as a matter affecting only witness credibility, does not serve as a basis for issuing a gatekeeping certificate under Section 2255(h)(1)'s rigorous substantive standards. *See Sawyer v. Whitley*, 505 U.S. at 349; *Keith v. Bobby*, 551 F.3d at 558-559.

Forensic investigator Tressel's declaration warrants the same conclusion.  Although Tressel found it implausible that Moody could have escaped from his apartment by jumping through a window, neither Berkley nor "Pepsi" Greene testified that they actually saw Moody jump through the window of his apartment.  Rather, Berkley testified that she and friends were smoking crack cocaine in another apartment in the same building in which Moody's

---

[11]  Dr. Fierro's recent declaration is troubling in that it suggests that an eyewitness is lying simply because the eyewitness' testimony is consistent with the medical examiner's findings.  It is more often the case that an eyewitness is accused of lying when his or her testimony is inconsistent with the forensic evidence.

apartment was located when she "heard a loud bang" that "[s]ounded like a gun or something" emanating from the rear apartment in the building.  JA 4424-4425.  As the examination of Berkley continued:

Q.  After you heard that shot, what occurred next?

A. We heard a window break.

Q.  Where did the sound of that window breaking come from?

A.  From the back of the house or the apartment.

Q.  Would that have been in the same location that you heard what you thought to be a shot?

A.  Yes.

Q.  What did you do in response to that?

A.  We thought it was the police, so we started gathering up the stuff and throwing it away.

Q.  Then what did you do?

A.  Then me and "Mousey" [Armstrong] * * * went outside.

Q.  What did you start gathering up to throw away?

A.  Gathering the crack cocaine.

Q.  When you got outside, where were you and "Mousey"?

A.  We was on the sidewalk.

Q. And what did you see when you got outside?

A. Doug Moody hollering and screaming, telling "J.R." [Roane] to stop, leave him alone.

JA 4426-4427. So too, while "Pepsi" Greene testified that Moody "jumped out the window" (JA 5273), she clarified that she had not seen Moody jump out the window, but had only been told by Curt Thorne that Moody did so (JA 5294). No matter how Moody escape from his apartment,[12] the fact remains – and is in no way controverted by Tressel's declaration – that Moody was shot inside his apartment; that an apartment window was then broken out; and that Moody was thereafter next seen by Berkley and "Pepsi" Greene on the porch or in the yard being accosted by Roane. And, while Tressel complains that "there is no indication that the clothing Mr. Moody was wearing at the time he was killed contained any of the glass or wood fragments which likely would have been present had he actually jumped through the broken window" (Mov. App. 59), there is likewise no indication that Moody's clothing did not contain glass or wood fragments. Quite simply, investigating officers did not inspect Moody's shoes or clothing for glass fragments, as they were unaware on the night of the murder that anyone might have jumped from the window of Moody's apartment. JA 4562-

---

[12] Although the opening created by the broken window panes was relatively small – approximately 12 by 18 inches in size (JA 4563) – Dr. Fierro testified at trial that Moody was only "five-foot-six-inches tall, and 160 pounds" at the time of his death. JA 4805.

4563. That Tressel now believes that the investigating officers were deficient in collecting and testing items found at the crime scene is not an adequate reason under Section 2255(h)(1) to authorize the filing of a second Section 2255 petition.

In sum, even when taken at face value and viewed in light of the evidence as a whole, it is apparent that Roane has fallen far short of clearly and convincingly demonstrating that no reasonable juror would have convicted him on the Moody murder count. In such circumstances, Roane's PFA motion should be denied.

C. The Timeliness of Roane's Latest "Actual Innocence" Claim Is Not Irrevant.

Movant Roane spends more time arguing about why this Court should not consider the timeliness of the claims raised in his PFA motion than he does in showing why he meets the stringent gatekeeping requirements in Sections 2255(h)(1) and 2244(b)(2)(B). But timeliness is hardly irrelevant, as the concept of newly-discovered evidence has an inherent due diligence component, and Section 2255(h)(1) expressly incorporates the procedural requirements in Section 2244(b)(2) governing motions for leave to file second or successive petitions, which includes a specific due diligence requirement when an actual innocence claim is based on the existence of newly-discovered evidence. As we argue above, Roane has failed to demonstrate that he acted with due diligence in locating the

"newly-discovered" evidence upon which his latest "actual innocence" claim rests. But beyond, the AEDPA contains a stringent one-year time limitation on the filing of all Section 2255 actions, with one of the triggering events being "the date on which the facts supporting the claim or claims presented could have been discovered through the exercise of due diligence."  28 U.S.C. 2255(f)(4).  Thus, the diligence with which Roane developed (or could have discovered) the facts supporting his latest "actual innocence" claim is relevant both to consideration of his gateway application and to his underlying claim as well.

Even assuming that Roane can survive the due diligence component of the gateway inquiry, there is a substantial question whether he can possibly satisfy the one-year time limitation contained in Section 2255(f)(4).  Two of the declarations submitted by Roane in connection with his present "actual innocence" claim were prepared more than a year before his instant PFA motion was filed (See Mov. App. 18-19 (Richard Coles), 20 ((Aimee Coley)), and most others – including Gina Taylor's declaration (JA 11-12) – were executed nearly a year before the instant PFA motion, raising serious concerns that "the date on which the facts supporting the claim * * * presented could have been discovered" was beyond the limitation period permitted by Section 2255(f)(4).

Although Roane maintains that this Court may not consider the applicability

of any limitations bar at this juncture, even if obvious, and that limitation bars are inapplicable in any event in capital cases involving claims of actual innocence (Mov. App. 8-11), we note that the AEDPA's time limitations are both strict and equally applicable to capital and non-capital cases alike. *See Rouse v. Lee*, 339 238, 251 (4th Cir. 2003) (en banc) (noting that no special equitable tolling rules apply based on a petitioner's "underlying claim or sentence" and that "[t]he doctrine of equitable tolling is not a license to suspend enactments of Congress whenever [courts] happen to believe that enforcement of a limitation period would create a hardship"). We have addressed the matter of limitation periods and equitable tolling more fully in our companion response to the brief filed by Roane's amicus litigants and do not belabor those points here. Nor do we believe that the Court need reach the statute of limitations issue or any related equitable tolling issues to dispose of the instant PFA motion. But, Roane to the contrary, his diligence in pursuing his instant "actual innocence" claim is a very relevant inquiry under the AEDPA's procedural requirements applicable to asserted claims grounded on "newly discovered" evidence of actual innocence.

CONCLUSION

For the foregoing reasons, movant Roane's motion for leave to file a second Section 2255 petition should be denied.

Respectfully submitted.

DANA J. BOENTE
UNITED STATES ATTORNEY

By: _____s/_____
G. Wingate Grant
Virginia Bar Number 18643
Attorney for the United States
United States Attorney's Office
600 East Main Street, Suite 1800
Richmond, Virginia 23219-2447
Telephone - 804-819-5500
FAX - 804-771-2316
wingate.grant@usdoj.gov

ROBERT J. ERICKSON
Criminal Division/Appellate Section
U.S. Department of Justice
950 Pennsylvania Ave., N.W.
Room 1264
Washington, D.C.  20530
Telephone - 202 514-2841
Robert.erickson@usdoj.gov

## CERTIFICATE OF SERVICE

I hereby certify that on September 10, 2009, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF System, which will send notice of such filing to the following CM/ECF users:

Billy H. Nolas, Esq.
Email: *william_nolas@fd.org*
Shawn Nolan, Esq.
Angela Elleman, Esq.
Email: *angela_elleman@fd.org*
Assistant Federal Defenders
Federal Community Defender Office
for the Eastern District of Pennsylvania
Suite 545 West - The Curtis Center
601 Walnut Street
Philadelphia, Pennsylvania 19106
(215) 928-0520

Paul F. Enzinna, Esq.
Baker Botts, LLP
1299 Pennsylvania Avenue, NW
Washington, D.C. 20004
(202) 639-7752
Email: *paul.enzinna@bakerbotts.com*

Charles B. Wayne
DLA Piper, LLP
500 8th Street, N.W.
Washington, D.C. 20004
charles.wayne@dlapiper.com

_____/s/_____
G. Wingate Grant
Assistant United States Attorney