No. 09-8

IN THE UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

FILED
SEP 09 2009
U.S. Court of Appeals
4th Circuit

---

UNITED STATES OF AMERICA,

v.

JAMES H. ROANE, JR.

Movant

---

**GOVERNMENT'S APPENDIX**

---

DANA J. BOENTE
United States Attorney
Eastern District of Virginia

G. WINGATE GRANT
Assistant U.S. Attorney
Eastern District of Virginia

ROBERT J. ERICKSON
Attorney
Department of Justice
Washington, D.C. 20530

## INDEX


**Page**

Demetruis Row .......... 2178x

Denise Berkley .......... 4399

Det. Paul Tuttle .......... 4549

Robert Davis .......... 4623

Ronita Hollman .......... 4689

Dr. Marcella Fierro .......... 4799

Priscella "Pepsi" Greene .......... 5272

Gina Taylor .......... 5625

Det. Steve Dalton .......... 5652

Rowe.

DEMETRIUS ROWE,

called as a witness by and on behalf of the Petitioner, having been first duly sworn by the Clerk, was examined and testified as follows:

DIRECT EXAMINATION

BY MR. ENZINNA:

Q Ms. Rowe, would you please state your name for the record?

A Demetrius Lavonne Rowe.

Q Where do you live?

A 508 North 33rd Street.

Q In Richmond?

A Richmond, Virginia.

Q How old are you?

A 34.

Q I want to take you back to January of 1992, roughly ten years ago. Did you witness a murder at the corner of Clay and Harrison Streets in January of 1992?

A Yes, I did.

Q Who was murdered?

A Douglas Moody.

Q I'd like to show you what is Government Exhibit 17-1 from the trial of this case.

(Document proffered to witness.)

MR. ENZINNA: May I approach the witness?

THE COURT: Go ahead.

BY MR. ENZINNA:

Q This is an aerial photograph. You will see that the streets are labeled here, Clay Street, Catherine Street, Harrison Street.

A Yes.

Q Can you show me on that photograph and show the Court where you were that night?

A That night I was standing on Harrison Street. I was standing -- this is some type of Virginia Power plant. I was standing on the porch across the street from where Doug -- by the alley where Doug was murdered.

Q So basically there is a white house next to that alley, correct?

A Yes.

Q And were you directly across the street from the white house?

A Yes, standing right on the porch.

Q Okay, thank you. And when were you standing there?

A Let me see. Well, I can't exactly give you the exact time, but I know it was between the hours of

eight to like 9:30, then I left and came back, and it was around about ten to after.

Q What were you doing there?

A Well, a friend of mine, we were drinking. And we just happened to leave where we were at to go drink alone, and we just walked, used to walk around. So the porch we sat in because no one lived there.

Q The house was empty?

A Yes, it was vacant at the time.

Q And tell me what you saw in the house across the street.

A Well, like I said, I had been drinking and --

Q How much had you been drinking?

A Well, through the course of the day I had been drinking for like several hours before, drinking like pints of gin or whatever. I was kind of high, but I was still -- my vision, I still was able to see what I witnessed.

Q What did you see?

A Me and Charles, we was sitting on the porch and I heard at the house where Doug had came out, I heard something that sounded like somebody was fighting inside. They were loud, like hollering. So I stood up. I said, "What's going on over there?" So the next thing I know, Doug and -- Doug is coming out the

door. It is like he is struggling. It is like whoever he is in the house with, they are fighting and he is trying to get out. So I see Doug come out and I see a guy like on him, but they are still struggling. So at that time --

Q Where were they struggling?

A They was outside the gate then. They was -- they were struggling coming out.

Q Coming out of the house?

A Coming out of the house. And at that time I got up. I'm like "Let me go there," because I could see at that time that Doug had really been messed up. At that time, I don't know exactly what happened or whatever, but I know that I could hear in the house it was like they were fighting. They was loud, like something had broke or something. They were struggling and -- he was struggling trying to get out the door.

Q How many people did you see come out of the house?

A Okay, at that time I saw Curt, Pepsi, and I saw, the guy that was on him, like I told you, I knew it wasn't James.

Q You knew James Roane?

A Yes, sir. I knew it wasn't James because of his

skin. James is about like I am.

Q And this person was what?

A He was light-skinned. So the guy that was kind of struggling with him, I figured it was over because it wasn't James because I knew James's figure. Because they always wore hoods. And I knew James because James, well, like now he is bigger. But back then "O" was always thicker. So I told Charles, I said, "I'm gone. That looks like "O" over there. What they doing with him?" At the time they said that Doug had been shot. This is what I heard, that he had been shot or whatever. I said, "I didn't hear no gunshots." If he had, I didn't hear it. But I know earlier that day I saw who was going in and out of the house. And although I wasn't sitting on the porch the whole time, from where I was standing on the corner I could see because it was a drug house. People were going in and out. And James never went over there.

Q That's what I wanted to ask you. You said you knew James Roane. Had you seen him at all that evening?

A The first time I saw James was on -- I saw Sandra Reavis. And I said, "Sandra, could you come here for a moment?" Because I wanted to ask her

could I borrow some money. She said, "Hold on, wait a minute." She said, "I'm getting ready to go out, we be getting ready to go out to the buffet and eat. You got to come with us, girl, because they have got some good food at Golden Corral." I said, "What?" "Me and James." I said, "You old enough to be James's mama. What you going out with him for?" She said they was going to the hotel. She walked down by the store. Now I'm standing on Catherine and Harrison Street. So I waited for her to come back. But when I see her come back with James, I forgot about asking for the money. That's the first time I saw James at that time.

Q What time was that?

A This had to have been, I don't know, like I say, at this time it was 8:30.

Q Did you see James and Sandra leave the area?

A Yes, I did.

Q Now, when you saw the murder occur, you saw this struggle in the alley across the street, did you see a woman come out of the house across the street?

A A woman?

Q A woman.

A Okay, as the struggle, as they came out, Pepsi, like I told you before, Pepsi and Curt came out. I

saw them two come out. Yes, I saw a woman come out. It was Pepsi.

Q Did you see a woman come out and try to help Doug Moody?

A Oh, yes, I did. By that time, like I said, I walked down because the way the commotion was, I knew that the police and the ambulance was coming. So I didn't want to be around because I had been drinking and I had liquor in my hand. So the girl, Gina, the alley is right here, and this where Doug came out. Her house is right here. I saw her come out. She came out. And the way her porch is, you can stand -- there is no railing or nothing, so she was standing like this looking. And she said, "Hmm, that's a damn shame. They got the man selling drugs, they going to kill him." I heard her say that. Because she was like kind of nervous and she was like scared because it was going on on the side of her house, the way she had came out. So after that I just went on.

Q Were you ever interviewed by the police about the murder?

A No.

Q Were you ever interviewed by a lawyer for James other than myself?

A What you mean, recently, or ten years ago?

Q I mean ten years ago.

A No.

MR. ENZINNA: Your Honor, nothing further.

THE COURT: All right. Cross?

CROSS-EXAMINATION

BY MR. GRANT:

Q Ms. Rowe, how many people did you see come out of the house when Doug Moody came out of the house in some distressed condition?

A I saw Doug and Pepsi and -- Doug, Pepsi, "O," Whitey, and there was another fellow.

Q And you couldn't --

A So that's five people.

Q You could not identify who the last person was, the third man; is that what you are saying?

A The third man?

Q Right.

A No, I can't identify. But I know it wasn't James because of the way that he was built. I knew it wasn't James.

Q Well --

A Because like I say, when Doug came out, it was "O" that was on him, that was struggling with him. Whitey had came out. I knew that -- because they always wore hoods. The third guy didn't have -- he

didn't have a hood on, but he had on, you know, like a sweatshirt or whatever. But Pepsi, Curt, and this fellow, and Whitey, they all came out. But at the time, "O" was still struggling with Doug. I guess they was coming out of the house. They already knew that the police was coming.

Q When did you leave the scene? What was happening at the time that you left? Was Doug Moody already on the ground?

A What was happening? Yes. As I was walking, I was standing walking and looking like this down the street real slow, and I see Doug on the side. I see the guy that's on him, it was "O", after Doug is on the ground. He just get up and walked away. Evidently, Gina had to have been standing at -- peeping out of her window or peeping out of the door, because as soon as he walked away from Doug, she opened her door and came out.

Q Did she have anything in her hand when she came out, Ms. Taylor?

A Oh, I can't remember.

Q Did you see a knife that she may have used?

A In her hand?

Q Yes, ma'am. That she may have tried to use to cut the clothes off of Doug Moody?

A Oh, no. I don't remember that.
Q Do you remember seeing that?
A Seeing her cut the clothes?
Q Yes, ma'am.
A No. But I remember when she was standing on the porch, I know that I found out later what I know now, that she does some type of nursing. And she did come off her porch. But whether she cut -- took a knife and cut his shirt, I don't know.
Q Did you see Denise Berkeley in the area the night Doug Moody was killed?
A Denise?
Q Do you know Denise Berkeley?
A No, I didn't see her.
Q Do you know who she is, though?
A Yes.
Q But you did see Pepsi Greene come out of the house after Moody came out struggling with three other people?
A Yes, sir.
Q Do you remember talking to me and Detective Leonard over at your house back on May 5th, a little over a month ago?
A Yes, I do.
Q Do you remember telling us that you didn't know

who the third person was, and that it could have been James Roane but you just did not know who the third person was that came out of the house with Doug Moody?

A You asked me at the house, you said -- these were your exact words -- you said, "Okay, you say that the third person wasn't James Roane." I said, "No, it wasn't James. I saw James leave." You said, "Well, is there any possible way that James could have backtracked?" I said, "Well, if he did, I didn't see him." But I told you the third person was not James. That's what I told you.

Q You said to me that --

A I said, "It is possible." No, you said, "Is it possible that James could have backtracked without you knowing?" And I told you that it is possible because anybody can leave and come back. But I never said -- yes, I said, after you kept asking me, I said, "Yeah, he could have backtracked," but I never said that it could have been James.

Q Well, didn't you tell me and Detective Leonard that the reason you said in your affidavit that we showed you, the reason you said why James Roane was not there at the time was because you had seen him leave earlier in the evening and that was what you

based that conclusion on; isn't that correct?

A Yes.

Q And then I asked you, "Well, if you said the reason for your belief that he was not there around midnight was that you had seen him leave earlier, isn't it possible that he could have come back in that three or four-hour period?" Isn't that what I asked you?

A Yes.

Q And you said, "Yes, it is possible he could have come back."

A Yes. I said that was possible after you kept saying -- I said, "I don't know if they came back or not." You said, "Well, I'll asking you again: Is it possible, was it possible that James just could have left and came back without you knowing?" I kept telling you "I don't know if they came back or not. And yes, it is possible." I said, "If they did -- if he did come back he is a good one because he would have had to come in the side door because there is only one way in and one way out."

Q But you did leave the area, you just testified, for some period of time. You were not in sight of the house that Moody was attacked in for how long, an hour or two?

A Well, I was in sight because there is a nip joint right here, and there is one right at the alley. But the time that I went to the nip joint that was on Catherine Street was like right after I saw James and Sandra, you know, leave.

Q And you were gone for some period of time. You were inside the nip joint for some period of time; is that correct?

A Maybe 15 minutes.

Q Do you know an individual named Keith Barley or Little Keith?

A Yes.

Q Did you see Little Keith Barley in the area on the night that Doug Moody was killed?

A No, I didn't see Keith.

Q How long had you known Little Keith Barley?

A Ever since he was three years of age, which would have been maybe about like 17 years.

Q Did you know Douglas Moody before he died?

A Yes, I knew Doug.

Q Do you know whether Doug Moody was selling drugs, crack cocaine?

A Now, like I told you, I did not know that Doug was affiliated with Whitey and "O" and James and the other people, but I knew that Doug was a heavy drug

user.

MR. GRANT: May I have just a moment, Your Honor?

THE COURT: Sure.

(Counsel conferring with co-counsel.)

MR. GRANT: That's all we have of this witness, Your Honor.

THE COURT: All right. Any redirect?

MR. ENZINNA: No, sir.

THE COURT: All right. I have a couple questions.

BY THE COURT:

Q Ms. Rowe, you say Mr. Roane and Ms. Reavis left; you saw them leave the area. How was that? Were they in a car, walking?

A Like I said, it has been ten years ago. If I am not mistaken, like I said, a cab had came and I saw James and Sandra get in the cab.

Q All right.

THE COURT: Anything based on that?

MR. ENZINNA: Your Honor?

THE COURT: Go ahead.

REDIRECT EXAMINATION

BY MR. ENZINNA:

Q Ms. Rowe, had you ever seen Mr. Roane and Ms.

Reavis ride in a cab on other nights besides that night?

A Yes. That was a routine for them. Basically, every weekend, twice a week. Because Sandra lived -- the apartment that I was staying at, she lived in the second duplex down. She would call a cab and James would come meet her. Yes, I've seen them leave several times.

Q So they rode in cabs pretty often?

A Yes.

Q Not always?

A Yes, every time I saw them leave, when I saw them leave I have seen them leave in a cab, like three or four times.

Q Did you ever see them walking around the neighborhood?

A Yes.

Q Did you ever see them riding in another car?

A Several cars. I have seen them ride in a guy named, this is a nickname, a guy named Dick's car, Linwood. He dead now.

Q Is Linwood Linwood Chiles?

A Yes. That was his name. Linwood. And there was another guy, but -- Talley. They used to ride with him.

MR. ENZINNA: Nothing further, Your Honor.

THE COURT: All right. Anything based on that?

MR. GRANT: No, sir.

THE COURT: Thank you, ma'am. You may stand down.

(Witness stood aside.)

Call your next witness, please.

MR. ENZINNA: We call Detective Dalton, please.

STEVE A. DALTON,

called as a witness by and on behalf of the Petitioner, having been first duly sworn by the Clerk, was examined and testified as follows:

DIRECT EXAMINATION

BY MR. ENZINNA:

Q Good morning.

A Good morning.

Q Would you please state your name for the record?

A Steve A. Dalton.

Q And in 1992, were you employed by the Richmond Police Department?

A Yes, sir, I was.

Q What was your position then?

A It was a couple days before Thanksgiving.

Q Of 1991?

A 1991.

Q Did you continue your association with them after that time?

A Yes.

Q Tell the ladies and gentlemen of the jury what your continued association with them was.

A I was to clean up the house for them, go make groceries, and do little odd things, watch out for them and stuff like that.

Q When you say "them," who do you mean?

A "J.R.," "O," "Whitey."

Q All right. Where did you live at that time?

A I was staying with "Pea Sue" and them, but then I moved up to the house on Norton Street.

Q Who was living in that house?

A It was "Whitey," "O," "J.R."

Q What were you given in return for cleaning that house and doing the odd jobs that you testified about?

A Crack cocaine.

Q How often would you be given crack cocaine?

A Every day.

Q How many times a day?

A About four or five times.

Q Is that --

A Maybe more.

Q You have testified about your drug use. Is that where you got the drugs that resulted in your drug use?

A Yes.

Q There came a time in February of 1992 -- let me withdraw that. Do you know an individual by the name of Dorothy "Mousey" Armstrong?

A Yes, I do.

Q How do you know her?

A Because we used to hang together.

Q Did there come a time in February of 1992 that you came to find out that she had been murdered?

A Yes.

Q Were you at that point, when you found out that Dorothy Armstrong, "Mousey," had been murdered, were you still involved with "J.R.," "Whitey," "C.O."?

A Yes, I was.

Q Were you still doing the same things you have testified to?

A Yes.

Q Where were you living at that point?

A I was staying on the street, on Norton Street,

Q Could you tell the ladies and gentlemen of the jury where you were at the time just prior to Doug Moody's killing?
A I was at the house on the corner of Clay and Harrison.
Q Whose house was that?
A It was Albert Walters' house.
MR. BAUGH: I didn't hear the name.
THE WITNESS: Albert Walters.
BY MR. VICK:
Q Who were you there to see?
A Me and "Mousey" went to see -- I forgot his name.
Q What occurred while you were there?
A We had went in and we had sat around and we had just started smoking crack cocaine.
Q And who was sitting with you?
A It was me and "Mousey," the guy, and some other girl.
Q Did there come a time when something happened after you had been in there for awhile?
A Yes. We heard a loud bang.
Q What did it sound like to you?
A Sounded like a gun or something.
Q All right. Where did that noise come from?

A From the back of the house.
Q Where in the back?
A It is a house -- it is another apartment in the back.
Q I'm going to show you what has been previously marked Government Exhibits 9-1, 9-2, 9-6, and 9-7.
(Photographs proffered to counsel and to witness.)
BY MR. VICK:
Q I ask you to look at those photographs and see if you can identify them.
A Yes. This is the house.
Q What number is on that picture?
A 9-1.
Q And what house is that?
A This is the house, in the back of the house that we was at on Harrison and Clay.
Q The next picture?
A This is the back door of the first house that we was in.
Q What number is on that picture?
A 9-2.
Q All right. The next picture?
A This is the alley between the house, the back of the house that we was at.

Q And what number is on that picture?
A 9-6.
Q The next picture?
A This is the back of the house.
Q What number is on that picture?
A 9-7.
Q Do those pictures depict the location you were at the evening Doug Moody was killed?
A Yes, they do.

MR. VICK: I would move those exhibits into evidence.

THE COURT: They will be admitted.

BY MR. VICK:

Q After you heard that shot, what occurred next? Or what sounded like a shot. What occurred next?
A We heard a window break.
Q Where did the sound of that window breaking come from?
A From the back of the house or the apartment.
Q Would that have been in the same location that you heard what you thought to be a shot?
A Yes.
Q What did you do in response to that?
A We thought it was the police, so we started gathering up the stuff and throwing it away.

Q Then what did you do?
A Then me and "Mousey" and the rest of us, mostly me and "Mousey," went outside.
Q What did you start gathering up to throw away?
A Gathering the crack cocaine.
Q When you got outside, where were you and "Mousey"?
A We was on the sidewalk.
Q And what did you see when you got outside?
A Doug Moody hollering and screaming, telling "J.R." to stop, leave him alone.
Q And where was "J.R."?
A "J.R." was -- he was standing near Doug Moody.
Q And what was he doing?
A He started stabbing him.
Q Did you see what he was stabbing him with?
A It looked like a butcher knife.
Q Could you tell the ladies and gentlemen of the jury based upon your own observation that evening approximately how many times you think you saw James Roane stab Doug Moody?
A Between 18 and 19 times.
Q When you say "J.R.," did you indeed mean the James Roane you identified earlier?
A Yes.

Q What did you do when you saw that?
A I just stood there and looked.
Q What was Doug Moody saying, if anything?
A He was trying to get away, he was telling him to leave him alone.
Q Did he call a name when he said that?
A He was hollering "J.R., please leave me alone."
Q Who was present with you?
A "Mousey," me, "J.R.," Sandra.
Q Sandra who?
A Sandra Rollins -- I don't know her last name.
Q Do you see that Sandra in the courtroom today?
A Yes, over there.
Q Who else was present?
A Linwood, "Pepsi,", and Curt.
Q After the 18 or 19 stabs, what occurred? Where did they occur; where exactly did that occur that you saw "J.R." stabbing Doug Moody?
A At first it was like in the yard then Doug Moody was trying to jump over the fence behind the house.
Q What was behind that fence?
A It was an alley.
Q Is that the alley depicted in the pictures you just saw?
A Yes.

Q The fence he jumped, is that the fence you saw in the pictures you just looked at?

A Yes.

Q Okay. Tell us where he ended up in that alley, Doug Moody?

A He ended up in the middle of the alley.

Q After the 18 or 19 stabbings, what did "J.R." do?

A After he did that, he came back towards us and gave the knife to "Pepsi," and told her to get rid of it.

Q Then what happened?

A Then "Pepsi," "J.R.," Sandra, Curt, and Linwood got into Linwood's station wagon and pulled off.

Q What did you and "Mousey" do?

A We stayed there and watched.

Q You watched what?

A We was watching the police and ambulance and stuff.

Q I'm going to show you what has been marked Government Exhibit 4-6.

(Exhibit proffered to witness.)

A This is Doug Moody.

Q Is that the same man you saw "J.R." stabbing?

A Yes.

cocaine from "Whitey," "C.O.," James Roane, "V," "E.B."?

MR. BAUGH: We object unless he is getting it from all of them.

MR. VICK: By one of those people.

THE COURT: Overruled.

THE WITNESS: He was getting it mostly from "O."

BY MR. VICK:

Q Did "J.R." ever say anything about that?

A Not that I recall.

Q When you went to Norton Street, who was present -- excuse me, when you and "Mousey" went to Norton Street, who was present there?

A Nobody.

Q All right. Later you went to Moore Street; is that correct?

A Yes.

Q Who was present at Moore Street when you went there?

A When I went there, when we got there it was "Whitey," "O," "V," "E.B."

Q All right. And what were they talking about?

A What had happened. Mostly "Whitey" was lying on the floor and he was saying that Doug was trying to

kill him with a gun or something, and he was all excited, you know, about what had happened.

Q All right. What was he talking about? When you say what had happened, what are you talking about?

A Talking about what had happened, him and Doug Moody had gotten to fighting at the house on Harrison Street.

Q And could you describe "Whitey's" demeanor that evening? How did he seem when he was describing what had happened?

A He was more excited.

Q All right. And was "J.R." there?

A No, he didn't come until the next day.

Q Did "V" and "O" and "Whitey" say anything about what they had to do because of what had happened?

A Yes, "V" and "O" told "Whitey" that he had to get away from around there for awhile.

Q When did you next see "J.R."?

A The next day.

Q All right. If Doug Moody was killed on January 13th, 1992, you next saw "J.R." when?

A The next day.

Q So that would have been January 14th, 1992?

A Yes.

Q On that day, did you have occasion to come to

Q I take it from your testimony that you were smoking crack from about November of 1990 until January of 1992?
A Yes.
Q And you were using, smoking three or four times a day?
A Yes.
Q What was that costing you per day?
A Excuse me?
Q What was it costing you per day to smoke crack?
A I wasn't paying money for it.
Q From November of 1990 until you met a person described as "Whitey" or "O" in 1991, in that one-year period of time, was someone giving you cocaine?
A No.
Q Were you buying cocaine?
A Before I met them, yes.
Q How much a day were you spending between November of 1990 and November of 1991?
A About $30.
Q $30 or $40 a day?
MR. VICK: She said $30.
BY MR. GEARY:
Q $30 a day. Who were you buying from from

November of 1990 until Thanksgiving of 1991?

A I was buying it from other people.

Q Well, tell the jury who the other people are.

A I don't know those people.

Q Excuse me?

A I do not know these people.

Q What area of Richmond were you buying the crack in?

A From the same area, but a different location.

Q Does that area have a name where you lived?

A It was Poe Street.

Q Is it fair to say you were buying crack three or four times a day, or would you buy once a day and smoke four times a day?

A Can you repeat that?

Q How many times a day did you buy?

A About twice every other day, something like that.

Q So basically once a day.

A Yes.

Q So from November of 1990 to November of 1991, you would have bought maybe 350, 360 times; is that correct?

A Yes.

Q You are telling this jury that you can't give

A Yes.

Q You never had to do anything illegal to support your crack habit? Did you ever have to do anything illegal to buy crack?

A Depends on what you are talking about.

Q You know what "illegal" means.

A Yes.

Q You know what Richmond General District Court means, don't you?

A Yes.

Q Did you ever have to do anything illegal to support your crack habit?

A No.

Q After January 13th of last year, did you ever see "Whitey" again until you came into the courtroom this morning?

A No.

Q That was the day that Doug Moody was killed, correct?

A I guess it was, yes.

Q If it is. You saw him that night, you saw "Whitey" that night at 1212 West Moore Street, correct?

A Yes.

Q He told you, among other people, that Doug Moody

had a gun, had tried to kill him.

A Yes.

Q Is that what he said to you?

A Yes.

MR. GEARY: May I have a minute, Judge?

THE COURT: Sure.

(Counsel conferring.)

MR. GEARY: Pass the witness, Judge.

THE COURT: All right. Mr. Johnson's counsel?

CROSS-EXAMINATION

BY MR. McGARVEY:

Q Ms. Berkley, starting with Katrina Rozier, you indicated that you had lived with "Mousey" as well; had you lived with "Mousey" other than those days prior to --

A Well, we was -- I was staying over at the house, over at the other house on Hancock Street with her, yes.

Q You also indicated that you had lived with "Papoose," right?

A Yes.

Q Did you and Katrina and "Papoose" live together?

A No.

Q Now, with respect to Ms. Rozier, you indicated

asked that already?

A I have bought one or two times from him.

Q You bought one or two times from Peyton Maurice Johnson. Was that before November of 1991?

A Yes, it was.

Q Was Peyton Maurice Johnson selling cocaine up there in Newtowne before November of 1991?

A Yes, he was.

Q Who did Peyton Maurice Johnson have selling for him? Was Lewis Johnson working for him?

A Old man Lewis Johnson?

Q I don't know.

A I don't know.

Q What about somebody named "Little Keith"?

A Yeah.

Q "Little Keith" was selling up there before November of 1991?

A Yes.

Q And am I correct that "Little Keith" is about 15 or 16 years old, about five-foot-three, five-foot-four, very dark-complected?

A I think so, yes.

Q But real young.

A Yes, he is young.

Q And he was selling drugs for about a year prior

that, didn't they?

A Yes, I have to tell the truth.

Q Who bought drugs for you? Tell me the truth.

A Who bought drugs --

Q You said someone was helping support your drug habit. You have to tell the truth to keep your deal. Who was buying drugs for you? Tell us in order to keep your deal.

A I was buying my own drugs.

Q Who was giving you money to buy drugs?

A I can't say that.

MR. BAUGH: Your Honor --

MR. VICK: What relevance?

THE COURT: The objection is sustained.

BY MR. BAUGH:

Q So is it your understanding you don't have to tell the truth unless they ask it, right?

MR. VICK: Objection, Your Honor.

THE COURT: Sustained.

BY MR. BAUGH:

Q When Doug Moody was getting stabbed was he lying down or standing up?

A At first he was standing up.

Q All right. Is it your testimony that James Roane sat on his chest and stabbed him?

A No, it wasn't my testimony.

Q All right. How was James Roane, according to your testimony, how was his body situated while he was stabbing him?

A He was standing in front of him.

Q When he fell down, did James Roane continue to stab him?

A I think so.

Q All right. Now, is it your testimony, and you mean to tell this jury in response to this man's questions and in response to that man's questions over there that you stayed there from the time you came out and saw him being stabbed until the police and ambulance arrived; did you tell them that?

A Yes.

Q Did you see the woman come out of 810 North Harrison, come out and do CPR on Doug Moody and cut his clothes off and try to stop the bleeding?

A All I seen was a lady come out of the house screaming. That was it.

Q How far away from Doug Moody were you standing?

A When he was laying in the alley?

Q When he was laying in the alley.

A After all of this had happened? Explain. I don't understand what you are saying.

Q All right. Did you see someone go back in, come out with a butcher knife and cut his clothing off?
A No.
Q I will ask you specifically -- strike that.
Did you see the police talk to the woman that you saw come out screaming, you say?
A Yeah, she was talking to them, yes.
Q Could you overhear what she was saying?
A No.
Q Was "Little Keith" a friend of yours?
A Not really a friend, no.
Q He was just someone you bought drugs from?
A Yes.
Q Did you see little Keith Barkley, age 15, dark-complected, sitting on Doug Moody's chest stabbing him to death on that night?
A No.
Q Have you ever seen the woman in 810 North Harrison before?
A No.
Q Before that night?
A No.
Q That's the house on the other side of the alley.
A I know. No.

Q When was the first time you saw her at Moore Street?

A What you mean?

Q You saw her two or three times there. Can you give an approximate date for the first time?

A No.

Q How about the first time at Norton Street?

A It was about a couple of days after they moved to Moore Street.

Q I was talking about Norton Street now.

A I don't understand.

Q I first asked you about Moore Street. You said you weren't sure when you first saw her at Moore Street. Then I asked you about Norton Street. I'm asking you now, what is the first time you saw her at Norton Street?

A Right after -- the Saturday after I cleaned the house.

Q That would be in early December?

A It was in November.

Q Late November?

A It was a couple of days before Thanksgiving.

Q Was she there with "J.R."?

A No.

Q Now, just about all the time you were there on

Moore Street and Norton Street, you were high on crack cocaine; isn't that right?

A The majority of the time, yes.

Q You say you were smoking crack cocaine four or five times a day; isn't that right?

A Yes.

Q You saw a lot of people come in and out of those two residences, didn't you?

A Most of the ones that lived there, yes.

Q But also people who came in to sell crack?

A Yes.

Q And to buy crack?

A No, mostly to sell, for them to give the crack to.

Q The night of the Doug Moody murder you were high on cocaine, weren't you?

A A little.

Q You testified that just right before you heard the shots you were smoking some cocaine with some people; isn't that right?

A I had just started taking a hit. Yes.

Q After you heard the shots, you said you thought it was the police.

A Yes.

Q Who said it was the police?

BY MR. VICK:

Q On how many times a week would you see them with new bags of the cocaine?

A About two, three weeks.

Q Would they go to New York every two to three weeks or have new bags of cocaine every two or three weeks?

MR. GEARY: Asked and answered.

THE COURT: Sustained.

BY MR. VICK:

Q Did these people make enough money, "J.R.," "C.O.," "Whitey," "V," did they make enough money to buy gold if they wanted to?

A Yes.

MR. GEARY: I object.

MR. BAUGH: We ask the jury be asked to disregard the answer.

THE COURT: Sustained.

BY MR. VICK:

Q Do you know what they did with their money?

A Counted it, wrapped it up, and would keep it until the next time they would go to New York.

Q Who stabbed Doug Moody?

A "J.R."

Q Why were you scared of Sandra?

(Document proffered to defense counsel.)

BY MR. VICK:

Q You made typewritten notes of that interview?

A I'm sorry?

Q You made typewritten notes of that interview?

A Those are the typewritten notes.

(Document proffered to witness.)

Q Can you identify that item?

A This is the original copy of my typed notes.

Q And that's Government Exhibit what?

A 142.

MR. VICK: I would move Government Exhibit 142 into evidence, Your Honor.

THE COURT: It will be admitted. All right, you may stand down, detective. Call your next witness.

MR. PARCELL: Detective Paul Tuttle, please.

PAUL TUTTLE,

called as a witness by and on behalf of the government, having been first duly sworn by the Clerk, was examined and testified as follows:

DIRECT EXAMINATION

BY MR. PARCELL:

Q Would you please state your name and

occupation?

A My name is Paul Tuttle. I'm a detective assigned to the forensic unit of the Richmond Police Department.

Q Tell the ladies and gentlemen of the jury what you mean by being assigned to the forensic unit?

A I respond to crime scenes to collect evidence, document, photograph, submit items of evidence to the appropriate agencies for further analysis if necessary. I do fingerprint work. I am recognized in both the state and the federal courts as a witness in crime scenes.

Q And were you so employed in that capacity on January 13th, 1992?

A I was.

Q Did you have occasion to respond to the intersection of Clay and Harrison Street in the City of Richmond to investigate a shooting?

A Yes, sir.

Q Would you please tell the ladies and gentlemen of the jury when you arrived what you initially observed?

A There was an area that had been roped off. There were some items of clothing in an alley and there were some items of clothing in the street

across the street. At that time I parked my van and I began videotaping the area.

Q Sir, I'll ask permission for him to approach the jury and explain what this diagram represents.

(Witness approached jury.)

THE WITNESS: This is an aerial photograph showing the location where I had gone to. This is Clay Street, and if you could look up top, you can see it is labeled "Clay Street." This street here is labeled "Harrison Street." And the location to which I responded was right in here. I have an arrow and a little marking here called "The Alley." As you can see, it is right here. That's the alley where the items of clothing were when I went to that location. And there was -- it was across the street, approximately in this location, that other items of clothing were found. Across the street on Harrison Street itself.

Q Would you point out, did you have occasion to continue the investigation, go inside a house?

A Yes, sir, I did.

Q Would you please point that out to the jury, also?

A There was an apartment located in the 800 block of North Harrison Street, and the entrance to that

apartment is right here where this little arrow is. You can see, it looks like a porch right through there. The actual entrance is over here on this side, but that little porch area is the apartment we are referring to. The arrow is pointing to it right there.

Q You can have a seat.

(Witness resumed witness stand.)

MR. PARCELL: Judge, that will be Government Exhibit 17-1, sir.

THE COURT: It will be admitted.

BY MR. PARCELL:

Q One of the first things you do when you arrive at a crime scene is what?

A I videotape the area after I have talked to some of the witnesses, some of the police officers on the scene, to determine the extent of the crime scene itself.

Q Did you do so in this situation?

A Yes, sir, I did.

Q I'll ask you to look at some video on the monitor. Walk through it with the ladies and gentlemen of the jury and the Court and explain to them what you found and what observations you made while you describe the scene.

A Yes, sir.

(Videotape began.)

That's the front door of the apartment right next to the alley. If you are looking in the photograph, it will be on the right of the alley, that little house on the corner. I'm standing on the sidewalk and I'm doing a 360-degree sweep of the area to show you the surrounding area, to give you a feel for what actually that neighborhood looks like down there on the street rather than from the air.

That intersection where the flashing light is is the intersection of Clay and Harrison streets. That little porch you see directly in front of you is the porch I referred to earlier, the apartment. I am just sweeping the alley itself so that you can see what I had seen when I first arrived. At the center of that photograph right there, toward the lower right-hand corner, are some items of clothing. There was a shoe -- it is on the left of the screen right now -- and some other items.

That's a kitchen knife that I found next to the porch. That's a portion of the belt that was cut off and some other items of clothing that were tossed off to the side. That area there, it doesn't show very well, but it is some blood spatter and some portions

of blood that were left behind. That's the shoe which I referred to earlier, and some more blood. These are some items of medical equipment that were discarded, box of an IV set, for example, some pads from a monitor, more items of clothing.

That's a bullet that was found in the alley. As you can see, it is still a live round. That is another area of blood that was left. That is the other boot, the other shoe. This is coming from the back of the house walking back toward that alley to give you another perspective. That's a sock. This is another sweep, 360-degree view. That's the other item of clothing that I found across the street. Now these items of clothing were left behind by the paramedics and the firefighters in the rescue attempts. The clothes were cut off and tossed to the side.

That's just a close-up of the address where the clothing was found. This is the door of the apartment which we spoke of earlier. If you look at the top of the window, you can see that the glass is broken and part of the windowframe is missing. The screen has been removed. These are some shards of glass and part of the windowframe, some more pieces of the window here. We are entering the kitchen area

of the apartment. This is the rest of the apartment. It appeared to be a little living area with a bed. That is a part of the window shade that had been pulled down from the window showing signs of some kind of a struggle. That's the window that was broken. We previously saw the outside view. There is the curtain. That spot there on that mirror is a bullet hole. That doorway that you saw was going toward the bathroom.

(Tape ended.)

Q As you processed this crime scene, you took photographs of what you indicated was the things you found in the alleyway as well as some things you found inside the residence: the broken window, the bedroom, and the hole in the mirror; is that correct?

A Yes, sir.

Q There are some other photographs, nine-whatever. I would ask that he be allowed to approach the jury and explain what those photographs represent.

THE COURT: Go ahead. Keep your voice up when you are over here, please.

THE WITNESS: This photograph shows the entrance to that apartment I had just videotaped.

BY MR. PARCELL:

Q If you would, please identify each photograph by its number.

A This is 9-1.

Q Thank you.

A 9-2 is a photograph of the window that was broken, and you can see on the sidewalk there is some shards of glass, the broken window up at the top, a piece of the frame missing. Would you like me to do these in order, how they are numbered?

MR. PARCELL: Yes, sir.

THE WITNESS: Photograph 9-3 is a photograph of the inside of the window showing the broken window and part of the curtain or the shade that had been torn down.

9-4 is just another angle of the window, and you can see part of a curtain on the floor. This is that portion right here. And on the mirror, there is a spot right there, and that is the bullet hole. This is the curtain, this is the bullet hole. Photograph 9-5 is a photograph of the bullet hole in the mirror. Photograph 9-6 is a portion of the alley showing back here one shoe, the sock, the other shoe, and the items of clothing, the shoe way back here with the sock, the other shoe and the clothing.

Photograph 9-7 is taken from the opposite side

showing the shoe, the sock, but here you can see some blood over by the side of the building. There was a pool of blood up next to the building, right here. This is from the back of the alley looking towards Harrison Street.

Photograph 9-8 is spots of blood in the alley. Some of the pieces of discarded medical equipment are here, and the shoe.

Photograph Number 9-9 is more of the clothing, another angle of the clothing. This is the corner of the house. It doesn't show you too much, but this is the corner of the house right here.

(The witness resumed the witness stand.)

BY MR. PARCELL:

Q I move the admission of those photographs, 9-1 through 9, please?

THE COURT: They will be admitted.

BY MR. PARCELL:

Q You indicated there was a butcher knife with blood on it near the clothing. As you continued the investigation, was that knife of any significance to you?

A It was significant. At the time, we did not know where it came from, but as the investigation continued we found out that that -- that an

individual with some medical training attempted a rescue and they used the knife to try to cut some of the clothing away from the wounds.

Q So that had nothing to do with the death of Douglas Moody?

A That's correct.

MR. McGARVEY: I object. That's a conclusion this gentleman cannot make.

THE COURT: Overruled.

BY MR. PARCELL:

Q As you continued your investigation, did you have occasion to go back with Detective Fleming seated to my right and retrieve the bullet that was recovered from behind the mirror?

A Yes, sir.

Q I'll ask that these photographs labeled 14-1, 2, 3, and 4 be proffered to you.

(Exhibit proffered to counsel and witness.)

BY MR. PARCELL:

Q Would you approach the jury briefly and explain those photographs?

(Witness approached jury.)

A Photograph 14-1 is Detective Fleming pointing to the mirror. We removed the mirror from the wall. When we went back into the apartment, it appeared to

have been as we left it the night the incident occurred. We took the mirror from the wall in an attempt to locate the hole behind the mirror. Obviously, that bullet had gone through the mirror. We did find that hole and this is a photograph showing the dresser pulled away from the wall with the hole. This is photograph 14-2. You can see right here by my index finger, this is the hole that was made behind the mirror. The mirror is up here next to the wall and this is the dresser. This is the hole that was made. Now, that hole did not go all the way through. There was a hole that was made by the impact, and the actual projectile fell onto the floor. We were prepared to open up the wall in an attempt to retrieve that bullet, but we did not have to. This is a photograph of the bullet as it lays on the floor. This is 14-3. This one is a little difficult to see, but by my index finger here, right here, this is the actual bullet. It had gone through the mirror, struck the wall, created that hole, and then fell to the floor.

MR. BAUGH: Could we ask the witness to circle it?

THE COURT: Sure.

(Witness complied.)

THE WITNESS: That is now circled in blue. That's the bullet. Photograph 14-4 is a close-up of the bullet with a scale to show you its relative size.

MR. PARCELL: I'll move the introduction of those four photographs as Government Exhibit 14-1, 2, 3, and 4.

THE COURT: They will be admitted.

BY MR. PARCELL:

Q Did you retrieve that bullet and send it in for analysis?

A Yes, sir.

Q I'll show you Exhibit 15 and identify it if you can, sir.

(Exhibit proffered to witness.)

A This is the bullet that I located on the floor that you saw in the photographs.

Q And you later on submitted that to Anne Jones of the state firearms laboratory for analysis?

A Yes, sir.

MR. PARCELL: That will be Government Exhibit 15, please.

THE COURT: Admitted.

BY MR. PARCELL:

Q Can you identify this next item?

A Yes, sir. This is a bullet that was recovered from the body by the Medical Examiner.

Q And you in turn submitted that to the state laboratory to Anne Jones for analysis as well?

A Yes, I did.

MR. PARCELL: That will be Government Exhibit 16.

THE COURT: Admitted.

MR. PARCELL: No further questions.

MR. GEARY: No questions, Your Honor.

MR. McGARVEY: No questions.

CROSS-EXAMINATION

BY MR. BAUGH:

Q Good afternoon, Mr. Tuttle.

A Good afternoon, sir.

Q Did you see any evidence that anyone had jumped out of that window?

A At the time, we did not know how the glass was broken. But apparently the information was developed later on that that may have indeed been the case.

Q And so someone told you or someone told someone else that the victim had jumped out of the window?

A Well, at the time when I was doing the photographing and the videotaping, we had no information to that effect.

Q Did you measure how big the opening is in that window?
A No, sir.
Q It is about the size of two panes; am I correct?
A Yes, sir.
Q It is kind of small?
A Yes, sir.
Q Additionally, whose shoes were those in the alley?
A Those apparently were the shoes from the victim. They were cut off by the paramedics and tossed to the side.
Q I assume you checked the soles of those shoes to see if there was glass ground into them as though someone had landed on broken glass?
A I didn't have the capability of doing that at the time.
Q Has it been done since?
A No, sir, I don't believe so. Those shoes were collected and taken to our property section.
Q Did you inspect the clothing of the deceased for broken glass in the fabrics?
A No, sir, I didn't. Not at the time.
Q Well, based on the shoes or the clothing or

footprints in the broken glass, at the time you were there you saw no indication anyone had jumped out of that window, had you?

A As I stated, we did not know how the glass was broken at the time. So no, we didn't have any idea that anyone had jumped out.

Q The question is, now that you have seen it, looking back on it a year later, as you look back on your crime scene with all the information that's developed since, do you recollect any indication that someone jumped out of that window or through that window?

A At the time, no.

Q I'm asking now.

A I can see how that could have occurred.

Q Could you show the jury the height and width of the opening in the window?

A The height?

Q How big is the opening?

A It would be two panes of glass side by side, about like that. So we will say --

Q 12 by 18?

A I would say that would be a fairly close guess, sir.

MR. BAUGH: Pass the witness.

rock cocaine. She knew the people who wanted to buy it.

Q Of those people who were selling cocaine that you have testified to, who controlled the money that was being made from the sale of that cocaine?

A Usually if "O" didn't have it, "V" was the one that I saw mostly have it. The times I've seen "V," he had most of it.

Q Have you ever talked to "O" about other areas of the City of Richmond: Southside, Church Hill?

A I haven't talked to him, but he has mentioned Southside, Central Gardens, North Side, West End.

Q How did he mention that?

A Have to go places like that.

Q What did he say he had to go get?

A I heard him mention money.

Q Did you ever hold any guns for "O" or "J.R." or "Whitey" or "V" or "E.B.?"

A I held guns for them.

Q Do you remember the killing of "Little Doug" Moody?

A Yes.

Q And were you living in that area when "Little Doug" Moody was killed?

A Yes.

Q Were you holding guns for these people in that time frame?

MR. GEARY: I object.

THE COURT: Sustained.

BY MR. VICK:

Q Were you holding guns for anyone at that time?

A At that time I was holding two pistols.

Q Describe those pistols.

A One was a long chrome pistol, looked like a .357. The other one was a long black pistol, looked like a .22 or 30-aught.

Q Who were you holding those guns for?

A For "O."

Q When did you get those guns?

A I got the .22 and -- the two hand pistols from "O" and "J.R."

Q When did they give them to you?

A Well --

Q In relation to when Doug Moody was killed, when did you get those guns?

A About a week before.

Q Did there come a time around the murder of Doug Moody that anyone came and retrieved those guns?

A One of the pistols disappeared and "J.R.," he asked about one.

Q When was that in relation to the murder of Doug Moody?

A That was like a day or two before.

Q Did you give a pistol to "J.R." a day or two before the murder of Doug Moody?

A Yes.

Q Did you ever see that gun back again?

A No.

Q Where were you when Doug Moody was killed?

A I was at the house with my sister.

Q And you came to find out that he was killed?

A My sister came to me and she was crying because she was high, drunk, talking about mad, and I didn't know what was wrong. She wouldn't talk to me. Next I no, someone else came down. I'm not sure, I think it was a young lady who came to the house. She said, "Do you know they --"

MR. McGARVEY: Objection, hearsay.

BY MR. VICK:

Q Did you come to find out that Doug Moody had been killed?

A Yes.

Q Did you have occasion to see "J.R." and "Whitey" after that?

A Yes, I did.

Q Where did you see "J.R." and "Whitey?"

A They came to my house in the rain; running, huffing, and puffing.

Q How soon was that after you found out Doug had been killed?

A My sister came and told me.

Q How soon after that did "Whitey" and "J.R." show up?

A "Mousey" left and they came.

Q Same evening that Doug Moody was killed?

A Yes.

Q Did they say anything? Did you hear them talk about anything when they were in your house that night?

A At the bottom of the steps in my doorway, they said, "Yeah, I got him, I got him." Said, "Yeah, man, we can't stay out here, man. This is hot anyway."

Q Who were they talking to?

A They were talking to each other, but they were referring to my house.

Q If Doug Moody's murder took place on January 13th, 1992, on January 14th, the very next day, did you have occasion to get any other guns from these people?

A Yes.

Q Who specifically on January 14th, 1992 did you receive guns from?

A I got a black bag, a Salem black bag that had two Uzis and a black 9mm.

Q Who did you get those from?

A "O," "J.R.," and "E.B."

Q I'm going to show you what has been previously marked and introduced into evidence as Government Exhibit 107, a black bag; 105, a black semi-automatic weapon; 106, a black semi-automatic weapon; and 104, a black handgun. And I ask if you have ever seen those items and if you can identify those items.

A Yes, I have seen them before.

Q Where have you seen those items before?

A They are the ones that "O" and "E.B." and "J.R." brought to my house.

Q The day after the killing of Doug Moody?

A Yes.

Q What did you do with those guns when they brought them to your house?

A They asked me to put them away. So I took them in the back yard and put them in the trash can. I didn't want them in the house. I'm against guns.

Q What time of day was that when they brought you

those guns?

A It was about between five and seven.

Q Later that evening, did they come back and get those guns from you?

A Yes.

Q About what time did they come back and get the guns from you?

A After 7 o'clock.

Q Who came back to get those guns?

A "J.R.," "O," and "E.B."

Q Did you come to find out that evening that Peyton Maurice Johnson had been killed?

A Yes, I did.

Q After you found out that Peyton Maurice Johnson was killed, did you have occasion to see "E.B.," "J.R." and "O" again?

A Yes, I did.

Q Where did you see them?

A They came back to the house.

Q To your house?

A Yes.

Q What did they have with them when they came back to the house?

A The same weapons.

Q Did they ask you to do anything about those

weapons?

MR. BAUGH: Objection to "they."

BY MR. VICK:

Q Did any of those three people ask you to do anything?

MR. BAUGH: Objection, irrelevant.

THE COURT: Overruled.

THE WITNESS: "J.R.," "O," and "E.B.," they sat on the bed -- on the couch, rather, by my bed, took them out of their clothes --

Q Took them out of what?

A Out of the clothes. Said, "Hey, you got towels; wipe these off."

Q Who said that?

A "O."

Q Wanted you to wipe the fingerprints off what?

A Off the weapons.

Q Did you do that?

A Yes, I did.

Q Did you hear them talking to each other that evening?

A Yes. The words, somebody said, "I was in the kitchen." And they said, "Yeah? How did they shoot?" "Shoot cool. Shoots all right." "Did you get them?" "Yeah, man. All of them."

the microphone so the ladies and gentlemen of the jury can hear you. Tell us your name.

A Ronita Hollman.

Q How old are you?

A 21.

Q Do you have any children?

A Yes, three.

Q Their ages?

A Four, two, and one.

Q Where are you presently residing right now?

A VCCW, Virginia Correctional Center for Women.

Q Is that as a result of an arrest on January 8th, 1992 at Norton Street in the City of Richmond?

A Yes.

Q What were you charged with?

A Distribution of cocaine with intent.

Q Possession of a firearm?

A Yes.

Q You were found guilty of those offenses in state court?

A Yes.

Q Has the United States Government made you any promises for your testimony today?

A No.

Q You have already been sentenced for those crimes

you were involved in?

A Yes.

Q Going back prior to January 8th, 1992, can you tell the ladies and gentlemen of the jury have you been a drug user?

A Yes.

Q What kind of drugs have you used?

A Crack cocaine.

Q How long and what time period prior to your arrest?

A Since I was the age of about 16.

Q And did there come a point in time when you got involved in the distribution of crack cocaine?

A About the age of 17.

Q When you were arrested, you were living with whom?

A Peyton Maurice Johnson.

Q You all were living together on January 8th, 1992?

A We weren't living together.

Q You all were sharing the same --

A Yes.

Q The same building.

A Yes.

Q Ma'am, the cocaine with which you were arrested,

who did you get that from?

A Peyton.

Q Were you also partners?

A Yes.

Q Were you selling cocaine you got from Peyton?

A Yes.

Q What area were you selling it in?

A On Norton Street and out of my apartment.

Q Out of your apartment?

A Yes.

Q Is that called Newtowne?

A Yes.

Q I think I asked you this before. The cocaine you were arrested with came from Peyton?

A Yes.

Q Would you please explain to the jury you all's business arrangement on the cocaine that you got and sold?

A I would sell most of it and give him the majority of the profit and then he would pay the bills and so forth, help me with my kids.

Q Pay your living expenses?

A Yes.

Q You occasionally would get some money from him for your own personal use?

A Yes.

Q Ma'am, can you tell us who some of your customers were?

A Katrina Rozier, Jerry Gaiters, lady named "Pea Sue," another one named "Peaches."

Q A woman by the name of "Pepsi?"

A Yes. "Pepsi," also.

Q How about a gentleman named Mr. Lewis?

A Yes.

Q When you sold them cocaine, that was inside your apartment on Norton Street; is that correct?

A Yes.

Q And can you tell us what was the largest amount of cocaine you ever had in your possession at any one given time?

A An eighth of a kilo.

Q Going back to a couple months prior to your arrest in January of 1992, did anyone come to you and offer you a different business proposition than you and Peyton had?

A Yes, before I was arrested, James Roane and Richard Tipton came to me and told me -- James Roane told me that I was making the area hot and that I needed to be cool. And Richard Tipton told me that they were going to open up a bunch of crack houses

and split everything half and half, and there was a lot of money out there and that they would get theirs even if bodies had to be laid.

Q He Told you what?

A There is a lot of money out there, and they would get theirs even if a number of bodies had to be laid.

Q Killed?

A Yes.

Q Do you see Mr. Tipton in the courtroom today, or Mr. Roane, either one?

A Roane.

Q Would you point him out for the ladies and gentlemen of the jury?

MR. HENDERSON: Stipulate.

MR. PARCELL: Do you see Mr. Tipton?

(Witness rose and scanned the courtroom.)

A Yes. Over there.

Q How is he dressed?

MR. WHITE: Stipulate ID.

MR. PARCELL: Let the record reflect she has identified the defendants Roane and Tipton.

THE COURT: Record will so reflect.

BY MR. PARCELL:

Q Was Peyton there when you were having this

conversation with Mr. Roane and Mr. Tipton?

A No.

Q You later brought to his attention that you had this discussion with these two gentlemen?

A Yes.

Q Did he encourage you or discourage you from getting involved?

MR. WHITE: Objection to leading.

MR. McGARVEY: Objection to hearsay.

THE COURT: Sustained.

BY MR. PARCELL:

Q Based on your conversations with Mr. Johnson, did you get involved with the offer from Mr. Roane and Mr. Tipton?

A No.

Q Did they tell you how much cocaine they would bring --

MR. WHITE: Objection to "they."

BY MR. PARCELL:

Q Did Mr. Roane or Tipton, either one, tell you what amounts of crack cocaine they wanted to get involved with you with?

A At one point in time, they asked me could they front me an eighth of a kilo.

Q What kind of arrangement would you all have with

that eighth of a kilo?

A We never discussed that.

Q Once again, did Mr. Roane make any comments to you about your drug dealings on Norton Street?

A No.

Q About you making the area hot?

MR. BAUGH: Asked and answered.

THE COURT: Sustained.

BY MR. PARCELL:

Q Did there come a point in time that they came back to you again and had another conversation with you about the sale and distribution of crack cocaine?

A No, at another point in time --

MR. GEARY: I can't hear the witness.

THE COURT: You need to speak up.

THE WITNESS: No, at another point in time they came to my house and wanted me to let them cook up an eighth of a key.

MR. McGARVEY: Who is "they?"

THE WITNESS: Richard Tipton, James Roane, and Cory Johnson.

BY MR. PARCELL:

Q Do you see Cory Johnson in the courtroom?

MR. McGARVEY: Stipulate ID.

A Yes.

Q Was this before or after Peyton's death?

A Before.

Q It was before or after your arrest?

A Before.

Q Tell the ladies and gentlemen of the jury exactly what they said and who said what when they came to you about that proposal.

A James Roane came to me first alone by himself and asked me could they cook up the eighth of a key. At one point I told him it was okay. All three, Roane, Tipton, and Johnson, came to my apartment and asked me was it okay, could they cook it up then? And I told them no, Peyton was at home.

Q That didn't go down, either, did it?

A No.

Q A minute ago you said they were going to front you an eighth of a kilo of cocaine. Tell the jury what a front means.

A To give you drugs at the price that they are worth, and plus you pay them an additional price.

Q When they front you that, does that mean you didn't have to give them the money at that point in time?

A No, you would sell the drugs and give them the

money later.

Q In regards to your January, 1992 arrest, when the police got there where did you have your cocaine stored?

A It was in a drawer. And I saw the police coming and I put it in the baby's pamper.

Q That's where the police recovered it?

A Some of it.

Q As a matter of fact, you told the police where it was, didn't you?

MR. BAUGH: Sustained.

THE COURT: Sustained. That's leading. Go ahead.

THE WITNESS: Yes.

BY MR. PARCELL:

Q How did the police know where to find the cocaine?

A I wanted my neighbor to come and get the kids.

MR. BAUGH: Objection. One of her neighbors told them?

THE COURT: Overruled.

BY MR. PARCELL:

Q Answer the question.

A I told the police that I wanted one of my neighbors to come and get my kids. So they knew

immediately to check the baby's pampers.

Q You told the police where it was?

MR. GEARY: I'd like to have the witness testify, please.

THE COURT: Sustained.

BY MR. PARCELL:

Q Who told the police where the cocaine was?

A I did.

Q And after your arrest, did there come a point in time where you had occasion to make bond?

A Yes.

Q When did you make bond?

A February 19th.

Q And --

MR. McGARVEY: I'm sorry, the date?

THE WITNESS: February 19th.

BY MR. PARCELL:

Q Was that before or after Peyton's death?

A After.

Q How long had you known Mr. Roane prior to his first proposal in the cocaine business?

A Not at all.

Q How long had you known or seen "C.O." or "Whitey?"

A A few times.

A Right.

Q Did a gentleman by the name of "Little Keith" also work for Peyton?

A No, he didn't.

Q Did he work for you?

A No.

Q Did he sell drugs?

A No.

Q "Little Keith" did not sell drugs?

A No.

Q Okay. You know a person by the name of Marvin?

A Yes.

Q What's Marvin's full name?

A Bonner.

Q Marvin Bonner. He worked for you, didn't he?

A No.

Q He worked for Peyton?

A No.

Q Did he buy drugs from you?

A Yes.

Q Did he sell those drugs?

A No.

Q He smoked all those drugs?

A Yes.

Q You are sure of that?

A That's correct.

Q Can you give us an idea of how much force was used to insert that weapon and remove it once it entered the brain?

A These entered through the vault of the skull, the thick part. So this would take moderate to severe force to penetrate the skull.

Q Would it take -- what are the chances of that instrument being stuck inside that cavity on injury?

A Sometimes blades get stuck in the skull.

Q How much force would be used to remove it?

A Moderate to severe force.

MR. PARCELL: No further questions in regard to this murder. We will go to the Moody one next, Judge. But we can have cross-examination for these folks now.

THE COURT: No. I think it might be better if we just went through the whole thing.

BY MR. PARCELL:

Q Did you have occasion to perform the autopsy on an individual by the name of Kareem Abdul Hakim, also known as Douglas Moody?

A I did.

Q During the course of your examination of that body, did you make certain findings and put them in

the form of an autopsy report?

A I did.

Q Also, did you take photographs of this victim as you proceeded with your examination?

A I did.

Q Have you reviewed those photographs in preparation for your testimony today?

A I have.

Q Did you select certain photographs to assist you in your testimony for that autopsy?

A I did.

THE COURT: Mr. Parcell, let her describe her findings utilizing the photographs.

MR. PARCELL: I was waiting for counsel to review the exhibits before I begin my questioning.

BY MR. PARCELL:

Q Government Exhibit 11, is that document familiar to you?

A This is a copy of the final autopsy report which I prepared on Mr. Hakim and which I have certified as a true copy of the original report.

MR. PARCELL: That will be Government Exhibit 11.

THE COURT: It will be admitted.

BY MR. PARCELL:

Q I'll ask you to approach --

MR. McGARVEY: I would have an objection prior, and I request the Court's permission to approach the bench, or at the Court's convenience.

(At Bench.)

MR. McGARVEY: Judge, the only problem I have with the report, I think this should be redacted. It is hearsay. It is a rendition of what -- that it is possibly related to other murders. That's the only problem I have.

MR. PARCELL: I have no objection.

MR. McGARVEY: Anything that is hearsay.

THE COURT: All right.

MR. McGARVEY: That would apply to the first autopsy report as well.

THE COURT: They are willing to remove it. There is no problem.

MR. PARCELL: I'll remove it and restamp this Government Exhibit 11.

(Witness approached easel.)

BY MR. PARCELL:

Q What do those photographs mean to you?

A These were taken for the same reason that the other gentleman's were. Namely, to show who he is, to document the kinds of injuries that he had and

didn't have, and to show the distribution of those injuries. In the totality, if you look at all these photographs at once, this gentleman has three types of injury. He has stab injury, he has gunshot injury, and he has blunt force injury. What that means is he got beat on with something hard. The first photograph of the right side of his right upper shoulder and face shows abrasion, which is blunt force injury to the right side of his head.

Now, if we look here at the second photograph, which shows the top of his head and his forehead, we can see that he has abrasion and a cut here around the left eye. And if we look at the left arm on this surface, on the lateral surface, there is a patterned abrasion which is indicative of an impact by a weapon, some edges of which would make these tracks. So whatever it was had edges on it.

So we have blunt force injury to the right face, to the left brow, to the left forehead, the left cheek, and the left arm. Here is the left arm in detail that shows that pattern. And the left eye, showing more detail of that abrasion there to his cheek and of his lid. So that's one kind of injury.

The second kind of injuries are stab wounds. Of the stab wounds, he had stabs and cuts that totaled

in total number 18. These were caused by a blade that was single edged in that the stab wounds, these wounds, if you will look at them, show one blunt edge and one sharp edge, telling us that this is a single-edged blade. The most frequent measurement of these wounds along their surface was five-eighths to three-quarters inches, so the blade is in that range. Of these injuries that are stab wounds, one, two, three, four, five, six that we can see well here, of those, this one and one other perforated through the chest wall into the left lung causing hemorrhage to the left chest space. There were other cuts. There were cuts to the left forehead, the anterior neck, and the left lateral chest. Then he himself had cuts to the hand, which would be characterized as defensive-type cuts.

The third kind of injury, we said he had blunt force injury, he has stab injury, and he has gunshot injury. The gunshot injury is to his right upper back. Here is one gunshot entrance hole at the upper part of his right back shoulder and a second gunshot injury just below the right shoulder blade. The bullets that entered these gunshot entrance holes penetrated the right lung, and they caused extensive hemorrhage into the left chest space.

Q Ma'am, based on your examination, were you able to determine what the cause of death was, whether it was the stab wounds or the gunshot wounds?

A The stab wounds and the gunshots are, to me, equally lethal. Either one of these injuries was sufficient to account for his death and both of them caused lethal hemorrhage into the chest space.

Q As you continued your examination of him, did you have occasion to remove those bullets from his body?

A I did.

Q They were submitted to Ms. Anne Jones for ballistics testing?

A Yes.

MR. PARCELL: I would ask that she be allowed to resume the stand. And I'll need Government Exhibit 16. I move the introduction of Government Exhibit 12-1, 2, 3, 4, and 5.

THE COURT: It will be admitted.

BY MR. PARCELL:

Q Dr. Fierro, in regard to your job as a Medical Examiner, as Mr. Cooley affectionately calls you, you are not "Quincy" on TV; you are the person that makes scientific findings or makes the cause of death report. In other words, you don't actually solve the

homicide or the cause of death by force, you just report your scientific findings; is that correct?

A The taxpayers paid me to figure out what killed people, not who did it.

Q I ask you to examine that item and identify it if you can.

A This bullet is the bullet that I recovered in the right front chest of Mr. Hakim. At the time of recovery, I took that bullet, made out a card for identification. I put it in this envelope and I sealed it. Then I receipted it to the investigating officer.

MR. PARCELL: That's already been received as Government Exhibit 16.

BY MR. PARCELL:

Q In regard to Mr. Moody's height and weight, can you tell the ladies and gentlemen of the jury how tall he was and how much he weighed at the time of death?

A At the time of autopsy he was five-foot-six-inches tall and 160 pounds.

MR. PARCELL: No further questions, Judge. Pass the witness.

THE COURT: All right. Mr. Geary?

CROSS-EXAMINATION

Q Okay. And in your community, your professional community, there is nothing wrong with that?

A No. As custodian of the record it was my duty to bring the records to Court and interpret that report.

Q As a doctor.

A Right.

Q Thank you.

THE COURT: Mr. Baugh?

CROSS-EXAMINATION

BY MR. BAUGH:

Q Good afternoon.

A Good afternoon.

Q Did you see any indication in the report of a bruise or an abrasion to the right eye or right side of the face consistent with being struck by a fist?

A Yes.

Q I'm sorry, on the first one, Mr. Talley.

A Right. Mr. Talley had a bruise to his eye.

Q Left eye or right eye?

A Well, let's take a look here. Left eye.

Q Left eye. Am I correct that there is no notation of any bruises or abrásions consistent with a blow to the right eye or the right side of the face?

A There is no notation.

Q Additionally, is there any notation of bruises, scratches, or injuries consistent with being throttled while he was being attacked, being held by his throat?

A There are no bruises or abrasions. The problem with throttling is that you can have throttling occur without external injury. In this gentleman, he has so much hemorrhage in his neck that you could have throttled him ten times and wouldn't be able to tell it.

Q In fact, there are actual wounds in the neck.

A That's correct.

Q Lastly -- and because we understand of course that you are more than just a doctor -- the kind of weapon, you said the weapon was like three-fourths of an inch in width?

A I said the most frequent blade size, wound size, was three-quarters of an inch.

Q But the blade could not have been bigger than that then?

A It could be if it were longer, if you had a great long blade and this much of it is three-quarters of an inch. At that point it is three-quarters of an inch.

Q We are talking about the width of, for those of us who don't know, like an average steak knife?

A Three-quarters is usually bigger than an average steak knife.

Q Certainly not a butcher knife or something like that?

A Only if it is three-quarters of an inch down at the tip.

Q Was the depth of these wounds determined?

A An estimate was made of depth, and it was three inches, two-and-three-quarters. Three inches would be the average.

Q Have you ever done an autopsy on a wound from a bayonet?

A Yes. It doesn't look like this.

Q This is not like an Army blade, is it?

A No.

MR. BAUGH: Thank you. No further questions.

REDIRECT EXAMINATION

BY MR. PARCELL:

Q In regard to the Talley autopsy, the instrument appeared to be a single-bladed knife; is that correct?

A That's correct.

Q You don't know whether it had straight edges above the -- Mr. McGarvey was asking you about could it have had a serrated top part of the knife.

A It could have. If that edge didn't go through, you won't see any reflection of it and the wound doesn't show any serration.

Q Mr. Baugh asked about a bayonet.

A I don't know squat about bayonets, but if it has that dimension it would be all right. The bayonets I remember from the movies looked bigger.

Q You don't know whether it was a butcher knife, Army knife, or kitchen knife, do you?

A It should have a dimension of its width about three-quarters of an inch.

THE COURT: All right. Thank you, Doctor. You may stand down.

(Witness stood aside.)

(At Bench.)

All right. Government, where are we?

MR. VICK: I'll defer to the Court on this. We could do the Louis Johnson crime scene. Our anticipation would have been better after some other witnesses that were there. We need to do Stanley Smithers next, who is the witness that won't be here.

A Like they would tell him a certain time they would need their money, and when he was to come pick up the drugs, go on up.

Q Did you know a man by the name of Doug Talley?

A Yes.

Q Did Doug Talley -- do you know whether Doug Talley helped "O" or "Whitey" or "J.R." in their drug distribution?

A No. Talley used to take them to New York before Linwood did.

Q And what did he take them to New York for?

A To pick up some drugs.

Q What kind of car did Talley drive; do you remember?

A All I know is it was a gray car.

Q "Pepsi," do you remember an individual by the name of Doug Moody, "Little Doug," he was called?

A Yes.

Q Do you know what happened to him?

A Yes.

Q What happened to him?

A "J.R." killed him.

Q Were you --

A Finished killing him.

Q Who started killing him?

A They was in the house. "Little Doug" jumped out the window.

BY MR. VICK:

Q Who was in the house?

A "J.R.," "Whitey."

Q Were you there?

A I was on the corner.

Q In the house where "Little Doug" was killed at?

A I was on the other side of the street.

Q Did you hear any shots that night?

A About two or three.

Q After you heard those shots, did anyone come out of that house?

A Did anybody come out?

Q Right.

A "J.R." came out, "J.R." and "Whitey."

Q Where did they go when they came out of that house?

A Well, Linwood had came --

Q I'll withdraw that. When "J.R." and "Whitey" came out of the house, was it after you heard the shots fired?

A Uh-huh.

Q What did they do when they came out of that house?

A Well, after they came out I didn't have any reason to leave because I was going back in the house. So I went back in the house to straighten up the house. Then "J.R.," he came back in the house and asked me for the knife.

Q What knife?

A It is a military knife.

Q All right. And could you describe that military knife?

A It had a black handle on it, kind of a big knife.

Q All right. Where had you gotten that knife?

A Well, I got that knife -- the knife was laying on the table. They used to bring the knife to Curt for Curt to keep.

Q Who is they?

A "Whitey" and "O" and "J.R."

Q Prior to the night that "Little Doug" was killed, did they ever bring you that knife before?

A Yes.

MR. McGARVEY: I object to "they." Who brought it?

BY MR. VICK:

Q Who brought you that knife? Was there a particular night where they brought you that knife,

where somebody brought you that knife and it was covered with something?

A Blood.

Q Who brought you that knife when it was covered with blood?

A "O."

Q And was that prior to or after the killing of Doug Moody?

A That was before.

Q All right. On the night of the killing of Doug Moody, did you give that knife to anyone?

A "J.R."

Q Did you see "J.R." use that knife that night?

A I didn't see him use it on him because I had left out the house.

Q Did "J.R." come back and give you that knife later that night?

A Yes.

Q All right. What did he give you that knife for?

A He wanted me to get rid of the evidence. I took and threw it across the fence.

Q When he gave you that knife back, did it have anything on it?

A Blood on it.

Q Is that the same night Doug Moody was killed?
A Yes.
Q After Doug Moody was killed, did you go anywhere?
A Up on Norton Street.
Q With who?
A With Linwood, Curt, "J.R.," Sandra.
Q Do you know whether Sandra Reavis was involved in any way with "J.R.," "C.O.," or "Whitey" in the sale or distribution of cocaine?
A Yes.
Q What do you know? Tell the ladies and gentlemen of the jury.
A She used to get cocaine from them to sell it.
Q Did you witness that?
A What?
Q You saw that?
A Yes.

MR. WAGNER: I object to "them," Your Honor. If he would ask specifically who.

THE COURT: Mr. Vick, make it specific.

BY MR. VICK:

Q Specifically, who do you know that Sandra got cocaine from?
A "O." Because "O" was the head man.

Q Did you ever see her get it from "J.R." or know whether she got it from "J.R.?"

MR. BAUGH: Objection to know. First question, "Did you see her," next question, "know."

THE COURT: Let her answer one question at a time.

BY MR. VICK:

Q Has Sandra ever told you who she got cocaine from?

A Yes.

Q Who did she say she got cocaine from?

A From "O."

Q Do you know why "Little Doug" Moody was killed?

A Yes.

Q Could you tell the ladies and gentlemen of the jury why "Little Doug" Moody was killed?

A He was killed because "O" and "Whitey" and them didn't want Maurice and "Little Doug" to work in that area.

Q Work in that area doing what?

A Selling cocaine.

Q When you say Maurice, do you mean Peyton Maurice Johnson?

A Yes.

Q Are you familiar with the fact that Peyton

A Yes.

Q Didn't you indicate that you said that Mr. Chiles took them to Southside when they asked about Peyton Maurice Johnson.

MR. VICK: Objection, misstatement of the evidence.

THE COURT: That is incorrect. Your understanding is incorrect, Mr. McGarvey.

MR. McGARVEY: I apologize, Your Honor.

MR. McGARVEY: That's all, Your Honor.

THE COURT: Any questions, Mr. Baugh?

CROSS-EXAMINATION

BY MR. BAUGH:

Q Ms. Greene, I just have a few questions for you. My name is David Baugh, and I represent Mr. Roane. The knife that you say that Mr. Roane came and got from you on the night that Doug Moody was killed, you said it was a black knife?

A It was a silver knife with a black handle.

Q Was it a military-type knife like a bayonet or something?

A Curt said it was a military knife.

Q Excuse me?

A Curt, he told me it was a military knife.

Q Did you see it yourself? Did you see it?

A Did I see it?
Q Yes.
A Yes.
Q All right. Are you familiar with the kind of knife that soldiers put on the end of their guns; have you seen one of those knives before?
A No.
Q All right. Can you show me about how long was the knife? About how long was it?
A It was a long knife.
(Witness indicating.)
Q Certainly longer than like your foot?
A I don't know.
Q And can you tell me, can you show me with the fingers of your left hand how wide the blade would have been?
A Like this. Wide blade.
Q Big blade?
A Yes.
Q Would you agree that's about three inches or two inches?
A I don't know. I can't say.
Q Could you hold it up again so the jury could see it?
(Witness indicating.)

That's how wide the blade was, about that long?
A Yes.
Q Now, is it your testimony, is that the same knife that you say one of these gentlemen brought over to you covered with blood after Doug Talley was killed?
A Brought to Curt, yes.
Q And who told you that Doug Moody jumped out of a window? Or did you see that?
A No. Curt told me.
Q You didn't see Doug Moody jump out of a window?
A No.
Q And who told you that James Roane, quote, finished him off? Who told you that?
A Nobody. I saw him do it.
Q Do I have this correct: You were out on the corner talking with someone when you heard some gunshots; am I correct?
A Uh-huh.
Q And then you went in your house to clean up.
A Yes.
Q And where was your house in relation -- where was your house from where Doug Moody was, across the street, on the next street, where?
A Well, Doug Moody was out on the porch.

minutes later, you started cleaning up.

A Yes.

Q And how long had you been cleaning up before Mr. Roane came up and asked you for the knife?

A Well, he came in the house behind me asking for the knife.

Q So if I have this correct, you heard gunshots, you stayed out on the corner five or ten minutes --

A Yes.

Q Then you went to Curt's house.

A Wasn't nobody in there. That's why I went back in the house.

Q Wasn't anybody where?

A In Curt's house.

Q Could you get in without Curt?

A The door wasn't locked.

Q Okay. You heard the shots. You stayed outside for five or ten minutes. And then you went over to Curt's house and Mr. Roane came with you.

A Yes.

Q And when he came with you, you are saying he asked you for this knife which was about this long and about this wide; am I correct?

A Yes.

Q And he left with that knife about what, ten

minutes after you heard the gunshots?

A He didn't go nowhere but on the porch.

Q He went on the porch?

A Yes.

Q Did you go out on the porch with him?

A No, I looked out the window.

Q You looked out the window --

A I saw him on the porch.

Q Mr. Roane?

A James Roane and "Little Doug."

Q On the porch of the house?

A Yes. Doug was laying on the porch.

Q And did James Roane sit on him?

A I don't know.

Q Well, did you see James Roane stab him?

A No.

Q So all you are talking about, about seeing Doug Moody and all that, that's all stuff people told you about, right?

A Yes. That's the last time I seen him, laying on the porch.

Q Did you ever see Mr. Roane when he came back from New York -- strike that.

Who told you that Mr. Roane went to New York to get drugs?

Roane get to Mr. Moody while Mr. Moody was on the porch; did Mr. Roane go over and touch him?

A     Yes. Slapped him in the face, tried to wake him up. But the man came through.

Q     What man came through?

A     "Little Doug."

Q     "Little Doug" came through?

A     Yes.

Q     All right.

A     Because he was unconscious. He was out on the porch.

Q     Were you there when the police showed up?

A     No.

Q     Were you back inside?

A     No.

Q     Where did you go by the time the police showed up?

A     Linwood, we all got in the car and went over on Norton Street.

Q     Who got in the car and went to Norton Street?

A     Okay. Me, Curt stayed up there on Norton Street, and Linwood and "O" and "J.R." and Sandra, I don't know where they went.

MR. BAUGH: Could I have a moment with counsel?

THE COURT: Yes.

(Counsel conferring.)

BY MR. BAUGH:

Q Do you know Denise Berkley?

A Uh-huh.

Q Was Denise Berkley with you at Curt's before you went out on the corner?

A I don't know. I didn't see her.

Q Let me ask you this: Were you, Denise Berkley, Curt Thorne, and Linwood Chiles doing drugs, doing crack cocaine in Curt's apartment when the shots were fired?

A No.

Q All right. When you went back to the apartment to clean things up, were you cleaning up crack? Were you cleaning up drugs?

A No.

Q Was Denise Berkley out there on the corner with you that night? Did you see?

A I didn't see.

Q And you were on the corner of Clay and Harrison?

A Yes.

Q Did you hear the ambulance or the police -- did you hear them when they came?

Q Are you saying that Mr. Roane brought that knife back to you that night, or someone else?
A No. He brought it back to me.
Q Mr. Roane did?
A Yes.
Q This was the same big knife?
A Yes.

MR. VICK: Objection to the summarization again. It was not a question.

THE COURT: Sustained. Do you have any more questions, Mr. Baugh?

BY MR. BAUGH:
Q You are talking about the same knife you described earlier?
A Yes, the same knife.

MR. BAUGH: Thank you. Pass the witness.

THE COURT: Mr. Wagner, do you have anything?

CROSS-EXAMINATION

BY MR. WAGNER:
Q Good morning, Ms. Greene.
A Good morning.
Q Ms. Greene, you have made statements to the police, haven't you?
A I can't hear you.

anybody told you how to answer any question?

A No.

Q You have had occasion to look at pictures of a knife that was drawn before, haven't you, last night?

A Yes.

Q I'm going to show you what's been previously marked Government Exhibit 146 and ask if the knife you got back from "J.R." after Doug Moody was killed -- point out which one of those knives that are drawn there looks like the one you saw?

A The first one.

Q At the top of the page?

A Yes.

Q Did the knife have any of those edges drawn on the second knife on that page?

A No.

Q At the end of that knife, I assume it was a pointed knife --

MR. BAUGH: Objection to the assumption.

THE COURT: Overruled.

BY MR. VICK:

Q It is a pointed knife at the end like any other knife?

A Yes.

on his right hand and arm that are consistent with cuts?

A Yes, sir.

Q Not on his left hand, other than one consistent with a scrape?

A That is correct.

Q This examination took place January 26th, 1993?

A Yes, it did.

MR. VICK: No further questions.

THE COURT: All right. You may stand down, ma'am. Thank you very much.

(Witness stood aside.)

MR. BAUGH: Ms. Gina Taylor, please.

GINA TAYLOR,

called as a witness by and on behalf of defendant Roane, having been first duly sworn by the Clerk, was examined and testified as follows:

DIRECT EXAMINATION

BY MR. BAUGH:

Q Please state your name for the Court and for the record, spelling your last name.

A Gina Stella Taylor, T-A-Y-L-O-R.

Q You have a very soft voice, so speak all the way to the gentlemen in the back. How old are you?

A I am 24.

Q What do you do for a living?
A I am a working mother of three as well as a full-time student at J. Sargeant Reynolds.
Q Where do you live at this time?
A 810 North Harrison.
Q Were you living there on January 13th, 1992?
A Yes, I was.
Q Now, could you tell the members of the jury where 810 North Harrison is in relationship to the intersection of Harrison and West Clay?
A In the middle.
Q Excuse me?
A In the middle.
Q About how many feet from the intersection would your home be?
A Feet? You are asking me feet?
Q I'm sorry, what runs -- as you look out your front door, what is on the right side of your house?
A Clay.
Q What?
A When I am looking out my front door.
Q No, on the side of your house is there an alley?
A Yes, there is an alley. It is a driveway, alley.

Q Calling your attention to January 13th, did you have occasion in the evening hours to look out into that alleyway?
A Yes, I did.
Q What caused you to look out there initially?
A The dogs barking in the back.
Q You have dogs?
A No, my neighbors do.
Q Where did you look from?
A I have a laundry room that's on that side.
Q When you looked out of your laundry room window, what did you see?
A At first I looked out the back door and didn't see anything. And I turned to the left. The curtain was open and I looked out the window, and there was a man lying on the ground and someone was over him.
Q What was the person over him doing or appear to be doing?
A Jabbing him.
Q Jabbing him?
A Something to that effect. I mean, you know, there is someone over someone.
Q What did you do then?
A Went in -- well, I looked out again. Then I turned the laundry room light off to look out again

to make sure I was seeing what I thought I was seeing. And once I established that I was actually seeing it, I went to my front door.

Q When you went to your front door, what happened, if anything?

A There was only one person there, and he asked me to help him.

Q Were there people standing in the street nearby watching this?

A Down on the corner.

Q All right. This person who was in the alleyway asked you to help him?

A Yes.

Q What did you do?

A I told him that I would, but first I needed to get someone to call 911. I yelled to the people on the corner to call, just yelled "Dial 911" and went back to him. And he was bleeding, so I had to go back in and get a knife to try and cut, because he had layers of clothing on, to try and cut through the layers to stop the bleeding.

Q Did you do that?

A I attempted to. Once I got through the first layer, I think nearly through the second layer, I don't know if it was the police, fire squad, or

ambulance that pulled up. But someone did, and they told me I had to move.

Q All right. During the time that you were working with him, did he say anything to you?

A Other than to help him and don't leave him alone, no.

Q About how long did you stay with him before the medical people got there?

A It was minutes. It wasn't seconds. It was, at the most, maybe two, three minutes.

Q All right. Now, had you seen the person that you were helping before?

A Yes.

Q Did you know who he was?

A The name he gave me was Hakim. At that time I was going to C.T.C.

Q What is that?

A Career Training Center, to obtain my certification as a nursing assistant. And he told me that he used to go there and that he wanted to get back into going. He was going for business or something and he wanted to go back.

Q Did you recognize the person that was sitting on this person and jabbing him?

A No.

Q Could you make out the person's face?

A No.

Q Could you give us a description, however, of the person that you saw doing the stabbing or jabbing?

A A physical description, basically, yes.

Q Give it to us.

A I would give it as I myself am five-six-and-a-half. They would be shorter than me and much, much smaller. They were a thin person. You could tell by the way they were bending as to their physical stature, and this was not a big person.

Q How long have you lived in that neighborhood?

A Two years.

Q Have you ever seen this gentleman here in the blue shirt, this gentleman here in the green shirt, or James Roane over there in the blue blazer and white shirt, ever seen these gentlemen before, any or all of them?

A Yes.

Q You have seen them around the neighborhood?

A Yes.

Q I will ask you specifically, the gentleman over there, James Roane, was that the man you saw sitting on Hakim's chest jabbing him?

A No.

Q Did you tell the police that that night?

A They didn't ask me that.

Q What did they ask you?

A Could I identify the person. They didn't ask me was there a particular -- did I think that it was a particular person. They asked me could I identify them facially. No, I couldn't.

Q Did you give a statement to Detective Dalton of the Richmond Bureau of Police?

A Yes.

MR. BAUGH: Thank you, ma'am.

CROSS-EXAMINATION

BY MR. VICK:

Q In your statement to the police, Ms. Taylor, you have told the police, in fact you have told Detective Fleming, that you could not, based upon what you saw, even state whether the person who was stabbing the victim was a man or a woman.

A Yes. That's true.

Q You don't even know whether it was a man or a woman.

A That's true. I don't know the gender, no.

Q All you can say is that you saw somebody bending down over the victim stabbing that person.

tall.

Q You are basing that --

A On my observation.

Q Just based on the fact somebody was stooped over stabbing someone?

A From my observation skills and what I have learned as far as observation goes, yes.

Q You know "Whitey" because you dated him, didn't you?

A We were friends.

Q Didn't you date him?

A Kind of.

Q Aren't you good friends with "Whitey's" family?

A Yes. But I need to clarify that before you go any further.

Q I don't need to go any further. You are good friends with the family?

A To say that, you would assume that I have known "Whitey" as well as the whole family, and that since this has happened I have had contact with them. Growing up in the neighborhood that I grew up in, yes, his uncles and cousins lived down the street, grandmother around the corner. Since leaving that neighborhood when I was 17, I'm now 24, constant contact has not been there.

Q Can't identify whether it was a man or a woman who was stabbing that person?

A Gender? No, I cannot.

MR. VICK: Beg the Court's indulgence. Nothing further.

REDIRECT EXAMINATION

BY MR. BAUGH:

Q Ms. Taylor, if it was a woman, was that woman smaller, about the same size or smaller than you?

A Way smaller than me.

Q And if it was a man, was that man way smaller than you?

A Way smaller.

Q If it was a man or woman, was it smaller than Mr. Roane?

MR. VICK: Leading.

THE COURT: I'll let it in.

BY MR. BAUGH:

Q If it was a man or woman, was it smaller than Mr. Roane?

A Yes.

MR. BAUGH: Pass the witness. No further questions.

THE COURT: The witness may stand down.

MR. BAUGH: We have no objection to her

later found out to be Stanley Smithers?

A That's correct.

Q At the time you first tried to interview him, did he give you his correct name?

A No, sir, he did not.

MR. McGARVEY: Thank you, sir. That's all I have.

THE COURT: Mr. Baugh?

DIRECT EXAMINATION

BY MR. BAUGH:

Q Detective Dalton, as part of your duties for the Richmond Bureau of Police, were you assigned any part of the investigation concerning the death of Kareem A. Hakim, also known as Douglas Moody?

A Yes, sir, I was the investigator.

Q As a consequence of your investigation, did you meet a Ms. Gina Taylor?

A Yes, sir, I did.

Q Additionally, did you interview other witnesses?

A Yes, sir, I did.

Q As a consequence of your conversations with witnesses, did you identify an initial suspect?

A Yes, sir, I did.

Q Am I correct that that initial suspect was a

gentleman known as Mr. Keith Barley or Barkley?

A Keith Barley, B-A-R-L-E-Y.

Q And Mr. Barley is a juvenile?

A That's correct.

Q Kind of a short little juvenile?

A I recall him being sort of tall and lanky. Not over six foot or anything, a small-featured type person.

Q Did you get a physical description of him?

A Yes, sir.

Q All right. Did you put it in your notes?

A I'm sure I put it in there if I got one.

Q We will come back to that, if I might.

Now, when you identified Keith Barley, was that predicated in part upon statements given to you by Gina Taylor and statements given to you by Mr. Moody's mother, Ms. Catherine Wallington?

A Keith Barley came into the picture through Ms. Wallington. Ms. Taylor did not know anybody by names or descriptions.

Q All right. The description of the person that you were looking for given to you by Ms. Taylor, was that person described as the smaller black male in the dark clothing who was on top of the victim?

A Yes, sir.

Q And you know, of course, that Mr. Moody, as per the autopsy reports, the decedent was only five-foot-six.

A Yes, sir.

Q Based on that, did you get the impression that the assailant was smaller, either in weight or height, than the victim?

A I don't recall whether there were two parties involved or just the two, the victim and the suspect. I would have to review my notes.

Q Please take your time. I'll refer you to your first page of your handwritten notes. Excuse me, if I might. "She then observed two males out of her window facing the alley. Both were on the ground and the smaller black male in dark clothing was on top of the victim."

A That would be the accurate statement she gave me that date.

Q So based on that, am I correct in assuming that she only saw two people, one the victim, one the assailant?

A Yes, sir.

Q All right. Now, did Ms. Wallington give you information that led you to identify Keith as the suspect?

A Yes, sir.

Q And in her statement that she gave that led or contributed to your identifying Keith, did she tell you that someone named Keith had been by the house two hours before her son was killed looking for the victim?

A Yes, sir.

Q All right. Did she also give you information, other information, concerning Keith coming by the house earlier? Referring to page three of your notes.

A Which paragraph?

Q Let me put it this way. Without knowing the truth or falsity of her statement, did you receive information that someone, or friends of Keith, had kicked the door in while armed with machine guns?

A Yes, sir.

Q All right.

MR. VICK: I would just note that Mr. Baugh has Detective Dalton on direct and not cross.

MR. BAUGH: I have him on cross.

THE COURT: Go ahead and ask your questions. Finish up.

BY MR. BAUGH:

Q I'm sorry, without knowing the truth or falsity,

did she tell you that some friends of this young man named Keith had been to her house several weeks before armed with machine guns?

A The way I have it written, "Approximately a week ago she came home to find the front door open. Later a neighbor told her it was some friends of Keith that kicked in the door while armed with machine guns."

Q Of course you didn't know if that was truthful or not?

A No, sir.

Q Additionally, did you receive information that her son had been hiding under a house next-door all that day?

A Yes, sir.

Q And that he was hiding out of concern for someone named Maurice?

A That's correct.

Q And that Maurice thinks that the victim had killed Maurice's brother a year earlier?

A That's correct.

Q Now, am I correct also then that Keith was cleared as a suspect or removed from the category of suspect because approximately two weeks later, Ms. Priscilla Greene, also known as "Pepsi" Greene, said she saw James Roane stab the man?

"Maurice." Never were able to identify the exact Maurice.

BY MR. PARCELL:

Q Never able to confirm that it was Peyton Maurice Johnson?

A No, sir.

Q Gina Taylor told you she did not identify or physically describe anyone in relation to the other person she saw in the alleyway with "Little Doug" Moody; is that correct?

A That's correct.

Q In fact, she didn't tell you she even saw him stabbing anyone. She said she saw someone over top of the body; is that also correct?

A That's correct.

MR. PARCELL: No further questions.

MR. WHITE: May I have a minute with Mr. Baugh, please?

THE COURT: Go ahead.

(Counsel conferring.)

REDIRECT EXAMINATION

BY MR. BAUGH:

Q The information that someone named Keith came by the house two hours before the killing, Ms. Wallington told you that of her own knowledge; am I

correct?

A Yes. That's correct.

Q And she indicated by that statement that she had seen this person, Keith, when he came by?

A That's correct. As far as I can tell from my notes.

MR. BAUGH: Thank you, sir.

THE COURT: All right, sir. You may stand down.

(Witness stood aside.)

MR. WHITE: Defendant Tipton rests.

MR. McGARVEY: Defendant Johnson as well rests.

MR. BAUGH: James Henry Roane, Jr. would rest.

MR. WAGNER: Defendant Reavis would rest.

THE COURT: Any rebuttal from the government?

MR. VICK: No rebuttal, Your Honor.

THE COURT: All right. The taking of evidence has been concluded on the merits portion of the trial. And what will happen for the rest of today is as follows: Right now I'm going to let you all go out to the jury room. We will be involved in instructions conference. That's when the lawyers and

## CERTIFICATE OF SERVICE

I hereby certify that on September 10, 2009, I served by Federal Express copies of the Government's Appendix on Movant Roane's counsel and amicus counsel at the following addresses:

Billy H. Nolas, Esq.
Angela Elleman, Esq.
Assistant Federal Defenders
Federal Community Defender Office
fort the Eastern District of Pennsylvania
Suite 545 West - The Curtis Center
601 Walnut Street
Philadelphia, Pennsylvania 19106

Paul F. Enzinna, Esq.
Baker Botts, LLP
1299 Pennsylvania Avenue, N.W.
Washington, D.C. 20004

Charles B. Wayne
DLA Piper, LLP
500 8th Street, N.W.
Washington, D.C. 20004

Robert J. Erickson